APPEAL,PSEUDO−GR,TYPE−D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <ins>1:25−cv−00766−JEB</ins>
# *Internal Use Only*

J.G.G. et al v. TRUMP et al
Assigned to: Chief Judge James E. Boasberg
Case in other court:  USCA, 25−05068
                 USCA, 25−05068
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 03/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **J.G.G.** | represented by | **Arthur B. Spitzer** |
| | | ACLU OF THE DISTRICT OF |
| | | COLUMBIA |
| | | 529 14th Street, NW |
| | | Suite 722 |
| | | Washington, DC 20045 |
| | | 202−601−4266 |
| | | Email: aspitzer@acludc.org |
| | | *ATTORNEY TO BE NOTICED* |

**Ashley Gorski**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
212−284−7305
Email: agorski@aclu.org
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202−448−9090
Email: awiggins@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
201−824−1304
Email: bgirard@democracyforward.org

*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
ACLU
425 California St
Suite 700
San Francisco, CA 94104
415–343–0775
Email: cwang@aclu.org
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: christine.l.coogle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Suite 7th Floor
San Francisco, CA 94104
415–343–0785
Email: cwofsy@aclu.org
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
Suite 18th Floor
New York
New York, NY 10004
646–905–8907
Email: dgalindo@aclu.org
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415–343–0780
Email: edanforth–scott@aclu.org
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th floor
New York, NY 10004
(212) 284–7321
Fax: (212) 549–2654
Email: hshamsi@aclu.org
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–442–9090
Email: mwaldman@democracyforward.org
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
718–483–5885
Email: mngo@aclu.org
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
214–663–7451
Email: nsmith@aclu.org
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
(212) 549–2620
Fax: (212) 549–2654
Email: ojadwat@aclu.org
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
AMERICAN CIVIL LIBERTIES UNION

FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
916–813–7891
Email: osarabia@aclu.org
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
212–519–7816
Email: ptoomey@aclu.org
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: pboisture@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Rich**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: srich@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
ACLU FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202–601–4267
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, NY 10004

631–741–3383
Email: smahfooz@aclu.org
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–904–7727
Email: strivedi@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
18th Floor
New York, NY 10004
212–549–2616
Fax: 212–549–2654
Email: lgelernt@aclu.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**G.F.F.**                     represented by  **Arthur B. Spitzer**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Ashley Gorski**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Audrey Jordan Wiggins**
                                               (See above for address)
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

                                               **Bradley Girard**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Cecillia D. Wang**
                                               (See above for address)

*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Rich**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.G.O.**                    represented by **Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Rich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**W.G.H.**                    represented by **Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Rich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.A.V.**                    represented by    **Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)

*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Rich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States*

represented by **Abhishek Kambli**
DOJ–USAO
950 Pennsylvania Avenue, NW
Washington, DC 20530–0001
202–445–5496
Email: abhishek.kambli@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
DOJ–Civ
PO Box 868 Ben Franklin Station
Washington, DC 20044
202–514–3309
Email: august.flentje@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
US DEPARTMENT OF JUSTICE, CIVIL
DIVISION
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
(202) 598–8770
Email: christina.p.greer@usdoj.gov
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue
Washington, DC 20004
202–514–2331
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
U.S. DEPARTMENT OF JUSTICE
Office of Immigration Litigation,
Appellate Section
PO BOX 878
Ben Franklin Station
Washington, DC 20044
(202) 616–9344
Email: ernesto.h.molina@usdoj.gov

*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**
*Attorney General of the United States, in her official capacity*

represented by    **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI NOEM**
*Secretary of the U.S. Department of Homeland Security, in her official capacity*

represented by    **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HOMELAND SECURITY**

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MADISON SHEAHAN**
*Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

15

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. IMMIGRATION AND**                    represented by   **Abhishek Kambli**
**CUSTOMS ENFORCEMENT**                                     (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **August Edward Flentje**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Christina Greer**
                                                            (See above for address)
                                                            *TERMINATED: 03/19/2025*
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Drew C Ensign**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Ernesto Horacio Molina , Jr.**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**                          represented by   **Abhishek Kambli**
*Secretary of State, in his official capacity*              (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **August Edward Flentje**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Christina Greer**
                                                            (See above for address)
                                                            *TERMINATED: 03/19/2025*
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Drew C Ensign**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. STATE DEPARTMENT**              represented by  **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**BRANDON GILL**                  represented by  **Andrew Block**
*The Honorable*                    AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Avenue SE
#231
Washington, DC 20003
202–836–7958
Email: andrew.block@aflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**JANICE WOLK GRENADIER**         represented by  **JANICE WOLK GRENADIER**
*TERMINATED: 03/27/2025*            15 West Spring Street
Alexandria, VA 22301
(202) 268–7178
PRO SE

**Amicus**

**MARK J. ROZELL**

represented by **Kelly Brian McClanahan**
NATIONAL SECURITY COUNSELORS
1451 Rockville Pike
Suite 250
Rockville, MD 20852
501–301–4672
Fax: 240–681–2189
Email: kel@nationalsecuritylaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**HEIDI KITROSSER**

represented by **Kelly Brian McClanahan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MITCHEL A. SOLLENBERGER**

represented by **Kelly Brian McClanahan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11544662) filed by J.G.O., G.F.F., J.G.G., W.G.H., J.A.V.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Donald J. Trump, # 3 Summons Pamela Bondi, # 4 Summons Kristi Noem, # 5 Summons DHS, # 6 Summons Madison Sheahan, # 7 Summons ICE, # 8 Summons Marco Rubio, # 9 Summons DOS, # 10 Summons USAO)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 2 | SEALED MOTION to Proceed Under Pseudonym filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration of J.G.G., # 2 Declaration of W.G.H., # 3 Declaration of Molly Lauterback, # 4 Declaration of J.A.V., # 5 Declaration of Grace Carney, # 6 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 3 | MOTION for Temporary Restraining Order by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Certificate of Counsel, # 2 Memorandum in Support, # 3 Declaration of J.G.G., # 4 Declaration of Grace Carney, # 5 Declaration of J.G.O., # 6 Declaration of W.G.H., # 7 Declaration of Molly Laterback, # 8 Declaration of J.A.V., # 9 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 4 | MOTION to Certify Class by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration of Daniel Galindo, # 2 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 5 | NOTICE of Appearance by Daniel Antonio Galindo on behalf of All Plaintiffs (Galindo, Daniel) (Entered: 03/15/2025) |
| 03/15/2025 |  | MINUTE ORDER granting 2 SEALED MOTION to Proceed Under Pseudonym. The Court has reviewed Plaintiffs' 2 Motion to Proceed Pseudonymously. Given the |

| | | |
|---|---|---|
| | | expedited nature of this matter, it determines that a full Opinion is not practical at this time. Believing that Plaintiffs have made the required showing on the relevant factors, the Court ORDERS that: 1) Their <u>2</u> Motion is GRANTED; and 2) They shall be permitted to proceed pseudonymously unless and until the assigned judge determines otherwise. Signed by Chief Judge James E. Boasberg on 3/15/2025. (zjd) Modified on 3/15/2025 (zjd). (Entered: 03/15/2025) |
| 03/15/2025 | | Case Assigned to Chief Judge James E. Boasberg. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | <u>6</u> | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # <u>1</u> Notice and Consent) (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | <u>7</u> | NOTICE of Appearance by Bradley Girard on behalf of All Plaintiffs (Girard, Bradley) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court has reviewed Plaintiffs' Complaint and Motion for Temporary Restraining Order. Given the exigent circumstances that it has been made aware of this morning, it has determined that an immediate Order is warranted to maintain the status quo until a hearing can be set. As Plaintiffs have satisfied the four factors governing the issuance of preliminary relief, the Court accordingly ORDERS that: 1) Plaintiffs' <u>3</u> Motion for TRO is GRANTED; 2) Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court; and 3) The parties shall appear for a Zoom hearing on March 17, 2025, at 4:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) Modified to add public access line on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | <u>8</u> | NOTICE of Appearance by Skye Perryman on behalf of All Plaintiffs (Perryman, Skye) (Entered: 03/15/2025) |
| 03/15/2025 | <u>9</u> | NOTICE of Appearance by Somil Trivedi on behalf of All Plaintiffs (Trivedi, Somil) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for Zoom hearing on Plaintiffs' <u>4</u> Motion for Class Certification on March 15, 2025, at 5:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | <u>10</u> | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 03/15/2025) |
| 03/15/2025 | | Set/Reset Hearings: Hearing set for 3/17/2025 at 04:00 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) Modified to correct hearing location on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | <u>11</u> | NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | <u>12</u> | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion for TRO,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. |

| | | (Greer, Christina) (Entered: 03/15/2025) |
|---|---|---|
| 03/15/2025 | 13 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 03/15/2025) |
| 03/15/2025 | 14 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 12 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 15 | ENTERED IN ERROR.....NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) Modified on 3/17/2025; refiled as docket entry 16 (znmw). (Entered: 03/15/2025) |
| 03/15/2025 | 16 | NOTICE of Appearance by Drew C Ensign on behalf of All Defendants (Ensign, Drew) (Entered: 03/15/2025) |
| 03/15/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held via Zoom (with public access line) on 3/15/2025 re 4 MOTION to Certify Class filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that: 1) Plaintiffs' 4 Motion for Class Certification is GRANTED insofar as a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation" is provisionally certified; 2) The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court; 3) The Government shall file any Motion to Vacate this TRO by March 17, 2025, with Plaintiffs' Opposition due by March 19, 2025; and 4) The hearing set for March 17, 2025, is VACATED and RESET for March 21, 2025, at 2:30 p.m. via Zoom. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | 17 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 18 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 17 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | | USCA Case Number 25–5067 for 12 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) Modified on 3/17/2025 to correct case number (zjm). (Entered: 03/17/2025) |
| 03/15/2025 | | |

| | | |
|---|---|---|
| | | USCA Case Number 25−5068 for <u>17</u> Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) (Entered: 03/17/2025) |
| 03/16/2025 | <u>19</u> | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Ensign, Drew) (Entered: 03/16/2025) |
| 03/16/2025 | <u>20</u> | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/15/25; Page Numbers: 1−47. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/6/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/14/2025.(Nestor, Tammy) (Entered: 03/16/2025) |
| 03/17/2025 | <u>21</u> | RESPONSE re <u>19</u> Notice (Other) filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear in person (or by Zoom if necessary) for a hearing at 4:00 p.m. today regarding the <u>19</u> Notice and <u>21</u> Response. The Government shall be prepared to provide answers to the questions raised by Plaintiffs on page 6 of their Response. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that, in order to accommodate the parties' schedules, the hearing set for today at 4:00 p.m. is VACATED and RESET for 5:00 p.m. The hearing will proceed in−person for the parties and by telephone for members of the public. Toll free number: 833−990−9400. Meeting ID: 049550816. Any use of the public−access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |

| 03/17/2025 | 22 | NOTICE of Appearance by August Edward Flentje on behalf of All Defendants (Flentje, August) (Entered: 03/17/2025) |
| --- | --- | --- |
| 03/17/2025 |  | Set/Reset Hearings: Miscellaneous Hearing set for 3/17/2025 at 05:00 PM in Courtroom 22A– In Person (Audio Line Available) before Chief Judge James E. Boasberg. Motion Hearing set for 3/21/2025 at 02:30 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | NOTICE of Appearance by Abhishek Kambli on behalf of All Defendants (Kambli, Abhishek) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | MOTION to Vacate *Response and Motion to Vacate Hearing* re 19 Notice (Other), Order,,,, Set Hearings,,, Set/Reset Hearings, 21 Response to Document by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event on 3/17/2025 (znmw). (Entered: 03/17/2025) |
| 03/17/2025 |  | MINUTE ORDER: The Court ORDERS that Defendants' 24 Motion to Vacate is DENIED. The hearing will proceed as scheduled. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 |  | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Hearing held on 3/17/2025. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/17/2025) |
| 03/17/2025 |  | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that by 12:00 p.m. on March 18, 2025, the Government shall file a Notice, which may, if necessary, be sealed in part, setting forth: 1) A sworn declaration that no one on any flight departing the United States after 7:25 p.m. on March 15, 2025, was removed solely on the basis of the Proclamation at issue; 2) A sworn declaration setting forth when the Proclamation at issue was signed, when it was made public, and when it went into effect; 3) The Government's best estimate of the number of individuals subject to the Proclamation currently remaining in the United States and how many are currently in U.S. custody; and 4) The Government's position on whether, and in what form, it will provide answers to the Court's questions regarding the particulars of the flights. Such form could include *in camera* review or in a classified setting. If the Government takes the position that it will not provide that information to the Court under any circumstances, it must support such position, including with classified authorities if necessary. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | 25 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/17/25; Page Numbers: 1–31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal |

|  |  | identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |
|---|---|---|
|  |  | Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/17/2025. Release of Transcript Restriction set for 6/15/2025.(Nestor, Tammy) (Entered: 03/17/2025) |
| 03/17/2025 | 26 | MOTION to Vacate re 3/15/2025 Minute Orders on Temporary Restraining Order and Certification of Class by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Robert L. Cerna, # 2 Declaration Declaration of Michael G. Kozak)(Flentje, August) Modified event and docket text on 3/18/2025 (znmw). (Entered: 03/17/2025) |
| 03/18/2025 | 27 | NOTICE of Appearance by Hina Shamsi on behalf of All Plaintiffs (Shamsi, Hina) (Entered: 03/18/2025) |
| 03/18/2025 | 28 | NOTICE in Response to March 17 Minute Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Affidavit Cerna Declaration)(Ensign, Drew) (Entered: 03/18/2025) |
| 03/18/2025 |  | MINUTE ORDER: The Court ORDERS that the Zoom hearing set for March 21, 2025, at 2:30 p.m. shall now take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 29 | NOTICE of Appearance– Pro Bono by Noelle Smith on behalf of All Plaintiffs (Smith, Noelle) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | NOTICE of Appearance– Pro Bono by Omar C. Jadwat on behalf of All Plaintiffs (Jadwat, Omar) (Entered: 03/18/2025) |
| 03/18/2025 |  | MINUTE ORDER: In response to Defendants' 28 Notice at page 2, the Court ORDERS that by 12:00 p.m. on March 19, 2025, Defendants shall file ex parte and under seal (or submit to the Court) a declaration providing the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? and 5) How many people were aboard solely on the basis of the Proclamation? So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |

