**No. 25-5124**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the
United States, *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

## EMERGENCY MOTION FOR A STAY PENDING APPEAL
## OR, IN THE ALTERNATIVE, A WRIT OF MANDAMUS

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
    Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

**INTRODUCTION**

"[O]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389-90 (2004). The district court's criminal contempt order instead escalates the constitutional stakes by infringing core executive prerogatives. The Supreme Court has already intervened once, vacating the district court's March 15, 2025 temporary restraining orders (TROs) and requiring that any further challenges to detention and removal under the Alien Enemies Act proceed in Texas, where plaintiffs are in custody.

Instead of winding down D.C. proceedings, the district court has pivoted to compelling the Executive Branch to pursue two alternative but equally unconstitutional avenues to address supposed violations of a now-vacated TRO. Either Defendants must aid the court in its efforts to effectuate a contempt prosecution—a step that unconstitutionally commandeers the President's exclusive and preclusive prosecutorial powers. Op.43-44. Or, the Defendants may cure contempt by "assert[ing] custody" of individuals who are in the custody of El Salvador—a step that unconstitutionally compels the Executive Branch to persuade or force a foreign sovereign to accede to the court's demands. Those separation-of-powers violations manifestly warrant this Court's immediate intervention. The district court's commands function like injunctions and are appealable as such. At a

1

minimum, the Executive Branch can obtain immediate review of an order that inflicts immediate, irreparable harms by subjecting the Executive Branch to actions that district courts cannot constitutionally require.

Worse, the district court is putting the Executive Branch to these unconstitutional choices to cure a nonexistent case of criminal contempt. Defendants fully complied with the TROs the district court issued, and certainly did not flout any clear, unambiguous command. The court enjoined the Executive Branch from "removing" certain aliens under the Alien Enemies Act (AEA). Thereafter, the Executive undisputedly stopped removing aliens from the United States under that Act. The district court now reasons that "remove" meant *legal* removal (i.e., transferring custody) not *physical* removal (i.e., moving from U.S. territory). That is legally wrong—but even the court recognized the meaning of "remove" was at least ambiguous, and contempt cannot lie based on a supposedly wrong reading of a facially ambiguous order.

This Court should immediately stay the district court's order and prevent further grave encroachments on the separation of powers.

## BACKGROUND

**The Alien Enemies Act.** The AEA empowers the President to detain and remove alien enemies when there is a "declared war" or "any invasion or predatory incursion" by a "foreign nation or government." 50 U.S.C. § 21. The Supreme Court

has observed that the AEA is "as unlimited" a grant of power "as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948). The statute confers largely "[u]nreviewable power in the President to restrain, and to provide for the removal of, alien enemies." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946).

**The President's Proclamation.** On March 15, 2025, the President published a Proclamation invoking the AEA to detain and remove members of Tren de Aragua (TdA), an entity that the State Department has designated a foreign terrorist organization. *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033. The Proclamation authorizes the detention and removal under the AEA of "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." *Id.* § 1; *see also id.* § 3.

**District Court Proceedings.** On Saturday, March 15, plaintiffs—five Venezuelan nationals detained at an immigration detention center in Texas—sued in Washington D.C. to block the government from removing them under the Proclamation. They moved to certify a class of "[a]ll noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation." Compl. 12. Plaintiffs sought relief under both habeas corpus and the Administrative

Procedure Act (APA). And they moved for a TRO "barring their summary removal under the AEA." D. Ct. Doc. 3-2, at 2.

Within hours, and without waiting to hear from the government, the district court granted an initial TRO and ordered Defendants not to "remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court." 3/15/25 Second Minute Order.

Later that day, the court held a hearing on the class certification motion. The government explained that plaintiffs' claims sound in habeas and accordingly must be brought in the district (in Texas) in which they are confined. In response, the district court inquired whether plaintiffs might want to dismiss their habeas claims, which they agreed to do. Tr.22:1-3. The court then stated without elaboration that "class certification is warranted under Federal Rule of Civil Procedure 23(a) and 23(b)(2)." Tr.23:1-6. Turning to the merits, the court held that plaintiffs were likely to succeed because the terms "invasion" and "predatory incursion" "really relate to hostile acts perpetrated by enemy nations and commensurate to war." Tr.41:7-18.

