### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **J.G.G.,** *et al.,* | ) |
| | ) |
| **Plaintiffs-Appellees,** | ) |
| | ) |
| **v.** | ) **No. 25-5124** |
| | ) |
| **DONALD J. TRUMP,** *et al.,* | ) |
| | ) |
| **Defendants-Appellants.** | ) |

**ATTACHMENT C:**

**TRANSCRIPT OF MOTION HEARING HELD MARCH 15, 2025 [DOCKET ENTRY 20]**

1

```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
     J.G.G., et al.,
 3                                        Civil Case
                       Plaintiff(s),      No. 25-00766 JEB
 4           v.
                                          Washington, D.C.
 5   DONALD J. TRUMP, et al.,
                                          March 15, 2025
 6                     Defendant(s).

 7   ---------------------------------------------------------

 8                  MOTION HEARING HELD VIA ZOOM
               BEFORE THE HONORABLE JAMES E. BOASBERG
 9                UNITED STATES DISTRICT CHIEF JUDGE

10   APPEARANCES:

11   FOR THE PLAINTIFF(S):  Lee Gelernt, Esquire
                            Daniel A. Galindo, Esquire
12                          American Civil Liberties Union
                            125 Broad Street
13                          18th Floor
                            New York, New York 10004
14
                            Skye Perryman, Esquire
15                          Somil Trivedi, Esquire
                            Sarah Rich, Esquire
16                          Democracy Forward Foundation
                            P.O. Box 34533
17                          Washington, D.C. 20043

18
     FOR THE DEFENDANT(S):  Drew C. Ensign, Esquire
19                          United States Department of Justice
                            950 Pennsylvania Avenue Northwest
20                          Washington, D.C. 20530

21
     REPORTED BY:           Tammy Nestor, RMR, CRR
22                          Official Court Reporter
                            333 Constitution Avenue Northwest
23                          Washington, D.C. 20001
                            tammy_nestor@dcd.uscourts.gov
24

25
```

1    The following proceedings began at 5:00 p.m.:

2         THE COURTROOM DEPUTY:  We are here today for a motion

3    hearing in Civil Action 25-766, JGG, et al. versus President

4    Donald Trump, et al.

5         Beginning with counsel for the plaintiff, please

6    state your name for the record.

7         MR. GELERNT:  Good afternoon, Your Honor.  Lee

8    Gelernt for the plaintiffs from the ACLU.

9         THE COURT:  Good afternoon.

10        MR. GALINDO:  Good afternoon, Your Honor.  Daniel

11   Galindo for the plaintiffs from the ACLU.

12        THE COURT:  Thank you.

13        MS. PERRYMAN:  Good afternoon, Your Honor.  Skye

14   Perryman for the plaintiffs from Democracy Forward

15   Foundation.

16        THE COURT:  Welcome.

17        MR. TRIVEDI:  Somil Trivedi from the Democracy

18   Forward Foundation for the plaintiffs.

19        THE COURT:  Thank you.

20        MS. RICH:  Good afternoon, Your Honor.  Sarah Rich

21   for the plaintiffs, also from Democracy Forward Foundation.

22        THE COURT:  Thank you.  Nice to see all of you.

23        THE COURTROOM DEPUTY:  Okay.  And defense?

24        MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign

25   for the federal defendants.

1          THE COURT:  Thanks, Mr. Ensign.

2          Okay.  So first, apologies for my attire.  I went

3     away for the weekend and brought with me neither a robe nor

4     tie nor appropriate shirt, so thank you all for being

5     appropriately attired and hope you will forgive my casual

6     ones.

7          Thanks also for everybody's availability on such

8     short notice.  Again, I only learned of this case first

9     thing this morning, and I know everybody has been working

10    hard to get up to speed on it since that time.

11         So I have a few -- just a couple preliminary points

12    and questions, and then we will move forward.

13         So the first is I was told first thing this morning

14    that at least one of the named plaintiffs was at that point

15    being placed on a plane or imminently being placed on a

16    plane to be deported, and my ruling this morning was,

17    because I was not aware of the issuance of any proclamation

18    and I don't think one had been issued at the time I ruled,

19    my ruling was based on my belief that under the INA, there

20    was no authority to immediately deport folks who were named

21    plaintiffs.

22         So my ruling was not a preventive ruling related to

23    the AEA because I didn't believe it had been -- there had

24    been a proclamation at that time.  I now see that there has

25    been a proclamation issued.

1          Mr. Ensign, do you have a time of day that that was

2     issued you can put on the record?

3          MR. ENSIGN:  I do not, Your Honor.  We are happy to

4     look into that and get back to you.  I know it was just put

5     on the presidential website about an hour ago.

6          THE COURT:  But fair to say this afternoon?

7          MR. ENSIGN:  Your Honor, I don't know the answer to

8     that question.

9          THE COURT:  Okay.

10         MR. GELERNT:  Your Honor, I apologize for

11    interrupting.  This is Mr. Gelernt.  My understanding from

12    the proclamation is that it was signed yesterday.  It may

13    not have been made public until today, but that it was

14    signed and, I guess, kept secret until today.

15         THE COURT:  It's an interesting question of when it

16    is effective if it's not published.  Thank you for that.

17    But just making clear that my ruling was INA-based this

18    morning.

19         Okay.  The second question which I think the

20    plaintiffs have raised in alerting my chambers to the

21    proclamation is that they expected planes to be departing

22    within the last couple of hours.

23         And so I will ask you, Mr. Ensign, if any of the

24    named plaintiffs are, in fact, on any plane that has

25    departed?

1     MR. ENSIGN:  Your Honor, I don't know specifically as

2     to particular planes, but we have confirmed with the clients

3     that these five plaintiffs that are named, the individual

4     named plaintiffs that are a subject of the TRO, will not be

5     removed during the course of that 14 days.

6          THE COURT:  Okay.  But then I would assume that means

7     that they are either not on the planes or that they will not

8     be removed from the planes and will be brought back once the

9     planes land in El Salvador.  Is that fair?

10          MR. ENSIGN:  Your Honor, I don't know the status of

11     the planes.  If there are removal flights, the five would

12     not be on them.

13          THE COURT:  Okay.  I'm sorry.  Was it not six,

14     Mr. Gelernt?

15          MR. GELERNT:  It was five, Your Honor.

16          THE COURT:  Sorry.  Okay.  All right.  So thank you,

17     Mr. Ensign.

18          And I also understand just from looking at the docket

19     that the government has appealed my TRO ruling.  And that's

20     obviously your right, Mr. Ensign.  So I won't go into,

21     because I don't think I have jurisdiction given the appeal,

22     to reargue the TRO ruling, but what we will just look at

23     today is the class question.  And then if I do, in fact,

24     certify provisionally, then we can talk.

25          I think what that would likely mean is that the

1    plaintiffs could then seek a TRO on behalf of a certified

2    class, and then we can talk about how we want to go from

3    there.  I think we are having an echo.

4        THE COURTROOM DEPUTY:  It is.  I am having difficulty

5    with the public line.  It may be too many people on here.

6    I'll keep it as long as I can, Your Honor.

7        THE COURT:  Okay.  Thank you.

8        So let me ask the government then what your position

9    is regarding the class issue only.

