[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 25-5124**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,

*Plaintiffs–Appellees,*

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES, *et al.*,

*Defendants–Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00766
The Hon. James E. Boasberg

**MOTION TO DISMISS APPEAL AND RESPONSE IN OPPOSITION TO
EMERGENCY MOTION FOR A STAY PENDING APPEAL**

Evelyn Danforth-Scott
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104

Lee Gelernt
    *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar C. Jadwat
Sidra Mahfooz
Hina Shamsi
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    THE DISTRICT OF
    COLUMBIA
529 14th Street, NW, Suite 722

Washington, D.C. 20045

Somil B. Trivedi
Bradley Girard
Michael Waldman
Sarah Rich
Skye Perryman
Audrey Wiggins
Christine L. Coogle
Pooja A. Boisture
DEMOCRACY FORWARD
P.O. Box 34553
Washington, DC 20043

*Counsel for Plaintiffs–Appellees*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

STATEMENT.................................................................................................4

I.      Factual and Legal Background ...........................................................4

III.    Post-TRO Developments.................................................................9

ARGUMENT ...............................................................................................12

I.      This Court Lacks Jurisdiction Over the Appeal. ...........................12

    A.      The district court did not issue an appealable final order. .................13

    B.      The district court has not ordered any of the actions the government
        purports to challenge. ..........................................................15

    C.      There is no basis for an interlocutory appeal .....................................19

        1.      The district court did not issue an appealable injunction. ........20

        2.      The collateral order doctrine does not establish jurisdiction....21

        3.      Mandamus is also improper. ......................................................22

II.     If This Appeal Continues, the Court Should Not Stay the District Court's
    Ongoing Proceedings. ......................................................................24

    A.      The government is unlikely to succeed on the merits. ........................24

    B.      The equities do not favor a stay.........................................................30

III.    At a minimum, this Court should expedite the appeal. ..................31

CONCLUSION ...........................................................................................31

## INTRODUCTION

This Court should dismiss the government's appeal because it lacks jurisdiction. As the government acknowledges, the district court order at issue here merely "embarks on" contempt proceedings. Emergency Motion for a Stay Pending Appeal, or, in the Alternative, a Writ of Mandamus at 7, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 18, 2025) ("Mot."). But nothing is resolved yet. While the court found probable cause of criminal contempt, it is still developing the facts and has made no final determinations about how its inquiry will proceed, whether contempt was committed, if there was contempt, what options the government may have to purge the contempt, or what, if any, sanctions to impose, and upon whom. The federal courts of appeals primarily review "final decisions of the district courts," 28 U.S.C. § 1291, a policy that "discourage[s] undue litigiousness and leaden-footed administration of justice," *DiBella v. United States*, 369 U.S. 121, 124 (1962). They do not exist to test a party's abstract and sweeping structural constitutional theories at the earliest possible juncture.

This Court has already explained that criminal contempt orders are "final and hence appealable" once the district court identifies "specific, unavoidable penalties." *Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 436 (D.C. Cir. 2010). Thus, recognizing that the district court's order was far from final, the government tries to shoehorn it into one of the exceptions to the final judgment rule. *See* 28

1

U.S.C. § 1292. It chiefly argues that the district court's order is tantamount to an appealable injunction because, among other things, the order "requested briefs from both parties" and "held an adversarial hearing." Mot. at 19. But to describe that argument is to refute it: if directing parties to file briefs and attend hearings were enough to transform district court orders into appealable injunctions, every case could be appealed dozens of times before final judgment, and courts of appeals would be awash in "the very sorts of piecemeal appeals and concomitant delays that the final judgment rule was designed to prevent." *Cunningham v. Hamilton Cty.*, 527 U.S. 198, 209 (1999).

The district court's order also does not fall within the collateral order doctrine, which provides a narrow pathway for interlocutory review of issues that otherwise "can never be reviewed at all," *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (internal quotations omitted). Virtually all the government's objections to the district court's order can be addressed through a regular appeal, once the district court reaches a final decision. The government makes a passing suggestion that the Executive Branch should be entirely insulated from judicial contempt proceedings, Mot. at 19, but it offers nothing in support, and binding circuit authority has foreclosed that remarkable proposition for well over half a century. *See Land v. Dollar*, 190 F.2d 623, 633–34 (D.C. Cir. 1951); *see also, e.g.*, *In re Contempt Finding in U.S. v. Stevens*, 663 F.3d 1270, 1271 (D.C. Cir. 2011) (upholding contempt finding

2

against DOJ lawyers). The government's request for mandamus fails for much the same reason: the government has no "clear and indisputable right to relief," *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016), much less a right it cannot vindicate through the "adequate alternative remedy," *id.*, of an appeal brought once contempt has been conclusively litigated in the district court.

