Oral Argument Not Yet Scheduled

No. 25-5124

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

## APPELLANTS' RESPONSE TO MOTION TO DISMISS AND REPLY IN SUPPORT OF A STAY PENDING APPEAL OR, IN THE ALTERNATIVE, A WRIT OF MANDAMUS

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
    Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

## INTRODUCTION

The district court's criminal contempt order invites needless constitutional confrontation. In defiance of bedrock separation-of-powers principles, the district court ordered the government to either engage in sensitive foreign relations negotiations and to regain custody over foreign terrorists, or to criminally prosecute itself. Worse, the district court did so to enforce a TRO that the Supreme Court vacated for lack of jurisdiction, and that the government did not violate anyway.

Instead of explaining any constitutional basis for this order, Plaintiffs largely insist this Court lacks jurisdiction to do anything about it. That is wrong—this Court has the power to act, whether through appeal or mandamus, and should exercise that authority to halt the constitutional harms that the order inflicts. Plaintiffs' argument that the district court's order is merely a preliminary investigation presenting a menu of options severely downplays both the order's terms and its consequences. The order forces the government to immediately choose between two equally unconstitutional options—thereby operating like an injunction that compels surrendering the Executive's foreign-affairs power or its prosecutorial power. That choice does not *deprive* this Court of jurisdiction; it *confers* jurisdiction, subjecting the government to a choice that is effectively final and so extraordinary that it warrants mandamus.

1

For similar reasons, this Court should stay and ultimately vacate the district court's order as an unjustified encroachment on Article II power, especially because the government did not even violate the TRO. As the district court acknowledged, the dispute over TRO compliance reduces to whether its order forbade only *physical* removal (from U.S. territory) or also *legal* removal (from U.S. custody). But Plaintiffs never dispute the bedrock principle that ambiguity in the court's written order precludes enforcement by contempt. And established law bars reliance on oral statements to reformulate a written injunction. Criminal contempt proceedings cannot be predicated on an order so unclear that, weeks later, parties and the court are parsing a hearing transcript to divine its true meaning—and where the Executive Branch, which is constitutionally charged with the prosecutorial power, believes that no crime was committed at all.

For these reasons, this Court should deny Plaintiffs' motion to dismiss, stay the district court's order pending appeal, or grant mandamus relief.

## ARGUMENT

### I.    This Court Has Jurisdiction to Enter Relief and Should Do So.

Most of Plaintiffs' brief is dedicated to questioning this Court's authority to grant any relief in this posture. But this Court has jurisdiction, and the order's merits cannot be rehabilitated.

**A. The Contempt Order is Doubly Unconstitutional.**

The grounds for jurisdiction here are bound up with the constitutional defects in the order below.  The district court's criminal contempt order requires the government to either: (1) purge the purported contempt by exercising the President's core foreign-relations power to the district court's specifications, complying with the district court's vacated TRO, and regaining custody of foreign terrorists; or (2) face criminal prosecution by a court-appointed prosecutor if necessary.  This choice places the Executive Branch in an untenable dilemma: abdicate either its "foreign relations" power or its "prosecutorial decisionmaking," both of which are "the special province of the Executive Branch." *Trump v. United States*, 603 U.S. 593, 607, 620 (2024).  Given the serious constitutional harms attendant to the district court's order, this Court has jurisdiction to stay this extraordinary and coercive Hobson's choice.

Plaintiffs' constant refrain is that appeal is premature because the district court made only a preliminary finding that contemplates alternate paths going forward. Resp.1-3, 13-24, 30.  But there is nothing preliminary about what the district court did or the imminent harms it imposes on the Executive.  The district court found probable cause for criminal contempt and "ORDERS" the government to comply with one of two unconstitutional options in just 7 days.  ECF 80.  Facing that

3

unconstitutional choice is a real "here-and-now injury" that cannot be ameliorated later. *See Axon Enters., Inc. v. FTC*, 598 U.S. 175, 192 (2023).

As to the "purge" option, Plaintiffs say the district court gave the government a "menu of options." Resp.16. But the court interprets its order to mean that purging contempt requires the government to regain custody of the removed class members. Op.30-31. So the only "purge" option is to engage in foreign relations with El Salvador to effectuate regaining custody of members of Tren de Aragua, a designated foreign terrorist organization. That usurps the President's core foreign affairs power. *See Biden v. Texas*, 597 U.S. 785, 805 (2022) (Supreme Court has "taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy'"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("policies on aliens" and "foreign relations" are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Once that unconstitutional bell has been rung, it cannot be unrung. Yet Plaintiffs fail to address these serious constitutional harms on the merits.