| 03/18/2025 | 31 | NOTICE of Appearance– Pro Bono by Sidra Mahfooz on behalf of All Plaintiffs (Mahfooz, Sidra) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 32 | NOTICE of Appearance– Pro Bono by Oscar Sarabia Roman on behalf of All Plaintiffs (Sarabia Roman, Oscar) (Entered: 03/18/2025) |
| 03/18/2025 | 33 | NOTICE of Appearance– Pro Bono by Ashley Gorski on behalf of All Plaintiffs (Gorski, Ashley) (Entered: 03/18/2025) |
| 03/18/2025 | 34 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sarah M. Rich, Filing fee $ 100, receipt number ADCDC–11550426. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
| 03/18/2025 | 35 | NOTICE of Appearance– Pro Bono by Patrick Toomey on behalf of All Plaintiffs (Toomey, Patrick) (Entered: 03/18/2025) |
| 03/18/2025 |  | MINUTE ORDER: The Court ORDERS that the 34 Motion for Leave to Appear Pro Hac Vice of Sarah Marion Rich is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Audrey Wiggins, Filing fee $ 100, receipt number ADCDC–11551084. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
| 03/18/2025 |  | MINUTE ORDER: The Court ORDERS that the 36 Motion for Leave to Appear Pro Hac Vice of Audrey J. Wiggins is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/19/2025 | 37 | Emergency MOTION to Stay re Order,,,, Set Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/19/2025) |
| 03/19/2025 | 38 | ORDER: The Court ORDERS that: 1) Defendants' 37 Motion is GRANTED IN PART and DENIED IN PART; and 2) Defendants shall have until March 20, 2025, at 12:00 p.m. to provide the information discussed in the Minute Order of March 18, 2025, or to invoke the state–secrets doctrine and explain the basis for such invocation. Signed by Chief Judge James E. Boasberg on March 19, 2025. (lcjeb3) (Entered: 03/19/2025) |
| 03/19/2025 | 39 | NOTICE of Appearance by Sarah Rich on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Rich, Sarah) (Entered: 03/19/2025) |
| 03/19/2025 | 40 | NOTICE of Appearance by Audrey Jordan Wiggins on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Wiggins, Audrey) (Entered: 03/19/2025) |
| 03/19/2025 | 41 | NOTICE of Appearance by Cody H. Wofsy on behalf of All Plaintiffs (Wofsy, Cody) (Entered: 03/19/2025) |
| 03/19/2025 | 42 |  |

| | | |
|---|---|---|
| | | NOTICE OF WITHDRAWAL OF APPEARANCE as to MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Attorney Christina Greer terminated. (Greer, Christina) (Entered: 03/19/2025) |
| 03/19/2025 | 43 | NOTICE of Appearance– Pro Bono by My Khanh Ngo on behalf of All Plaintiffs (Ngo, My Khanh) (Entered: 03/19/2025) |
| 03/19/2025 | 44 | RESPONSE re 26 MOTION to Vacate *TRO* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Index of Exhibits, # 2 Declaration of Deborah Fleishaker, # 3 Declaration of Juanita Goebertus, # 4 Declaration of Sarah Bishop, # 5 Declaration of Linette Tobin, # 6 Declaration of Austin Thierry, # 7 Declaration of Osvaldo E. Caro–Cruz, # 8 Declaration of Katherine Kim, # 9 Declaration of Karyn Ann Shealy, # 10 Declaration of Stephanie Quintero, # 11 Declaration of Grace Carney, # 12 Declaration of Melissa Smyth, # 13 Declaration of Solanyer Michell Sarabia Gonzalez, # 14 Declaration of Jennifer Venghaus, # 15 Declaration of Oscar Sarabia Roman)(Gelernt, Lee) (Entered: 03/19/2025) |
| 03/20/2025 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Christine L. Coogle, Filing fee $ 100, receipt number ADCDC–11556213. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/20/2025) |
| 03/20/2025 | 46 | NOTICE of Appearance by Michael Lawrence Waldman on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Waldman, Michael) (Entered: 03/20/2025) |
| 03/20/2025 | 47 | ORDER: The Court ORDERS that: 1) By March 21, 2025, at 10:00 a.m., Defendants shall submit a sworn declaration by a person with direct involvement in the Cabinet–level discussions regarding invocation of the state–secrets privilege; 2) By March 25, 2025, Defendants shall submit a declaration indicating whether or not the Government is invoking the privilege; 3) By March 25, 2025, Defendants shall file a brief showing cause why they did not violate the Court's Temporary Restraining Orders by failing to return class members removed from the United States on the two earliest planes that departed on March 15, 2025; and 4) Plaintiffs may file any response to such brief by March 31, 2025. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
| 03/20/2025 | 48 | MOTION for Leave to File *Amicus Curiae Brief* by BRANDON GILL. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Block, Andrew) (Entered: 03/20/2025) |
| 03/20/2025 | 49 | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration Declaration of Robert L. Cerna)(Flentje, August) (Entered: 03/20/2025) |
| 03/20/2025 | | MINUTE ORDER: The Court ORDERS that the 45 Motion for Leave to Appear Pro Hac Vice of Christine L. Coogle is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
| 03/21/2025 | 50 | |

| | | |
|---|---|---|
| | | RESPONSE TO ORDER OF THE COURT re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration)(Flentje, August) Modified event title on 3/21/2025 (znmw). (Entered: 03/21/2025) |
| 03/21/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 3/21/2025. Oral arguments heard. Order forthcoming. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER: The Court ORDERS that Amicus's 48 Motion for Leave to File is DENIED as untimely. Filing the night before the hearing does not permit the Court sufficient time to consider the arguments asserted. So ORDERED by Chief Judge James E. Boasberg on 3/21/2025. (lcjeb1) (Entered: 03/21/2025) |
| 03/21/2025 | 51 | TRANSCRIPT OF MOTION HEARING before Chief Judge James E. Boasberg held on March 21, 2025; Page Numbers: 1–65. Date of Issuance:March 21, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Sonja_Reeves@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Reeves, Sonja) (Entered: 03/21/2025) |
| 03/24/2025 | 52 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Defendants' 26 Motion to Vacate is DENIED; and 2) If Plaintiffs wish to convert the Temporary Restraining Order into a preliminary injunction, they shall so inform the Court by March 26, 2025. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 53 | MEMORANDUM OPINION re 52 Order on Motion to Vacate. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 54 | NOTICE of Appearance by Christine L. Coogle on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Coogle, Christine) (Entered: 03/24/2025) |
| 03/24/2025 | 55 | NOTICE *in Response to March 19 Minute Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Exhibit A: Declaration of S.Z.F.R., # 2 Exhibit B: Declaration of E.E.P.B.)(Gelernt, Lee) (Entered: 03/24/2025) |
| 03/24/2025 | 56 | NOTICE *Invoking State Secrets Privilege* by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. |

| | | |
|---|---|---|
| | | STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Affidavit Attorney General Bondi Declaration, # 2 Affidavit Secretary Rubio Declaration, # 3 Affidavit Secretary Noem Declaration)(Ensign, Drew) (Entered: 03/24/2025) |
| 03/25/2025 | | MINUTE ORDER: Given the Government's 56 Notice Invoking State Secrets Privilege, the Court ORDERS that if Plaintiffs wish to respond, they shall file any Response by March 31, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/25/2025. (lcjeb1) (Entered: 03/25/2025) |
| 03/25/2025 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Pooja A. Boisture, Filing fee $ 100, receipt number ADCDC–11566919. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/25/2025) |
| 03/25/2025 | 58 | RESPONSE TO ORDER TO SHOW CAUSE re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event title on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/25/2025 | 59 | LEAVE TO FILE DENIED– Janice Wolk Grenadier – Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED." Signed by Chief Judge James E. Boasberg on 3/25/2025. (zjm) (Entered: 03/26/2025) |
| 03/25/2025 | 63 | MOTION to Intervene by JANICE WOLK GRENADIER. "Leave to file GRANTED." signed by Chief Judge James E. Boasberg on 3/25/2025 (Attachment: # 1 Exhibits)(zjm) Modified on 3/27/2025 to correct docket text (zjm). (Entered: 03/27/2025) |
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that the 57 Motion for Leave to Appear Pro Hac Vice of Pooja Ashok Boisture is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. Signed by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/26/2025 | 60 | Unopposed MOTION for Leave to File Amicus Brief by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that: 1) The consent 60 Motion for Leave to File Amicus Brief is GRANTED; and 2) Movants shall file any such brief by April 1, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/26/2025 | 61 | NOTICE re 52 Order *Regarding Plaintiffs' Motion for a Preliminary Injunction* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Gelernt, Lee) Modified to add link on 3/27/2025 (znmw). (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: Given Plaintiffs' 61 Notice, the Court ORDERS that: 1) Plaintiffs shall file a Motion to Extend the TRO by 5:00 p.m. on March 27, 2025, and Defendants shall file any Opposition by 12:00 p.m. on March 28, 2025; 2) Plaintiffs shall file their PI Motion by March 28, 2025; Defendants' Opposition shall be due by |

| | | |
|---|---|---|
| | | April 1, 2025; and Plaintiffs' Reply shall be due by April 4, 2025; and 3) The parties shall appear for a hearing on the Motion on April 8, 2025, at 3:00 p.m. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/27/2025 | 62 | NOTICE of Appearance by Pooja Boisture on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Boisture, Pooja) (Entered: 03/27/2025) |
| 03/27/2025 | 64 | MOTION for Temporary Restraining Order , *Motion to Extend Temporary Restraining Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/27/2025) |
| 03/27/2025 | | MINUTE ORDER: The Court ORDERS that the 63 Motion to Intervene is DENIED. So ORDERED by Chief Judge James E. Boasberg on 3/27/2025. (lcjeb1) (Entered: 03/27/2025) |
| 03/28/2025 | 65 | RESPONSE re 64 MOTION for Temporary Restraining Order , *Motion to Extend Temporary Restraining Order* filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/28/2025) |
| 03/28/2025 | 66 | ORDER: The Court ORDERS that the TROs entered on March 15, 2025, are extended and shall remain in effect until April 12, 2025, or until further order of the Court. Signed by Chief Judge James E. Boasberg on 3/28/2025. (lcjeb1) (Entered: 03/28/2025) |
| 03/28/2025 | 67 | MOTION for Preliminary Injunction by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Memorandum in Support, # 2 Index of Exhibits, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/29/2025) |
| 03/31/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear on April 3, 2025, at 3:00 p.m. for a hearing on the Court's 47 Order to Defendants to show cause why they did not violate the Court's Temporary Restraining Orders. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on March 31, 2025. (lcjeb2) (Entered: 03/31/2025) |
| 03/31/2025 | 68 | NOTICE of Appearance by Cecillia D. Wang on behalf of All Plaintiffs (Wang, Cecillia) (Entered: 03/31/2025) |
| 03/31/2025 | 69 | RESPONSE re 56 Notice (Other), *Re: Invocation of State Secrets Privilege* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 70 | REPLY re 58 Memorandum, *Re: Order to Show Cause* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 74 | |

| | | |
|---|---|---|
| | | LEAVE TO FILE DENIED– DANA ALBRECHT – Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED. Improper to file such motion in this case." Signed by Chief Judge James E. Boasberg on 3/31/25. (zjm) (Entered: 04/02/2025) |
| 04/01/2025 | 71 | NOTICE of Appearance– Pro Bono by Evelyn Danforth–Scott on behalf of All Plaintiffs (Danforth–Scott, Evelyn) (Entered: 04/01/2025) |
| 04/01/2025 | 72 | Memorandum in opposition to re 67 Motion for Preliminary Injunction, filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO A. RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA J. BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Selwyn Smith, # 2 Declaration Declaration of Marcos Charles)(Flentje, August) (Entered: 04/01/2025) |
| 04/01/2025 | 75 | LEAVE TO FILE DENIED– DANA ALBRECHT – Motion for CM/ECF.. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to fine DENIED." Signed by Chief Judge James E. Boasberg on 4/1/2025. (zjm) (Entered: 04/03/2025) |
| 04/02/2025 | 73 | AMICUS BRIEF re 56 Notice (Other), *(Amici Curiae)* filed by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (McClanahan, Kelly) Modified event title on 4/2/2025 (znmw). (Entered: 04/02/2025) |
| 04/03/2025 | | Minute Entry for Show Cause Hearing held before Chief Judge James E. Boasberg on 4/3/2025. Matter taken under advisement; forthcoming Order. (Court Reporter: Tammy Nestor) (lsj) (Entered: 04/03/2025) |
| 04/04/2025 | 76 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 4/3/25; Page Numbers: 1–31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/25/2025. Redacted Transcript Deadline set for 5/5/2025. Release of Transcript Restriction set for 7/3/2025.(Nestor, Tammy) (Entered: 04/04/2025) |
| 04/04/2025 | 77 | REPLY to opposition to motion re 67 Motion for Preliminary Injunction, filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Gelernt, Lee) (Entered: 04/04/2025) |
| 04/07/2025 | | MINUTE ORDER: The Court ORDERS that the hearing set for April 8, 2025, at 3:00 p.m. shall take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use |