The district court next addressed the implementation of its order. The court reassured counsel that it "w[ould] issue a minute order memorializing [a TRO] so you don't have to race to write it down." Tr.42:22-23. Thereafter, in light of an earlier assertion by plaintiffs' counsel that flights removing individuals pursuant to the Proclamation were scheduled to take off during the hearing, the court stated that

"any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States," including by "turning around a plane." Tr.43:11-19. The court then repeated its pledge to "issue a minute order memorializing all of this." Tr.46:9-10.

Shortly after the hearing, at 7:25 p.m., the district court issued a minute order provisionally certifying a class and enjoining Defendants "from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Critically, the court's written order did *not* direct Defendants to turn around planes or to return already-removed aliens.

**Appellate Proceedings.** The government appealed both TRO orders and filed emergency motions for stays pending appeal. After oral argument, this Court issued a divided ruling denying a stay, with each judge writing separately. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025).

The Supreme Court vacated the TROs, holding that the district court lacked authority to issue them. *Trump v. J.G.G.,* No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025). The Supreme Court held that plaintiffs' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," and that "[f]or 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement,'" which in this case was in Texas. *Id.* at *1.

**The Contempt Order.**  In the meantime, the district court issued an order to show cause regarding compliance with its TROs and held a hearing on April 3.  As the government explained, it had fully complied with the TROs by (i) not removing the named plaintiffs, and (ii) not removing any other class member from United States territory after the second TRO issued.

The Supreme Court's order vacating those TROs issued 4 days after the show-cause hearing.  Yet, notwithstanding the Supreme Court's judgment, the district court proceeded to issue an order finding probable cause that Defendants had committed criminal contempt by violating the vacated orders.  The court reasoned that its "written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials"—though the TRO's terms said nothing of the sort.  Op.31.  The court characterized the government's reading of the TRO as "clever" and consistent with "dictionary definitions," but nonetheless rejected it.  Op.24.  The court reasoned that Defendants should have understood the court's TRO in light of the oral statements about turning around the planes.

Having found probable cause, the district court sought to secure prospective compliance by "allow[ing] the [government] an opportunity to purge its contempt" within 7 days.  But the government could only do so, the court prescribed, "by asserting custody of the individuals who were removed in violation of the Court's

classwide TRO so that they might avail themselves of their right to challenge their removability through a habeas proceeding," i.e., by taking custody back from El Salvador and bringing those aliens to the United States. Op.43-44. (A few hours later, plaintiffs asserted that those individuals already can press habeas claims from El Salvador without any such assertion of custody. Doc. 85.)

The only other choice, the district court ordered, is for the government to "identify[] the individual(s) who … made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025." Doc. 80 at 1. The court would then "'request that the contempt be prosecuted by an attorney for the government.'" Op.44. If the government declined to prosecute, the court stated that it "*will* 'appoint another attorney to prosecute the contempt.'" *Id.* (emphasis added). Under this option, then, the government must identify relevant individuals for prosecution and either prosecute them itself or allow a district court-appointed prosecutor to exert that prosecutorial function.

## ARGUMENT

### I.     The District Court's Contempt Order Is Plainly Unconstitutional.

Whether construed as an appeal of an injunction or as a petition for writ of mandamus, immediate relief from the district court's order is manifestly warranted. The district court's order embarks on criminal contempt proceedings—a remedy of "last resort" that requires the clearest of violations, not the nonexistent violation

here. *In re Att'y Gen. of U. S.*, 596 F.2d 58, 65 (2d Cir. 1979). Yet the district court is compelling the government to pursue one of two unconstitutional options to address criminal contempt:  prosecute the Executive Branch's own officials, in contravention of obvious separation of powers principles that prohibit the Judiciary from turning the Executive Branch's powers of prosecution against itself. *See Donziger v. United States*, 143 S. Ct. 868, 869 (2023) (Gorsuch, J., dissenting from denial). Or, the government must successfully persuade or force El Salvador to release and return aliens in its custody—unconstitutionally seizing foreign-relations powers. Putting the government to those unconstitutional choices is especially inappropriate because the government did not violate the TRO, let alone unambiguously.