10       MR. ENSIGN:  Your Honor, we oppose class

11   certification.  The principal reason is one of venue and

12   authority.  Under -- I think we are getting the echo again.

13       THE COURT:  We are, but let's try to go ahead, and as

14   annoying as it is, let's see if we can push through with the

15   echo.

16       MR. ENSIGN:  Thank you, Your Honor.  Will do.

17       These are claims that plaintiffs have brought that

18   fundamentally sound in habeas.  When the supreme court

19   considered the last AEA case in Ludecke versus Watkins, 355

20   U.S. 160, these were all considered within the scope of

21   habeas.  And because this is a habeas case, because it

22   sounds in habeas and because plaintiffs have specifically

23   included a habeas claim, I believe it's Count 9 of their

24   complaint, then the venue rules of habeas apply.

25       Under the supreme court decision in Rumsfeld v.

```
 1     Padilla, venue was only appropriate for a habeas case solely
 2     in the location where the person is being detained or where
 3     (unintelligible), and so because of that --
 4              (There was an interruption by the court reporter.)
 5              THE COURT:  Sorry, Tammy, the court reporter.
 6              I think when there's an echo, I think you might have
 7     to sort of proceed sentence by sentence and pause and let
 8     the echo go through and then continue.
 9              And, Tammy, we'll hope that will be satisfactory.
10              So, Mr. Ensign, again, the issue is venue.  You are
11     saying that it must be brought where the warden or the --
12     typically prisoner cases, it's the warden, but here, whoever
13     is actually detaining the plaintiffs.  Is that correct?
14              MR. ENSIGN:  That's correct, Your Honor.  In
15     addition, this Court has recognized, and I believe Your
16     Honor in the Vetre versus Sessions case, which is
17     316 F. Supp. 70, that when habeas is available, then that is
18     an -- that's an adequate alternative remedy that precludes
19     APA claims under Section 702, and so all the claims would
20     have to be considered under habeas.
21              And because of that, you know, to the extent that
22     there could ever be a class, it could only be solely within
23     a single judicial district of people there.  And of course,
24     it would still have to satisfy all the other requirements of
25     classes, but certainly that venue issue precludes this Court
```

```
1     certifying a nationwide class.

2             THE COURT:  Okay.  Thank you very much.

3             Mr. Gelernt, can you respond to the venue question?

4             MR. GELERNT:  Sure, Your Honor.  I think initially --

5     I guess I don't have an echo, so I can continue.

6             Initially we have -- we think this conflates the

7     merits.  And you know, you issued a TRO.  You found you had

8     jurisdiction to issue a TRO.  So we think that's sufficient

9     at this point.  I think we are veering pretty far into the

10    merits.

11            But just taking it on those terms, for one thing, we

12    filed both a habeas and APA 1331.  And you can challenge the

13    Enemy Aliens Act without habeas.  There are cases like Clark

14    that do that.  But also, for habeas, I would also say that

15    the immediate custodian rule does not apply because this is

16    not core habeas asking for relief.  It's to stop the

17    transfer and challenge the constitutionality.

18            So both because we haven non-habeas fonds of

19    jurisdiction and because the immediate custodian rule

20    doesn't immediately apply in this case, I think that's more

21    than sufficient for this Court to proceed.

22            THE COURT:  So, Mr. Ensign, Mr. Gelernt is right that

23    they are not seeking release, so tell me why you think your

24    venue argument is still appropriate.

25            MR. ENSIGN:  Your Honor, because these claims
```

1    inherently sound in habeas.  Plaintiffs recognize that

2    themselves by bringing a habeas case.  The supreme court

3    itself has recognized that it's appropriate to consider this

4    in habeas when it did so in the Ludecke case.

5        And where habeas applies, it displaces a lot of other

6    law including specifically the APA, as this court found in

7    the Vetre case.  It also displaces even statutory causes of

8    action.  You know, Heck v. Humphrey, for example, even

9    though you would otherwise have a 1983 suit for most

10   constitutional claims, the second they sound in habeas,

11   habeas, you know, cuts off 1983 entirely and forces you to

12   go through the route of habeas.

13       And so the habeas rule has some real teeth and is

14   ultimately an attack on the authority of wardens to turn

15   people over, you know, to be removed, and they would -- I

16   mean, what they are seeking ultimately is the equivalent to

17   telling the immigration, equivalent to a warden, you may not

18   release these people to be removed from the country.

19       THE COURT:  Isn't that the exact opposite of habeas

20   where you just said you are ordering them you may not be

21   released as opposed to habeas which is you must be released,

22   right?

23       MR. ENSIGN:  Your Honor, it is -- in this

24   application, it is a little odd, but certainly the way the

25   supreme court has considered it previously, like,

1    specifically challenges to the AEA sounded in habeas.  And

2    that was an utterly uncontroversial aspect of the Ludecke

3    decision.  Even though it was five-four about, you know, the

4    intricacies of the AEA, it nonetheless was uncontroversial

5    there that this was properly heard as a habeas claim.

6        THE COURT:  Do you want to respond to that,

7    Mr. Gelernt?

8        MR. GELERNT:  Your Honor, I would just say that the

9    fact that some cases can be brought in habeas certainly

10   doesn't preclude them being brought under 1331 and the APA

11   and this court.  And Your Honor has opinions along those

12   lines with detainees outside of the district in Damus and I

13   think Heredia Mons as well.

14       As Your Honor said, this is not a core habeas.  We

15   certainly can proceed in habeas in this district, but we

16   don't need to proceed in habeas.  We are not aware of any

17   case that says we cannot challenge the Alien Enemies Act on

18   non-habeas grounds.

19       THE COURT:  All right.  Well, this is obviously an

20   issue that has not been briefed.

21       I should have said earlier at the beginning of the

22   hearing, although it is implicit, that there is no

23   broadcasting or recording of this hearing, and I am being

24   informed that it is, in fact, being broadcast by a certain

25   individual.  That's in violation of the court's rules.  That

1    can be punishable by contempt.  You may not broadcast or

2    record any court proceedings.  And further -- I am getting

3    further information we will shut down the public line.

4            THE COURTROOM DEPUTY:  Your Honor, I did make that

5    statement.

6            THE COURT:  Thank you.

7            THE COURTROOM DEPUTY:  You're welcome.

8            THE COURT:  So I think it would be very helpful for

9    me to get some expedited briefing on this.  And I know that

10   given the circumstances, the plaintiffs are justifiably

11   concerned about imminent deportation.

12           Can you tell us, Mr. Ensign, are imminent

13   deportations and removals under this proclamation planned?

14   When I say imminent, I mean in the next 24 or 48 hours.

15           MR. ENSIGN:  Your Honor, I don't know the answer to

16   that question.  We can certainly investigate that and report

17   that back to you.  But I don't know that -- the answer to

18   that.  I know what plaintiffs have said to the clerk's

19   office.  I don't yet know -- have an ability to confirm that

20   or, you know, contest that.

21           THE COURT:  Okay.  So how soon can you get that

22   information?

23           MR. ENSIGN:  Your Honor, I can certainly talk to them

24   ASAP and see.  You know, it is Saturday.  I will try to get

25   people as quickly as possible and find out that information.

1    You know, I think we were certainly planning on opposing the

2    TRO by tomorrow night in advance of the hearing on Monday if

3    that's still going forward.  We can certainly include it in

4    that filing if that works.