At a minimum, the Court should decline to stay district court proceedings while any appeal is ongoing. The government is unlikely to succeed on the merits because, as the district court's methodical opinion makes plain, the government acted in knowing and willful—even "gleeful," Mem. Op., *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Apr. 16, 2025), ECF No. 81 ("Order")—contempt of its restraining order. The government also faces no irreparable harm, because the district court has not resolved any issues yet and is merely investigating the likely contempt. By seeking to stop this process at the outset, the government would disable the district court from even determining whether contempt was committed and who committed it. That would have troubling implications for the court's ability to ensure that the government complies with judicial orders, and this Court should reject that effective call for effective executive branch immunity.

3

## STATEMENT

### I.     Factual and Legal Background

The Alien Enemies Act ("AEA") is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II.

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Proclamation No. 10903, 90 Fed. Reg. 13033.

In addition to claiming that the activities of a criminal gang during peacetime satisfies the AEA's statutory predicates, the Proclamation does not provide any process for individuals to contest that they are members of TdA and therefore fall within the terms of the Proclamation. The Proclamation also purports to supplant the removal process prescribed in Congress's immigration laws, which, among other things, provide a right to seek protection from persecution and torture in the country of removal. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make its invocation of the statute public until around 3:53 p.m. EDT on Saturday, March 15. Order at 3. Prior to that, however, the government began staging individuals for summary removal. Decl. of Robert L. Cerna ¶ 5, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 18, 2025), ECF No. 28-1 ("Cerna Decl"); *J.G.G. v. Trump*, 2025 WL 890401, at *3 (D.D.C. Mar. 24, 2025) (prior to publication of Proclamation, and after a lawsuit was filed challenging the AEA removals, it appeared "the government . . . was nonetheless moving forward with its summary-deportation plans."). Individuals who were in ongoing immigration proceedings started being moved overnight from ICE detention facilities around the country and blocked from appearing at their proceedings, where many were seeking asylum. *See* Decl. of Katherine Kim, ¶¶ 2, 4–5, 11–13, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-8 ("Kim Decl.") ; Decl.

of Osvaldo E. Caro-Cruz ¶¶ 2–6, 13, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-7 ("Caro-Cruz Decl."); Decl. of J.G.G. ¶¶ 2–5, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3-3 ("J.G.G. Decl."); Decl. of J.A.V. ¶¶ 6–7, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3-8 ("J.A.V. Decl."); Decl. of Austin Thierry ¶¶ 5–6, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-6 ("Thierry Decl."); Decl. of Solanyer Michell Sarabia Gonzalez ¶ 4, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-13 ("Gonzalez Decl."). After searching for answers in online detainee locators, calling detention centers, and e-mailing officials within the detention system, lawyers for these men began to hear from their clients that they had been taken to detention centers in Texas. *See, e.g.*, Decl. of Grace Carney ¶ 12, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3-4 ("Carney Decl."); Decl. of Karyn Ann Shealy ¶ 5, *J.G.G.*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-9 ("Shealy Decl."); Kim Decl. ¶¶ 10–14; Caro-Cruz Decl. ¶ 18; Thierry Decl. ¶ 5; Decl. of Stephanie Quintero ¶¶ 2–3, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-10 ("Quintero Decl.").

Detention officials began to tell the men they were to be immediately removed from the country. Those warnings began on Friday, March 14. Kim Decl. ¶ 19; Thierry Decl. ¶ 8. On March 15, by the time the Proclamation was made public, these men, five of whom are the named Plaintiffs here, had been shackled and driven

to an airport, despite having no final removal order. Shealy Decl. ¶ 8; Quintero Decl. ¶ 3; Carney Decl. ¶¶ 11–12; Decl. of Melissa Smyth ¶ 14, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 19, 2025), ECF No. 44-12 ("Smyth Decl."). For several Plaintiffs, their asylum claims were based in part on having been *targeted by* TdA. *See* Decl. of J.G.O ¶ 8, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3-5 ("J.G.O. Decl."); Decl. of Molly Lauterback ¶ 8, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3-7 ("Lauterback Decl."); Decl. of J.A.V. ¶ 3, *J.G.G. v. Trump*, No. 25-cv-766, ECF No. 3-8 ("J.A.V. Decl."); *see also* Carney Decl. ¶ 3; Smyth Decl. ¶ 5; *see also* Order at 9 (describing Nicaraguan man who was wrongfully sent to El Salvador and returned).

## II.     The Current Litigation and the District Court's Emergency TRO

In the early hours of Saturday, March 15, five named Plaintiffs filed a class action complaint alleging that the President's invocation of the AEA violated the express terms of the statute, illegally bypassed the immigration processes laid out in the INA, and violated due process under the Fifth Amendment. Order at 4. That morning, Chief Judge Boasberg entered a temporary restraining order prohibiting Defendants from removing the named Plaintiffs pending a hearing. *Id.* at 5.