As to the prosecution option, Plaintiffs say the threat of a special prosecutor is merely an attenuated possibility. Resp.17-18. Not so. The district court first compelled the government to serve up and identify the alleged violators—thereby requiring the government to take concrete action and incur an immediate obligation, i.e., to comply with an injunction. After that, the "next step" the district court

mandated is to request the Executive to prosecute its own officials; if the "Government declines," then "the Court *will* appoint another attorney to prosecute the contempt." Op.44, 46 (emphasis added). There is nothing equivocal about the district court's promise that it "*will* appoint" a prosecutor if the Executive declines to prosecute itself. Yet that directly contravenes the President's "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Again, the Plaintiffs do not address, much less contest, this significant constitutional harm. As a result, Plaintiffs all but concede that if the district court is taken at its word, a serious constitutional violation would occur.

Plaintiffs' ultimate response to this dilemma is to declare that the government cannot be free to simply ignore court orders. Resp.18-19. This is a straw man. The government is not arguing that it can never be sanctioned; that it could never be subjected to civil contempt[1]; or that it would never prosecute an official for criminal

---

[1] In a footnote, Plaintiffs suggests that "contempt proceedings" in this case "will be properly be [sic] characterized as civil, not criminal." Resp.15 n.3. That is wrong, as the district court itself recognized. Civil contempt is designed to induce compliance, so there is no such thing as civil contempt to enforce a *vacated* TRO. Had the district court initiated civil contempt proceedings, the government could have challenged the order for lack of jurisdiction. *See United States v. Straub*, 508 F.3d 1003, 1009 (11th Cir. 2007); *Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992). That is undoubtedly why the district court instead made clear it was pursuing criminal, not civil, contempt. Op.1.

contempt—let alone claiming any power to defy judicial orders. But employing criminal contempt against the government, even in the face of a refusal to prosecute based on a determination that no violation occurred, would be an unprecedented breach of the separation of powers. Conversely, preventing a district court judge from improperly using criminal contempt against the government to dictate foreign affairs or face prosecution does not somehow leave the judiciary powerless to enforce its valid orders.

Again, Plaintiffs do not rebut this. All of their cited cases are inapposite civil contempt cases. *See* Resp.18-19; *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996) (whether executive official could appeal a discovery issue without first facing final civil contempt order); *In re Contempt Finding in U.S. v. Stevens*, 663 F.3d 1270, 1271 (D.C. Cir. 2011) (upholding civil contempt order). Indeed, their central case emphasized that it involved "civil contempt" and that the court "refrain[ed] from imposing penalties for criminal contempt." *Land v. Dollar*, 190 F.2d 623, 636, 648 (D.C. Cir. 1951). Even then, the Supreme Court stayed the case, *Sawyer v. Dollar*, 1951 WL 44185, at *1 (U.S. May 22, 1951), and then vacated it as moot, *Sawyer v. Dollar*, 344 U.S. 806, 806 (1952).

The Executive must abide by judicial orders. But the Judiciary also owes senior executive officials "respect" as representing "another branch of government coequal to the judicial branch in constitutional function and design," which is why

pursuing any form of contempt must be a "last resort," if it may be resorted to at all. *In re Att'y Gen. of U.S.*, 596 F.2d 58, 65, 68 (2d Cir. 1979) (vacating civil contempt against Attorney General on mandamus).  Such respect was not afforded here.  At bottom, the district court's order is a circuitous attempt to enforce a vacated TRO—which the district court concededly was without authority to enter—through unconstitutional means.  And, absent a stay, the government will have to comply at an unbearable constitutional cost—the kind of constitutional conflict that courts ordinarily endeavor to avoid.

### B.  The Contempt Order Is an Appealable Injunction.

Plaintiffs' basic attack on appealability reflects their misguided theme: that the district court has not imposed sanctions and that multiple avenues remain open to the government.  Resp.14-15, 20.  By directing modes of compliance that are different in form but equally unconstitutional, however, the district court's contempt order "has the 'practical effect' of granting … an injunction."  *Abbott v. Perez*, 585 U.S. 579, 594 (2018).  For all of the reasons discussed, it threatens "serious, perhaps irreparable, consequence" to the separation of powers, *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981), by mandating that the Executive exercise either its foreign-affairs power or its prosecutorial authority in the way the district court desires.  If this is a "menu of options," it is a wholly unappetizing one.