| | | of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 4/7/2025. (lcjeb3) (Entered: 04/07/2025) |
|---|---|---|
| 04/07/2025 | 78 | NOTICE *Regarding Supreme Court Decision* by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Exhibit JGG Supreme Court Decision)(Ensign, Drew) (Entered: 04/07/2025) |
| 04/08/2025 | | MINUTE ORDER: In yesterday's ruling vacating this Court's TROs, the Supreme Court held that Plaintiffs cannot be deported under the Alien Enemies Act without an opportunity to challenge their removal in federal court. It also determined that the appropriate venue for such proceedings is the Southern District of Texas or wherever Plaintiffs are currently held. This Court accordingly ORDERS that: 1) Today's preliminary–injunction hearing is VACATED; and 2) Plaintiffs shall file a Notice by April 16, 2025, indicating whether they believe that they still have a basis to proceed on their Motion for Preliminary Injunction in this Court and, if so, proposing a briefing schedule. So ORDERED by Chief Judge James E. Boasberg on 4/8/2025. (lcjeb1) (Entered: 04/08/2025) |
| 04/11/2025 | 79 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: LAMAR C. CHAPMAN, III – MOTION. Reason(s): Filer is not a party to the case. (Attachments: # 1 Motion, # 2 Motion) (zjm) (Entered: 04/11/2025) |
| 04/14/2025 | 82 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MIKE YELLEN's Motion. Reason(s): Filer is not a party to the case. (znmw) (Entered: 04/16/2025) |
| 04/15/2025 | | MINUTE ORDER re 79 Request for Leave to File Review. Leave to file is denied. So ORDERED by Chief Judge James E. Boasberg on 4/15/2025. (lcjeb1) Modified filed date on 4/16/2025 (znmw). (Entered: 04/15/2025) |
| 04/16/2025 | 80 | ORDER: Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that: (1) If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and (2) If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |
| 04/16/2025 | 81 | MEMORANDUM OPINION re: 80 Probable Cause Order. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |
| 04/16/2025 | 83 | NOTICE of Appearance by Ernesto Horacio Molina, Jr on behalf of All Defendants (Molina, Ernesto) (Entered: 04/16/2025) |
| 04/16/2025 | 84 | |

| | | |
|---|---|---|
| | | NOTICE OF APPEAL TO DC CIRCUIT COURT by U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PAMELA J. BONDI, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, MADISON SHEAHAN. Fee Status: No Fee Paid. Parties have been notified. (Molina, Ernesto) (Entered: 04/16/2025) |
| 04/16/2025 | 85 | MOTION for Temporary Restraining Order *and Notice in Response to the Court's April 8, 2025 Order* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER: The Court ORDERS that the 82 Request for Leave to File is DENIED. So ORDERED by Chief Judge James E. Boasberg on 4/16/2025. (lcjeb1) (Entered: 04/16/2025) |
| 04/16/2025 | 86 | RESPONSE TO ORDER OF THE COURT re 4/8/2025 Minute Order filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (See Docket Entry 85 to view document). (znmw) (Entered: 04/17/2025) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.G.G., *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )    No. 1:25-cv-00766-JEB |
| | ) |
| DONALD J. TRUMP, *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

**NOTICE OF APPEAL**

Defendants hereby appeal from the Court's Order and Memorandum Opinion entered

April 16, 2025 (ECF Nos. 80 & 81) in the above-captioned case to the United States Court of

Appeals for the District of Columbia Circuit.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW ENSIGN
Deputy Assistant Attorney General

By: *s/ Ernesto H. Molina, Jr.*
Ernesto H. Molina, Jr.
Deputy Director
United States Department of Justice
Civil Division
Office of Immigration Litigation--
    General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9344
ATTORNEYS FOR DEFENDANTS

Dated:  April 16, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants.  There are no unregistered participants.

*s/* Ernesto H. Molina, Jr.
ERNESTO H. MOLINA, JR.
Deputy Director

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **J.G.G.**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 25-766 (JEB)** |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

**ORDER**

Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1.  If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and

2.  If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: April 16, 2025

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **J.G.G.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 25-766 (JEB)** |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

On the evening of Saturday, March 15, 2025, this Court issued a written Temporary Restraining Order barring the Government from transferring certain individuals into foreign custody pursuant to the Alien Enemies Act. At the time the Order issued, those individuals were on planes being flown overseas, having been spirited out of the United States by the Government before they could vindicate their due-process rights by contesting their removability in a federal court, as the law requires. Trump v. J.G.G., 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (*per curiam*). Rather than comply with the Court's Order, the Government continued the hurried removal operation. Early on Sunday morning — hours after the Order issued — it transferred two planeloads of passengers protected by the TRO into a Salvadoran mega-prison.

As this Opinion will detail, the Court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt. The Court does not reach such conclusion lightly or hastily; indeed, it has given Defendants ample opportunity to rectify or explain their actions. None of their responses has been satisfactory.

1

One might nonetheless ask how this inquiry into compliance is able to proceed at all given that the Supreme Court vacated the TRO after the events in question. That Court's later determination that the TRO suffered from a legal defect, however, does not excuse the Government's violation. Instead, it is a foundational legal precept that every judicial order "must be obeyed" — no matter how "erroneous" it "may be" — until a court reverses it. Walker v. City of Birmingham, 388 U.S. 307, 314 (1967). If a party chooses to disobey the order — rather than wait for it to be reversed through the judicial process — such disobedience is punishable as contempt, notwithstanding any later-revealed deficiencies in the order. See id. at 314, 320. That foundational "rule of law" answers not just how this compliance inquiry can proceed, but why it must. See id. at 320. The rule "reflects a belief that in the fair administration of justice no man can be judge in his own case," no matter how "exalted his station" or "righteous his motives." Id. at 320–21.

The Constitution does not tolerate willful disobedience of judicial orders — especially by officials of a coordinate branch who have sworn an oath to uphold it. To permit such officials to freely "annul the judgments of the courts of the United States" would not just "destroy the rights acquired under those judgments"; it would make "a solemn mockery" of "the constitution itself." United States v. Peters, 9 U.S. (5 Cranch) 115, 136 (1809) (Marshall, C.J.). "So fatal a result must be deprecated by all." Id.

I.    **Background**

A.  Factual Background

As just noted, the injunction in question was issued on the evening of Saturday, March 15, a day of events that moved at breakneck speed because of the Government's apparent effort to remove individuals more quickly than the judicial proceedings in which it was actively

participating could keep pace.  See generally J.G.G. v. Trump, 2025 WL 890401, at *1, *3–5 (D.D.C. Mar. 24, 2025).

The day prior, the President had seemingly signed — but not yet made public — a Proclamation invoking the Alien Enemies Act.  See 90 Fed. Reg. 13033 (Mar. 14, 2025).  Through that 1798 Act, Congress granted the President broad authority if there is a "declared war" with a "foreign nation or government," or if a foreign government has "perpetrated, attempted, or threatened" an "invasion or predatory incursion . . . against the territory of the United States."  50 U.S.C. § 21.  In such a scenario, and if the President "makes public proclamation of the event," he is authorized to "apprehend[], restrain[], secure[], and remove[]" any "natives, citizens, denizens, or subjects of the hostile nation or government" who are fourteen years or older.  See id.  In his Proclamation, President Trump announced that the Government would use the Act's authorities to apprehend and remove members of Tren de Aragua, a violent Venezuelan transnational gang that had recently been designated a Foreign Terrorist Organization.  See 90 Fed. Reg. at 13033.  To support that finding, the President asserted that the Venezuelan government of Nicolas Maduro indirectly "relies" on Tren de Aragua and has been "infiltrated" by the gang.  Id.  He further announced that Tren de Aragua had committed or attempted an "invasion" or "predatory incursion" upon the United States, including through "drug trafficking," "mass illegal migration," and "irregular warfare," though he provided no examples of the last.  Id.

Although the Proclamation was not published until 3:53 p.m. on Saturday, see ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5, Defendants had begun setting Act-based removals into motion weeks earlier.  Beginning in early March, the Government interrogated Venezuelans in its custody about alleged membership in Tren de Aragua and transferred many of those it deemed

gang members to El Valle Detention Facility, located outside Harlingen, Texas, not far from the Mexico border.  The reason for staging them together at El Valle became clear on Saturday. Early that morning — when the signed Proclamation was still hours from being disclosed to the public — the Government reportedly loaded scores of Venezuelans onto buses, drove them to a nearby airport, and began putting them onto three planes.  See ECF Nos. 44-9 (Karyn Ann Shealy Second Decl.), ¶¶ 3–9; 44-10 (Stephanie Quintero Decl.), ¶¶ 3–4; 44-11 (Grace Carney Third Decl.), ¶¶ 11–13; 44-12 (Melissa Smyth Decl.), ¶¶ 11, 14; see also ECF No. 76 (Apr. 3 Hrg. Tr.) at 9 (Government counsel agreeing Defendants "were acting in preparation of the Proclamation before it was posted").  As the planes sat on the tarmac, officials refused to answer the deportees' questions about where they would be taken.  See Shealy Second Decl., ¶ 10; Carney Third Decl., ¶ 12.

Among those queued on the tarmac or placed onto planes that morning were the five Plaintiffs in this lawsuit.  Apparently catching wind of the impending Proclamation, they filed suit at 1:12 a.m. on Saturday — before the buses left El Valle — and then moved for a TRO preventing their removal under the Proclamation.  In addition to asserting that the Proclamation lacks a legal foundation, each Plaintiff adamantly denies that he is even a member of Tren de Aragua.  See Shealy Second Decl., ¶ 4 (J.G.O.); Carney Third Decl., ¶ 3 (G.F.F.); ECF Nos. 1 (Compl.), ¶¶ 9–10, 12 (J.G.G., J.A.V., W.G.H.); 3-6 (W.G.H. Decl.), ¶ 12; 3-8 (J.A.V. Decl.), ¶ 5.

Around 8:00 a.m., this Court learned that it had drawn the case through the court's random-assignment system.  Chambers then reached out to locate Government counsel.  Less than an hour later, Plaintiffs' counsel informed chambers that at least one Plaintiff was reportedly already aboard a removal flight.  Having not yet heard from the Government, and given the "exigent circumstances" prompting the need to freeze in place the status quo until a hearing

could be held, the Court entered an *ex parte* TRO preventing Defendants from removing the five Plaintiffs for 14 days.  See Minute Order of Mar. 15, 9:40 a.m.  Not long after the TRO issued at 9:40 a.m., Government counsel informed chambers by email that the TRO "ha[d] been disseminated to the relevant executive branch agencies."  Sure enough, several of the named Plaintiffs report that they were abruptly removed from planes, see Shealy Second Decl., ¶ 11; Carney Decl., ¶ 13; Smyth Decl., ¶ 14 — evidence that Defendants were able, if they wished, to ensure that people on the ground knew relatively quickly of developments in the Court proceedings.  See also ECF No. 20 (Mar. 15 Hrg. Tr.) at 5 (Government stating on Saturday evening that relevant agencies had "confirmed" named Plaintiffs were not to be removed).

    At 10:15 a.m., in an email thread including chambers and counsel for both sides, Plaintiffs asked the Court to hold an emergency hearing on their pending request to provisionally certify a class — comprising them and those similarly situated — and issue a second TRO covering the whole class.  The Government objected that a "broader injunction" and a "hearing" on the issue would be "premature," and it asked the Court to wait until Monday for a hearing. The Government notably did not respond to Plaintiffs' pointed question about whether it was "prepare[d] to halt removals pursuant to the Act" in the interim.  So, just after 11:00 a.m., the Court set an emergency hearing for 5:00 p.m. that same afternoon.

    Shortly after the Proclamation appeared on the White House website at 3:53 p.m., and about 45 minutes before the hearing began, Plaintiffs' counsel informed chambers that he believed that two flights, both operated by a contractor used by Immigrations and Customs Enforcement for deportations, were scheduled to depart Harlingen that afternoon.  Counsel expressed concern that the flights might imminently take off with his five clients and members of the potential class on board.  The Government again offered no response.

In the 5:00 p.m. hearing, the Court clarified the limited scope of the TRO then in place, see Mar. 15 Hrg. Tr. at 3, and turned to whether it should provisionally certify the class. Id. at 5–6. The Government began by objecting that venue was improper because Plaintiffs' claims could be raised only through a petition for habeas corpus in the federal district in Texas where they were being held, not in the District of Columbia. Id. at 6–11.

Noting that it would benefit from further argument on the issue, the Court pivoted to addressing Plaintiffs' concerns "about imminent deportation." Id. at 11. It asked the Government point blank whether there were any "removals under this Proclamation planned . . . in the next 24 or 48 hours." Id. Government counsel said that he did not know, but that he could "investigate" and "report . . . back." Id. Plaintiffs' counsel then interjected that various "sources" had informed him that the two removal flights that were scheduled to depart that afternoon "may have already taken off," including "during this hearing." Id. at 12. So, at 5:22 p.m., the Court adjourned the hearing until 6:00 p.m. and directed Government counsel to find out whether the Government was in the process of removing people under the Proclamation. Id. at 13–15.

It was. Although the Government has refused to provide the particular details, all evidence suggests that during the short window that the Court was adjourned, two removal flights took off from Harlingen — one around 5:25 p.m. and the other at about 5:45 p.m. See ECF No. 21 (Resp. to Mar. 16 Notice) at 3–4 (relying on flight-tracking data for GlobalX Flights 6143, 6145, and 6122); see also Marianne LeVine et al., White House Official Says 137 Immigrants Deported Under Alien Enemies Act, Wash. Post (Mar. 16, 2025), https://perma.cc/U3NY-V3AS (comparing flight-tracking data with planes visible in three-minute video posted online by President of El Salvador and reposted by President Trump

and Secretary of State Rubio); Joyce Sohyun Lee & Kevin Schaul, <u>Deportation Flights Landed</u>
<u>After Judge Said Planes Should Turn Around</u>, Wash. Post (Mar. 16, 2025),
https://perma.cc/QT6J-3SEQ (same); Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 8:13
a.m. EDT), https://perma.cc/XLE4-DDRW.