### A. The District Court Cannot Constitutionally Compel the Executive Branch to Prosecute Itself or Transfer Its Prosecutorial Powers.

Because the Judiciary owes senior Executive Branch officials "respect" as representing "another branch of government coequal to the judicial branch in constitutional function and design," pursuing criminal contempt proceedings against such officials must be a "last resort," if resorted to at all. *Att'y Gen.*, 596 F.2d at 65; *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (for criminal contempt, "temptation must be resisted in order to maintain separation between executive and judicial roles"). Yet the district court's contempt order initiates further constitutional collision. The court instructed the government to investigate and identify senior

officials responsible for decision-making with respect to the AEA removals—then prosecute them for purportedly disobeying the court's TRO. *See* Op.44. Recognizing that the Attorney General is unlikely to prosecute a criminal referral, the court indicated its intent to appoint a private attorney to prosecute the criminal contempt charges. *See* Op.44. That entire process egregiously intrudes on the Executive Branch's exclusive prosecutorial powers.

"Criminal contempt is a crime in the ordinary sense." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 826 (1994). Thus, prosecuting criminal contempt is a task exclusively for the Executive Branch: "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 679 (2023); *Trump v. United States*, 603 U.S. 593, 609 (2024) ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority."). And only the Executive Branch, not the Judiciary, decides "whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). This "power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." *In re Aiken Cty*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). So "neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the

Executive Branch to prosecute particular individuals" for criminal offenses. *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 115 (1984) ("*Prosecution for Contempt*"); *see also United States v. Donziger*, 38 F. 4th 290, 307 (2d Cir. 2022) (Menashi, J., dissenting).

Sometimes, courts have appointed private prosecutors where the Executive Branch declines to prosecute a contempt case against *private* individuals for non-substantive reasons—say, lack of resources. *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987). But that appointment practice lacks any justification—and transgresses constitutional bounds—when, as here, the Executive Branch affirmatively decides *against* prosecution on the merits. *See Prosecution for Contempt*, 8 Op. O.L.C. at 115; *United States v. Fokker Servs. B.V.,* 818 F.3d 733, 737 (D.C. Cir. 2016) ("It has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations" regarding the exercise of its "charging authority.").

Indeed, the Second Circuit recently upheld the appointment of a private prosecutor to prosecute a private citizen by explaining that such an appointment is constitutional only so long as "the Attorney General has the power to direct and even remove" the court-appointed prosecutor at will and may "take control of and even . . . terminate the contempt prosecution." *Donziger*, 38 F.4th at 302. But the

court's proposal here vitiates every guardrail. The Executive Branch must itself prosecute, or face a court-appointed private prosecutor who would apparently exercise core executive powers of prosecution. And that private prosecutor would exercise those powers outside the President's or the Attorney General's control, all in service of a prosecution that the Executive Branch opposes. District courts cannot outsource prosecutorial power to private citizens, insulate them from Executive Branch control, and then unleash them against the Executive Branch.

### B. The District Court Lacks Constitutional Authority to Compel the Government to Cure Putative Contempt via Foreign Diplomacy

Alternatively, the district court's contempt order gives the government just one option "to purge their contempt":  the United States must "assert[] custody of the individuals who were removed" on March 15, 2025. Op.42-43. That avenue lacks any legal basis. Inviting the government to "purge" contempt makes no sense in the context of *criminal* contempt, which is designed to punish rather than induce compliance. *United States v. Perry*, 116 F.3d 952, 956 (1st Cir. 1997).[1]

Further, forcing the government to successfully execute foreign diplomacy represents an improper attempt to enforce the district court's vacated TRO and

---

[1] In the context of civil contempt, by contrast, invitations to "purge" are generally appropriate—but the district court could not directly pursue civil contempt here given the Supreme Court's vacatur of the TROs. *See Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992).

intrude on the President's core foreign affairs power. The only way the government could "purge" is by gaining custody of the Tren de Aragua terrorists being held by El Salvador through negotiations with that foreign sovereign. Op.42-43.