5        THE COURT:  So, Mr. Gelernt, do you want to propose a

6    schedule for me?  I think I would like the -- we should

7    probably have the government first respond saying there

8    is -- arguing just on the venue issue of class

9    certification, and then you can respond to that and I would

10   rule quickly.

11       MR. GELERNT:  Your Honor, a couple of things.  One is

12   that I recognize it's Saturday, but on the other hand, the

13   government appears to be moving planes very rapidly to

14   El Salvador with hundreds of people.  So we hope that in the

15   next five minutes, counsel for the government can get an

16   answer to that.

17       Our understanding from people on the ground, from

18   different sources, is that planes are going right now taking

19   Venezuelans to El Salvador and may be ending up in a

20   Salvadoran prison.  Not only will that divest this Court of

21   jurisdiction, but I think those people are in real trouble,

22   Venezuelans put into a Salvadoran prison.

23       So we had two flights that we believe were scheduled

24   for this afternoon that may have already taken off or during

25   this hearing, so I think in the next five minutes.

1          And we would further ask Your Honor that you issue a

2    class-wide TRO pending the briefing, and we will be prepared

3    to get the venue briefing in as soon as the government can

4    do it and you would like.  But I think there is so much

5    urgency here and there is so much harm at stake and this

6    Court's jurisdiction is at stake.

7          And just one clarification, Your Honor, we don't

8    believe we would need to amend the TRO because the TRO did

9    ask for a class-wide TRO.  The complaint was a class

10   complaint.  We have class papers, and the TRO was seeking a

11   class TRO.

12         So we would respectfully urge this Court to issue a

13   class TRO now to avoid any more harm and then brief the

14   venue as fast as the government would like.  And we would

15   respond in eight hours or so or ten hours or whatever the

16   Court thinks is appropriate.

17         THE COURT:  I think it would probably be helpful if

18   we adjourned this hearing briefly and let Mr. Ensign do some

19   digging and then returned and talked about this further.  So

20   why don't we -- can we adjourn this hearing until

21   6:00 Eastern Time, at which time, Mr. Ensign, I will want to

22   know, have planes, in fact -- is deportation of people under

23   the proclamation pursuant to the AEA in motion now and will

24   it be for the next 48 hours, because that would require a

25   more immediate decision.  All right, Mr. Ensign?

```
1              MR. ENSIGN:  We can do that, Your Honor.  I mean,

2       briefly on the irreparable harm point, as the supreme court

3       said in Nken, Although removal is a serious burden for many

4       aliens, it's not categorically irreparable as some courts

5       have said.  It is accordingly plain that the burden of

6       removal alone cannot constitute the requisite irreparable

7       injury.

8              THE COURT:  I think they have made out more than just

9       removal.  I think they have made out the harm that will

10      befall the individual plaintiffs upon removal.

11             So what we will do is we will adjourn the hearing

12      until 6:00 p.m. Eastern Time.  We will resume the hearing at

13      that point and get information from Mr. Ensign, and then I

14      will also try to have a better sense of whether I am

15      prepared to -- again, it could be issuing a separate TRO

16      covering this provisional class or not.

17             Okay.  Any objection to that, Mr. Gelernt?

18             MR. GELERNT:  No, Your Honor.  Thank you.

19             THE COURT:  Good.

20             Mr. Ensign?

21             MR. ENSIGN:  No, Your Honor.  We will proceed as you

22      instruct.

23             THE COURT:  Okay.  See everybody in 38 minutes.

24      Thanks.

25             THE COURTROOM DEPUTY:  This honorable court is
```

1    adjourned until 6:00 p.m.

2          (The hearing adjourned at 5:22 p.m.)

3          THE COURT:  Thanks, Nikki.

4          Welcome back, everybody.  I don't think we need to

5    have everyone identify themselves again.  I've got the same

6    counsel present.

7          Mr. Ensign, let's hear your report.

8          MR. ENSIGN:  Your Honor, unfortunately I don't have

9    many details to share.  I have talked to the clients who let

10   me know the sort of operational details as to what is going

11   on with raised potential national security issues,

12   particularly ones if discussed with a public line.  So I do

13   not have additional details I can provide at this time.

14         They raised that we may be able to provide Your Honor

15   additional details in an in camera hearing if we were to --

16         THE COURT:  Fine.  Maybe what we should do -- Nikki,

17   can we either disconnect the public line, or can you put us

18   in breakout rooms?  Can we disconnect and then reconnect the

19   public line, or can we go into a breakout room?

20         THE COURTROOM DEPUTY:  I can just remove the public

21   line right now.

22         THE COURT:  And then can you reinstate it?

23         THE COURTROOM DEPUTY:  I believe so.  If it

24   disconnects, I can call it without interrupting as well.

25   It's different than the courtroom.

1      THE COURT:  Okay.  So we are going to disconnect the

2   public line for this in camera proceeding, and then we will

3   come back.

4      (The public line was disconnected.)

5      THE COURT:  Okay.  The public line is disconnected.

6      Mr. Ensign.

7      MR. ENSIGN:  Your Honor, I am still trying to get

8   additional details.  I don't -- we would have to sort out

9   what can still be provided in camera.  They suggested that

10  as a way to potentially provide some details, but I do not

11  personally have those right now.

12     THE COURT:  So you have no details for us in camera?

13     MR. ENSIGN:  Not at this time, Your Honor.  We would

14  have to figure out what could be provided in camera.

15     THE COURT:  Okay.  Well, when is that going to be

16  determined?

17     MR. ENSIGN:  I don't know.  I have been trying to get

18  those details, and I don't presently know when I would be

19  able to get that.  I'm certainly trying to get that

20  information, but that is not something, the details, that I

21  know.

22     MR. GELERNT:  Your Honor, I'm sorry.

23     THE COURT:  Sure.  Go ahead.

24     MR. GELERNT:  Your Honor, what we understand is that

25  two flights went to El Salvador this afternoon, one very

```
1    recently, and there's another one, we are not sure where

2    it's scheduled to go exactly.  It may be Honduras.  We are

3    not sure.  But it's supposed to leave at 6:23.

4          THE COURT:  All right.  Let's reconnect the public

5    line.

6          THE COURT REPORTER:  Your Honor, is the in camera

7    portion of the hearing under seal?

8          THE COURT:  I trust not, Mr. Ensign, since we didn't

9    hear anything.  Any reason we need to put that under seal,

10   Mr. Ensign?

11         MR. ENSIGN:  No objection, Your Honor.

12         THE COURT:  Okay.  So no, Tammy.

13         (The public line was reconnected.)

14         THE COURT:  All right.  It looks like it's -- is it

15   back up, Nikki?

16         THE COURTROOM DEPUTY:  Yes, Your Honor.

17         THE COURT:  Okay.  So for the public, there were no

18   representations that were able to be made in our private

19   session, so the public has not missed anything.

20         All right.  So, Mr. Gelernt, why don't you just

21   repeat your statement.

22         MR. GELERNT:  We understand that two flights went to

23   El Salvador this afternoon; one very recently, and then

24   another flight is scheduled for 6:23, we believe, to

25   Honduras, but we are not entirely sure.  And the flight
```

 1     destinations have changed for these past two flights.  But

 2     we believe it's scheduled for 6:23, so only in a matter of

 3     minutes.