The same evening, Chief Judge Boasberg held a hastily scheduled virtual hearing. *Id.* at 5. Counsel for Plaintiffs urged the district court to immediately issue class-wide temporary relief, because although "it's Saturday," the government

"appears to be moving planes very rapidly to El Salvador with hundreds of people," where they "may be ending up in a Salvadorean prison." Tr. of Proceedings at 12, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C Mar. 15, 2025), ECF No. 20 ("Tr. of Mar 15 Hr'g"). Counsel expressed alarm that transferring members of the proposed class to El Salvador would put class members in "real trouble." *Id.* Plaintiffs' counsel further posited that two flights "may have already taken off" or were in the process of departing "during this hearing." *Id.*

Chief Judge Boasberg briefly adjourned the hearing so counsel for the government could do "some digging" into whether AEA removal flights were "in motion now." *Id.* at 13. He explained to the parties that, if flights were in motion, the circumstances would warrant a "more immediate decision." *Id.* at 13. Counsel for the government, however, returned without "many details to share." *Id.* at 15. Based on the "unrebutted" possibility that "flights are actively departing and plan to depart," Chief Judge Boasberg determined emergency relief could not "wait any longer," and he was "required to act immediately." *Id.* at 43.

Chief Judge Boasberg provisionally certified a class of "all noncitizens who are subject to the AEA proclamation," *id.* at 25. He stated on the record that he was "prepared to rule," *id.* at 41, then issued an unequivocal command: that "any plane containing these folks that is going to take off or is in the air needs to be returned to the United States." *Id.* at 43. Underscoring his intention, Chief Judge Boasberg twice

directed the government's attorney to communicate this order to his clients "immediately." *Id.* at 43. Thirty minutes after the hearing concluded, the judge memorialized his ruling by issuing a written minute order barring the government from "removing members of such class" under the AEA. Min. Order on Motion to Certify Class, *J.G.G. v. Trump,* No. 25-cv-00766 (D.D.C. Mar. 15, 2025) ("Mar. 15 Min. Order") (cleaned up).

## III.    Post-TRO Developments

The government did not ensure that "any plane" containing members of the provisional class was "returned to the United States." Tr. of Mar. 15 Hr'g at 43. At least two planes carrying individuals who were being removed under the AEA took off during the short recess in the hearing and were in the air when the district judge issued his oral ruling. Order at 8–9. They remained in flight thirty minutes later, when Chief Judge Boasberg entered a minute order memorializing this ruling. *Id.* And the flights continued (with an intermediate stop in Honduras) for several hours *after that*, landing in El Salvador shortly after midnight. *Id.* The government then transferred over a hundred Venezuelan migrants to CECOT, a notorious Salvadoran prison where prisoners face torture and abuse, and where the President of El Salvador has stated that accused gang members, like the deported class members, may remain indefinitely. *See J.G.G* 2025 WL 890401, at *16. Aware of the district court's order, the President of El Salvador tweeted, "Oopsie . . . Too late 😂." *J.G.G.*

*v. Trump*, 2025 WL 1119481, at *5 (D.D.C. Apr. 16, 2025). Order at 10. Secretary of State Rubio re-tweeted the comment. *Id.*[1]

At a subsequent hearing, counsel for Defendants acknowledged that he "understood" that the district court on March 15 had orally directed the government to turn planes around immediately. Tr. of Mot. Hr'g at 5–6, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C Mar. 21, 2025), ECF No. 51 ("Tr. of Mar. 21 Hr'g") ("Your Honor, I understood your intent, that you meant that to be effective at that time."). But the government refused to provide more details about its actions on March 15, instead issuing an unprecedented invocation of the state secrets privilege, even though the government does not claim that the information is even classified, and even though high-level government officials had publicly confirmed many of the details through social media postings. *See* Notice Invoking State Secrets Privilege, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 24, 2025), ECF No. 56; Order at 12.

On April 16, 2025, the district court issued the probable cause order at issue in this appeal. It detailed the administration's extraordinary efforts to remove class members to a prison in El Salvador, with no notice or any process, and in secret before any court could review the legality of its actions. Order at 2–7 (describing

---

[1] The government has since acknowledged that at least one of the individuals on those flights was transferred erroneously, blaming an administrative error. *See Abrego Garcia v. Noem*, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025); *Noem v. Abrego Garcia*, 604 U.S. ___, at *1 (Apr. 10, 2025) Nevertheless, that individual remains in Salvadoran custody. *Id.* at 1—2.

how the administration staged removals in secret, rushed planes off the ground during the TRO hearing, and did not inform the court when asked about flights). The court explained that it had unambiguously enjoined any removals under the AEA and ordered the government to return any class members who were still in U.S. custody, but that the government defied this order and nevertheless removed 137 class members, all of whom were still in U.S. custody when the court issued both its oral and written orders. *Id*. at 7–9, 22–31. The court therefore found that there was "probable cause" to believe that the government had committed contempt. Order at 1, 15, 41, 43, 46; *id.* at 16 (explaining that the Order "inquires only into whether there is probable cause").