7

This Court's decision in *Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978) underscores the existence of appellate jurisdiction here. There (as here) a district court "commanded an unprecedented action irreversibly altering [a] delicate diplomatic balance." *Id.* at 953 (D.C. Cir. 1978). The district court's order below is equally appealable as an "action so potent with consequences so irretrievable." *Id.*

In addition, as the government observed, the district court's cited authorities underscore the injunctive nature of its order. *See* Op.43 (describing the "opportunity to purge" contempt as a first attempt at "coercive remedies" (quoting *Yates v. United States*, 355 U.S. 66, 75 (1957)); *id.* (calling it "an order *directing* either compliance … or a showing of an excuse for the noncompliance" (emphasis added) (quoting 9A Wright & Miller, *Federal Practice & Procedure*, § 2465)). The same is true of Plaintiffs' cited cases. Resp.14. In one, this Court explained that "[b]eing placed under the threat of future sanction *is* a present sanction," so an order threatening even a "conditional sanction for failure to comply with a preexisting order" must be appealable. *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). So too here. Plaintiffs' other case also held that "conditional sanction[s]" were sufficient (not necessary) for appealability. *Salazar ex rel. Salazar v. D.C.*, 602 F.3d 431, 436 (D.C. Cir. 2010). This case is even stronger, as the government was only given 7 days to pick its unconstitutional poison.

8

Plaintiffs also misunderstand the relevance of adversarial briefing and hearing. Though they are of course not *alone* sufficient to render a particular order an appealable injunction, those factors undoubtedly weigh in favor of treating an order with injunctive effect as appealable, as the Supreme Court just recognized. *See*, *e.g.*, *Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025). Where the "'basis for issuing the order is strongly challenged," the resulting order is more likely to be akin to an appealable order. *Id.* (cleaned up).

In short, the district court's contempt order required the Executive Branch to pick from two unconstitutional options. That the district court framed its order as a "choice" does not save it from review.

### C. The Contempt Order Is an Appealable Collateral Order.

The contempt order is also an appealable collateral order. Plaintiffs contend otherwise because an "actual contempt determination or sanction can still be considered in the usual course of appellate review." Resp. 21-22. But while that observation may generally be true for ordinary contempt cases, it misunderstands the unique constitutional harm that accrues each day the district court's extraordinary contempt crusade continues. The district court may not dangle the sword of criminal prosecution over the Executive to coerce it to engage in foreign relations in a manner that the court has deemed desirable. And even if the Executive withstands the coercion, the Executive suffers irreparable harm from the usurpation

of its prosecutorial power, whether or not it can prevail at trial or on appeal from any contempt judgment. Because the threatened proceedings *themselves* impose constitutional harm, appellate review at the conclusion of contempt proceedings are inadequate. *See Will v. Hallock*, 546 U.S. 345, 352 (2006) ("honoring the separation of powers" is a "particular value of a high order … marshaled in support of the interest in avoiding trial"); *cf. Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1140 (9th Cir. 2013) ("immunity doctrines entitle the defendant to avoid facing suit and bearing the burdens of litigation," so they can be appealed before finality); *Axon Enters.*, 598 U.S. at 190-91 (where plaintiff suffers a here-and-now injury from being subjected to unconstitutional proceedings, "it is impossible to remedy once the proceeding is over, which is when appellate review kicks in").

The district court has already made a conclusive determination as to the relevant question—whether the Executive may be subjected to a criminal contempt prosecution, with only two unconstitutional options for how to proceed. Once the government has been forced to proceed down one of those unconstitutional paths, the harm cannot be undone by a later appeal. Plaintiffs worry that this would "vitiate" finality because collateral orders are appealable on a categorical basis. Resp.22. But the category here is exceedingly narrow: criminal contempt against the Executive Branch. And it appears to be a class of one—neither Plaintiffs nor the district court have been able to point to any examples. The separation of powers is

in a category of its own, which is why the Supreme Court gives "special solicitude [] to claims alleging a threatened breach of essential Presidential prerogatives" in considering the scope of collateral order jurisdiction. *Nixon*, 457 U.S. at 743. That same fundamental principle warrants recognizing jurisdiction here.