      Those later-discovered flight movements, however, were obscured from the Court when
the hearing resumed shortly after 6:00 p.m. because the Government surprisingly represented
that it <u>still</u> had no flight details to share.  <u>See</u> Mar. 15 Hrg. Tr. at 15–18; <u>see also</u> ECF No. 51
(Mar. 21 Hrg. Tr.) at 7 (Defendants' counsel later affirming that at that time he had no
"information from the Government as to the status" of the flights).  When pressed, Government
counsel stated that the "operational details" he had learned during the recess "raised potential
national security issues," so they could not be shared while the public and press listened to the
hearing through a call-in line.  <u>See</u> Mar. 15 Hrg. Tr. at 15.  He suggested, however, that the
Government could "provide [the Court] additional details in an *in camera*" setting.  <u>Id.</u>  So the
Court arranged to do just that.  It disconnected the public line so that only counsel for the parties
were present and asked Government counsel to report.  <u>Id.</u> at 15–16.  Except that he did not: he
clarified only that the "additional details" he had just mentioned could <u>eventually</u> be provided *in*
*camera*, but he had no information to share at that time.  <u>Id.</u> at 16.

      With the growing realization, then, that the Government might be rapidly dispatching
removal flights in an apparent effort to evade judicial review while also refusing to provide any
helpful information, the Court turned to the pending legal issues.  <u>Id.</u> at 18.  After hearing
argument, it first determined that venue was proper, <u>id.</u> at 18–22, and it next provisionally
certified a class of Plaintiffs covering all noncitizens in custody subject to removal solely under
the Proclamation.  <u>Id.</u> at 23–26; <u>see also id.</u> at 38.

The Court then addressed the sole remaining question: whether it should issue a broader TRO covering the entire class. It concluded that this was appropriate because Plaintiffs had satisfied the factors governing emergency relief and because the distinct possibility — "unrebutted by the Government" — that flights were "actively departing" or planning to depart required an immediate order preserving the status quo. Id. at 41–43. The Court therefore ordered that for 14 days the Government was enjoined from conducting the "removal" of any noncitizens in its custody solely on the basis of the Proclamation. Id. at 42. Then, at about 6:45 p.m., the Court delivered an oral command clarifying what compliance with the TRO meant. It directed Government counsel to "inform your clients of [the Order] immediately" and to notify them that if class members were on a plane "that is going to take off or is in the air, . . . those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately." Id. at 43. The hearing adjourned at 6:53 p.m. Id. at 47. Roughly 30 minutes later, the Court memorialized the TRO in a written Order. See Minute Order of Mar. 15, 7:25 p.m. That Order referenced the just-concluded hearing and reiterated that the Government was enjoined from "removing" class members. Id.

Despite the Court's written Order and the oral command spelling out what was required for compliance, the Government did not stop the ongoing removal process. According to Defendants, the two planes that took off during the adjournment departed U.S. airspace before the Court's 6:45 p.m. oral command, see ECF No. 49-1 (Robert L. Cerna Third Decl.), ¶ 5, and "landed abroad" sometime after the Court posted the Minute Order at 7:25 p.m. See ECF No. 56 (State Secrets Notice) at 7–8. A third flight reportedly took off from Harlingen at 7:36 p.m., see

Lee & Schaul, *supra*, but the Government maintains that all aboard were removed under authorities other than the Proclamation.  See Cerna Second Decl., ¶ 6.  The first two planes — those carrying members of the Plaintiff class covered by the TRO — apparently touched down in Honduras at 7:37 p.m. and 8:10 p.m., and remained there for several hours before taking off again for El Salvador.  See Lee & Schaul, *supra*; LeVine *et al.*, *supra*.  After the planes landed in El Salvador shortly after midnight on Sunday, see Lee & Schaul, *supra*, most of the passengers were apparently transferred into one of that country's prisons, known as the Center for Terrorism Confinement (CECOT).

But not all passengers, it seems.  One Venezuelan woman swears in a declaration that she was on one of the flights that landed in El Salvador but was flown back to the United States along with seven other women, apparently because Salvadoran authorities on the ground refused to accept any female prisoners.  See ECF No. 55-1 (S.Z.F.R. Decl.), ¶¶ 1, 19–21; see also Didi Martinez, Julia Ainsley & Laura Strickler, "We Were Lied To:" Two Women the Trump Administration Tried to Send to El Salvador Prison Speak Out, NBC News (Apr. 2, 2024), https://perma.cc/F5Y6-XCG8.  Her account is corroborated by a declaration from a Nicaraguan man, who avows that he was also on board one of the removal flights but was returned alongside the women because Salvadoran officials would not take custody of Central American nationals such as himself.  See ECF No. 55-2 (Katiana Gonzalez Decl.), ¶¶ 1, 7–9.

By mid-Sunday morning, the picture of what had happened the previous night came into clearer focus.  It appeared that the Government had transferred members of the Plaintiff class into El Salvador's custody hours after this Court's injunction prohibited their deportation under the Proclamation.  Worse, boasts by Defendants intimated that they had defied the Court's Order deliberately and gleefully.  The Secretary of State, for instance, retweeted a post in which, above

a news headline noting this Court's Order to return the flights to the United States, the President of El Salvador wrote: "Oopsie . . . Too late 😂ꞏ"  Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 7:46 a.m. EDT), https://perma.cc/Y384-4TDW, https://perma.cc/6VTW-5KRD (ellipses in original).

    B.  Procedural Background

    A filing submitted by Defendants on Sunday afternoon failed to dispel any concerns that they had flouted the Court's injunction.  See ECF No. 19 (Mar. 16 Notice); see also Resp. to Mar. 16 Notice at 1–6.  So the Court set a hearing for Monday, March 17, to determine what had transpired over the weekend.  See Minute Order of Mar. 17, 3:09 p.m. (denying ECF No. 24 (Mot. to Vacate Mar. 17 Hrg.)).  The Court expected that at the hearing, Defendants might explain that, despite appearances otherwise, none of the people on the first two flights was a member of the Plaintiff class.  Or, at worst, Defendants would admit to a grave mistake, explain how it transpired, and detail plans to rectify it.

    The United States Government took neither tack.  Rather, what followed in the ensuing days was increasing obstructionism on the part of the Government as it refused to answer basic questions about what had happened, questions that were all ultimately in service of resolving one key fact: whether members of the Plaintiff class — that is, noncitizens removable solely on the basis of the Proclamation — were transferred out of U.S. custody after this Court's injunction preventing their deportation.

    Such stonewalling started before the Monday hearing.  Just before it was set to begin, Defendants sought to cancel it as an unnecessary "incursion[] on Executive Branch authority."  Mot. to Vacate Mar. 17 Hrg. at 1.  Nowhere in their filing did they dispute that class members were transferred into Salvadoran custody hours after the injunction issued.  Instead, Defendants

10

set forth several hyper-technical legal arguments for why, in spite of that fact, they had complied with the Court's Order.  Id. at 2–5.  Such arguments were unconvincing then and remain so now.

Then, in the hearing itself, the Government refused to provide any relevant facts.  The lawyer the Government sent to the proceeding — conveniently not the counsel who had appeared at the TRO hearing — repeatedly stated in some form or another that he was not "at liberty to disclose anything about any flights."  ECF No. 25 (Mar. 17 Hrg. Tr.) at 7.  Although he would not say that such information was even classified, see id. at 9–10, he claimed that it could not be shared — even ex parte with the Court — because of "diplomatic concerns" and "national security concerns with flight patterns and things of that sort."  Id. at 6, 8; see id. at 30.  That is, the Government maintained that it could not share any details about the flights even privately with the Court despite the fact that, the previous day, Defendants had retweeted a three-minute video that portrayed a host of operational details.  See Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 16, 2025, 3:54 p.m. EDT), https://perma.cc/WJ8H-F8HW; Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, 8:39 a.m. EDT), https://perma.cc/ZD8J-KAGH.  In high definition, the video displayed the planes and the runway where they parked; how migrants were restrained and transported; the faces and uniforms of many detainees, guards, and other officials; where the vehicles apparently entered CECOT; and the inside of the prison.  Id.

So, on Monday evening, the Court ordered the Government to submit another filing the next day.  Seeking to accommodate Defendants' national-security concerns — vague as they were — yet nonetheless needing answers on how members of the Plaintiff class had been transferred into a foreign prison hours after the injunction issued, the Court directed the Government to explain its "position on whether, and in what form, it will provide answers to the Court's questions regarding the particulars of the flights."  Minute Order of Mar. 17, 6:47 p.m.

The Court again offered that such information could be provided *in camera*, including in a classified setting.  Id.

In their March 18 response, Defendants reiterated their various arguments for why they should not have to share information related to flights, but conceded that if ordered to do so, they would submit "an *in camera* and *ex parte* declaration."  ECF No. 28 (Mar. 18 Notice) at 1–2. The Court ordered Defendants to do just that by noon the next day, and it set out five basic questions that the declaration needed to answer: when the two flights in question took off and from where; when they left U.S. airspace; when they landed in a foreign country (or countries); what time people subject solely to the Proclamation (and not other authorities, such as the Immigration and Nationality Act) were transferred out of U.S. custody; and how many people were on the flights solely on the basis of the Proclamation.  See Minute Order of Mar. 18, 2:27 p.m.

Defendants then reversed course entirely.  On Wednesday morning, the 19th, a few hours before their deadline, they moved this Court to stay its Tuesday Order on various grounds.  See ECF No. 37 (Emergency Mot. to Stay Mar. 18 Minute Order).  Most relevant, they asserted for the first time that they were considering invoking the state-secrets privilege over the flight details and needed more time to make that determination.  See id. at 3–4.  The Court was "unsure" how answering its five questions could "jeopardize state secrets" — Defendants, after all, had publicly shared images of the flights making them trackable and had still not claimed that the questions bore on any classified information, see ECF No. 38 (Mar. 19 Order) at 2 — but nonetheless sought to accommodate their last-minute request.  It gave them yet another day either to answer the five questions or to invoke the state-secrets doctrine.  Id. at 4.

On Thursday, the 20th, the Government "again evaded its obligations." ECF No. 47 (Mar. 20 Order) at 1. Rather than invoke the privilege or answer the questions, it submitted a short declaration from an Immigration and Customs Enforcement officer stationed in Harlingen. See Cerna Third Decl. It was his "understand[ing]," he said, that Cabinet Secretaries were then considering whether to invoke the privilege. Id. at 2. In response to this wholly inadequate response from a low-level official without any actual knowledge, the Court required Defendants to submit a declaration from someone directly involved with the Cabinet-level discussions and gave Defendants five days to indicate whether they were invoking the state-secrets privilege. See Mar. 20 Order at 3. The Government has since invoked it. See State Secrets Notice. The Court also directed the parties to brief whether Defendants had violated the Court's TROs. See Mar. 20 Order at 3. That briefing is complete, and the Court held a hearing on the matter in early April.

In parallel to the investigation of Defendants' compliance have been further proceedings on the TROs' merits. After briefing and a hearing, the Court denied Defendants' motion to vacate the TROs; it held that Plaintiffs had shown a likelihood of success on one of their core claims — i.e., those subject to removal under the Proclamation had a due-process right to challenge the Government's determination that they were removable — and that they would face irreparable harm if the TROs were dissolved, a harm that also tipped the balance of equities in their favor. See J.G.G., 2025 WL 890401, at *11–14, 16–17. The Court of Appeals then rejected Defendants' request to stay the Orders, raising concerns with both the applicability of the Act and the lack of due-process. See J.G.G. v. Trump, No. 25-5067, 2025 WL 914682, at *8–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); id. at *13–14 (Millett, J., concurring).

13

The Supreme Court subsequently vacated the TROs on a narrow ground. It held that challenges to removal under the Act must be brought through a habeas-corpus proceeding — not, as Plaintiffs did, through the Administrative Procedure Act — and therefore venue lay in the district of the class members' confinement, not the District of Columbia. See J.G.G., 2025 WL 1024097, at *1. While the Court split on the venue question, it unanimously held — as this Court did when declining to dissolve the TROs — that those subject to removal under the Act must be allowed to challenge their removability in federal court before being deported. See id. at *2; id. at *2 (Kavanaugh, J., concurring); id. at *2, 6 (Sotomayor, J., dissenting). Specifically, all Justices agreed that the Due Process Clause requires the Government to provide anyone it seeks to remove notice "that they are subject to removal under the Act," and to do so "within [a] reasonable time and in such manner as will allow them to actually seek habeas relief" before being removed. Id. at *2 (*per curiam*); id. at *6 (Sotomayor, J., dissenting). In holding as much, the Court effectively said that the Constitution flatly prohibits the Government from doing exactly what it did that Saturday, when it secretly loaded people onto planes, kept many of them in the dark about their destination, and raced to spirit them away before they could invoke their due-process rights.

As this Opinion will shortly explain at greater length, the fact that the Supreme Court determined that this Court's TROs suffered from a venue defect does not affect — let alone moot — the compliance inquiry presently teed up here.

## II.    Analysis

Defendants provide no convincing reason to avoid the conclusion that appears obvious from the above factual recitation: that they deliberately flouted this Court's written Order and, separately, its oral command that explicitly delineated what compliance entailed. They do not

14

dispute that it was hours after the written Order issued when they disembarked the class members aboard the two planes and transferred them out of U.S. custody. See State Secrets Notice at 7–8; ECF No. 58 (Resp.) at 4. Rather than offer a *mea culpa* and attempt to explain this grave error and detail plans to rectify it, Defendants offer various imaginative arguments for why they nevertheless technically complied with the Order. None of their positions withstands scrutiny.