Yet, under the Constitution, "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952); *see also Trump*, 603 U.S. at 607 (The President's duties are of "unrivaled gravity and breadth" including "meeting foreign leaders, overseeing international diplomacy and intelligence gathering."). Article II "authorizes the Executive to engag[e] in direct diplomacy with foreign heads of state and their ministers," *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), which is why the Supreme Court has "taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,'" *Biden v. Texas*, 597 U.S. 785, 805 (2022). The district court's order impermissibly seeks to wrestle this complex matter of foreign affairs away from the Executive by hanging a contempt Sword of Damocles over senior officials.

## C. Criminal Contempt Is Unwarranted Because the Government Did Not Violate the TROs, Let Alone Unambiguously.

Relief is especially warranted because the district court's order was fundamentally misconceived from the start, needlessly prompting a constitutional confrontation over criminal contempt that never should have arisen. The

government did not violate the TROs, let alone violate the kind of clear and unambiguous command necessary for contempt.

Even civil contempt is a "potent weapon" that "courts should not resort [to] where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct"—and the bar for criminal contempt is higher. *King v. Allied Vision*, *Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). Since contempt is such an extreme remedy, the Federal Rules require orders to specifically "describe in reasonable detail" just what "acts" they forbid. *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (quoting Fed. R. Civ. P. 65(d)) (Breyer, J.). When an order is "too vague to be understood, it can be a deadly one." *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982). So the "long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971). Indeed, it is "settled law that contempt will not lie for violation of an order of the court unless the order is clear and decisive and contains no doubt about what it requires to be done." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974).

Here, the March 15, 2025 TROs—the written orders the court memorialized in writing—prohibited the government from removing aliens under the Alien Enemies Act after the TRO issued. The first TRO, in a written minute order, enjoined Defendants from "remov[ing] any of the individual Plaintiffs from the

United States for 14 days absent further Order of the Court." No one disputes the government's compliance with that order.

The second TRO issued via a minute order at 7:25 PM: "The Government is ENJOINED from removing members of [the] class (not otherwise subject to such removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Defendants fully complied: The government undisputedly did not "remove" any class members from United States territory after that time. The ordinary meaning of "removal" is "[t]he transfer or moving of a person or thing from one location, position, or residence to another." *Removal*, Black's Law Dictionary 1409 (9th ed. 2009). No such removal occurred after the district court's TRO.

Nonetheless, the district court ruled that Defendants violated its order based on muddled "context" provided at a hearing. Op.22-30. The court determined that some enemy aliens had been removed from United States territory *before* the order, but were not transferred from United States custody until *after* the order. Under the district court's view, the word "remove" in the TRO did not refer to *physical* removal (which had already occurred) but instead to *legal* removal (which, in the district court's view, did not occur until transfer of custody).

Regardless of the correct answer, the district court itself acknowledged that both definitions are possible—and that alone should have foreclosed contempt. Op.25 (conceding removal "can convey" either "territorial exit" or some form of

"legal departure").  "[W]here there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance."  *Joyce*, 498 F.2d at 596.

In all events, the district court's reading is incorrect and implausible.  The district court held that "context" made clear that the TRO's reference to removal included not only "flying class members outside of the United States" but also "the further act of relinquishing custody of them into the hands of a foreign government." Op.24.  Quite the opposite.  Plaintiffs challenged the President's exercise of authority under the AEA, which authorizes the President to "remove[]" dangerous aliens in the event of certain threats against "the territory of the United States."  50 U.S.C. § 21.  Given that territorial focus, the most appropriate contextual reading of "removal" is the physical, territorial one—not anything to do with "custody."

The district court's contrary inferences from "context" undermine its post hoc non-territorial interpretation.  *First*, the court pointed to a colloquy about compliance with its first TRO.  Op.26.  But, as counsel stated at the hearing, the named plaintiffs were not "on any plane that has departed" (Tr.4)—consistent with Defendants' understanding that removal meant departure from the United States.