 4          THE COURT:  So, Mr. Ensign, you can't -- can you

 5     confirm that people -- you can't even confirm -- well, I

 6     guess on the public line, you're not -- and actually

 7     couldn't make any representations even privately what's

 8     happening with any flights.

 9          So let me just go over then a few issues that we

10     discussed earlier.  So the first is the people who would be

11     subject to be certified as a class and then further

12     requested TRO, Mr. Gelernt, they are, as you believe, all

13     currently held under INA?

14          MR. GELERNT:  They are all in proceedings as far as

15     we understand, and so what the government apparently is

16     doing is using the Alien Enemies Act to circumvent the

17     immigration laws and to remove them before they actually

18     have a final order.  That's the case with the five

19     plaintiffs, and that's what we understand to be happening

20     around the country.

21          THE COURT:  Right, but what I'm trying to look at is

22     the venue and habeas question.

23          MR. GELERNT:  Right.

24          THE COURT:  And so I guess -- it seems that you are

25     not seeking to challenge the fact or duration of their

1    confinement.  Is that true?

2         MR. GELERNT:  That's absolutely right, Your Honor.

3    And I think that's the critical distinction here, that it's

4    not a core habeas challenging release.  They are not trying

5    to get out of detention in this lawsuit.  They are going to

6    be held in detention presumably unless they have some

7    individual basis under the INA to get out.  This lawsuit

8    will not allow them to be released, but it will stop their

9    removal hopefully under the Alien Enemies Act so they can

10   continue their proceedings under the immigration law.  So

11   it's absolutely not a core habeas.

12        THE COURT:  So --

13        MR. GELERNT:  I apologize, Your Honor.  I was just

14   going to add the point --

15        THE COURT:  Go ahead.

16        MR. GELERNT:  -- even if it could be brought in

17   habeas, that doesn't mean it has to be.  So your decision in

18   RILR makes that point, Araceli.  There's a number of cases

19   in this district.  You made the point very clearly in your

20   IRLR decision that even if it could be brought in habeas, it

21   doesn't have to be.

22        THE COURT:  Mr. Ensign, why do you think then that

23   they are challenging the fact or duration of confinement?

24        MR. ENSIGN:  Your Honor, I think that this sounds in

25   habeas for several reasons.  I think one is that because the

1    AEA vests all its authority, relevant authority, with the

2    president himself and the APA can't be used to challenge

3    presidential actions, the only claims that we are left with

4    here are habeas claims.

5         We think the supreme court's decision in the 1948

6    case in Ludecke also indicates that this is a habeas case.

7    And it's ultimately challenging, you know, the exercise of

8    the authority over their person under the AEA in a way that

9    has been recognized to sound in habeas previously.

10        But on top of all those things, we think that even if

11   wasn't core habeas, it would still be subject to the habeas

12   rule.  Notably this court in the Vetre case --

13        THE COURT:  You keep saying this court, and I don't

14   think you mean me.  Do you?

15        MR. ENSIGN:  I actually do, Your Honor.

16        THE COURT:  Okay.  So the 316 F. Supp. 70?

17        MR. ENSIGN:  Yes.  316 F. Supp. 3d.

18        THE COURT:  Right.  So I'm saying that F. Supp.

19   predates my time here.  Okay.  Sorry.  Go ahead.

20        MR. ENSIGN:  I apologize, Your Honor.  Of course when

21   I mean the court, I mean the district for the District of

22   Columbia.

23        THE COURT:  Right, which I'm not bound by.  So if you

24   will distinguish, I try to do that in my opinions, if you

25   would be so kind.

1          MR. ENSIGN:  Absolutely, Your Honor.  In the Vetre

2    case, there were non-core habeas claims including

3    conditions.  And in that case, this court recognized, this

4    was in a somewhat odd posture, that within DDC, that because

5    prison condition cases could be brought in habeas, they had

6    to be.  And so similarly, because these claims can be

7    brought in habeas, they have to be.

8          THE COURT:  The prison condition cases, again, relate

9    to the nature of confinement and duration of your

10   confinement.  And here, they are not arguing that they can't

11   be confined.  They are just saying they can't be removed,

12   right?

13         MR. ENSIGN:  Your Honor, we are using it to address

14   whether this is core or non-core.  In Vetre, a non-core

15   habeas claim was transferred under the venue rule.  So

16   whether this is core habeas, as we have argued, and clearly

17   where the venue rule would apply or even if this were

18   non-core habeas, then nonetheless the venue rule still

19   applies to it as this court has recognized.

20         MR. GELERNT:  Your Honor, I would just say that that

21   case involved, I think you were getting at this, but the

22   length of someone's confinement.

23         THE COURT:  Again, I have not gone back and reviewed

24   that case because your citation earlier, Mr. Ensign, led me

25   to believe it was not my case.  I know IRLR is.

```
1          I guess your -- do you want to dismiss your habeas

2     claim, Mr. Gelernt?  I don't know.  It's certainly not your

3     primary claim.  You may have other reasons for including it.

4          MR. GELERNT:  Your Honor, I think if the Court felt

5     like it needed us to dismiss the habeas in order to issue a

6     class-wide TRO, then we are prepared to do that.  We

7     certainly don't feel like we need it.

8          On the other hand, I think the Court could just hold

9     it in abeyance.  I mean, I think that it's very clear that

10     if you don't need to bring it in habeas, you don't have to

11     and you can bring it -- in other words, I think Your Honor

12     could not have been clearer in IRLR.  There are a number of

13     cases that say that.  Otherwise, virtually every case would

14     be brought in habeas.

15          THE COURT:  Again, I think this is a reasonably close

16     question, but I've got to rule on it with essentially 40

17     minutes' notice given that this was first raised by the

18     government in our hearing.  And I'm not blaming the

19     government at all because they haven't had an opportunity to

20     brief it.

21          And so as brief as my research has been at this

22     period of time, I don't think that venue bars certification.

23     I will, for clarity, I will grant the plaintiffs' -- first

24     grant the plaintiffs' motion to dismiss their habeas count.

25     So that count is dismissed without prejudice at this point.
```

1          But I do find that class certification is warranted

2     under Federal Rule of Civil Procedure 23(a) and 23(b)(2).

3     So I will certify a class, and the class will be -- let's

4     talk about the definition.  The plaintiffs ask for all

5     noncitizens who were, are, or will be subject to the AEA

6     proclamation and its implementation.

7          So now that we actually have a proclamation that we

8     have been able to review, Mr. Gelernt, is there a reason to

9     modify that class definition?

10         MR. GELERNT:  I think certainly, Your Honor, if you

11    want to insert the name of the proclamation and the date,

12    that would be fine with us, or we could submit it to the

13    Court.  But I think, if I'm understanding you correctly, I

14    think that's what you are getting at, and that would make

15    sense.

16         THE COURT:  Or if there's other -- that's one point,

17    but whether there's another modification that you would

18    make.

19         MR. GELERNT:  Yeah.

20         THE COURT:  Go ahead.

21         MR. GELERNT:  I think the other point would be that

22    it seems to be the government's position that they can begin

23    these removals pursuant to the act without publicizing and

24    publicize after the removals have started.  So that makes us

25    very concerned that there could be another proclamation

1    coming tomorrow naming a different gang, MS-13 or some other

2    gang.