To further investigate and address this likely contempt, the district court identified several possible future actions. First, it explained that the government has the "opportunity to purge its contempt," either "by asserting custody of the individuals who were removed in violation of the Court's classwide TRO," or by "propos[ing] other methods of coming into compliance."  Order at 43–44. Second, if the government chooses not to purge the contempt, the court explained that it would "requir[e] declarations" to explain the government's actions. *Id*. at 44. "Should those be unsatisfactory, the Court will proceed either to hearings with live witness testimony under oath or to depositions." *Id.* After all of those steps, the district court stated that it would decide what sanctions to pursue, including a

possible referral of the matter to the government for prosecution or the appointment of another attorney to prosecute the contempt. *Id.*

In parallel, Plaintiffs' substantive claims have progressed further through the judicial system. This Court denied the government's motion to stay the district court's emergency class-wide TRO. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025). The Supreme Court reversed, holding that the detained Plaintiffs' claims must proceed through habeas in their district of confinement, although upholding Plaintiffs' position that "AEA detainees must receive notice," which the government must "afford[] within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, 604 U.S. ___, (Apr. 7, 2025) at *1–2. Plaintiffs are now planning to amend their complaint to seek class-wide habeas relief for those detained at CECOT and in criminal custody throughout the country, as well as class-wide relief on their notice claim for all those subject to the Proclamation. The district court has not yet had an opportunity to rule on that forthcoming motion.

## ARGUMENT

### I. This Court Lacks Jurisdiction Over the Appeal.

To ensure the orderly administration of justice, the Supreme Court and Congress have confined the circumstances where a party may seek appellate relief. Chief among those constraints is the final judgment rule: under 28 U.S.C. § 1291,

the federal courts of appeals have authority to entertain appeals from "final decisions of the district court." Because "[f]inality as a condition of review is a historic characteristic of federal appellate procedure," *Cobbledick v. United States*, 309 U.S. 323, 324 (1940), appellate review afforded outside the typical posture of a "single appeal following final judgment on the merits" must fall within certain specifically delineated exceptions. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. at 374 (1981); *see also* 28 U.S.C. § 1292 (outlining those exceptions).

Here, the government does not even attempt to argue that the district court issued an appealable final order—which, in the criminal contempt context, would have required the district court to make a conclusive liability determination and impose specific penalties. *Salazar ex rel. Salazar*, 602 F.3d at 436. In fact, the government acknowledges that the order here merely "*embark[ed]*" on contempt proceedings, rather than resolved them. Mot. at 7 (emphasis added). Instead, it invokes several of the exceptions to the final judgment rule. But none of them are available here, primarily because the district court has not yet taken any of the actions the government seeks to challenge. The government thus faces no immediate harm from allowing the district court to continue developing the facts regarding the government's defiance of its orders, and to decide what (if any) remedies it will pursue.

## A. The district court did not issue an appealable final order.

13

The government is correct not to claim that the order below is final. Contempt orders are not final and appealable until the district court has definitively resolved "both liability and sanction, just as with ordinary civil and criminal proceedings." 15B Edward H. Cooper, Fed. Prac. & Proc. Jurisdiction § 3917 (2d ed., & June 2022 update). This Court has therefore explained that criminal contempt orders become "final and hence appealable" only once the district court identifies "specific, unavoidable penalties." *Salazar ex rel. Salazar*, 602 F.3d at 436; *see also, e.g.*, *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (contempt orders appealable where order imposes a "present sanction" (cleaned up)). This Court's sister circuits have said much the same.[2]

There is nothing remotely final about the order below. The district court has not concluded that contempt occurred, only that there is probable cause to believe it has. It has not imposed any sanctions on anyone, nor has it even identified a contemnor. The court invited the government to purge its contempt, suggesting one possible avenue while giving the government "an opportunity to propose other methods." Order at 43–44. If the government elects not to purge, the district court

---

[2] *See, e.g.*, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 759 F.3d 1333, 1340 (Fed. Cir. 2014) (no appeal of contempt order where "no sanction has yet been imposed for that contempt and proceedings with respect to that question remain ongoing at the time the appeal before us is filed." (cleaned up)); *In re Grand Jury Subpoena, FGJ-21-01-MIA*, 58 F.4th 1232, 1233 (11th Cir. 2023) ("contempt citations do not satisfy the final judgment rule unless there is both a finding of contempt and a noncontingent order of sanctions").

stated it will develop the facts regarding who did what, but it has not even chosen which means of investigation to pursue. Order at 44 (ordering declarations but deferring any decision on whether to require depositions and witness testimony). This is precisely the kind of intermediate order for which immediate appellate review would violate the "strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals." *United States v. Nixon*, 418 U.S. 683, 690 (1974). Thus, under basic principles of finality and Circuit precedent specific to contempt orders, this Court lacks jurisdiction over this appeal and should dismiss it.[3]

### B. The district court has not ordered any of the actions the government purports to challenge.

Underscoring the premature nature of this appeal, the district court has not ordered the government to do any of the things the government argues are invalid. All of the government's claims remain entirely hypothetical. Set aside the government's seeming suggestion that it does not think there is anything courts can do to punish open defiance of their orders by the executive branch; precedent forecloses that striking assertion of unchecked executive power. Otherwise, there is

---

[3] Because proceedings are ongoing in the district court, and the district court has not yet had an opportunity to consider Plaintiffs' motion to amend the complaint, there is also a real possibility that, ultimately, these contempt proceedings will be properly be characterized as civil, not criminal. That indeterminacy is further reason for this Court not to wade in at such an early stage.

no reason for this Court to review the legality of all the possible outcomes to these proceedings in advance, before the district court has decided which options, if any, to pursue.