### D. The Contempt Order Also Warrants Mandamus.

Plaintiffs hardly address the government's request for mandamus. Resp.23. Their argument is, again, the government should be forced to suffer severe separation of powers harms before it can appeal. But, as explained above and in the motion, it is clear and indisputable that the criminal contempt order is improper. And the nature of this harm warrants mandamus.

Once more, the government will suffer irreparable constitutional harms if the district court's contempt order is not stayed or vacated. That is a traditional ground for mandamus. *See Ex parte Peru*, 318 U.S. 578, 587 (1943) (mandamus jurisdiction appropriate to ensure that "the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings"). This is especially true in the field of foreign relations, where "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *Id.* at 588. Without immediate relief, the government will be forced to negotiate with a foreign

power to take custody of foreign terrorists, under pain of criminal prosecution. Such "occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382, 389-90 (2004) ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities."). Indeed, mandamus has been granted where the Attorney General faced civil contempt because the "public importance, with separation of power overtones, [ ] warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." *In re Att'y Gen.*, 596 F.2d at 64. *A fortiori* here, where senior executive officials face *criminal* contempt.

## II.    Relief Is Especially Warranted Because There Was No Contempt.

The constitutional confrontation invited by the district court is especially ill-advised because it is so unnecessary: the government *complied* with all court orders. The TRO enjoined the government "from removing members of [the] class." March 15, 2025, 7:25 PM Minute Order. By its plain terms, that meant the government could not remove class members from United States territory. And no class member was removed from the United States after the order and while it remained in effect. That should end the matter.

Yet the district court contorted itself to interpret its now-vacated order to mean removal not just from U.S. territory but also from U.S. "custody"—at once turning

the order into an extraterritorial interference with the President's Article II powers and triggering an unprecedented criminal contempt proceeding. Op.23. That is not a fair reading of the TRO, given the Alien Enemies Act context. Plaintiffs claim the Act does not define removal (Resp.27n.4), but they ignore Sections 23 and 24, which allow a court to order an alien to be "removed *out of the territory of the United States*" and direct a marshal to cause "a removal of such alien *out of the territory of the United States*." 50 U.S.C. §§ 23, 24 (emphases added). So removal, under the Act, clearly refers to leaving U.S. territory. The TRO is best read *in pari materia*. And dictionaries point the same way. *See* ECF 58 at 3; *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023) (relying on dictionaries at the time of passage, including Black's).

At worst, the written TRO was ambiguous. Indeed, the district court itself admitted both interpretations were possible. Op.25-26. That acknowledgement should have foreclosed criminal contempt, since "long-standing" law states that "ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971). "[W]here there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974). This Court thus "resolve[s] 'omissions or ambiguities in the order' in favor of the enjoined party." *United States ex rel.*

*Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 587 (D.C. Cir. 2016) (quoting Charles Alan Wright et al., 11A Federal Practice and Procedure § 2955 (3d ed. 2013)).

Plaintiffs do not contest that any contempt is a "potent weapon" that "courts should not resort [to] where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision*, *Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). Nor do Plaintiffs contest that it is "settled law that contempt will not lie for violation of an order of the court unless the order is clear and decisive and contains no doubt about what it requires to be done." *Joyce*, 498 F.2d at 596. In fact, they do not address this case law at all. Plaintiffs cannot justify this particular order by combing through the hearing to cherry-pick quotes to manufacture clarity where there is none and claiming any ambiguity in the written order amounts to "nitpicking." *See* Op.22-30; Rep.24-30.

Rule 65(d) provides that a TRO or injunction "must … state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." That rule would be meaningless if parties had to rely on second-hand descriptions of what was said during a hearing (not even a hearing transcript was available during the relevant time period) to divine the true meaning of a court's injunctions rather than the court's written order. *Bates v. Johnson*, 901 F.2d 1424,

1427 (7th Cir. 1990) (Easterbrook, J.); *see also Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003).