Defendants' core contention — that in prohibiting class members' removal, the written Order barred only their physical exit from the United States, not their subsequent transfer into Salvadoran custody — requires ignoring the clear context in which the Order was issued. Their other arguments amount only to retroactive attacks on the legal validity of the injunction, but that road leads nowhere: even a legally defective order must be complied with until reversed through the appeals process. Defendants' conduct, moreover, manifests a willful disregard of the Court's legally binding proscriptions. Given the evidence at this early stage in the inquiry, and offered no persuasive reason to conclude otherwise, the Court finds that there is probable cause that Defendants acted contemptuously.

The following analysis first sets out the parameters of criminal contempt and then explains why court orders, regardless of their ultimate validity, must be complied with. The Court last analyzes why Defendants' willful and knowing actions here constitute probable cause for a finding of contempt.

    A.  <u>Contempt</u>

        1.  *Legal Standard*

When Congress established lower federal courts in the Judiciary Act of 1789, it conferred on them the power "to punish by fine or imprisonment, at the discretion of said courts, all

contempts of authority in any cause or hearing before the same."  1 Stat. 83; see Bloom v. Illinois, 391 U.S. 194, 202 (1968).  In doing so, Congress "gave federal courts the discretionary power to punish for contempt as that power was known to the common law."  United States v. Barnett, 376 U.S. 681, 687 (1964); see id. at 699–700 ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.") (quotation marks omitted); United States v. Dixon, 509 U.S. 688, 694–95 (1993).  Although Congress eventually pared back federal courts' statutory contempt power, it preserved their authority to punish, among other transgressions, "'disobedience or resistance' to court orders."  Dixon, 509 U.S. at 694 (quoting 4. Stat. 488); see Bloom, 391 U.S. at 202–04.

    That statutory authority is now codified in 18 U.S.C. § 401, which provides that any "court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."  For a contemnor to be convicted of criminal contempt under § 401(3), it must be shown beyond a reasonable doubt: (1) that the court order was "clear and reasonably specific"; (2) "that the defendant violated the order"; and (3) "that the violation was willful."  United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (quoting United States v. NYNEX Corp., 8 F.3d 52, 54 (D.C. Cir. 1993)).

    The Court here inquires only into whether there is probable cause that Defendants violated § 401.  Such an inquiry does not appear to be strictly necessary.  The statute does not include a probable-cause requirement, and as the Department of Justice has explained in an internal manual, "It is unclear whether probable cause that a willful violation has occurred is a condition precedent to the commencement of a criminal contempt action."  U.S. Dep't of Just.,

Criminal Resource Manual § 763, https://perma.cc/Z5DV-RUNU.  In practice, "the vast majority of criminal contempt decisions make no mention of such a requirement."  Id.  Some courts, however, have opted to make or require findings of probable cause before initiating criminal-contempt proceedings.  See, e.g., In re Res. Tech. Corp., 2008 WL 5411771, at *4 (N.D. Ill. Dec. 23, 2008); Beyond Blond Prods., LLC v. Heldman, 2025 WL 902445, at *1 (C.D. Cal. Mar. 25, 2025); In re Sydor, 132 B.R. 243, 245–46 (E.D.N.Y. Bankr. 1991); Reed v. Rhodes, 500 F. Supp. 363, 376, 404 (N.D. Ohio 1980); United States v. Hovind, 2014 WL 12887669, at *2 (N.D. Fla. July 8, 2014); In re United Corp., 166 F. Supp. 343, 345 (D. Del. 1958).  The Court finds that practice to be a prudent way of affording alleged contemnors the procedural protections associated with other criminal proceedings and so follows it here.

### 2.  *Effect of Supreme Court Vacatur*

But hold on, Defendants protest.  If the Supreme Court has since vacated the TROs, how can contempt lie?  See ECF No. 78 (Notice Regarding Supreme Court Decision) at 1.  The Supreme Court long ago answered that question: it is firmly settled that a court order "must be obeyed" until it is "reversed for error" by the issuing court or a "higher" one.  Walker, 388 U.S. at 314 (quoting Howat v. Kansas, 258 U.S. 181, 189–90 (1922)).  That, in turn, means that a party "may be punished for criminal contempt for disobedience of an order later set aside on appeal" for being defective.  United States v. United Mine Workers of Am., 330 U.S. 258, 294–95 (1947).  If a party believes that a court order suffers from legal deficiencies, it therefore "must have the injunction modified or vacated; [it] cannot simply ignore it."  Evans v. Williams, 206 F.3d 1292, 1299 (D.C. Cir. 2000).  The so-called collateral-bar rule enforces that principle.  It provides that if a party is charged with contempt for disobeying a court order, it cannot raise the legal invalidity of the order as a defense.  See id. (citing Walker, 388 U.S. 307).  Defendants

were thus obligated to comply with this Court's TRO until vacated by this Court or a higher one;

if they failed to comply, the fact that the TRO was legally unsound is no obstacle to a contempt

conviction.

There are only two narrow exceptions to this rule, neither of which applies here. First, an

enjoined party can violate an order and then challenge its validity in a contempt proceeding if —

and only if — "there was no opportunity for effective review of the order before it was violated."

11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2960 (3d ed. Apr.

2025 update). Defendants do not seek cover behind this exception. For good reason. Just as

they had sought emergency appellate relief for the first TRO mere hours after it issued, see ECF

No. 12 (First Notice of Appeal), they notified this Court while the planes were en route to El

Salvador that they intended to do the same for the TRO in question, see ECF No. 17 (Second

Notice of Appeal) (filed 8:37 p.m.), docketing their appeal only minutes after the planes landed

in that country. See Corrected Emergency Mot. for a Stay Pending Appeal, J.G.G. v. Trump, No.

25-5067 (D.C. Cir. Mar. 16, 2025) (filed 1:07 a.m. Sunday). Defendants also could have sought

relief from this Court, including, for example, requesting a stay of the TRO pending appeal. See

Fed. R. App. P. 8(a)(1)(A); J.G.G., 2025 WL 914682, at *22–23 (Millett, J., concurring) (noting

failure to do so). Defendants, moreover, nowhere identify a reason that the transfer had to occur

early Sunday morning. If they considered waiting for appellate relief impracticable or

unattractive given the speed at which events transpired, that circumstance was entirely of their

own making, not the result of any bona-fide obstacle to effective review. Indeed, the appellate

process worked at a breakneck pace. Cf. Walker, 388 U.S. at 318–19 (case is "different" if party

faces "delay or frustration of their . . . claims" in appellate courts).

Second, a party need not obey an injunction that is "transparently invalid or had only a frivolous pretense to validity." Id. at 315. That is an exceedingly high bar. This narrow carveout does not apply if the order was "arguably proper" or "had any pretence to validity at the time it was issued." Matter of Providence J. Co., 820 F.2d 1342, 1347 (1st Cir. 1986). The exception therefore applies "[o]nly in the rarest of situations." Zapon v. U.S. Dep't of Just., 53 F.3d 283, 285 (9th Cir. 1995). This is not one. The Supreme Court has admittedly held that Plaintiffs' claims should have been brought in habeas, see J.G.G., 2025 WL 1024097, at *1, but this Court's view of the issue at the time of the Orders was not patently frivolous. Rather, the question was "substantial," United Mine Workers, 330 U.S. at 293, dividing both the Court of Appeals and the Supreme Court. See J.G.G., 2025 WL 914682, at *23–31 (Millett, J., concurring); id. at *34–37 (Walker, J., dissenting); J.G.G., 2025 WL 1024097, at *1; id. at *7–10 (Sotomayor, J., dissenting).

To be sure, some courts outside this Circuit have suggested that when a court lacks subject-matter jurisdiction to adjudicate a dispute, an enjoined party may raise that fact as a defense to contempt. See, e.g., In re Novak, 932 F.2d 1397, 1401–02 (11th Cir. 1991); In re Estab. Inspection of Hern Iron Works, Inc., 881 F.2d 722, 726–27, 726 n.12 (9th Cir. 1989) (but noting pervasive uncertainty on the issue). Those statements, however, do not control here, not least because they are incompatible with the Supreme Court's subsequent opinion in Willy v. Coastal Corp., 503 U.S. 131 (1992). See United States v. Straub, 508 F.3d 1003, 1006, 1010 (11th Cir. 2007) (upholding 18 U.S.C. § 401(3) contempt charge even though court lacked jurisdiction "over the underlying controversy," and noting Willy "resolve[d] this issue").

In Willy, a district court imposed Rule 11 sanctions — which function like criminal contempt, as they are "designed to punish a party who has already violated the court's rules," 503

U.S. at 139 — even though it was later shown that it did not have subject-matter jurisdiction when the sanctionable conduct occurred; indeed, it issued the final sanctions order <u>after</u> its lack of jurisdiction had been determined by the court of appeals. <u>Id.</u> at 133–34. The Supreme Court nonetheless upheld the sanctions order. <u>Id.</u> at 135–39. "A final determination of lack of subject-matter jurisdiction," the Court explained, "precludes further adjudication of" the case's merits, but a sanctions order is "collateral to the merits," so a court's lack of subject-matter jurisdiction poses no constitutional bar. <u>Id.</u> at 137–38; <u>see also</u> <u>id.</u> at 137 (explaining that <u>United Mine Workers</u>, 330 U.S. 258, "upheld a criminal contempt citation even on the assumption that the District Court issuing the citation was without jurisdiction over the underlying action"). Following <u>Willy</u>, the D.C. Circuit has made clear that "subject-matter jurisdiction over an underlying action is not a precondition of a federal court's authority to sanction those who violate its orders." <u>In re LeFande</u>, 919 F.3d 554, 561 (D.C. Cir. 2019) (citing <u>Willy</u>, 503 U.S. at 137). Notwithstanding whether a court is later determined to have lacked subject-matter jurisdiction at the time of the violation, then, a party can be held in contempt for disobedience, and the same court can impose the sanctions even after its lack of jurisdiction has been revealed.

In any event, this Court possessed such jurisdiction. Recall, the Supreme Court held in its *per curiam* opinion that claims challenging removal under the Alien Enemies Act "must be brought in habeas." <u>J.G.G.</u>, 2025 WL 1024097, at *1. That conclusion rested on a line of cases holding that habeas is the "exclusive remedy" for state prisoners challenging their sentences, even though such claims "may come within the literal terms of" another statute. <u>Heck v. Humphrey</u>, 512 U.S. 477, 481 (1994); <u>see also</u> <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 489–90 (1973). In such circumstances, the Court has previously explained, the availability of habeas relief means a separate "cause of action . . . does not accrue." <u>Heck</u>, 512 U.S. at 489–90. By

analogy, the same occurred here.  In holding that habeas is the exclusive remedy for Plaintiffs, the Supreme Court denied that they possessed a valid cause of action under the APA when this Court granted the classwide TRO; it did <u>not</u> hold that this Court lacked subject-matter jurisdiction.  In fact, Justice Kavanaugh noted in his concurrence that the availability of habeas relief constitutes an "adequate remedy" barring suit under the APA.  <u>See</u> <u>J.G.G.</u>, 2025 WL 1024097, at *2 (Kavanaugh, J., concurring) (quoting 5 U.S.C. § 704); <u>see also</u> <u>J.G.G.</u>, 2025 WL 914682, at *34 (Walker, J., dissenting) (making same point).  The adequate-remedy bar, however, is not a jurisdictional one: on the contrary, the D.C. Circuit has explained that § 704 "determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction."  <u>Perry Capital LLC v. Mnuchin</u>, 864 F.3d 591, 621 (D.C. Cir. 2017).  Under either habeas or APA precedents, then, both paths lead to the same destination: the relevant defect in this Court's classwide TRO was not jurisdictional.

At worst, as the Supreme Court held here, "<u>venue</u> [was] improper in the District of Columbia."  <u>J.G.G.</u>, 2025 WL 1024097, at *1 (emphasis added).  Indeed, regardless of how the issue is framed, the Court has been clear that any reference to habeas "jurisdiction" does not refer to a court's "subject-matter jurisdiction."  <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 434 n.7 (2004).  Rather, the "territorial-jurisdiction rule[]" is a question of proper "venue."  <u>Id.</u> at 452 (Kennedy, J., concurring); <u>see also</u> <u>Chatman-Bey v. Thornburgh</u>, 864 F.2d 804, 812–13 (D.C. Cir. 1988) (similar).  And it is black-letter law that while subject-matter jurisdiction goes to whether any federal court may even hear the dispute, venue determines <u>which</u> jurisdiction-possessing court is the most convenient.  <u>See</u> 14D Wright & Miller, *supra*, § 3801 (4th ed. Apr. 2025 update); <u>Neirbo Co. v. Bethlehem Shipbuilding Corp.</u>, 308 U.S. 165, 167–68 (1939) (same).  Just

like the availability of a cause of action under the APA, that question has been determined by

statute — the federal habeas statute.  See 28 U.S.C. §§ 2241–2242.

The upshot is that, after the Supreme Court's decision in this case, it has been

preliminarily determined that Congress channeled a challenge to removal under the Alien

Enemies Act to a habeas petition filed in a detainee's district of confinement.  This Court's

decision to recognize a cause of action under the APA in the District of Columbia, while

ultimately found erroneous by the Supreme Court, therefore is not a defect that would excuse

compliance under any of the recognized exceptions.

The "firmly established" "rule of law" that even a legally unsound order must be obeyed

at the risk of contempt therefore focuses the present inquiry.  Walker, 388 U.S. at 319.  The

question presented here is whether there is probable cause that Defendants deliberately or

recklessly disregarded a clear and reasonably specific order.  See Young, 107 F.3d at 907, 910.