*Second*, the district court pointed to its oral comments about "how the Court would lose equitable jurisdiction."  Op.27.  But the court sidestepped its most on-point statement: "Right.  Sure.  I mean, once they are *out of the country*, I'm not sure

what I can do there." Tr.36 (emphasis added). The court later reasoned that this "affirmed Plaintiffs' custody-based articulation" (Op.29), but the statement says the opposite: jurisdiction was *territorial*. Insofar as other comments during a lengthy hearing were inconsistent, that only underscores the ambiguity—and defeats contempt.

*Third*, the district court referred to its oral statements at the hearing directing counsel to "inform" his clients that "any plane … that is going to take off or is in the air needs to be returned to the United States." Tr.43. Critically, however, the court's subsequent written order *omitted* that language, just after the court had stated that it "w[ould] issue a minute order memorializing [a TRO] so *you don't have to race to write it down*." Tr.42. (emphasis added). It is perverse to punish Defendants based on this oral statement after assuring them that they could rely on a forthcoming written order that omitted the relevant language.

Indeed, under black-letter law across multiple circuits, Defendants had to treat the written order as governing. "Oral statements are not injunctions," so "[a] judge who proclaims 'I enjoin you' and does not follow up with an injunction [in writing] has done nothing." *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) (Easterbrook, J.). Rule 65(d) provides that a TRO or injunction "must … state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts

restrained or required." Those requirements "contemplate[] … a *written* order." *Lau v. Meddaugh*, 229 F.3d 624, 633 (2d Cir. 1976) (emphasis added). Accordingly, "[i]f an injunction is not recorded in writing, the defendant is *under no judicial compulsion*." *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003) (emphasis added); *see also Hispanics United v. Village of Addison*, 248 F.3d 617, 621 (7th Cir. 2001) ("[O]ral statements … under Rule 65(d) have no legal effect."). "Where the record includes both oral and written rulings," the "written opinion" is what matters. *PlayMakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004).

The district court cited other circuits' cases suggesting that "violation of an oral command" alone "<u>itself</u> is grounds for contempt." Op.40. But the Seventh Circuit, and district courts in this Circuit, have held otherwise. Being on the wrong side of a circuit split cannot be grounds for criminal contempt.

The court also reasoned that, even if its "oral command" was not directly enforceable, Defendants should have understood the TRO's prohibition on "removal" as encompassing the duty to return already-removed alien enemies. Op.30. But longstanding precedent elevates written orders above oral directives precisely because "[o]ral responses from the bench may fail to convey the judge's ultimate evaluation," and "[s]ubsequent consideration may cause the district judge to modify his or her views." *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989). And that inference was manifestly reasonable here. Ordering the government

to reverse an extant counterterrorism operation and turn planes around to return foreign terrorists to United States soil—without regard to the potential dangers or whether the planes even had adequate fuel—is a staggering command. When the written order excluded that command, the reasonable inference was that the Court took a more considered view in a rapidly evolving situation. Any mistake on that score is not grounds for a willful or contumacious violation.

In sum, "the specificity provisions of Rule 65(d) are … designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "[A]n ordinary person reading the court's *order* should be able to ascertain from the *document itself* exactly what conduct is prescribed." Wright & Miller, Fed. Prac. & Proc. § 2955 (3d ed. 2024) (emphases added). Rule 65(d) would be turned on its head if courts could treat unwritten "context" from a hearing as grounds for criminal contempt.

## II. This Court Should Stay the Order Pending Appeal Or, Alternatively, Grant Relief Through Mandamus.

The district court's order is properly construed as an appealable injunctive order and thus can, and should, be stayed pending appeal. Although the court did not so label its order, "the label attached to an order is not dispositive." *Abbott v. Perez*, 585 U.S. 579, 594 (2018). Rather, "where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Id.* The order here qualifies: The district court ordered that

Defendants take one of two actions: (1) "assert[] custody" of individuals who are in the custody of a foreign sovereign; or (2) aid the court in its efforts to effectuate a contempt prosecution. Op.43-44.