3         So I guess we could start with this one if Your Honor

4    would like to proceed more slowly, but there may be a

5    modification that could say any proclamation that names a

6    non-state actor.

7         THE COURT:  Yeah, I'm just -- I appreciate that.  I

8    feel that that's going farther than I would be prepared to

9    go as to deal with a hypothetical --

10        MR. GELERNT:  Right.

11        THE COURT:  -- proclamation.

12        MR. GELERNT:  Understood.

13        THE COURT:  So let me ask you, Mr. Ensign.  I know

14   you are objecting to the certification of the class, and

15   this is a provisional certification only, but do you have

16   concerns, if certified, with the wording, and would you

17   propose amendments to that?

18        MR. ENSIGN:  Your Honor, first, just for the record,

19   we do object to the class certification, as you know.  I am

20   trying to pull up the specific language right now.

21   Candidly, it's not a question I have given thought to

22   before.

23        THE COURT:  No, I understand.  I understand.

24   Everybody here is operating on the fly a bit.  I can tell

25   you what the -- I think I wrote the -- the language I wrote

1    down earlier was all noncitizens who were, are, or will be

2    subject to the AEA proclamation.

3         I mean, I think -- I don't know why -- Mr. Gelernt,

4    is there a reason we can't simply say all noncitizens who

5    are subject to the proclamation?

6         MR. GELERNT:  I would prefer that we have will be,

7    but I understand if Your Honor thinks that are covers the

8    waterfront.

9         THE COURT:  I think so.  So the language would be all

10    noncitizens who are subject to the AEA proclamation, and we

11    will get the specifics, and its implementation.

12         MR. GELERNT:  And so I assume, Your Honor, that would

13    mean that anybody who is designated a week from now, I mean,

14    will be would cover it obviously, assuming it's going to

15    continue designating people, so I assume that's why it is in

16    there.

17         THE COURT:  Yes.  Well, when you say designated, you

18    mean for removal?

19         MR. GELERNT:  Well, I think they have to say you are

20    designated.  I gather what the government is doing is

21    designating you as someone subject to the Alien Enemies Act,

22    and then they can do whatever they want to them, detain

23    them, remove them.  And so that's why the will is in there.

24    But if Your Honor is stating on the record that are would

25    cover anybody who in the future is subject to it --

```
 1              THE COURT:  Yes.

 2              MR. GELERNT:  Okay.

 3              THE COURT:  Now or in the future is.

 4              MR. GELERNT:  Right.

 5              THE COURT:  So back to you, Mr. Ensign.  Any

 6     modification of that?

 7              MR. ENSIGN:  No, Your Honor.  I mean, no, Your Honor.

 8     We don't believe we have a basis to dictate to plaintiffs

 9     how they would, you know, define their own class.

10              THE COURT:  Okay.

11              MR. ENSIGN:  But as to the substitution of, you know,

12     the specific proclamation at issue, to make it specific to

13     that, that we don't have objection specifically to that.  I

14     would preserve, you know, our objections to -- we focused on

15     venue, but we don't believe the other requirements of class

16     certification have been met here.  In particular, for

17     typicality, there may be very different claims as to those

18     that were lawfully admitted to the United States and those

19     who, you know, never had lawful admission.

20              THE COURT:  Okay.  I think, again, at this

21     provisional time, and I guess -- what we will say is APA

22     proclamation of March 15, 2025, and we can actually use the

23     specific title which I see based on the text of that.

24              Okay.  So plaintiffs then are also seeking a TRO

25     related to that class.  And again, so -- I'll just say a few
```

1   things here, that this is obviously a difficult question.

2   My ruling earlier related to the INA.  This is difficult for

3   a few reasons.  And again, I'm just looking at the

4   likelihood of success on the merits.  And under our circuit,

5   the question is is there a serious legal question presented,

6   not is there necessarily a 51 percent chance of prevailing.

7       And there are really sort of two issues on this.  The

8   first is does the political question doctrine or other -- or

9   do other prudential considerations bar judicial scrutiny of

10   the proclamation in the first place, and second, if they do

11   not bar such scrutiny, is the proclamation illegal.

12       I think that the first question is harder than the

13   second.  And again, we have tried to do quick research on a

14   very expedited time frame, and I'm well aware of the

15   president's broad authority to apprehend, restrain, and

16   remove noncitizens deemed alien enemies.

17       For example, the president has unreviewable authority

18   to determine whether a state of war actually exists, and if

19   so, to remove enemy aliens in the manner he wishes.

20       So the question is does such authority extend to

21   other determinations within the statute such as invasion or

22   predatory incursion or foreign nation or government.  And

23   that, unfortunately, is a question of first impression here.

24       We certainly looked at some of the cases like

25   Ludecke, L-U-D-E-C-K-E, the 1948 supreme court case, in

1   addition to Lockington versus Smith from the hoary vintage

2   of 1817, as well as Clark, which is the D.C. Circuit case

3   from 1946, and Von Heyman, H-E-Y-M-A-N, Second Circuit,

4   1947.

5           These are difficult questions.  There's also a

6   helpful law review by Professor Vladeck, V-L-A-D-E-C-K, from

7   2007 in the Lewis & Clark Law Review about enemy aliens,

8   enemy property, and access to courts which sets some of

9   these points out as well.

10          So I guess, Mr. Ensign, maybe you are prepared to

11  deal with this and maybe you are not yet, but tell me why,

12  given the lack of authority regarding the president's --

13  whether the president's authority extends to his

14  determination of some of those other terms, I should hold

15  that it does.

16          Again, I know this was going to be a class cert

17  hearing and we are all racing to get up to speed on this,

18  but I will be happy to hear you if you want to discuss that.

19          MR. ENSIGN:  Sure, Your Honor.  As you know, there

20  isn't a lot of precedent on this, but what there is, you

21  know, recognizes the quite broad discretion of the president

22  here.

23          In particular, the Ludecke case arose from a

24  circumstance where a German plaintiff, you know, was still

25  being held under the AEA, who had a facially quite

1    reasonable claim, you know, that the war has ended, the war

2    has been over for three years, what are you doing still, you

3    know, exercising AEA authority over me.

4         And the court said quite clearly, like, no, this is

5    left to the discretion of the president, and the president

6    has determined that the war is continuing notwithstanding

7    the fact that they are not -- you know, there is not

8    fighting going on and that, in fact, the E-day was, I

9    believe, more than three years in the rearview mirror at

10   that point.

11        And so certainly when the supreme court reached this,

12   it recognized the very broad discretion of the president.

13   There's other language in that case towards the tail end of

14   it that I unfortunately don't have at my fingertips but

15   again underscores the extent to which discretion is vested

16   in the president as to these sorts of questions.