Start with the government's complaint that the district court order forces it to "successfully execute foreign diplomacy." Mot. at 11. The order does no such thing. As the district court explained in denying the government's motion for a stay pending appeal, "[i]n offering the government a chance to *voluntarily* assert custody of the people it placed in a foreign prison, then, the Order did not 'forc[e] the government to successfully execute foreign diplomacy' in violation of the separation of powers." *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Apr. 18, 2025), ECF No. 91 at 2 ("Order of Apr. 18") (emphasis in original). The court also invited the government to "propose other methods of coming into compliance."  Order at 44. Nothing about that menu of options—which includes the possibility of purging the contempt through a plan the government *itself* devises—can remotely be characterized as forcing the government to reach a specific outcome through "negotiations with [a] foreign sovereign." Mot. at 12.

Even if the district court had ordered the government to facilitate the return of class members it deported in violation of the court's order and due process, the Supreme Court has just held that district courts may properly order the government to "facilitate" the return of individuals who have been wrongly removed under the

16

AEA. *See Noem v. Abrego Garcia*, 604 U.S. ___, at *1–2 (Apr. 10, 2025); *cf. Abrego Garcia v. Noem*, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025) (denying motion for stay pending appeal and immediate administrative stay). The government provides no explanation for why it can properly be ordered to "facilitate" such a return to cure an administrative error but cannot be ordered to follow any of the steps the district court proposed here to purge its contempt. *See, e.g.*, *United States v. Winter*, 70 F.3d 655, 664 (1st Cir. 1995) (court can provide "an offer to purge" criminal contempt). But in any event, for purposes of appellate jurisdiction, what matters most is that the district court *has not* ordered this.

The government also asserts the district court has attempted to "unconstitutionally commandeer[] the President's exclusive and preclusive prosecutorial powers," Mot. at 1, by directing the Executive Branch to prosecute its own officials for contempt, Mot. at 9. Again, the order does no such thing. *If* the government chooses not to purge its contempt (including through a proposal of its own making), the district court directed the government to provide "declarations" so the court could begin to "identify the individual(s) responsible for the contumacious conduct." Order at 44. That is an initial investigative step, not a prosecution order. As the court itself explained, although its "Opinion noted that the Court might eventually refer this matter for prosecution, *see* Op. at 44 (citing Fed. R. Crim. P. 42(a)(2)), we are not at that juncture." Order of Apr. 18 at 2.

17

Finally, the government takes issue with the possibility that the district court might ultimately appoint an attorney from outside the Department of Justice to prosecute the contempt. *See* Mot. at 10–11. While the Federal Rules of Criminal Procedure explicitly contemplates independent prosecution of criminal contempt if the government declines, Fed. R. Crim. P. 42(a)(2), it is entirely conjectural at this time that the district court will pursue such a course. To reach the point of appointing a private lawyer as a prosecutor—even once contumacious officials have been definitively identified through further fact-finding, Order at 44—several contingencies would have to fall into place. First, the government would have to decline to purge its contempt. Second, the government would have to decline to prosecute any individual official itself (a prospect it characterizes only as "unlikely," Mot. at 9). And finally, the Court would have to determine that no alternative punitive scheme was appropriate in place of prosecution. *See* Brief of *Amici Curiae* John W. Keker, et al. In Support of The Plaintiffs at 23, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Apr. 18, 2025), ECF No. 94-1 at 23 ("Keker Amici"). That string of eventualities further underscores why appellate consideration at this stage is totally premature. *See* Order of Apr. 18 at 2.

That leaves the government's insinuation that immediate appellate review is warranted based on the bare injury of subjecting the Executive Branch to a contempt inquiry. But the judiciary's power to hold the Executive Branch in contempt is firmly

established. For over seventy years, this Court has recognized that Executive Branch officials may be held accountable through contempt proceedings. *Land*, 190 F.2d at 633–34 ("The official status of the respondents does not immunize them from punishment for contempt."); *see also, e.g.*, *In re Contempt Finding*, 663 F.3d at 1271 (upholding contempt finding against Department of Justice lawyers). During that time, "[c]ontempt orders have been levied against executive branch officials and agencies without even so much as a hint that such orders offend separation of powers." *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996), *as amended* (Jan. 17, 1997). And federal officials' susceptibility to contempt proceedings makes good sense: when federal courts issue injunctive relief, they are not merely "hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978), *abrogated on other grounds*, *Dep't of Agric. v. Kirtz*, 601 U.S. 42, 56 (2024). Rather, "[o]nce issued, an injunction may be enforced." *Id.* If the judiciary's power to "say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177 (1803), means anything, it must include the power to ensure Executive Branch compliance with what the law is.