Plaintiffs claim that this well-established line of authority is irrelevant because (1) those cases involved only oral orders while the order here was written; (2) here there was no conflict between the written order and the oral statements; and (3) the written order somehow incorporated the hearing.  Resp.29-30.  All of this is wrong as a matter of both law and fact.  As to the first, "statements in court or in opinions do not change the contents of injunctions," including by supplementing a written TRO.  *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988) (Easterbrook, J.) (refusing to supplement written TRO with other sources); *see also Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 896 (9th Cir. 2004) (where record includes both oral and written rulings on the same matter, "[w]e review the written opinion and not the oral statements").  As to the second, the "conflict" is that the written TRO included no directive to return aliens from abroad; if the two orders were truly identical, contempt would be apparent from the written order alone. Finally, Rule 65(d) "forbid[s] giving effect to such an incorporation," even if express in the order.  *Bethune Plaza*, 863 F.2d at 527.[2]

---

[2] For what it's worth, Plaintiffs themselves previously recognized in this Court the fundamental separation between the oral instruction and written order, arguing that the district court's oral instruction to return planes was *not* incorporated into the written minute order.  *See* Oral Arg. at 1:19:39-42 ("I don't think the order to return

Plaintiffs' only rejoinder is that other circuits supposedly consider oral orders to be binding. Resp.28-30. But no one claims that this Court has weighed in on this circuit split. So if anything, this conflict (which the district court acknowledged Op.40) proves the government could not have acted willfully—a complete defense to a criminal contempt charge. Criminal liability does not attach for being on the putative "wrong" side of a circuit split, especially when the relevant circuit has not itself addressed the issue. Plaintiffs do not even address this point. This is because it defeats any possible basis for criminal contempt against any party, let alone a government official when the government itself agrees with the official. *See Joyce*, 498 F.2d at 596.

All that said, even if this Court considers the hearing transcript, it obfuscates more than it elucidates. Plaintiffs' argument simply mirrors the district court's opinion. *See* Op.8, 26-30; Resp.25-26. So it fails for the same reasons explained in the opening motion. *See* Mot.15-20. If anything, some of the district court's statements support the government's interpretation that removal is territorial. *See* Tr. 36 ("once they are *out of the country*, I'm not sure what I can do there."). Indeed, the district court specifically indicated that its written order would set forth all of the

---

the planes is before you."), https://media.cadc.uscourts.gov/recordings/docs/2025/03/25-5067.mp3; *id.* at 1:17:29-37 ("The order about bringing people back, or potentially bringing people back, is not before you."). That should resolve whether the oral pronouncements are binding and enforceable by contempt: They are not.

16

necessary details: telling the government that it "w[ould] issue a minute order memorializing [a TRO] so *you don't have to race to write it down*." Tr.42. (emphasis added). And then the written order included no "turn the planes around" language.

Plaintiffs also argue that if the order was so ambiguous, the government should have sought clarification—and, by implication, acted *criminally* by failing to do so. Resp.27-28. But, in the course of fast-moving events and the execution of a major counterterrorism operation that involved coordination with foreign sovereigns, the government in good faith interpreted the limited written order to mean territorial removal. Again, this is the whole point of requiring a written order, so the government "need not guess their obligations at peril of contempt sanctions." *Hisps. United of DuPage Cnty. v. Vill. of Addison*, 248 F.3d 617, 620 (7th Cir. 2001) (rejecting reliance on oral statements). At a minimum, the written order needed to be clearer to justify criminal contempt. *See Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 83 (3d Cir. 1982) ("The order unreasonably requires the parties to guess at the kinds of conduct that will be deemed infringement").

Ultimately, the government faces irreparable constitutional harm if the contempt order is allowed to take effect. For the same reasons, the equities and public interest favor the government. And *Plaintiffs* face no injury from staying a criminal contempt order meant to vindicate the *court's* authority. *See United States v. Perry*, 116 F.3d 952, 956 (1st Cir. 1997) (criminal contempt is about the court, not

the plaintiffs).  And any judicial interest in vindicating its authority is at its nadir here, after the Supreme Court's determination that the district court did not properly have jurisdiction in the first place.  *See J.G.G.*, 2025 WL 1024097 ("jurisdiction lies in only one district: the district of confinement.").  This Court should stay the district court's improper contempt order or grant mandamus.

## CONCLUSION

This Court should deny Plaintiffs' motion to dismiss, stay the contempt order pending appeal, or alternatively grant mandamus relief terminating the criminal contempt proceedings.

Dated: April 25, 2025

Respectfully submitted,
PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
   Attorney General

CHAD MIZELLE
   Acting Associate Attorney General

*/s/ Drew Ensign*
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 4229 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Drew C. Ensign*
DREW C. ENSIGN