The question is not — as many of Defendants' evasive legal arguments imply — whether that

Order was legally impeccable.

### 3. *Sufficiently Clear, Reasonably Specific, and Unequivocal Order*

The first element of contempt requires that the injunction be "clear," "reasonably

specific," Young, 107 F.3d at 907 (quotation marks omitted), and "unequivocal at the time it is

issued."  In re Holloway, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (quoting Traub v. United States,

232 F.2d 43, 47 (D.C. Cir. 1955)).  To "determin[e] whether an order is sufficiently clear and

specific," courts "apply an objective standard that takes into account" not just "the language of

the order" but also "the objective circumstances surrounding the issuance of the order."  Young,

107 F.3d at 907.  Thus, "[w]hether an order is clear enough depends on the context in which it

[was] issued," which includes "the audience to which it [was] addressed," id. at 907–08 (quoting

22

In re Levine, 27 F.3d 594, 596 (D.C. Cir. 1994)), as well as "the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." Common Cause v. Nuclear Regul. Comm'n, 674 F.2d 921, 927 (D.C. Cir. 1982) (quotation marks omitted).

The question here, then, is whether it was sufficiently clear to the Government that the Court was prohibiting it from transferring class members into another country's custody — something Defendants admit to doing hours after the written Order issued. See State Secrets Notice at 7–8. The Government, however, now contends that the Court's Order should be understood to have enjoined it only from transporting class members outside of U.S. territory, not from relinquishing custody of them once they were already outside the United States. That narrower Order, it argues, was one with which it fully complied. That interpretation is deliberately blind to the Court's unequivocal language and the context surrounding its Order.

At 7:25 p.m. on Saturday evening, roughly 30 minutes after the hearing adjourned, see Mar. 15 Hrg. Tr. at 47, the Court issued its written Order. See Minute Order of Mar. 15, 7:25 p.m. Expressly referencing the hearing, the Order certified a Plaintiff class consisting of all noncitizens in U.S. custody who were subject to the Proclamation, and, relevant here, memorialized the TRO using the same language as in the hearing. See Mar. 15 Hrg. Tr. at 42, 46–47. Specifically, this part of the Order stated:

> As discussed in today's hearing, the Court ORDERS that . . . [t]he Government is ENJOINED from removing members of [the] class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court.

Minute Order of Mar. 15, 7:25 p.m.

As already explained, the Government does not dispute that after this written TRO issued, it temporarily landed two planeloads of class members in Honduras, flew them to El

Salvador, deplaned them there, and then — critically — transferred them from U.S. to Salvadoran custody.  See State Secrets Notice at 7–8.  Indeed, the Government does not challenge that this transfer of custody happened some five hours, at least, after the written Order was docketed.  See LeVine *et al.*, *supra* (planes landed in El Salvador at 12:10 and 12:18 a.m.).

Defendants offer a novel interpretation of the Order that, if adopted, would mean that they were not in violation.  The linchpin of their argument is that in forbidding them from "removing" class members, see Minute Order of Mar. 15, 7:25 p.m., the TRO prohibited only flying class members outside of the United States, not the further act of relinquishing custody of them into the hands of a foreign government.  See Resp. at 2–4.  And, they continue, because both planes had already departed U.S. airspace before the written Order posted (and before the oral command preceding it), everyone on board had already been removed before the Order issued.  See id.  While perhaps clever, this argument does not carry the day.

Defendants agree that an injunction must be understood in the context in which it is issued.  See Young, 107 F.3d at 907–08; Resp. at 2.  But they would have the Court search for context in all the wrong places.  After observing that the written TRO did not define "remove," Resp. at 3, they seek to show that the term has a clear meaning under the Act, with the implication that the Court incorporated that definition into its Order.  They do not make their case.

Across a couple paragraphs, Defendants halfheartedly seek to root their narrow reading of "removal" in the Act.  They cite several dictionary definitions from around the time that Congress passed the Alien Enemies Act in 1798, but these are far from conclusive.  See Resp. at 3.  They also suggest that their territorial understanding makes sense because the Act speaks of "the territory of the United States."  Id. (quoting 50 U.S.C. § 21).  This, too, is hardly definitive:

24

just because an "invasion" or "predatory incursion" must be "against the territory of the United

States" to trigger the Act's authorities does not resolve whether the process of removal comprises

a physical departure or a transfer of custody.  Defendants therefore fall well short of showing that

"removal" carries a definitive meaning under the Act.

      As a fallback of sorts, Defendants gesture toward the adjacent INA context, but that

undercuts their position.  They cite a lone case in which the Ninth Circuit held that an INA

removal order is executed when the person physically exits the United States.  <u>Nicusor-Remus v.</u>

<u>Sessions</u>, 902 F.3d 895, 898, 899 (9th Cir. 2018) (citation omitted).  That court, however,

recognized that departure can convey a "physical departure" (territorial exit) or, conversely, a

"legal departure" (implicating questions of one's legal admission to and status in the country of

destination), and it found that the former controlled only because the INA's own statutory

definition made that conclusion unavoidable.  <u>Id.</u> at 899–900 (noting statute defined "deported or

removed" as having "left the United States") (quotation marks omitted).  Here, by contrast, as

Defendants concede, <u>see</u> Resp. at 3, we have no statutory definition that might be dispositive.

      Insofar as INA cases are relevant, moreover, they demonstrate that, at the time the TRO

issued, the Government understood removal to mean the exact <u>opposite</u> of what they now claim.

But don't take the Court's word for it.  Just listen to the argument the Government made a mere

five days before the events in question here.  In a different case in this district — with some of

the same Defendants, and in a filing signed by some of the same lawyers signing Defendants'

show-cause response — the Government argued that "removal" under the INA is a "term of art,"

and that "[t]o effectuate a departure or removal, the alien must lawfully enter another country,"

as "the fact that [he] is physically on foreign soil is <u>not</u> alone sufficient to establish that he has

25

legally departed the United States." Escalona v. Noem, No. 25-604, ECF No. 14 (Opp. to Mot.

for Stay of Transfer) at 29–30 (D.D.C. Mar. 10, 2025) (citations omitted); see id. at 40 (lawyers).

Defendants, then, do not show that "removal" carries the specific meaning they urge

under the Act. For that reason, rather than a smattering of late-18th-century dictionaries and an

inconclusive fragment of the Act's text, the better — indeed the obvious — place to look for the

meaning of "removal" in the Court's written TRO is the hour-plus-long hearing that immediately

preceded it. See Young, 107 F.3d at 907–08 (context for determining meaning of injunction

includes "objective circumstances surrounding the issuance of the order" and "audience to which

it is addressed") (quotation marks omitted).

Anyone paying attention to the hearing (as the Government presumably was) would have

known that the ultimate action Plaintiffs sought to prevent through a TRO was not their mere

transportation across the U.S. border, but instead their discharge from U.S. custody into a foreign

country or into foreign hands. Common Cause, 674 F.2d at 927 (context for determining

meaning of injunction includes "the relief sought by the moving party" and "mischief that the

injunction seeks to prevent"). When the Court accordingly referred to removal or deportation in

the hearing, it consistently used those terms to mean a legal departure that was complete upon

discharge from U.S. custody, not upon mere physical exit from U.S. territory.

First, mark the opening exchange of the hearing. The Court asked the Government to

confirm that none of the five named Plaintiffs was "on any plane that has departed," Mar. 15

Hrg. Tr. at 4, as the first TRO then in place prohibited their "remov[al] . . . from the United

States." Minute Order of Mar. 15, 9:40 a.m. Government counsel said that he had "confirmed"

that they would "not be removed." See Mar. 15 Hrg. Tr. at 5. The Court then clarified what that

must entail, stating: "I would assume that means that they are either not on the planes or that they

26

<u>will not be removed from the planes and will be brought back once the planes land in El</u>

<u>Salvador</u>." <u>Id.</u> (emphasis added). The Government did not disagree with that characterization.

<u>Id.</u> From the start, then, the Court plainly considered removal (from the United States) — *i.e.*,

the action that would violate the TRO — to mean a legal removal, and specifically a process that

culminated not in a detainee's movement out of U.S. airspace or arrival in a foreign country, but

instead upon his transfer out of U.S. custody. Similarly, during a later exchange on irreparable

harm, the Court expressly said that it viewed "the status quo" (which Plaintiffs sought to

maintain) as "keeping [class members] in ICE custody but not deporting them." Mar. 15 Hrg. Tr.

at 35. Again, the issue was custody, not physical location.

     *Second*, consider the recurring discussion about when and how the Court would lose

equitable jurisdiction. These exchanges make clear that the Court considered a TRO to be

appropriate in part to preserve the status quo; that the Court (and Plaintiffs) felt that this entailed

ensuring that it did not lose jurisdiction; and that it was concerned that it would lose jurisdiction

<u>not</u> when class members exited U.S. airspace but instead when they left U.S. custody. The

Government listened to and indeed participated in these exchanges.

     To start, prior to the mid-hearing adjournment, Plaintiffs' counsel interjected that

"sources" "on the ground" had indicated that planes were actively departing or could be at any

moment. <u>Id.</u> at 12. That created time pressure, he said, but not because class members would

simply be flown outside the United States; instead, it was because they could imminently "end[]

up in a Salvadoran prison," and <u>that</u> eventuality might "divest this Court of jurisdiction." <u>Id.</u>

     The reason was explained later in the hearing, when the discussion returned to irreparable

harm. The Government said that it did not understand Plaintiffs' irreparable-harm argument,

which it construed to be "predicated on the premise that this Court would somehow lose

27

jurisdiction if [class members] were" "in the United States" but "not in D.C."  Id. at 35.  The
Court clarified for the Government that Plaintiffs' "argument in part is [that class members] are
going to be sent to Salvadoran or Honduran prisons."  Id. (emphasis added).  Indeed, that event,
Plaintiffs again agreed, was the crux: not only did they face "real danger . . . if they end up in a
Salvadoran prison," but if that were to occur, "the Court would lose jurisdiction because it
wouldn't be able to offer a remedy" — and a TRO was needed to prevent both things from
happening.  Id. at 36–37.  The Government surely understood the black-letter principle that to
have jurisdiction, a Court must be able to redress the plaintiff's injury.  See Uzuegbunam v.
Preczewski, 592 U.S. 279, 291 (2021).  Plaintiffs here clearly recognized that if they were turned
over to Salvadoran authorities, the Court might lose its ability to offer any remedy: while a
federal court can exercise equitable powers over U.S. officials even if they are overseas, it cannot
directly control foreign officials, see Doe v. Mattis, 928 F.3d 1, 22 (D.C. Cir. 2019), meaning that
this Court could not order the guards at CECOT to release class members.  But see Abu Ali v.
Ashcroft, 350 F. Supp. 2d 28, 30–31, 47–50 (D.D.C. 2004) (denying motion to dismiss habeas
petition filed by U.S. citizen held in Saudi prison at United States's behest because prisoner was
in "constructive" U.S. custody); Munaf v. Geren, 553 U.S. 674, 686 (2008) (one is "held 'in
custody' by the United States when" a U.S. official "has 'the power to produce' him") (citation
omitted).

In an egregious case of cherry-picking, Defendants selectively quote only a fragment of
the Court's response here to mischaracterize its position, suggesting that the Court acknowledged
that it lacked jurisdiction once class members left U.S. airspace.  See Resp. at 8; see also id. at
11.  But that contention overlooks that the first words of the response — "Right.  Sure.  I mean,
once they are out of the country, I'm not sure what I can do there," Mar. 15 Hrg. Tr. at 36 —

28

affirmed Plaintiffs' custody-based articulation of why it would lose jurisdiction.  Defendants'

suggestion also ignores the Court's prior and repeated references to removal as a transfer of

custody.  Any lingering doubt on this score is dispelled by the exchange that occurred just a few

minutes later.  Immediately after the Court ruled on the TRO and delivered the oral command on

how it should be implemented (which will be addressed shortly), see id. at 42–43, Plaintiffs

provided an update on the two flights that they understood to have taken off that afternoon; one

had ended up in El Salvador and the other in Honduras, they said.  Id. at 44.  In response, the

Court said:

> Again, just so we are clear, if planes have already landed and
> discharged their occupants, aside from the five Plaintiffs I enjoined
> earlier, then . . . I don't have jurisdiction to require [the occupants']
> return.

Id. (emphasis added).  "Right," agreed Plaintiffs.  Id.  If the Court believed jurisdiction to be

territorial, it would not have said the emphasized portion; instead, its answer would have been,

"If the planes have left the United States, I don't have jurisdiction to require their return."

In short, then, these exchanges on equitable jurisdiction — in which the Government was

both "audience" and participant, Young, 107 F.3d at 907–08 — demonstrate that Plaintiffs sought

a classwide TRO that would ensure that the Court retained that jurisdiction over class members;

that the Court agreed that it would lose such jurisdiction upon class members' handover to

foreign authorities, and not before; and that the only TRO the Court was considering granting

was one that would prevent such an eventuality.

*Third*, return to the oral ruling and command.  At around 6:45 p.m., the Court ruled on

Plaintiffs' request for a broader TRO covering all class members.  After explaining the reasons

that a TRO covering the Plaintiff class was "appropriate," the Court spelled out its scope: the

TRO "would be to prevent the removal of the class for 14 days or until further order of the Court.

And the class will be all noncitizens in U.S. custody who are subject to the Proclamation . . . and [to] its implementation." Mar. 15 Hrg. Tr. at 42 (emphasis added). After noting that it would "memorializ[e]" the TRO through a Minute Order, the Court then addressed "where we go from here," id., and turned to the Government to emphasize "the first point":

> [Y]ou shall inform your clients of [the Order] immediately, and that any plane containing [class members] that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately.