Like other appealable orders, this order "carries many of the hallmarks of a preliminary injunction." *Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025). The court requested briefs from both parties in response to an order to show cause; held an adversarial hearing; and "the court's basis for issuing the order [was] strongly challenged." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). Further weighing in favor of appealability, the order threatens "serious, perhaps irreparable, consequence" to the separation of powers. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

In any event, the order would qualify as an appealable collateral order. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The order conclusively determined whether the Executive may lawfully be subjected to contempt proceedings. Those proceedings are separate from the merits of plaintiffs' APA claims—over which the court admittedly lacks jurisdiction. Further, the order is effectively unreviewable on appeal from final judgment because it subjects the Executive to the burdens of contempt proceedings in violation of the separation of powers—burdens that cannot be remedied later. *See Will v. Hallock*, 546 U.S. 345, 352 (2006) ("honoring the separation of powers" is a "particular value of a high

order … marshaled in support of the interest in avoiding trial"); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (denial of President's claim of absolute immunity).

Indeed, the Court has emphasized "the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers" in considering the scope of collateral order jurisdiction. *Nixon*, 457 U.S. at 743. The order's severe incursion on the Executive's domain within the separation of powers has already materialized—and any contempt proceeding "would imperil" the separation of powers, "a substantial public interest." *Will*, 546 U.S. at 353.

As such, the Court should stay the district court's order pending appeal. For the reasons explained, the government is likely to win on the merits. And given the grave separation of powers concerns here, the government faces an irreparable harm, which means that the public interest favors a stay as well. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in the context of a stay, assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party"). Moreover, since criminal contempt is "punitive and imposed to vindicate the authority of the court," the Plaintiffs will not be injured by a stay. *See Perry*, 116 F.3d at 956. The government has also sought relief in the district court,

but given the 7 day deadline the government needed file with this Court contemporaneously.

Alternatively, this Court should grant mandamus relief. This Court may issue a writ of mandamus to vindicate a "clear and indisputable" right, where "no other adequate means" of relief exists, if the writ is "appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81. As explained above, the Government's right to relief in this case is "clear and indisputable." The contempt order dangerously intrudes on core executive prerogatives over foreign affairs and prosecutorial discretion, presenting a classic case for mandamus to maintain the Constitution's separation of powers. *See Cheney*, 542 U.S. at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities.").

The Government has no other adequate means of relief. These incursions on Article II functions will occur before any final contempt conviction. *See Ex parte Peru*, 318 U.S. 578, 587 (1943) (mandamus jurisdiction appropriate to ensure that "the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings").

Finally, mandamus is especially appropriate because the district court's only option to purportedly purge contempt is for the Government to "assert custody" over

individuals over whom a foreign sovereign currently claims custody. It is well-established that mandamus is appropriate to preclude courts from mandating actions with respect to "the property of a friendly sovereign, as to embarrass the executive arm of the government in conducting foreign relations." *Id.* at 588. In the field of foreign relations, "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *Id.*; *see also Clinton v. Jones*, 520 U.S. 681, 701 (1997) ("[E]ven when a branch does not arrogate power to itself … the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."). Relief is warranted now, before the district court's proceedings escalate the constitutional confrontation any further.

## CONCLUSION

This Court should stay the contempt order pending appeal, or alternatively grant mandamus relief terminating the criminal contempt proceedings.

Dated: April 17, 2025        Respectfully submitted,

                                PAMELA J. BONDI
                                U.S. Attorney General

                                TODD BLANCHE
                                Deputy Attorney General

                                EMIL BOVE
                                Principal Associate Deputy
                                    Attorney General

CHAD MIZELLE
  Acting Associate Attorney General

*/s/ Drew Ensign*
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5190 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the Defendants-Appellants contacted Lee Gelernt, counsel for the Plaintiffs-Appellees, who expressed opposition to this motion on behalf of the Plaintiffs-Appellees.

*/s/ Drew C. Ensign*
DREW C. ENSIGN