17        THE COURT:  Right.  But isn't -- and again, read

18   broadly, Ludecke certainly supports you, and certainly even

19   read narrowly, I understand the courts can't question the

20   president's power to remove enemy aliens or even his

21   determination that a state of war continues to exist, but it

22   did seem to accept that courts could hear challenges to the

23   construction and validity of the statute and in that case

24   challenges raising whether the person restrained is, in

25   fact, an enemy alien 14 years of age or older.  That's at

```
 1    page 171, footnote 17.

 2         So read more narrowly, why doesn't it leave open the

 3    question that judicial review is available to look at

 4    whether certain preconditions have been met for the

 5    president to invoke the statute?

 6         MR. ENSIGN:  Your Honor, I think the nature of the

 7    claims here are ones that are more of the sort that are the

 8    political questions.  For example, plaintiffs are very much

 9    advancing the concept that, you know, war is not something

10    that can be engaged in or, you know, is a concept that has

11    relevance as to subnational actors.  I think that is a

12    question that has been reserved for the political branches.

13         In particular, for example, the Congress in 2001 gave

14    the president authorization of war powers to use against

15    subnational actors such as Al-Qaeda.  Here, we have TDA has

16    specifically been designated as a foreign terrorist

17    organization.  So you have a recognition that the war powers

18    do extend to this sort of context as to which plaintiffs are

19    advancing a claim.

20         And so I think that sort of claim that plaintiffs are

21    raising here sounds in that sort of core political question

22    that has been reserved for the political branches.

23         THE COURT:  Mr. Gelernt, do you want to respond to

24    that?

25         MR. GELERNT:  I think Your Honor made the point that
```

1    I was going to make.  I mean, this is ultimately a

2    separation of powers question.  What was going on in Ludecke

3    was whether the war was over, and it was a declared war by

4    Congress, and Congress has not stated that the war was over.

5    I think that's what the supreme court was ultimately saying.

6         I don't read Ludecke as saying that the

7    preconditions, the statutory preconditions, can't be

8    challenged; otherwise, there would be no end to what the

9    executive branch could do.  This is a delegation from

10   Congress.  There are very specific terms.  And we read

11   Ludecke as saying that the construction of the statute can

12   be challenged and whether someone fits within the

13   proclamation can be challenged.  I think Ludecke was

14   ultimately, again, about separation of powers.

15        THE COURT:  And then it would seem that Clark and

16   Von Heyman are better cases for you even though they are --

17   they precede Ludecke, Mr. Gelernt.  Do you agree with that?

18        MR. GELERNT:  Your Honor, I don't want to get ahead

19   of myself.  I have not looked back on those cases before

20   this hearing.

21        THE COURT:  Okay.

22        MR. GELERNT:  I think there are certainly additional

23   cases.  I was simply responding to Ludecke.  But I think

24   there are many other cases that allow -- that challenge the

25   statutory preconditions.  I think that's, you know, sort of

1   fundamental separation of powers law.  This is not sort of

2   the president invoking his inherent authority under the

3   constitution.  We don't think that he would have the power

4   to do it anyway.  But this is the president invoking a

5   specific statutory provision that Congress has laid out very

6   clear guidelines, and I think it would be fundamentally

7   inconsistent with separation of powers for this Court not to

8   be able to review whether those preconditions were met.

9          THE COURT:  Let me ask you, in looking at the

10  language of the proclamation, why on the merits, if I got to

11  it and found it's not a political question, why don't you

12  think, Mr. Gelernt, that the proclamation suffices to say

13  that TDA is part of the Venezuelan government that is

14  involved in an invasion or predatory incursion?

15         MR. GELERNT:  Well, Your Honor, I think the

16  government -- I think the proclamation doesn't even go as

17  far as actually stating that TDA is a foreign government.

18  And the language is pretty clear in the statute that you

19  need a foreign government.  As Your Honor knows, the statute

20  has only been invoked three times in the history of the

21  country and always during a declared war, the War of --

22         THE COURT:  Let me interrupt.  So it says that, and

23  I'm reading from the proclamation, Venezuelan national and

24  local authorities have ceded ever greater control over their

25  territories to transnational criminal organizations

1    including TDA.  The result is a hybrid criminal state that

2    is perpetrating an invasion of and predatory incursion into

3    the United States.

4         So why don't you think that's a foreign nation?

5         MR. GELERNT:  Well, I think there's a lot of law, and

6    we will be prepared to reply to the government's submission

7    at the TRO and talk more about it at the TRO on the merits,

8    but I think there is a lot of law about what constitutes a

9    foreign government.  And I don't think the United States

10   recognizes TDA as a foreign government.  They recognize

11   Venezuela as a foreign government.  I think that's the

12   historic understanding of the statute.

13        We also would take issue with the fact that we think

14   the Court certainly can review whether immigration

15   constitutes some kind of invasion.  You know, it may be that

16   the Court can't second-guess how much of an invasion a

17   foreign government is making, that that may be a matter of

18   degree, but certainly that sort of threshold legal question

19   about whether immigration constitutes an invasion is

20   something the Court can rule on.  And we know of no

21   historical precedent that would suggest that straight

22   migration or noncitizens coming and committing crimes

23   constitutes an invasion within the meaning of the statute or

24   the constitution.

25        THE COURT:  Mr. Ensign, do you want to respond to

1    that?

2         MR. ENSIGN:  Certainly.  A few things, Your Honor.  I

3    think first, they are trying to draw a distinction between

4    the statutory preconditions at issue here from Ludecke, but

5    it was statutory preconditions in both cases.  Whether or

6    not there's, in fact, a war was very much the issue in

7    Ludecke.  That is one of the statutory conditions.  They are

8    challenging others.  But it's -- they are all part of the

9    same statutory preconditions, you know, framework, are they

10    met or not.  And the Court just straight up deferred to the

11    president in circumstances where a lot of people would think

12    there was not a war.

13         I guess two other things I would say.  One is that

14    this -- I think this discussion very much illustrates why

15    additional briefing would be desirable to resolve this.

16         THE COURT:  No, no, absolutely.  I couldn't agree

17    with you more.  But the question is what do we do in the

18    interim, right?  No, I want further briefing from both

19    sides.  I want to look at this longer.  This is not easy.

20    These are not easy issues.  And I appreciate everyone's

21    diligence on such short notice.  But the question in a case

22    like this is why shouldn't a TRO issue to maintain the

23    status quo on difficult issues while you folks figure it

24    out.

25         In other words, maybe there's some national security

1    or other concerns that you have that you haven't raised yet

2    because you haven't learned of them yet that you could tell

3    me and I would hear, but right now it seems that the status

4    quo is keeping these folks in ICE custody but not deporting

5    them.  And I'm not sure what the prejudice to the government

6    is from such a determination.

7         I mean, tell me if I'm -- to the extent you can say

8    anything that's not national security to respond to that.

9         MR. ENSIGN:  Your Honor, I think two responses.  The

10   first is that much of plaintiffs' irreparable harm arguments

11   were predicated on the premise that this Court would somehow

12   lose jurisdiction if people were not -- I mean, not in D.C.,

13   but in the United States.  I think that was more a question

14   of habeas.  Now that we are past habeas and we are really

15   just talking about APA, I don't understand why this Court

16   would necessarily lose jurisdiction.