### C. There is no basis for an interlocutory appeal

Just as there is no final order to appeal, the government has no entitlement to interlocutory relief under any exception to the final judgment rule. Precisely because the district court has not ordered the government to do any of the things defendants claim are improper, there is no final injunction to appeal. The collateral order

doctrine also does not permit an appeal. While the government does not even attempt to show it satisfies that doctrine's requirements, in particular none of the cognizable rights and injuries the government asserts will be lost if an appeal waits until the district court has rendered a final judgment. And mandamus is improper for much the same reason: an appeal brought after a final determination on the merits serves as an entirely adequate alternative remedy for the government.

### 1. The district court did not issue an appealable injunction.

The government first argues the intermediate order constructively amounts to an "appealable injunctive order," Mot. at 18, within the meaning of 28 U.S.C. § 1292. Although its basis for that assertion is unclear, the government appears to suggest because the order requires the government to either "assert custody" of the detainees or "aid the court in its efforts to effectuate a contempt prosecution," Mot. at 19. Again, the early nature of the district court's order refutes these arguments. The court has not *ordered* the government to purge its contempt, nor even identified an exclusive means for doing so. And the government does not explain what precisely it thinks the district court may not order. If the government means the district cannot investigate the government's contempt *at all*, that is foreclosed by decades of circuit precedent. And if it means the district court cannot "request[] briefs," "h[o]ld an adversarial hearing," or order a party to submit a declaration, Mot. at 19, those arguments are scarcely worth considering. District courts demand

actions like that of litigants, including Executive Branch litigants, every day, without triggering an entitlement to appellate review. Many such orders are even "strongly challenged" by the parties, Mot. at 19 (quoting *Sampson v. Murray*, 45 U.S. 61, 86-87 (1974)). That does not transform such workaday case management orders into appealable injunctions.

### 2. The collateral order doctrine does not establish jurisdiction.

The collateral order doctrine also does not apply here. That doctrine supplies a narrow exception to the standard course of judicial review, to preserve the possibility of appellate review for issues that otherwise "can never be reviewed at all." *Mitchell,* 472 U.S. at 525 (internal quotation omitted). An immediately appealable collateral order must: (i) be effectively unreviewable otherwise, (ii) conclusively determine a disputed question, and (iii) resolve an important issue separate from the merits of the action. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). The doctrine operates as a "blunt, categorical instrument," that, when applied, makes an *entire class* of orders immediately appealable regardless of an individual order's strength or weakness. *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994).

The government fails to satisfy these requirements on multiple fronts. Nothing about the government's arguments "cannot be effectively vindicated," *Mohawk*

*Indus.*, 558 U.S. at 106, once a final order has been rendered. Any actual contempt determination or sanction can still be considered in the usual course of appellate review. No prosecutorial referral or decision has even been made, so it is hard to see how the government's right to challenge such a decision would be lost forever absent interlocutory appeal now. And the government's complaint that it may be subjected to the irreversible "burden[] of contempt proceedings in violation of the separation of powers," Mot. at 19, flies in the face of settled circuit precedent. *See, e.g.*, *Land*, 190 F.2d at 633-34 ("The official status of the respondents does not immunize them from punishment for contempt.").  Equally to the point, the district court has not "conclusively determine[d]" anything yet or ordered the government to take any specific action, *Mohawk Indus.*, 558 U.S. at 106—because, of course, the order here is merely an intermediate step in an ongoing inquiry. What's more, since the collateral order doctrine operates categorically, *Digit. Equip. Corp.*, 511 U.S. at 883, a holding that early contempt orders like this one are, as a class, subject to the collateral order doctrine would effectively vitiate the well-settled principles of finality that otherwise govern when parties may appeal contempt orders.

### 3. Mandamus is also improper.

For similar reasons, mandamus relief also is not warranted. "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to

22

plaintiff." *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010) (internal quotation omitted). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Burwell*, 812 F.3d at 189. What's more, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (internal quotation omitted).

The government does not even attempt to demonstrate how it surmounts this high bar. But, for the avoidance of doubt, the government's right to relief has no basis in established circuit caselaw, which has long recognized the propriety of contempt proceedings against Executive Branch officials. Equally important, the government has another pathway to relief: namely, letting the contempt process play out in district court and then pursuing appellate remedies at the conclusion of that process—the path this Court has laid out. *See Salazar ex. rel. Salazar,* 602 F.3d at 443; *Armstrong,* 1 F.3d at 1289; *see generally Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380-81 (2004) (no-other-adequate-remedy requirement for mandamus "ensure[s] that the writ will not be used as a substitute for the regular appeals process"). Because the government cannot satisfy these basic jurisdictional prerequisites, the Court should deny the government's request for this extraordinary remedy and leave the questions it poses for the appropriate time: once the district court has rendered a final decision.

**II.    If This Appeal Continues, the Court Should Not Stay the District Court's Ongoing Proceedings.**

Even if this court had appellate jurisdiction, a stay of proceedings in the district court is not warranted. A stay pending appeal is an "extraordinary" remedy, *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam), and requires a stay applicant to (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) establish it will be "irreparably injured" absent a pause while the appeal proceeds; (3) show a stay will not "substantially injure the other parties"; and (4) demonstrate that "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Here, the government is unlikely to succeed on the merits because the evidence is significant that it violated the district court's order. Moreover, the government faces no irreparable harm, because the district court has not ordered any of things the government complains of. And the equities decisively favor continuing proceedings in the district court, particularly for the sake of the proposed class members whom the government wrongfully sent to a notorious Salvadorean prison without any notice or process whatsoever.