Id. at 43 (emphasis added).

From this command alone, it was clear and unequivocal that the ultimate action proscribed by the TRO was not class members' removal from U.S. territory, but instead their transfer from U.S. custody into foreign hands. If the Court's TRO only prohibited class members from being transported out of U.S. territory, much of the oral command would be nonsensical. It would make no sense to command that "people" who had never left the United States needed "to be returned to the United States." Id. (emphasis added). Nor would it make any sense for the Court to have ordered the Government not to deplane "anyone on [a] plane." Id. The inescapable meaning of that directive, particularly in light of the exchanges leading up to it, was that anyone on a removal flight that had already landed abroad should not be discharged from U.S. custody and turned over to Salvadoran (or Honduran) authorities. That was clearly the ultimate harm Plaintiffs sought to prevent and the jurisdiction-terminating event they endeavored to preclude by freezing the status quo. If the injunction only prevented class members' exit from U.S. airspace, the Court would have had no need to detail how they should be handled if their plane had already landed abroad.

* * *

In sum, numerous exchanges throughout the hearing, including the ultimate unequivocal oral command that clarified how the TRO must be obeyed, demonstrate that the Court consistently considered removal to be not mere physical removal, but instead legal deportation that was complete upon transfer out of U.S. custody. Defendants' proposition — that the written Order used removal in a dramatically narrower sense — flies in the face of this overwhelming context. And they provide no convincing explanation for why, after its emphatic oral command, the Court would have made an abrupt U-turn in the 30-minute window between the end of the hearing and the docketing of the Order. Contra Resp. at 7. Indeed, the Court twice told the Government in the hearing that it would "memorializ[e]" the TRO in the written Order, see Mar. 15 Hrg. Tr. at 42, 46; the only objectively reasonable expectation, then, was that the written order enshrined the injunction unchanged unless the Court expressly drew attention to any discrepancies between what was said and what was recorded in writing. Nor did the Government seek to clarify the relationship between the oral command and written Order, which it plainly should have done had it felt any confusion. The Court therefore concludes that the written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials.

4. *Violation*

The second element of contempt requires that the sufficiently clear and specific order was in fact violated. Young, 107 F.3d at 907. Defendants do not dispute that, if the Order indeed proscribed transferring class members out of U.S. custody, they plainly violated it hours after it issued. Rather than mount any factual defense, they rely on *post-hoc* legal arguments to attack the validity of the Order itself. These positions are without merit, but, more important, they are

31

not even available to Defendants.  As previously explained, per the collateral-bar rule, what matters is whether they violated the terms of the Order, not whether the Order itself was legally valid.

> a.  Separation of Powers

Defendants first claim that even if the TRO used the term "removal" to describe a legal departure and thereby did enjoin class members' transfer into foreign custody, it did not prohibit — indeed could not prohibit — Defendants from making such a transfer if the class members "were already outside the United States" at the time of the Order.  See Resp. at 9; id. at 2, 9–13. That argument sails wide of the mark.

Underpinning their claim is a sweeping assertion: they contend that once the class members exited U.S. airspace, Defendants' authority over them flowed solely from the President's Article II powers, not from the congressional grant of immigration authority invoked by the Proclamation.  Id. at 10, 12.  In their view, from El Valle to the U.S. border, Defendants transported class members pursuant to the Act; upon exiting U.S. airspace, however, the Act fell away, and Defendants continued on under only the President's Article II powers.

From that bold premise, Defendants urge two points.  They first posit that because it only enjoined removals effectuated "pursuant to the Proclamation," Minute Order of Mar. 15, 7:25 p.m., the TRO "by its terms" did not reach conduct outside of United States territory taken pursuant to Article II.  See Resp. at 9–10, 12.  Even were the premise solid (which it is not), this is simply another argument about how the TRO should be construed based on its language.  But we have already been down this path: the TRO should be understood in light of the circumstances in which it issued — not given a belated gloss by virtue of sweeping separation-of-powers theories raised for the first time in briefing.  To reiterate again, the relevant context here demonstrates that the Order clearly and specifically prohibited Defendants from transferring

any class members into a Salvadoran prison, even — in fact, especially — if they had already

been flown outside the United States.  See *supra* pp. 26–30.

To the degree that Defendants' objection does not concern the Order's interpretation, it

melds into their secondary argument: even if the Court's Order prohibited (or "purported to"

prohibit, see Resp. at 9) transferring custody of class members already outside the United States,

the Court lacked the constitutional power to enjoin such transfers.  Id. at 11 (Executive Branch's

handling of class members abroad "was beyond the courts' authority to adjudicate").  This

position does not persuade.

First and most important, the collateral-bar rule stops it in its tracks.  Even if Defendants'

theory of Article II power were sound, it would not help them in this contempt inquiry.  The

argument, at bottom, is an attack on the legal validity of the TRO: by restraining their conduct,

Defendants say, the Order infringed on the President's Article II powers and thus violated the

Constitution.  See Resp. at 7; id. at 12 ("extraterritorial exercise" of President's Article II

authority "present[s] a non-reviewable political question").  But, as explained above, Defendants

cannot "defend contempt charges by asserting the unconstitutionality of the injunction."  Carroll

v. President & Comm'rs of Princess Anne, 393 U.S. 175, 179 (1968) (citing Walker, 388 U.S.

307).  If Defendants believed — correctly or not — that the Order encroached upon the

President's Article II powers, they had two options: they could seek judicial review of the

injunction but not disobey it, or they could disobey it but forfeit any right to raise their legal

argument as a defense against criminal-contempt charges.  See *supra* pp. 17–18.  They chose the

latter course.

Even if their Article II argument could be construed as something other than a barred

collateral attack on the legal soundness of the Orders, it would still come up short.  There is no

merit to their contention that outside U.S. airspace, Defendants somehow operated solely under the President's Commander-in-Chief powers, not the Alien Enemies Act.  The Constitution gives Congress "plenary authority" over immigration, INS v. Chadha, 462 U.S. 919, 940 (1983), so any "discretion over the admission and exclusion of aliens" possessed by the Executive "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations."  Abourzek v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986).  Since the Act's passage, moreover, an unbroken line of cases has considered the "disposition of alien enemies during a state of war" to be within Congress's constitutional ambit, not the President's.  See Ludecke, 335 U.S. at 173; id. at 161; Brown v. United States, 12 U.S. (8 Cranch) 110, 126 (1814) (Marshall, C.J.) (Act "affords a strong implication that" President "did not possess" power over "alien enemies" "by virtue of [a] declaration of war"); Citizens Protective League v. Clark, 155 F.2d 290, 293 (D.C. Cir. 1946).

Although Defendants offer certain soundbite-ready assertions, see State Secrets Notice at 1 (declaring "President's plenary authority, derived from Article II and the mandate of the electorate . . . to remove from the homeland designated terrorists"), they cite no legal authority that Defendants here operated pursuant to a presidential power preclusive of both congressional and judicial power.  Such an extraordinary claim "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).  Yet across multiple filings they muster not a single case in direct support of the proposition that when the Government carries out deportations pursuant to a grant of statutory authority, that authority is necessarily eclipsed by the Executive's exclusive constitutional prerogative when deportees leave U.S. territory.  See State Secrets Notice at 1–2; Resp. at 9–13; Mot. to Vacate Mar. 17 Hrg. at 4–5.

Were that true, Executive Branch officials could do as they please with deportees abroad, regardless of statutory constraints that plainly apply — for example, by rerouting a plane to discharge deportees into a country where they would be tortured, even though federal law expressly forbids that outcome.  See Huisha-Huisha v. Mayorkas, 27 F.4th 718, 721–22 (D.C. Cir. 2022).  The Constitution cannot tolerate that result.

Even when the Supreme Court has found that an immigration statute does not apply extraterritorially, its reasoning undercuts Defendants' claim.  In Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993), the Court considered the legality of a program in which the Coast Guard interdicted Haitian refugees on the high seas and repatriated them.  The executive order authorizing those operations relied on an INA provision that allowed the President to "suspend the entry of" aliens in certain circumstances, id. at 172 (quoting 8 U.S.C. § 1182(f)), but it also gestured toward the President's constitutional powers.  Id. at 164 n.13.  The challengers urged that the operations violated a separate provision of the INA from the one undergirding the operation.  Id. at 170–71.  The Court held that the second provision did not apply to extraterritorial actions, but that was a matter of statutory interpretation, not because any Article II powers dissolved all statutory constraints.  Id. at 171–74, 177.

Defendants' extravagant assertion of Article II power, moreover, runs headlong into the fact that courts regularly adjudicate — and sometimes, through their equitable powers, restrain — Executive Branch conduct abroad.  Indeed, this occurs even when national-security concerns are at their apex and Article II powers robust.  See, e.g., Hamdan v. Rumsfeld, 548 U.S. 557 (2006) (holding Executive's military commissions on Guantanamo Bay cannot proceed given their unlawful structure and procedures); Boumediene v. Bush, 553 U.S. 723 (2008) (concluding that U.S. courts retain authority to constrain Executive action in Guantanamo Bay through writ

35

of habeas corpus). In <u>Doe v. Mattis</u>, for instance, the U.S military held a dual U.S./Saudi citizen in Iraq, believing him to be a member of the Islamic State. <u>See</u> 928 F.3d at 3. The district court enjoined the U.S. military from transferring him into another country's custody without 72 hours' notice. <u>Id.</u> at 3–4. After the military then provided such notice, the court enjoined the ensuing transfer on the ground that the military lacked legal authority. <u>Id.</u> at 4. The D.C. Circuit upheld both orders, agreeing that the military had failed to satisfy the legal preconditions for such a transfer. <u>Id.</u> at 4–5.

That courts can enjoin U.S. officials' overseas conduct simply reflects the fact that an injunction operates *in personam*, meaning that it "is directed at someone, and governs that party's conduct." <u>Nken v. Holder</u>, 556 U.S. 418, 428 (2009). It therefore binds the enjoined parties wherever they might be; the "situs of the [violation], whether within or without the United States, is of no importance." <u>New Jersey v. City of New York</u>, 283 U.S. 473, 482 (1931); <u>Steele v. Bulova Watch Co.</u>, 344 U.S. 280, 289 (1952) ("Where . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction."); <u>cf.</u> <u>Massie v. Watts</u>, 10 U.S. (6 Cranch) 148, 158 (1810) ("[T]he principles of equity give a court jurisdiction wherever the person may be found."); <u>Mallory v. Norfolk S. Railway Co.</u>, 600 U.S. 122, 128 (2023).

To argue that this Court did something more than what courts routinely do, Defendants must grossly mischaracterize its Order and oral command. They contend that this Court ordered "the Government to reverse an extant counterterrorism operation and deliver foreign terrorists to United States soil," Resp. at 7; <u>see id.</u> at 10–11 (similar), including by mandating that they "turn[] planes around mid-air without regard to important logistical constraints such as fuel

availability or foreign airspace restrictions." State Secrets Notice at 8. Hardly. The fair reading

of the TRO is that it only prevented class members' transfer from American into foreign custody.

See *supra* pp. 26–30. To be sure, in its oral command, the Court said: "[A]ny plane containing

[class members] that is going to take off or is in the air needs to be returned to the United States,

but those people need to be returned to the United States." Mar. 15 Hrg. Tr. at 43. But the Court

made clear in the same breath: "However that's accomplished" — *i.e.*, however custody is

retained — "whether turning around a plane or not [dis]embarking anyone [on it] . . . , I leave to

you." Id. The overriding implication was therefore that U.S. officials needed to retain custody.

The Court thus warned that if retaining custody hinged on ensuring that planes did not take off,

or turned around, or did not discharge their passengers, then such actions needed to happen —

but it was up to Defendants to comply however they saw logistically and operationally prudent.

See J.G.G., 2025 WL 914682, at *21 (Millett, J., concurring) (TROs did "nothing remotely like"

Government's characterization, as they "only directed immigration officials to preserve their

custody, and thus the court's jurisdiction, over the Plaintiffs"). And if the Government indeed

voluntarily delivered nine passengers back to U.S. soil, see *supra* p. 9, the choice to hold them in

the United States as opposed to somewhere else was the Government's, not this Court's.

    Once the dust Defendants kick up is cleared away, it is evident that the TRO merely did

what courts consistently do: review and sometimes restrict Executive actions, including when the

officials are overseas and the issues implicate national security or foreign affairs. It in no way

invaded any Article II powers, despite Defendants' effort to incant new ones into existence. In

any event, even if the TRO did somehow overstep the Court's Article III power, Defendants

cannot now evade a contempt charge on that basis.

b.  Rule 65(d)

Defendants next seek protection in one of the Federal Rules of Civil Procedure.  Rule
65(d)(1), which sets out the parameters for issuing a preliminary injunction or TRO, provides
that "every restraining order must: (A) state the reasons why it issued; (B) state its terms
specifically; and (C) describe in reasonable detail — and not by referring to the complaint or
other document — the act or acts restrained or required."  Defendants argue that the written
Minute Order failed to satisfy Rule 65(d)'s requirements because it did not "state the reasons
why it issued" and was thus not binding upon them.  And, they contend, neither was the oral
command standing alone.  See Resp. at 2, 5–9.  On each point, they are mistaken.

*First,* the collateral-bar rule once again renders this entire line of argument a non-starter.
As will shortly be explained, the written Order fully satisfied Rule 65(d).  But even if the written
Order had been deficient, it would not have been void and thus non-binding; instead, it would
have been subject to reversal or vacatur on appeal, while binding the parties in the interim.  See
11A Wright & Miller, *supra*, § 2955 ("A court's failure to comply with the prerequisites in Rule
65(d) as to the proper scope or form of an injunction or restraining order does not deprive it of
jurisdiction or render its order void.  But an order challenged on appeal should be set aside if it
fails to comply with the rule.") (footnotes omitted).  By disobeying the Order rather than
pursuing appellate relief, Defendants cannot now rely on any nonconformity with Rule 65(d) as a
defense to contempt.  See *supra* pp. 17–18.