17        THE COURT:  If they are deported?

18        MR. ENSIGN:  And I think second is how Nken looks at

19   it as irreparable harm where --

20        THE COURT:  I think the argument -- the argument,

21   excuse me for interrupting and I will let you respond, but

22   the argument in part is these folks are going to be sent to

23   Salvadoran or Honduran prisons, which were not going to be

24   terribly receptive to Venezuelans, particularly whom you

25   have labeled TDA, and so not only are they going to be

```
 1    deported, but it's not going to be to a friendly
 2    countryside, but to prisons.  So why isn't -- don't you
 3    think that's irreparable?
 4          MR. ENSIGN:  Your Honor, I don't think that's been
 5    established by their filings.  More generally, I would just
 6    point out that this cuts to the core of the president's
 7    Article II powers.  And so interfering with that, you know,
 8    both in the -- both in the -- this goes to foreign powers --
 9    or foreign policy.  This goes to war powers.  This goes to
10    immigration.  These are core Article III -- or sorry,
11    Article II areas that -- I mean, this would cut very deeply
12    into the prerogatives of the executive, and for that basis,
13    we think the balance of harms are tipped sharply in our
14    direction.
15          THE COURT:  So, Mr. Gelernt, do you want to respond
16    to the irreparable harm issue?
17          MR. GELERNT:  Yes, Your Honor, a few things.  One is
18    I think the Court would lose jurisdiction because it
19    wouldn't be able to offer a remedy.
20          THE COURT:  Right.  Sure.  I mean, once they are out
21    of the country, I'm not sure what I can do there.
22          MR. GELERNT:  Right.  So you clearly would lose
23    jurisdiction.  I think that alone is critical.
24          The other point is that this is just not straight
25    removal, as Your Honor has pointed out.  They may be sent to
```

1    El Salvador.  It seems like many of them already have been

2    sent to El Salvador.  They are in real danger, I can't

3    express that strongly enough, if they end up in a Salvadoran

4    prison.  But even if they end up back in Venezuela, many of

5    them, all of our plaintiffs and many of them, will have

6    asylum claims, and they have been tagged now as the worst of

7    the worst by the president, and so they will be in real

8    danger in Venezuela.

9         Now, ultimately some of them may lose their asylum

10    claims in the U.S., but they are entitled, we believe, to

11    finishing that, and the Aliens Enemy Act can't circumvent

12    that point.

13         And the government keeps bringing up the Nken case.

14    Nken was very clear that the court was not going to lose

15    jurisdiction in that petition for review, that particular

16    petition for review, but also that if there was harm like

17    torture or persecution, then that would be irreparable harm.

18    The court was just making the simple point that not every

19    deportation involves irreparable harm.  They could be

20    removed to the UK, and there may not be irreparable harm.

21         So I think this goes far beyond the normal type of

22    irreparable harm.  And even in removal cases, of course,

23    this Court often stays things while it figures it out.

24    These are individuals who are in detention, so it's not as

25    if they are roaming around.  I think for the government to

1    say that the delay in doing this is irreparable --

2        THE COURT:  Let me ask you, Mr. Gelernt, let me just

3    interrupt you for a second.  I think there was a little bit

4    of confusion or uncertainty in your response earlier on this

5    point.  Is it fair that -- I think you equivocated a little

6    bit, and I'm not saying that in a negative way, on whether

7    all of the potential class was actually held by -- was

8    actually currently in custody in the United States.  Do you

9    know the answer to that?

10       MR. GELERNT:  We believe that everyone right now who

11   is going to be put on flights is in custody.  I don't know

12   that the proclamation limits it to that, but I think --

13       THE COURT:  So let me ask you.  So what if the class

14   were narrowed to all noncitizens in United States custody?

15       MR. GELERNT:  Right.  I think two points about that.

16   One is that would solve the immediate problem of them being

17   put on planes, because if they are not in detention, they

18   can't be put on planes.

19       But the other point, I think, in terms of irreparable

20   harm is obviously the government remains free to arrest them

21   if they've committed an immigration violation or a criminal

22   violation and put them in detention.  And as Your Honor

23   pointed out earlier, we are not seeking their release from

24   U.S. facilities.  So we are not in any way saying that the

25   government needs to allow them to continue roaming the

1    streets.  But if Your Honor feels like at this stage issuing

2    a TRO for the class of individuals who are currently in

3    detention or will be imminently put in detention, I think

4    that would work given that we are all moving very quickly

5    and I know Your Honor is trying to figure this out on the

6    fly.

7        THE COURT:  So back to you, Mr. Ensign.  In terms

8    of -- so harm to the United States by a TRO of short

9    duration regarding only people who are already in detention

10   so they can't cause any harm within the United States and

11   enjoin their removal from the United States, what's the harm

12   to the government by such a status quo TRO?

13       MR. ENSIGN:  I mean, I think it cuts to the core of

14   the president's authority over critical areas that have been

15   assigned to them, that war powers, immigration, you know,

16   conducting foreign policy, like, those are harms of, you

17   know, significant sorts.

18       This is where you have an express statutory

19   authorization, so this is a Youngstown Steel, you know,

20   category 1 type case in our perspective.  So we certainly

21   think there are very substantial harms.

22       I mean, you know, certainly we object to any TRO.

23   Our preference would obviously be a narrower one if there is

24   one, but we believe that any TRO impermissibly and

25   unconstitutionally infringes upon the prerogatives of the

1    president, no more so here than it would have been for the

2    supreme court in Ludecke to tell the president, you know

3    what, you're wrong, World War II is over.

4        THE COURT:  Right.  And that sort of is the

5    justiciability argument, not the balance of the equities

6    argument, right?

7        MR. ENSIGN:  No, Your Honor.  I think it sounds in

8    both.  Certainly you see it more frequently in that context,

9    and usually where it applies, you will never get to

10   irreparable harm because it's not justiciable.  But those

11   sorts of harms to the executive have been recognized, you

12   know, certainly as to anything that enjoins an act of

13   Congress.  Maryland versus King recognizes that's

14   irreparable harm.

15       The same principle applies to, you know, the

16   injunction against the president exercising his powers both

17   inherent in Article II and those given to him by statute

18   such as the AEA.

19       THE COURT:  All right.  Any response to that,

20   Mr. Gelernt?

21       MR. GELERNT:  No, Your Honor.  I think I --

22       THE COURT:  Right.

23       MR. GELERNT:  I apologize.  I just wanted two

24   housekeeping things, but I will do that after you finish,

25   Your Honor.

1          THE COURT:  Okay.  I am prepared to rule.  Again, I
2     think these are hard questions, close questions, and
3     particularly hard questions on the expedited time frame that
4     we are talking about here.  But I believe that the
5     plaintiffs have sufficiently made out and satisfied the TRO
6     factors.

7          I think the hardest remains the likelihood of success
8     on the merits because of the justiciability question.  But
9     at this point, they have certainly presented a serious
10    question that this is justiciable because it's outside of
11    what Ludecke talked about, and that once it is justiciable,
12    I think they have certainly presented a serious question
13    that the president's proclamation is not legal under the
14    AEA, or a different way of saying it is that the AEA does
15    not provide a basis for the president's proclamation given
16    that the terms invasion, predatory incursion really relate
17    to hostile acts perpetrated by enemy nations and
18    commensurate to war.

19         Also the terms nation and government do not apply to
20    non-state actors like criminal gangs.  And the statute
21    doesn't refer in my interpretation to unauthorized presence
22    of individuals here including individuals who have entered
23    illegally.