### A. The government is unlikely to succeed on the merits.

As the district court explained in its probable cause order, the government plainly violated its temporary restraining order. *See* Order at 8–9, 22–31. Both orally

24

and in writing, the district court enjoined any "removal" under the AEA, and in response to indications that the government was rushing planes off the ground to evade judicial review, the court ordered that anyone on planes "need[ed] to be returned to the United States," either by "turning around a plane or not [dis]embarking anyone on the plane." *Id.* at 8. Lest there was any doubt, the court told the government: "this is something that you need to make sure is complied with immediately." *Id*.; *see* Mar. 15 Min. Order, 7:25 p.m. (written order barring removals "[a]s discussed in today's hearing"). Yet even after the oral and written orders, the government *did not* turn around the two planes that were in the air, and it *did not* return them from their intermediate stops in Honduras, and it *did* remove 137 people under the AEA—precisely what the district court had enjoined. Afterward, public "boasts by Defendants intimated that they had defied the Court's Order deliberately and gleefully." *Id.* at 9.

This striking record of open defiance by the government was more than enough for the district court to find "probable cause" of criminal contempt. *See* Order at 41, 43, 46. The government strains to manufacture ambiguity in the district court's clear orders, Mot. 12–18, but none of its "imaginative" claims are plausible. Order at 15.

1. The government maintains that the court's written order not to "remove" any class member was ambiguous—that it was unclear whether the judge meant to

bar the government from (1) flying people outside U.S. airspace, or (2) transferring custody to another country. Mot. 13–16. But the written order enjoined removals "[a]s discussed in today's hearing," which had ended only a half hour earlier. Min. Order, Mar. 15, 7:25 p.m. And at the hearing, the district court made its intended meaning 100% clear: It ordered that any class members en route to El Salvador "need to be returned to the United States," and that compliance would require "immediately" "turning around a plane or not [dis]embarking anyone on the plane" once it landed abroad. Tr. of Mar. 15 Hr'g. at 43. The Court stated that for the named plaintiffs to "not be removed," they would need, if necessary, to "be brought back once the planes land in El Salvador." *Id.* at 5. There was nothing remotely "muddled" about how the district court understood the removals it was enjoining. Mot. 14.

Indeed, the explicit purpose of the hearing and the plaintiffs' TRO motion was to prevent class members from being transferred out of U.S. *custody* and thus beyond the reach of the district court's jurisdiction, *see* 28 U.S.C. § 1651 (All Writs Act)— a purpose that was highlighted again and again throughout the hearing. *See* Order at 27–29 (Plaintiffs raising the danger that planes were already en route to El Salvador). In that context it would have been "nonsensical" for the court to enjoin anything less than transfer from U.S. custody. *Id.* at 30.

26

No reasonable participant in these events could have misunderstood what the district court ordered. The government advances a series of reasons why the single word "remove," standing alone, could arguably mean flying someone outside of U.S. airspace. Mot. 14–15 (citing dictionary and the AEA's description of an "invasion").[4] But this Court has rejected such attempts to avoid complying with court orders by nit-picking the ambiguity of individual words in otherwise-clear judicial commands. "In determining whether an order is sufficiently clear and specific to justify a contempt conviction, we apply an objective standard that takes into account both the language of the order *and* the objective circumstances surrounding the issuance of the order." *United States v. Young*, 107 F.3d 903, 907–08 (D.C. Cir. 1997) (emphasis added) (examining "the context in which the order was issued" to determine the clarity of "its intended coverage"). And that has to be true, because otherwise litigants could disregard court orders anytime they identify some isolated ambiguity in one of the words, even when the order in context is crystal clear.

This concern—that litigants could ignore court orders with impunity if they can later identify an ambiguous word out of context—is especially acute here, where

---

[4] The government's reliance on the AEA is misplaced, because the AEA provides no definition of the word "removal." The fact that it describes an "invasion or predatory incursion" as taking place against "the territory of the United States," 50 U.S.C. 21, has no bearing on whether "removal"—even in the AEA, much less the district court's TRO—means transferring a person to another country or flying out of U.S. airspace.

the government makes no effort to claim that it misunderstood the district court's orders the day they were issued. It notably did not ask the court for any clarification, despite being "in regular email contact with chambers throughout the day."  Order at 42. And in fact, the government's own understanding of removal, prior to this dispute, has been the same as the district court's. Just days before the TRO proceedings, the same government lawyers had explained its view that in order "to effectuate a departure or removal, the alien must lawfully enter another country," not simply leave U.S. territory. Order at 25–26 (quotation marks omitted). In fact, the government does not identify any other time it has advanced the U.S.-airspace view of removal that it claims here. It came up with this theory solely for the purpose of this dispute, as a post hoc justification for disobeying a court order that was crystal clear in the moment.