To suggest otherwise, Defendants cite two cases from the Seventh Circuit.  See Resp. at
5.  But both undercut their contrarian proposition, as that Circuit considered a failure to satisfy
Rule 65(d) as reason either to reverse the injunction or to remand for an explanation, but not to
declare the injunction void.  Adkins v. Nestle Purina PetCare Co., 779 F.3d 481, 483 (7th Cir.
2015); e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007).  Defendants'

38

argument, moreover, makes little sense.  They nowhere explain why a failure to fulfill Rule 65(d)'s requirements is a unique legal defect, rendering an injunction void rather than — like all other defects — binding but potentially reversible.  Other circuits, unsurprisingly, hold the exact opposite.  See In re U.S. Bureau of Prisons, 918 F.3d 431, 437 n.3 (5th Cir. 2019); Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 577 (5th Cir. 2005); Lau v. Meddaugh, 229 F.3d 121, 123 n.2 (2d Cir. 2000); Bethlehem Mines Corp. v. United Mine Workers of Am., 476 F.2d 860, 862 (3d Cir. 1973); Va. Coal. for Immigrant Rts. v. Beals, 2024 WL 4601052, at *3 (4th Cir. Oct. 27, 2024); see also Lawrence v. St. Louis-San Francisco Ry. Co., 274 U.S. 588, 591–92 (1927) (failure to adhere to analogous requirements set forth by statute — requiring "every order of injunction" to "set forth the reasons for [its] issuance" — "did not render the [order] void," but instead meant it "must be . . . reversed").

*Second*, in any event, the written TRO did comply with Rule 65(d).  Defendants assert that it did not contain any "reasoning," although they acknowledge that it contained "directives." Resp. at 5.  They overlook, however, that the written Order expressly incorporated the reasoning provided during the hearing.  See Mar. 15 Minute Order, 7:25 p.m. ("As discussed in today's hearing . . . ."); Mar. 15 Hrg. Tr. at 41–42 (explaining reasons why TRO issued).  Defendants nowhere suggest that that reasoning was insufficient for purposes of Rule 65(d).  They are wrong, furthermore, insofar as they contend that a TRO falls short of Rule 65(d) if its reasoning is expounded orally in a hearing (and not reiterated in the written Order).  Although this section of their Response relies heavily on Seventh Circuit cases, they conspicuously neglect to address the one in which that court squarely held that to satisfy the requirements of Rule 65(d), the "explanation can be oral rather than written."  EEOC v. Severn Trent Servs., Inc., 358 F.3d 438, 442 (7th Cir. 2004); see Dexia Credit Loc. v. Rogan, 602 F.3d 879, 885 (7th Cir. 2010) (same for

39

similar rule); see also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400–01

(6th Cir. 1997) (similar).  Defendants muster no contrary authorities.

That rule makes sense, moreover, in light of the purposes behind Rule 65(d).  One is to

ensure that parties understand their legal obligations.  Int'l Longshoremen's Ass'n v. Phila.

Marine Trade Ass'n, 389 U.S. 64, 75–76 (1967).  That concern is not present if the bound party

— here, the Government — has direct knowledge of the Court's reasoning, regardless of whether

it was in written or oral form.  Another purpose is to facilitate judicial review.  Schmidt v.

Lessard, 414 U.S. 473, 477 (1974).  Although a written opinion is presumably better on this

score, a court can review the correctness of an injunction by reviewing a Court's oral exposition

of its reasoning.  See, e.g., Six Clinics Holding Corp., 119 F.3d at 400–01.

*Third*, even if the written Order were somehow completely out of the picture — that is, if

Defendants were able to show that the written TRO failed to satisfy Rule 65(d) and was therefore

void, despite no legal support for that view — a violation of the oral command itself is grounds

for contempt.  The Fifth Circuit, for instance, has held that contempt can lie where — as here —

the oral command was "not tentative" and the court "made clear that [it] would be effective

immediately."  In re U.S. Bureau of Prisons, 918 F.3d at 437 & n.3; see also Malautea v. Suzuki

Motor Co., 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) ("Oral orders are just as binding on litigants

as written orders"); United States v. Elcock, 851 F. App'x 299, 302 (3d Cir. 2021) (citing id. for

same); In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (treating oral injunction as

enforceable but vacating on merits); Lau, 229 F.3d at 123 & n.2 (noting Rule 65(d)

"contemplates" a written order but "oral order" is not "void" by virtue of not being

"memorialize[d]").  Indeed, consider the absurd mischief that Defendants' position would

license: if an oral command is not binding for purposes of contempt unless or until memorialized

in a written Order, the enjoined party could race to accomplish the plainly proscribed act before the court could put pen to paper.

* * *

In sum, each of Defendants' arguments about whether there was a violation — arguments crafted for the most part as this contempt litigation has developed — are, at root, attacks on the TRO's legal soundness and are therefore precluded by the collateral-bar rule. Even if they were not, however, they do not pass muster. The Court therefore must conclude that probable cause exists to find that Defendants violated its Order.

### 5. *Willful*

Having so determined, the sole remaining question is whether such defiance was willful. See Young, 107 F.3d at 907. "To establish willfulness," the Court must determine that Defendants "acted with deliberate or reckless disregard of [their] obligation[s] under the" Order. Id. at 909 (citing In re Holloway, 995 F.2d at 1082); accord United States v. Rapone, 131 F.3d 188, 195 (D.C. Cir. 1997). Several aspects of Defendants' conduct strongly support such a conclusion. Cf. In re Holloway, 995 F.2d at 1082 (analyzing whether there was willful "intent properly encompasses the contemnor's behavior in related incidents such as disobedience or resistance to other orders of the court").

From the opening hours of Saturday, the Government's conduct betrayed a desire to outrun the equitable reach of the Judiciary. See *supra* pp. 2–10; J.G.G., 2025 WL 1024097, at *9 (Sotomayor, J., dissenting). Hustling class members to an airport before the Proclamation had even been published and in the face of a suit that sought a TRO was bad enough. The decision to launch planes during the afternoon hearing was even worse. The Government knew as of that morning that the Court would hold a hearing on whether anyone in its custody could, consistent

41

with the law, be removed pursuant to the Act — and yet it nonetheless rushed to load people onto planes and get them airborne. Such conduct suggests an attempt to evade an injunction and deny those aboard the planes the chance to avail themselves of the judicial review that the Government itself later told the Supreme Court is "obviously" available to them. See Government Reply in Support of Application at 1, Trump v. J.G.G., No. 24A931 (U.S. Apr. 2, 2025).

Second, although Defendants now seek to muddy the waters, at no point on Saturday evening — not when the Court delivered the oral command directly to the Government, nor at any time after the written Order issued — did the Government so much as hint that it was not "clear . . . precisely what action [was] proscribed." Young, 107 F.3d at 907 n.5 (quotation marks omitted). After the oral command, the hearing progressed for another five minutes. See Mar. 15 Hrg. Tr. at 43–47. Although the Government spoke for the majority of that time, it never mentioned — much less asked the Court to clarify — the injunction just issued. See id. Government counsel has since confirmed that he understood the oral command and communicated it up the chain. See Mar. 21 Hrg. Tr. at 5. Additionally, that night — after the oral injunction was relayed to the agencies, see Apr. 3 Hrg. Tr. at 21, and as custody-transfer operations proceeded — the Government never contacted the Court with any questions about the injunctions' scope. That is telling. The Government had been in regular email contact with chambers throughout the day, and it thus knew that it would get a rapid reply to any question it might have about the injunction. Indeed, that is exactly what had happened that morning: on the email chain that included the Government, Plaintiffs asked the Court to confirm whether the first TRO covered only named Plaintiffs, and the Court replied a mere nine minutes later. Only now

42

does the Government suggest that the Court ordered something less than what it unequivocally stated in the hearing.

Finally, the Government plainly had an opportunity to avoid noncompliance — and yet it chose to press ahead. As previously explained, the Government pulled named Plaintiffs from removal flights in response to the Court's first TRO, and two class members now aver that they were among the nine people who landed in El Salvador early Sunday morning but were later returned to the United States. See supra pp. 5, 9. Although Defendants maintain that they "did not order any removal flights to return to the United States," Resp. at 4, they offer no evidence to support that assertion or discredit the first-hand declarations of class members.

Taken together, this behavior indicates "deliberate or reckless disregard" of the Order, Young, 107 F.3d at 909, leading this Court to conclude that there is probable cause that Defendants willfully disobeyed a binding judicial decree.

B. Next Steps

So now what? The Court last details the next steps that these proceedings may take.

First, before initiating any criminal-contempt proceedings, courts typically allow the contumacious party an opportunity to purge its contempt — that is, to remedy its violation by voluntarily obeying the court order. See Yates v. United States, 355 U.S. 66, 75 (1957) ("[A] court should first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues."); cf. 9A Wright & Miller, supra, § 2465 ("The district judge normally will preface a contempt citation with an order directing either compliance with the subpoena or a showing of an excuse for the noncompliance."). The most obvious way for Defendants to do so here is by asserting custody of the individuals who were removed in violation of the Court's classwide TRO so that they might

43

avail themselves of their right to challenge their removability through a habeas proceeding.  See J.G.G., 2025 WL 1024097, at *2.  Per the terms of the TRO, the Government would not need to release any of those individuals, nor would it need to transport them back to the homeland.  The Court will also give Defendants an opportunity to propose other methods of coming into compliance, which the Court will evaluate.

In the event that Defendants do not choose to purge their contempt, the Court will proceed to identify the individual(s) responsible for the contumacious conduct by determining whose "specific act or omission" caused the noncompliance.  See Cobell v. Norton, 334 F.3d 1128, 1147 (D.C. Cir. 2003); United States v. Voss, 82 F.3d 1521, 1525–27 (10th Cir. 1996).  At the suggestion of the Government in the last hearing, the Court will begin by requiring declarations.  See Apr. 3 Hrg. Tr. at 24–25.  Should those be unsatisfactory, the Court will proceed either to hearings with live witness testimony under oath or to depositions conducted by Plaintiffs.  Id. at 29–30 (Plaintiffs suggesting declarations, depositions, hearings).  The next step would be for the Court, pursuant to the Federal Rules of Criminal Procedure, to "request that the contempt be prosecuted by an attorney for the government."  Fed. R. Crim. P. 42(a)(2).  If the Government "declines" or "the interest of justice requires," the Court will "appoint another attorney to prosecute the contempt."  Id.

\* \* \*

Finally, a note on Defendants' invocation of the state-secrets privilege, which "permits the Government to prevent disclosure of information when that disclosure would harm national security interests."  United States v. Zubaydah, 595 U.S. 195, 204 (2022).  They invoke the privilege as a ground for not providing certain details related to the movement of flights and class members before and after this Court's TROs.  Sharing such details, they assert, could make

foreign countries less likely to collaborate with the U.S. in the future, and would disclose means used to thwart alien enemies, allowing them to evade capture and risking the security of removal personnel.  See State Secrets Notice at 4–6; see also ECF Nos. 56-2 (Marco Rubio Decl.), ¶¶ 10, 13; No. 56-3 (Kristi Noem Decl.), ¶ 10.  Defendants also add that there is also no need for the information in this case, as this Court "has all of the facts it needs to address the compliance issues."  State Secrets Notice at 1; see id. at 8–9.

Judicial review of a state-secrets invocation is circumscribed, but not nonexistent.  The Government's claim is to be afforded the utmost deference, and the Court must evaluate whether "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged."  United States v. Reynolds, 345 U.S. 1, 10 (1953); but see El-Masri v. United States, 479 F.3d 296, 312 (4th Cir. 2007) ("[T]he state secrets doctrine does not represent a surrender of judicial control over access to the courts."); Linder v. Dep't of Def., 133 F.3d 17, 23 (D.C. Cir. 1998) (describing proper examination of information's national-security impact).

The Court is exceedingly doubtful that the privilege applies here.  It is not inquiring into the diplomatic agreements that facilitated the flights nor the operational specifics of how Defendants apprehended and transported class members.  Instead, the Court is simply seeking to confirm times and numbers: how many passengers the two flights carried, whether they were all deported pursuant to the Proclamation, and when they were transferred out of U.S. custody.  See Minute Order of Mar. 18, 2:27 p.m.  The Court is skeptical that such information rises to the level of a state secret.  As noted, the Government has widely publicized details of the flights through social media and official announcements, see supra p. 11 (reposting video showing operational details); ECF No. 69 (Resp. to State Secrets) at 4–10, thereby revealing snippets of

the information the Court seeks and raising doubts that such information would jeopardize future

diplomatic engagements or operational security.  Defendants, moreover, have still not asserted

that the information is even classified, and they have identified no case in which unclassified

material was nonetheless protected by the privilege.  Nor is the Court yet persuaded that even if

<u>publicly</u> disclosing the information might harm state secrets, sharing it only *ex parte* with a

federal court would do the same.

    At this point in the contempt inquiry, however, the information at issue is not necessary to

proceed, so the Court will not resolve whether the invocation is warranted.  Reynolds, 345 U.S.

at 11 ("necessity" of information "determine[s] how far the court should probe in satisfying itself

that the occasion for invoking the privilege is appropriate").  But if the information turns out to

be necessary later in these proceedings, the Court may revisit the invocation.

**III.    Conclusion**

    For the foregoing reasons, the Court will find probable cause that Defendants' actions

constitute contempt.  It will provide them an opportunity to purge such contempt.  If they opt not

to do so, the Court will proceed to identify the contemnor(s) and refer the matter for prosecution.

A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  April 16, 2025