24         And so as a result, I don't think the AEA provides a
25    basis for removal under this proclamation.

1      I think on the other three factors, the plaintiffs

2 have an easier time.  I think there's clearly irreparable

3 harm here given that these folks will be deported and many

4 or a vast majority to prisons in other countries or even

5 back to Venezuela where they face persecution or worse.

6      Again, based on the record that I have, balance of

7 the equities, I think is reasonably straightforward inasmuch

8 as a brief delay in their removal does not cause the

9 government harm, and I haven't heard any harm from the

10 government beyond general infringement on presidential

11 powers which, again, I don't take lightly, but I think

12 that's more of an issue that relates to the justiciability

13 than it does to the balance of the equities.  And again, the

14 public interest in a case like this runs with the factors I

15 have already mentioned.

16      So I find that a TRO is appropriate for the class

17 members, and it would be to prevent the removal of the class

18 for 14 days or until further order of the Court.  And the

19 class will be all noncitizens in U.S. custody who are

20 subject to the proclamation of March 15, 2025 and its

21 implementation.

22      And I will issue a minute order memorializing this so

23 you don't have to race to write it down.

24      So we need to talk about where we go from here

25 because I want to revisit this after some more briefing.

1    And again, these are hard questions, and I may end up coming

2    out the other way on some of them after I have had more time

3    to think about them and hear from both sides.  But what I am

4    tasked to do today is to make the best ruling I can under

5    the law and the circumstances.

6         And particularly given the plaintiffs' information

7    unrebutted by the government that flights are actively

8    departing and plan to depart, I do not believe that I am

9    able to wait any longer and that I am required to act

10   immediately, which I have done so.

11        So, Mr. Ensign, the first point is that I -- that you

12   shall inform your clients of this immediately, and that any

13   plane containing these folks that is going to take off or is

14   in the air needs to be returned to the United States, but

15   those people need to be returned to the United States.

16   However that's accomplished, whether turning around a plane

17   or not embarking anyone on the plane or those people covered

18   by this on the plane, I leave to you.  But this is something

19   that you need to make sure is complied with immediately.

20        We need to set briefing and hearing schedules.

21   Otherwise, Mr. Gelernt, did your housekeeping matters relate

22   to those or something else?

23        MR. GELERNT:  No, they didn't, Your Honor.

24        THE COURT:  So do you want to raise those now?

25        MR. GELERNT:  Oh, they were very, very small.  One is

```
 1      that of the two flights I mentioned that took off this

 2      afternoon, I had said that both went to El Salvador.  We are

 3      now hearing that maybe only one went to El Salvador, and one

 4      may have gone to Honduras.  I just wanted to correct the

 5      record.

 6           THE COURT:  Again, just so we are clear, if planes

 7      have already landed and discharged their occupants, aside

 8      from the five plaintiffs I enjoined earlier, then this

 9      order -- I don't have jurisdiction to require their return.

10           MR. GELERNT:  Right.  And the other thing was also

11      very small.  It's just we would just -- if Your Honor is

12      going to use March 15 as the date, just to say that it was

13      published on the 15th, but we do think it was a March 14

14      order because that's when it was signed by the president.

15           THE COURT:  Well, I will be sure to cite the title so

16      there won't be any confusion.

17           MR. GELERNT:  Thank you, Your Honor.

18           THE COURT:  Okay.  So, Mr. Ensign, I want to hear

19      from you since you are now the party being restrained what

20      you would like to do in terms of briefing and hearing.  I

21      had set a hearing for Monday.  Given what's now happened,

22      that's not in stone, so what would you like?

23           MR. ENSIGN:  Your Honor, offhand, I think we would be

24      prepared to file a brief Monday night.  We could potentially

25      do so earlier, but in particular, many of the people subject
```

1    to this order, many, most, or all of them are incredibly

2    dangerous individuals, and so we would like to be able to

3    develop that as appropriate to --

4         THE COURT:  No, given -- let me just say, as I said,

5    you are the one being restrained, so I will give you as much

6    time as you want because you are the one now who's being

7    disadvantaged, so it's your motive to expedite.

8         MR. ENSIGN:  Thank you, Your Honor.  Could we

9    tentatively set, you know, Monday night, and then we will

10    inform the Court if we think we need additional time, and

11    then we would ask that the plaintiffs' response be on a

12    similarly expedited basis given that the government is now

13    under a TRO.

14         THE COURT:  Okay.  So March 17, and that will give

15    you until midnight for the government's opposition, and so

16    this will be, again, to their -- I guess your brief then

17    would be to -- I think your brief would be to vacate the

18    TRO, which, as opposed to an opposition to their request, it

19    should be, I think, to vacate the TRO.

20         And then the government can -- I'm sorry, the

21    plaintiffs then, I will give you the same amount of time, 48

22    hours till the end of March -- till March 19 to oppose.

23         And then for a hearing, we could do Friday, the 21st.

24    Again, because I will need time to review this myself, could

25    we do 2:00 or 2:30 on the 21st, Mr. Gelernt?  And this,

```
 1      again, can be by Zoom.
 2            MR. GELERNT:  2:30 works in person or Zoom, Your
 3      Honor.
 4            THE COURT:  Mr. Ensign?
 5            MR. ENSIGN:  That should work for us, Your Honor.
 6            THE COURT:  Okay.  I will say 2:30.
 7            So I'm vacating the March 17 hearing.  It will be
 8      March 21 at 2:30.
 9            Okay.  So I will issue a minute order memorializing
10      all of this.  And again, it will be -- Mr. Ensign, it's
11      going to be to vacate the current TRO, because the other TRO
12      is on appeal, so it won't be obviously the reason -- well,
13      the reason is somewhat different because now the
14      proclamation has been filed.  But I do not have jurisdiction
15      to act on the prior TRO, so this would be for the current
16      TRO.
17            MR. ENSIGN:  Understood, Your Honor.  And one point
18      related to that if I might.
19            THE COURT:  Sure.
20            MR. ENSIGN:  Would this TRO apply to aliens that
21      otherwise have final orders of removal, because from our
22      perspective, that would be an independent basis to
23      effectuate their removal.
24            THE COURT:  Right.
25            MR. ENSIGN:  And the 1252 jurisdictional bars on this
```

 1    Court would also apply if --

 2          THE COURT:  Right.  Yes.  No, I think that that's

 3    fair.

 4          I would think not, Mr. Gelernt.

 5          MR. GELERNT:  Your Honor, if they are not removing

 6    someone based on the Alien Enemies Act but based on some

 7    other authority, it wouldn't fall within this jurisdiction.

 8          THE COURT:  Right.  So yes, Mr. Ensign, I agree.

 9          MR. ENSIGN:  Okay.

10          THE COURT:  Anything else, Mr. Gelernt?

11          MR. GELERNT:  No, Your Honor.

12          THE COURT:  Mr. Ensign?

13          MR. ENSIGN:  No, Your Honor.

14          THE COURT:  All right.  Again, thanks, everyone, for

15    your diligent work.  I will issue the order, and we will see

16    you on Friday.  Thank you.

17          MR. GELERNT:  Thank you, Your Honor.

18          MR. ENSIGN:  Thank you, Your Honor.

19          (The hearing concluded at 6:53 p.m.)

20                          – – –

21

22

23

24

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



3/16/25                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           tammy_nestor@dcd.uscourts.gov