2. Even if the written order was ambiguous, the district court's orders at the hearing were direct and specific on the point of turning planes around—something the government does not contest. Those oral orders were themselves binding, as the Second, Third, Fourth, Fifth, and Eleventh Circuits have concluded. Order at 40 (collecting cases). Any other rule would leave litigants free to ignore direct orders from courts, or, even worse, rush to complete the enjoined action before the court can reduce it to writing. Order at 40–41. Indeed, much of the government's conduct in this case—rushing people onto planes and planes into the air during a short recess

in the district court's hearing—have been plainly designed "to outrun the equitable reach of the Judiciary." *Id.* at 41; *see id.* at 6–7 (court adjourned for 38 minutes, so that the government could report on the status of any flights; two flights took off *during* the recess; after the recess, the government did not inform the court of these flights); *see also* Order, *A.A.R.P. v. Trump*, No. 24A1007 (U.S. Apr. 19, 2025) (staying removals); *id.*, Applicants' Reply, at 1–11 (filed Apr. 21, 2025) (detailing further efforts by the government to remove people to a prison in El Salvador without judicial review).

The government notes that a written order trumps a contradictory oral order. Mot. at 17. But there was no conflict here. To the contrary, both orders enjoined the same thing: "removal" under the AEA. And the written order expressly incorporated the court's oral statements, by enjoining removals "[a]s discussed in today's hearing."   The government criticizes the district court for writing a short minute order, *Id*. at 16, 18, but the parties and the court were all operating under a crisis of the government's own making, as it "rushed to load people onto planes and get them airborne" before courts could intervene. Order at 41–42. Having created an emergency as it sought to avoid judicial review, the government cannot use the district court's speed to justify disobeying its orders.

The government also cites a small minority of cases that have held that an injunction is not effective until it is reduced to writing. Mot. 16–17.[5] But even if that were the rule, unlike in those cases, the injunction here *was* entered in writing. The government cites no case for the stunning proposition that litigants can not only ignore a judge's oral commands but also disregard those commands even when they are referenced in, and clearly explain the meaning of, the court's subsequent written order. That is a recipe for widespread defiance of court orders, which this Court should not sanction.

### B. The equities do not favor a stay.

None of the other stay factors warrant the exceptional relief of a stay pending an appeal. *See Nken*, 556 U.S. at 434. The government faces no irreparable harm, because, as explained, none of the orders it purports to challenge have in fact been issued yet. It gestures at the supposed injury of the district court investigating contempt in the first place, Mot. at 19, but under long-settled Circuit precedent, that is no injury at all. *Plaintiffs*, on the other hand, stand to suffer substantial injuries if the district court's contempt proceedings are paused pending an interlocutory appeal.

---

[5] *See Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) (citations omitted) (discussing oral statements when judge "does not follow up with an injunction" in writing); *Hisps. United v. Village of Addison*, 248 F.3d 617, 621 (7th Cir. 2001) ("district judge's ruminations" not binding and appealable); *Landmark Legal Found. v. E.P.A.*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003) (injunction "not recorded in writing").

The question of why the government violated the district court's orders—and how that contempt might be remedied—is a matter of urgent importance to those members of Plaintiffs' proposed class who remain imprisoned in El Salvador, and who were brought there in defiance of the district court's orders and in violation of due process.

The public interest also counsels strongly against a stay. The public has an important interest in the judiciary's ability to investigate violations of its orders, and a right to understand why Executive Branch officials willfully defied the court orders in this case. And the public would suffer a real injury from any suggestion that the government can violate court orders with impunity when it illegally removes people to a notorious prison in El Salvador.

## III.    At a minimum, this Court should expedite the appeal.

If the Court does conclude that it has jurisdiction and grants a stay pending appeal, then Plaintiffs respectfully request that it expedite the appeal.

## CONCLUSION

The Court should dismiss this appeal for lack of jurisdiction. In the alternative, it should deny the requested stay. If it grants the stay, it should expedite the appeal.

31

Respectfully submitted,

Evelyn Danforth-Scott
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104

Lee Gelernt
    *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar C. Jadwat
Sidra Mahfooz
Hina Shamsi
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    THE DISTRICT OF
    COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045

Somil B. Trivedi
Bradley Girard
Michael Waldman
Sarah Rich
Skye Perryman
Audrey Wiggins
Christine L. Coogle
Pooja A. Boisture
DEMOCRACY FORWARD
P.O. Box 34553
Washington, DC 20043

Dated: April 23, 2025

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of D.C. Cir. R. 27(c) because it contains 7793 words.

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ Lee Gelernt
Lee Gelernt
Counsel for *Plaintiffs–Appellees*
Date: April 23, 2025

**CERTIFICATE OF SERVICE**

On April 23, 2025, I served one copy of the Motion to Dismiss Appeal and Response in Opposition to Emergency Motion for a Stay Pending Appeal upon Defendants–Appellants' counsel via this Court's electronic-filing system.

/s/ Lee Gelernt
Lee Gelernt
Counsel for *Plaintiffs–Appellees*
Date: April 23, 2025