No. 25-5124

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,

*Plaintiffs–Appellees*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, *et al.*,

*Defendants–Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00766
The Hon. James E. Boasberg

ADDENDUM TO PLAINTIFFS-APPELLEES'
PETITION FOR REHEARING *EN BANC*

Evelyn Danforth-Scott
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Lee Gelernt
   *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar

(212) 549-2660
lgelernt@aclu.org

Brian Netter
Bradley Girard
Christine L. Coogle
DEMOCRACY FORWARD
    FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Phone: (202) 448-9090
Fax: (202) 796-4426

*Counsel for Plaintiffs–Appellees*

ii

## TABLE OF CONTENTS

Appellate Court's Order (Aug. 8, 2021) ....................................................1

Appellate Court's Opinion (Aug. 8, 2021) ..............................................3

Certificate of Parties and Amici Curiae ...............................................113

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5124**            **September Term, 2024**

**1:25-cv-00766-JEB**

**Filed On:** August 8, 2025

J.G.G., et al.,

      Appellees

   v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

      Appellants

**BEFORE:**    Pillard, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for a stay pending appeal or, in the alternative, a writ of mandamus, the opposition thereto, and the reply; the motion to dismiss the appeal, the opposition thereto, and the reply; the Rule 28(j) letter and the response thereto; the motion to supplement the record on appeal or alternatively remand for further fact finding, the opposition thereto, and the reply; the supplemental brief and the response thereto; and the corrected motion to participate as amicus curiae and the lodged amicus brief, it is

**ORDERED** that the corrected motion to participate as amicus curiae be granted. The Clerk is directed to file the lodged amicus brief. It is

**FURTHER ORDERED** that the motion to supplement the record on appeal be granted and that the alternative motion to remand for further fact finding be denied. It is

**FURTHER ORDERED** that the motion to dismiss the appeal be granted and that the petition for a writ of mandamus be granted and the district court's contempt-related order entered on April 16, 2025, be vacated, in accordance with the per curiam opinion filed herein this date.[*] Separate concurring opinions of Circuit Judge Katsas and Circuit Judge Rao and the dissenting opinion of Circuit Judge Pillard accompany the per curiam opinion.

_____

[*] Circuit Judge Pillard dissents from the order granting mandamus and vacating the district court's order.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5124**                                    **September Term, 2024**

The grant of mandamus relief will become effective and the administrative stay entered on April 18, 2025, will dissolve 21 days after issuance of this order.  See D.C. Cir. Rule 41(a)(3).  It is

**FURTHER ORDERED** that the emergency motion for a stay pending appeal be dismissed as moot.

The Clerk is directed to withhold issuance of the appeal-related mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc.  See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:     /s/
Daniel J. Reidy
Deputy Clerk

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Decided August 8, 2025

No. 25-5124

J.G.G., ET AL.,
APPELLEES

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia and
Emergency Motion for a Stay Pending Appeal or,
in the Alternative, a Writ of Mandamus
(No. 1:25-cv-00766)

———

*Pamela J. Bondi*, Attorney General, U.S. Department of
Justice, *Yaakov M. Roth*, Principal Deputy Assistant Attorney
General, *Drew C. Ensign*, Deputy Assistant Attorney General,
*Emil Bove*, Principal Associate Deputy Attorney General, and
*Chad Mizelle*, Acting Associate Attorney General, were on
appellants' emergency motion for a stay pending appeal or, in
the alternative, a writ of mandamus and the reply.  *August E.
Flentje*, Acting Director, entered an appearance.

2

*Richard P. Hutchison* was on the brief for amicus curiae Landmark Legal Foundation in support of appellants.

*Lee Gelernt*, *Daniel Galindo*, *Ashley Gorski*, *Patrick Toomey*, *Omar Jadwat*, *Hina Shamsi*, *My Khanh Ngo*, *Cody Wofsy*, *Arthur B. Spitzer*, *Scott M. Michelman*, *Aditi Shah*, *Somil B. Trivedi*, *Bradley Girard*, *Michael Waldman*, *Sarah Rich*, *Audrey Wiggins*, *Christine L. Coogle*, and *Pooja Boisture* were on appellees' motion to dismiss the appeal and opposition to appellants' emergency motion for a stay pending appeal or, in the alternative, a writ of mandamus.

Before: PILLARD, KATSAS, and RAO, Circuit Judges.

Opinion for the Court filed *Per Curiam*.

Concurring opinion filed by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* PILLARD.

*Per Curiam*:  This matter arises from challenges to the government's removal of alleged members of the transnational criminal gang Tren de Aragua (TdA) pursuant to a presidential proclamation designating TdA members as alien enemies under the Alien Enemies Act, 50 U.S.C. § 21.  Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 20, 2025). On March 15, 2025, five alleged TdA members sued on their own behalf and as representatives of a proposed class to direct the President, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Acting Director of Immigration and Customs Enforcement to halt their impending removals pursuant to the proclamation.  That same day, the district court held an emergency hearing, provisionally

4

3

certified a class of aliens subject to the proclamation, and issued a temporary restraining order (TRO) barring their removal.  The government nonetheless flew class members from the United States to El Salvador and transferred them into the custody of Salvadoran authorities.  According to the government, the TRO barred only the removal of class members from United States territory, which had already occurred before the TRO was entered.  According to the district court, the TRO barred the removal of class members from United States custody, and the government likely violated it by transferring the class members into Salvadoran custody after the TRO was entered.

In response to these events, the district court issued an order and accompanying opinion finding probable cause that some federal officials willfully violated the TRO.  The court offered the government an option to "purge" the putative contempt by asserting custody over the removed individuals or proposing other methods of coming into compliance.  Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 80 (D.D.C. Apr. 16, 2025); *see* Memorandum Opinion, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), 2025 WL 1119481, at *20 (D.D.C. Apr. 16, 2025) (the government may "propose other methods of coming into compliance, which the Court will evaluate").  The court also stated that, if the government opts not to purge, it must identify the Executive Branch officials who, aware of the court's TRO, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025.  Order, Dkt. No. 80.  The court further stated that its "next step would be" to "request that the contempt be prosecuted by an attorney for the government."  Memorandum Opinion, 2025 WL 1119481 at *21 (quoting Fed. R. Crim. P. 42(a)(2)).  And it stated:  "If the government 'declines' or 'the interest of justice requires,' the Court will 'appoint another attorney to prosecute the contempt.'"  *Id.* (quoting same rule).

4

The government appealed the probable-cause order and moved for an emergency stay or a writ of mandamus terminating the criminal-contempt proceedings. The plaintiffs moved to dismiss the appeal. This Court granted an administrative stay pending consideration of these motions.

We grant the appellees' motion to dismiss the appeal for lack of appellate jurisdiction. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949); *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986). The panel is unanimous on this point.

Judge Katsas and Judge Rao conclude that the government has satisfied the stringent requirements for a writ of mandamus. The Court therefore grants the government's petition for mandamus and vacates the district court's probable-cause order. Judge Pillard dissents from the grant of mandamus and the vacatur.

KATSAS, *Circuit Judge*, concurring:  This case involves an extraordinary, ongoing confrontation between the Executive and Judicial Branches.  On March 15, 2025, the Executive sought to implement a presidential proclamation mandating the swift, wholesale removal of adult members of the Venezuelan criminal gang Tren de Aragua (TdA)—a designated foreign terrorist organization.  This operation required precise coordination among at least three different sovereign nations, as planes carrying more than 100 alleged TdA members flew from Texas to Honduras to El Salvador.  The operation also involved a transfer of physical custody over these detainees from the United States to El Salvador, accomplished at a Salvadoran airport with Salvadoran security forces assembled *en masse*.  But while this operation was ongoing, five alleged TdA members sued in Washington, D.C. to prevent the removals, and the district court urgently attempted—within a matter of hours—to preliminarily assess their lawfulness.  After flights carrying some of the alleged TdA members had exited United States airspace, the court, through a minute order, temporarily restrained the removals.  According to the Executive Branch, the removals had already occurred before the TRO was entered.  According to the district court, the Executive carried out the removals in defiance of the TRO.

In response to these events, the district court initiated a criminal-contempt proceeding.  The court found probable cause that some federal officials willfully violated the TRO, and it ordered the government to identify who.  The court offered to stand down if the Executive Branch chose to purge the putative contempt by asserting custody over the removed individuals—Venezuelan nationals then being detained by the Salvadoran government in El Salvador.  If necessary, the court promised to appoint a private attorney to prosecute the responsible Executive Branch officials.  And it did all this to vindicate a TRO that the Supreme Court had vacated for lack of jurisdiction.  The district court's order raises troubling questions about judicial control over core executive functions

2

like the conduct of foreign policy and the prosecution of criminal offenses. And it implicates an unsettled issue whether the judiciary may impose criminal contempt for violating injunctions entered without jurisdiction.

At the end of this dispute lies a much simpler question. By its terms, the TRO prohibited the government from "removing" suspected TdA members. This prohibition could be interpreted in either of two ways. It might have barred the government simply from expelling detainees from United States *territory*. Or, it might have barred the government from surrendering *custody* of the detainees to a foreign sovereign. All agree that the government did not violate the TRO under the former view, so the contempt question boils down to a straightforward interpretive dispute over what constituted "removing" within the meaning of the TRO. For purposes of criminal contempt, ambiguities in the underlying injunction must be resolved in favor of the alleged contemnor. At the time of the alleged contempt, just hours after the TRO hearing and before any transcript of it was available, the district court's minute order could reasonably have been read either way. Thus, the TRO cannot support a criminal-contempt conviction here.

The government has sought review of the probable-cause order by way of appeal and mandamus. There is no basis for interlocutory appellate jurisdiction. Nonetheless, mandamus is appropriate because the government is plainly correct about the merits of the criminal contempt, and our saying so now would prevent long disputes between the Executive and the Judiciary over difficult, contentious issues regarding the courts' power to control foreign policy or prosecutions, or to impose criminal sanctions for violating injunctions entered without jurisdiction. In circumstances much less fraught than these, courts have reviewed interlocutory orders through mandamus to prevent extended inter-branch conflict.

3

For these reasons, I concur in the order granting the petition for mandamus and vacating the probable cause order.

I

A

The Alien Enemies Act authorizes the President, during times of conflict, to remove aliens with allegiance to a hostile foreign nation. The statute applies whenever the United States is in a declared war or "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation." 50 U.S.C. § 21. In those circumstances, the President may "make[] public proclamation of the event," in which case all nationals of the hostile country who are at least 14 years old and "within the United States" become "liable to be apprehended, restrained, secured, and removed as alien enemies." *Id.*

Tren de Aragua is a transnational criminal organization based in Venezuela. On February 20, 2025, the Secretary of State designated TdA as a foreign terrorist organization under the Antiterrorism and Effective Death Penalty Act of 1996. That statute allows the Secretary of State, after consulting with the Secretary of the Treasury and the Attorney General, to designate as a "foreign terrorist organization" any foreign group engaging in terrorism that "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(C); *see id.* § 1189(a)(1), (d)(4). To support such a designation, the Secretary must make findings based on an administrative record. *See id.* § 1189(a)(2)(A)(i), (3)(A). The designated FTO may seek judicial review. *See id.* § 1189(c)(1); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196–97 (D.C. Cir. 2001). The consequences of a designation are severe: Alien members of a designated FTO are inadmissible

4

to the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(V), (vi)(I). It is a criminal offense to knowingly provide material support to the FTO. 18 U.S.C. § 2339B(a)(1). And the FTO's funds are frozen. *Id.* § 2339B(a)(2). Prior administrations had imposed other sanctions to curb TdA's human and drug trafficking in the United States. *See* Notice of OFAC Sanctions Actions, 89 Fed. Reg. 57,994 (July 16, 2024); *Treasury Sanctions Tren de Aragua as a Transnational Criminal Organization*, U.S. Dep't of the Treasury (July 11, 2024), https://perma.cc/6FYN-JMGP.

On Friday, March 14, 2025, the President issued an AEA proclamation directed at TdA. *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 20, 2025). The proclamation found that TdA is conducting "irregular warfare" against the United States by committing "brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking." *Id.* at 13,033. The proclamation further noted TdA's designation as an FTO, as well as a 2024 statement by the International Criminal Police Organization that TdA "has emerged as a significant threat to the United States." *Id.* The proclamation determined that the Venezuelan government, acting through TdA, uses "illegal narcotics as a weapon to 'flood' the United States." *Id.* Based on these findings, the President determined that TdA, "at the direction" of Venezuela, is engaged in "an invasion or predatory incursion against the territory of the United States." *Id.* at 13,034. And he therefore proclaimed that Venezuelan citizens who are members of TdA, at least 14 years old, present in the United States, and neither naturalized nor lawful permanent residents are "liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id*. (citing AEA). Finally, the President directed the Attorney General and the Secretary of Homeland Security to apprehend, detain, and remove all such aliens. *Id.*

5

The proclamation was published one day after its issuance, on Saturday, March 15.

The Executive Branch moved quickly and forcefully to implement this proclamation. Before the President signed it, the government began apprehending and interviewing suspected TdA members. The government moved some of them to the El Valle Detention Facility in Raymondville, Texas, about 40 miles from our southern border. The government also arranged to immediately remove more than 100 of these detainees from the United States and to transfer physical custody over them to the government of El Salvador. According to evidence credited by the district court, two flights carrying these detainees took off from an airport near El Valle around 5:25 P.M. and 5:45 P.M. on March 15. The flights landed at a Honduran military base and remained there for several hours. Then, the flights took off for El Salvador and landed there shortly after midnight on Sunday, March 16. Awaiting the flights were hundreds of Salvadoran security forces, dressed in full combat gear. These forces removed the detainees from the planes and placed them on buses, which whisked them away to a Salvadoran prison known as the Terrorism Confinement Center (CECOT). The President of El Salvador oversaw this operation on his end.[1]

---

[1] In a different AEA removal case, the Solicitor General indicated that TdA members "have proven to be especially dangerous to maintain in prolonged detention." Suppl. Mem. Regarding Emergency Appl. at 3, *A.A.R.P. v. Trump*, No. 24A1007 (U.S. May 12, 2025). Some of them "recently barricaded themselves in a housing unit for several hours and threatened to take hostages and harm ICE officers." *Id.* And transferring them to other facilities "creates ongoing risks of prison recruitment and expansion of" TdA gang activities within the United States. *Id.* Given these facts, it is unsurprising that the government moved expeditiously.

11

6

B

While the Executive Branch worked feverishly to accomplish these AEA removals, lawyers for the suspected TdA members worked feverishly to stop them. Shortly after 1:00 A.M. on March 15, they filed suit in the District Court for the District of Columbia. The named plaintiffs were five individuals detained in Texas at El Valle. The named defendants included the President, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Acting Director of Immigration and Customs Enforcement. The complaint alleged that the AEA did not authorize the proclamation, which also allegedly violated the Immigration and Nationality Act, the Convention Against Torture, the Due Process Clause, and the Suspension Clause. The complaint invoked causes of action under the federal habeas corpus statute, the Administrative Procedure Act, and principles of nonstatutory review. It also sought class certification and a TRO. The complaint took no issue with the President's description of TdA as a terrorist organization posing a substantial threat to national security. However, the complaint disputed that TdA was conducting a predatory incursion on behalf of Venezuela, and it alleged that none of the named plaintiffs were TdA members.

Over the course of the day, litigation proceeded on an emergency basis. At 9:40 A.M., the district court entered an *ex parte* TRO stating that the government "shall not remove any of the individual Plaintiffs from the United States for 14 days." Minute Order (Mar. 15, 2025) (First Minute Order).[2] Apparently, the government had already placed some of the named plaintiffs on airplanes, but it returned them to the

---

[2] Unless otherwise indicated, all docket citations are to *J.G.G. v. Trump*, No. 25-cv-766.

7

detention facility after learning of the TRO. The government continues to detain these five individuals within the United States, so there is no allegation that it has violated this TRO.

Given the likelihood of imminent removal flights, the district court scheduled a videoconference hearing for 5:00 P.M. to consider further interim relief. At that hearing, the court dismissed the habeas claims without prejudice and provisionally certified a class of aliens held by the United States and subject to the proclamation. At about 6:45 P.M., the court decided to issue a second TRO despite acknowledging "hard" and "close" questions whether disputes under the AEA are justiciable. Tr. of Mot. Hr'g 41, Dkt. No. 20 (Mar. 16, 2025) ("Tr.").[3] After the court announced that a second TRO would be appropriate "to prevent the removal of the class for 14 days," it promised to "issue a minute order memorializing this so you don't have to race to write it down." *Id.* at 42. The court then told government counsel:

> [Y]ou shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.

*Id.* at 43. At approximately 7:25 P.M., the court followed up with a written minute order prohibiting the government "from removing members of such class (not otherwise subject to

---

[3] Although this hearing occurred on March 15, the transcript was not available or docketed until March 16.

8

removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Minute Order (Mar. 15, 2025) (Second Minute Order). After this TRO was entered, no more planes departed to carry out removals based on the proclamation. The court later extended both TROs by 14 days.

The government appealed and sought a stay of the TROs. This Court denied relief, but the Supreme Court vacated the TROs. *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025) (per curiam). It concluded that, because the plaintiffs had in substance raised "core" habeas claims, "jurisdiction lies in only one district: the district of confinement." *Id.* at 1005–06 (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). For the named plaintiffs, that was the Southern District of Texas. *See id.* at 1006.

Since the Supreme Court's decision, alleged TdA members have continued to seek relief. Individuals currently detained in the United States have filed habeas actions in the districts where they are confined, and courts have afforded temporary relief to putative classes. *See*, *e.g.*, *A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025) (per curiam) (*A.A.R.P. II*). Moreover, the plaintiffs in this case have filed an amended complaint raising habeas and due-process claims on behalf of the individuals who were removed and transferred to CECOT. In considering that complaint, the district court held that habeas jurisdiction would lie if the United States had "constructive custody" over the detainees—in other words, if El Salvador were holding the detainees "at the behest and ongoing supervision" of the United States. Order at 2, Dkt. No. 116 (May 8, 2025) (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 30 (D.D.C. 2004)). After jurisdictional discovery revealed no such constructive custody, the court nonetheless enjoined the government to "facilitate" the ability of the CECOT detainees to file habeas petitions. Mem. Op. at 64–67, Dkt. No.

14

9

148 (June 4, 2025) (Second Mem. Op.).  The propriety of that injunction is not presently before us.

C

In response to the March 15 removals, the district court has begun criminal-contempt proceedings.  On April 16, the court issued an order finding probable cause that yet-unnamed government officials committed criminal contempt by willfully defying the court's second minute order.  The court concluded that the Supreme Court's vacatur of that order does not bar the imposition of criminal sanctions.  The court reasoned that an injunction can support criminal contempt even if the court lacked jurisdiction to enter it, because parties must obey even void judicial orders unless and until they are reversed on appeal.  Mem. Op. at 17–20, Dkt. No. 81 (Apr. 16, 2025) (Mem. Op.).  Alternatively, the district court reasoned, it had jurisdiction because the Supreme Court vacated the TRO only for improper venue and no cause of action.  *Id.* at 20–21.  On the merits, the court held that the TRO had unambiguously prohibited the government from "relinquishing custody" over the detainees "into the hands of a foreign government," which occurred several hours after the TRO was entered.  *Id.* at 24. The court offered to stand down if the defendants "choose to purge their contempt" by "asserting custody" over the individuals transferred to CECOT, "so that they might avail themselves of their right to challenge their removability through a habeas proceeding."  *Id.* at 43–44.  Otherwise, the court said that it "will proceed to identify" which government officials, with knowledge of the TRO, "made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025."  *Id.* at 44; Order at 1, Dkt. No. 80 (Apr. 16, 2025).  The court promised a criminal prosecution of those individuals, either by the Executive Branch or, if necessary, by a private attorney appointed by the district court.

15

10

Mem. Op. at 44 ("If the Government declines [to prosecute] or the interest of justice requires, the Court will appoint another attorney to prosecute the contempt." (cleaned up)).

The government appealed the probable-cause order and moved for an emergency stay or a writ of mandamus terminating the criminal-contempt proceeding. The plaintiffs moved to dismiss the appeal. This Court granted an administrative stay pending consideration of these motions.

D

While these motions were pending, El Salvador released the class members from CECOT and transferred them to Venezuela as part of a prisoner exchange.

II

The show-cause order is not presently appealable. It is not a final decision appealable under the literal terms of 28 U.S.C. § 1291, *see Catlin v. United States*, 324 U.S. 229, 233 (1945); it is not an injunction immediately appealable under 28 U.S.C. § 1292(a)(1), *see Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84 (1981); and it does not conclusively resolve any discrete issue collateral to the merits of the case, so as to trigger the collateral-order doctrine, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). So, I focus on mandamus.

The All Writs Act authorizes federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). These writs include mandamus, for which "three conditions must be satisfied": (1) the petitioner must have a "clear and indisputable" right to relief, (2) the petitioner must have "no other adequate means to attain the relief he desires," and (3) issuance of the writ must be

11

"appropriate" under the circumstances. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) (cleaned up). The first requirement "is substantially informed by our consideration of the merits," so mandamus cases often start with that question. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 740 (D.C. Cir. 2016); *see In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757–60 (D.C. Cir. 2014).

The government presents three arguments in support of mandamus. First, the show-cause order unconstitutionally pressures the Executive Branch to engage in sensitive foreign-policy negotiations. Second, a court cannot constitutionally appoint a private attorney to prosecute members of the Executive Branch. Third, the TRO was not clear enough to support criminal contempt. Another objection, although not presently advanced here, lurks in the background—that an injunction entered without jurisdiction cannot support criminal contempt. As explained below, the government has a clear and indisputable right to relief because the TRO was insufficiently clear to support criminal contempt. And the other points raise difficult questions placing the Executive and Judicial Branches into substantial conflict, which cinches up the case for granting relief now rather than waiting for a final-judgment appeal.

III

On the merits, the probable-cause finding rests on an asserted violation of the second TRO entered by the district court on March 15. It reads: "The Government is ENJOINED from removing members of [the] class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Second Minute Order. The docket text did not explain what constituted "removing" class members. As the district court later recounted, one possible reading is that the TRO simply prohibited the government

12

"from <u>transporting</u> class members outside of U.S. territory"—
*i.e.*, from physically expelling them from the country.  Mem.
Op. at 23.  On that interpretation, the government did not
violate the TRO, for it is undisputed that the removal flights at
issue—which departed south Texas around 5:25 P.M. and 5:45
P.M.—were well outside United States airspace when the
second TRO issued around 7:25 P.M (and, for that matter,
when the oral command issued around 6:45 P.M.).  However,
the TRO also could be read to have prohibited the government
from "relinquishing custody" over the detainees "into the hands
of a foreign government."  *Id.* at 24.  And the government
relinquished physical custody over the detainees to Salvadoran
authorities in the early morning of March 16—several hours
after the TRO had issued.  Whether the government violated
the TRO thus turns on a question about what constituted
"removing" the suspected TdA members.

A strong interpretive presumption governs this analysis.
In the context of criminal contempt, ambiguity in the
underlying injunction must be resolved in favor of the alleged
contemnor.  This Court has stressed that, for criminal contempt,
the injunction must be "clear and reasonably specific" in its
application to the conduct at issue.  *United States v. Young*, 107
F.3d 903, 907 (D.C. Cir. 1997) (quoting *United States v.
NYNEX Corp.*, 8 F.3d 52, 54 (D.C. Cir. 1993)); *see United
States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 587
(D.C. Cir. 2016) (courts "resolve omissions or ambiguities in
the order in favor of the enjoined party" (quoting C. Wright &
A. Miller, 11A Federal Practice & Procedure § 2955 (3d ed.
2013) (cleaned up))).  Other circuits agree:  The "long-
standing, salutary rule in contempt cases is that ambiguities and
omissions in orders redound to the benefit of the person
charged with contempt."  *Ford v. Kammerer*, 450 F.2d 279,
280 (3d Cir. 1971) (per curiam).  And it is "settled law that
contempt will not lie for violation of an order of the court

13

unless the order is clear and decisive and contains no doubt about what it requires to be done." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974). These principles track the rule of lenity that applies in all criminal cases. *See, e.g.*, *United States v. Santos*, 553 U.S. 507, 514 (2008). Yet they are even more important in the specific context of contempt, where a single judge undertakes to set the governing rule, prosecute its alleged violation, adjudicate liability, and then impose punishment. For as the Supreme Court has warned, this "fusion of legislative, executive, and judicial powers summons forth the prospect of the most tyrannical licentiousness." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (cleaned up).

A

Plain language, legal context, and the Court's first TRO all support the government's narrower reading of the second TRO as keyed to physical expulsion from United States territory.

Start with the ordinary meaning of the term *removing*. Lay dictionaries define "remove" to mean "[t]o make (a person) leave a place; to compel (a person or a people) by law to move to another place." *Remove*, Oxford English Dictionary, sense 3.b (Mar. 2025), https://www.oed.com/dictionary/remove_v. And for decades, legal dictionaries have defined "removal" to mean "[t]he transfer or moving of a person or thing from one location, position, or residence to another." *Removal*, Black's Law Dictionary (12th ed. 2024); *see Removal*, Ballentine's Law Dictionary 1090 (3d ed. 1969) ("a moving of something"); *Remove*, Bouvier's Law Dictionary 2880 (3d ed. 1914) ("To change place in any manner, to go from one place to another"). These definitions clearly connote *physical* displacement from one location to another—here, movement *away* from the United States and *to* another country. They do not clearly

14

connote anything about *custody*.  Nor do they connote any specific action by the destination country, such as legal admittance or assumption of custody.

Statutory context reinforces this understanding.  This case involves removals under the Alien Enemies Act, which applies only in wartime or if a foreign nation has threatened a predatory incursion "against the territory of the United States."  50 U.S.C. § 21.  In that context, the AEA gives the President an emergency power to ensure that citizens of the offending government are "apprehended, restrained, secured, and removed."  *Id.*  Moreover, the AEA repeatedly ties removal to physical expulsion.  It allows courts to order aliens subject to an AEA proclamation "to be removed out of the territory of the United States."  *Id.* § 23.  And it requires marshals to "caus[e] a removal of such alien[s] out of the territory of the United States."  *Id.* § 24.  A companion statute to the AEA likewise tied removal to physical expulsion:  The Alien Friends Act allowed the President "to order to be removed out of the territory" aliens he deemed dangerous to the public safety.  Act of June 25, 1798, ch. 58, 1 Stat. 570, 571; *see also id.* (President may order aliens "to depart out of the territory of the United States").  This statutory focus on physical expulsion makes particular sense given the AEA's purpose as a national-security tool during times of hostility.  As this Court explained long ago, expulsion under the AEA involves the government's ability "to rid itself of enemies within its borders" during times of conflict, "whether the individuals be actually hostile or merely potentially so."  *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946).  If the United States were at war with a neighboring country, would its power to *remove* citizens

15

of that country really depend on that country's agreeing to take them back or to assume custody over them?

The Immigration and Nationality Act likewise supports an understanding of *removal* to mean the physical expulsion of an alien from the United States—regardless of any admission or detention decision by the country on the receiving end.  The INA specifically provides that "any alien ordered deported or removed … who has left the United States, shall be considered to have been deported or removed in pursuance of law."  8 U.S.C. § 1101(g).  Applying section 1101(g), courts have held that *removal* under the INA is accomplished when the alien has "briefly departed the United States."  *Nicusor-Remus v. Sessions*, 902 F.3d 895, 896 (9th Cir. 2018); *see United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010).  These cases reject the proposition that *removal* requires a "legal departure" involving acceptance by the receiving country.  *See Nicusor-Remus*, 902 F.3d at 899 ("the statute makes no distinction between physical and legal departures" (cleaned up)).  To be sure, the INA regulates the manner of removal, by restricting the countries to which an alien may lawfully be removed.  8 U.S.C. § 1231(b).  But the *removal* itself does not hinge on admission or assumption of custody by the receiving country.  Sometimes, the removal can lawfully occur without either.  *See Jama v. ICE*, 543 U.S. 335, 337 (2005).  Sometimes the removal can occur without any government taking the alien into custody at all.  *See, e.g.*, *United States v. Ramirez-Carcamo*, 559 F.3d 384, 387–89 (5th Cir. 2009).  And removal in an unlawful manner—for instance, by taking an alien to the wrong country—does not affect whether the *removal* itself was executed.  *See Sanchez*, 604 F.3d at 356–57.  Indeed, an alien would be *removed* from the United States (albeit not lawfully) if the government effected the removal "by sailing her out to

16

the boundary of the territorial waters of the United States and tossing her overboard." *Id.* at 359.

The district court brushed aside this INA precedent based on the government's litigating position in a different case. In a challenge to its authority to detain removable aliens outside the United States, the government stated that "[t]o effectuate a departure or removal, the alien must lawfully enter another country." Mem. in Opp'n to Mot. to Stay at 30, *Escalona v. Noem*, No. 25-cv-604, Dkt. No. 14 (D.D.C. Mar. 10, 2025) (*Escalona* Opp'n). The government cited the district-court decision in *Handa v. Crawford*, 312 F. Supp. 2d 1367 (W.D. Wash. 2004), *aff'd sub nom. Handa v. Clark*, 401 F.3d 1129 (9th Cir. 2005), which held that an alien had not "legally departed" the United States when he was denied admission into Canada at a border crossing, drove his car "around the Canadian flag pole" at the border, and returned immediately to the United States. *Id.* at 1373. But in *Nicusor-Remus*, the Ninth Circuit expressly limited *Handa* to its facts. *See* 902 F.3d at 899–900. The Court held that *Handa* had recognized only a *de minimis* "exception" to the general "rule" that a "brief departure" from the United States qualifies as a removal. *Id.* at 899. In doing so, the Court stressed that the alien in *Handa* had made a "physical entry into Canada for a few seconds" only, when Canadian officials stopped him at the border and turned him around. *Id.* (quoting *Handa*, 401 F.3d at 1133). In short, the government's account of *removal* in this case finds more support in the caselaw than does its litigating position in *Escalona*. And to the extent decisions like *Handa* may slightly complicate the territorial focus of removal under the INA, that

22

17

only highlights that the term does not connote a transfer of custody with any degree of clarity at all.[4]

Finally, consider the March 15 TROs together. Both were entered to prevent removal of suspected TdA members—the first one for the five named plaintiffs, the second for all other members of the putative class. The first TRO provided that the government "shall not remove any of the individual Plaintiffs from the United States for 14 days." First Minute Order. The second TRO enjoined the government from "removing" class members "pursuant to the Proclamation for 14 days." Second Minute Order. The first order was expressly territorial in focus. The second order, referencing neither territory nor custody, was less precise. But there is no reason to think that *removing* under the second TRO meant something different from *remove* under the first. And there is certainly no reason to think that the protection afforded to absent class members under the second TRO exceeded the protection afforded to named plaintiffs under the first—*i.e.*, that although the first TRO protected named plaintiffs only until departure from United States territory, the second TRO protected absent putative class members up until the transfer of custody.

## B

To construe the TRO, the district court looked primarily to the oral hearing. In construing injunctions, courts may look to

---

[4] The government's litigating position in *Escalona* seems to reflect a concern that, if a removal is complete upon physical departure, the government might lack authority to continue detaining aliens while they remain *en route* to their ultimate destination. *Escalona* Opp'n at 27–29. But the government may take acts it "deems necessary for carrying out [its] authority" under the INA, 8 U.S.C. § 1103(a)(3), which includes moving aliens to specific countries selected under section 1231(b).

18

the "context" in which they were entered. *See Young*, 107 F.3d at 907–08. Such context includes "the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *Common Cause v. NRC*, 674 F.2d 921, 927 (D.C. Cir. 1982) (cleaned up). Nonetheless, caution is appropriate. For one thing, we should not "dissect the sentences" spoken in oral hearings as if they were statutes. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1992). Moreover, the transcript of the March 15 hearing was not even available until the next day—*after* the government had to decide whether to proceed with an ongoing counter-terrorism operation on the night of March 15, as it was unfolding internationally and in real time. Finally, the district court reassured government counsel that it would "memorializ[e]" its oral ruling in a written injunction, "so you don't have to race to write it down." Tr. at 42. With these caveats, consider the context of the oral hearing.

Most notably, the district court highlighted its oral command to the government:

> [Y]ou shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.

Tr. at 43. The court reasoned that "not embarking anyone on the plane" actually meant not *dis*-embarking anyone—*i.e.*, that part of its oral command was "not to deplane" anyone on a removal flight that had already landed somewhere abroad.

24

19

Mem. Op. at 30.  That much makes sense, though this slight bit of garbling does highlight the pitfalls of attempting to glean the meaning of written legal text from transcripts purporting to record exact turns of phrase in spoken English.  Moreover, the district court continued, the command either to "turn[] around a plane" that was still in the air, or else "not to deplane" anyone on a flight that had already landed, made clear that the prohibition covered the "ultimate action" of transferring "custody" over the detainees "into foreign hands."  *Id.*

The district court also drew a similar inference based on the first TRO.  By its written terms, that TRO merely stated that the government "shall not remove" the five named plaintiffs "from the United States."  First Minute Order.  Yet in the oral hearing, the court construed that TRO to require that the named plaintiffs, if already bound for El Salvador, would have to be "brought back once the planes land in El Salvador."  Tr. at 5.  In its show-cause order, the court reasoned that this statement likewise made clear that a prohibition on *removal* included a requirement not to relinquish custody.  Mem. Op. at 26–27.

I read these exchanges differently.  As the oral command establishes by its terms, and the comment about the first TRO confirms, the "ultimate action" that was orally required was to "return[]" any detainees already outside the United States "to the United States," whether by turning planes around in mid-air or by return flights with no deplaning in the interim.  But the written order excluded all of that—and for good reason.  Each of these options was problematic:  First, any order to bring suspected members of a foreign terrorist organization into the United States would have faced an objection that the judiciary cannot override the statutory prohibition on the admission of such aliens.  *See* 8 U.S.C. § 1182(a)(3)(B)(i)(V), (vi)(I); *Kiyemba v. Obama*, 555 F.3d 1022, 1025–26 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010), *reinstated on remand*,

20

605 F.3d 1046 (D.C. Cir. 2010). Second, any freestanding order to turn planes around mid-air would have been indefensible, akin to the single-Justice order (set aside by the full Supreme Court within hours) for the Executive Branch to stop bombing Cambodia during the Vietnam War. *See Holtzman v. Schlesinger*, 414 U.S. 1316 (1973). Third, any freestanding order prohibiting the government from relinquishing custody *to* El Salvador of individuals already physically present *in* El Salvador would have faced an objection that courts may not enjoin the Executive Branch "from transferring individuals detained within another sovereign's territory to that sovereign's government." *Munaf v. Geren*, 553 U.S. 674, 689 (2008); *see also id.* at 694 ("the jurisdiction of the nation within its own territory is necessarily exclusive and absolute" (quoting *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.))). To be sure, *Munaf* involved the transfer of an American citizen for criminal prosecution, but there is no reason to think that a different result would apply to the transfer of aliens for preventive detention authorized by the laws of the receiving sovereign. Indeed, in finding that the United States had no constructive custody over detainees at CECOT, the district court itself stressed that El Salvador had "chosen" to detain the plaintiffs "for reasons far outside the ken of a federal district court." Second Mem. Op. at 24.

In its show-cause order, the district court itself disclaimed two of these three commands referenced in its oral order. It stressed that it had never imposed any freestanding requirement to turn planes around. Mem. Op. at 36–37. And it repeatedly denied having imposed any overarching requirement to return suspected TdA members to the United States. *See, e.g.*, *id.* at 37 ("The fair reading of the TRO is that it only prevented class members' transfer from American into foreign custody."); *id.* ("And if the Government indeed voluntarily delivered nine

21

passengers back to U.S. soil, the choice to hold them in the United States as opposed to somewhere else was the Government's, not this Court's." (cleaned up)). Judge Pillard suggests that the district court never backed away from its oral commands. *Post* at 35–36. But at the TRO hearing, the court expressly required that class members already expelled from the United States "need to be returned to the United States." Tr. at 43. And that statement cannot be reconciled with its later statement, in the show-cause order, that the TRO had "only" prevented a "transfer from American into foreign custody." Mem. Op. at 37.[5]

What does all of this mean for construing the TROs? Put aside the question whether an oral injunction can ever be binding, despite some authority that it cannot. *See, e.g.*, *Hisps. United of DuPage Cnty. v. Village of Addison*, 248 F.3d 617, 620–21 (7th Cir. 2001) (Easterbrook, J.); *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003) (citing *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990)). At a minimum, when an injunction is supported by "both oral and written statements on the same matter," courts must focus on the latter. *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 896 (9th Cir. 2004). For one thing, Federal Rule of Civil Procedure

---

[5]  Judge Pillard flags documents showing that one Department of Justice attorney advised client agencies in real time that the district court had orally required that "anyone in the air should be returned to the United States" and that detainees "on the ground in El Salvador" should not be "disembarked." *Post* at 12 n.1. These documents have at best limited relevance to the ambiguity question, which turns on an objective rather than a subjective standard. *Young*, 107 F.3d at 907. In any event, although the DOJ lawyer correctly relayed the terms of the oral command, none of those terms appeared in the final, written TRO. And, again, the ultimate command to return detainees to the United States was precisely what the district court later denied ever having imposed.

22

65(d) "contemplates the issuance of a written order" to ensure "that the litigants receive explicit notice of precisely what conduct is outlawed." *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000). Moreover, from the time between statements in an oral hearing and the actual issuance of a written injunction, the district court might simply make adjustments. *See Playmakers*, 376 F.3d at 896 (citing *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989)). By the time of its show-cause order, the court here *had* changed its mind about the oral command to bring back to the United States any suspected TdA members who had already been physically expelled. Likewise, it strongly disclaimed having imposed any subsidiary obligation to turn planes around mid-flight. Given all of this, the oral prohibition on "[dis]embarking" from airplanes on the ground in El Salvador—which was never reduced to writing, was subsidiary to the abandoned oral command to return individuals to the United States, and was related to the disclaimed statement about turning around airplanes—does not count for much. Judge Pillard responds that the oral commands were striking in their "clarity." *Post* at 22. Perhaps so, but that makes all the more striking their wholesale omission from the final written order, particularly when the district court had promised to issue a written order "memorializing" all of the operative commands. Tr. at 42.

The district court further referenced the "recurring discussion about when and how the Court would lose equitable jurisdiction," which it described as the harm against which the TRO was designed to protect. Mem. Op. at 27. The relevant passages are equivocal. Two of them suggest that the court's underlying concern was transfer of physical custody to a foreign sovereign. Tr. at 35 ("the argument in part is these folks are going to be sent to Salvadoran or Honduran prisons"); *id.* at 44 ("if planes have already landed and discharged their occupants … I don't have jurisdiction to require their return").

23

But a third suggests that the underlying concern arose from the aliens' mere physical expulsion from the United States. *Id.* at 36 ("I mean, once they are out of the country, I'm not sure what I can do there."). Moreover, the authorities cited by the district court much later, with the luxury of time to parse extant caselaw and transcripts, do not reveal any easy answer to the question of when the court would have become unable to afford effective relief. *See* Mem. Op. at 28. One of the cited cases suggests that the court could *not* have afforded relief even *before* the transfer of physical custody to Salvadoran officials in El Salvador. *See Munaf*, 553 U.S. at 692–700. But another suggests that the court *could* have afforded relief even *after* such a transfer. *See Abu Ali*, 350 F. Supp. 2d at 45–51. None of this unambiguously resolves whether the prohibited "removing" turned on a custodial or territorial standard.

One final contextual consideration involves the relief sought by the plaintiffs, who asked the court to enter a two-paragraph TRO. Paragraph 1 of the proposed TRO would have ordered the government "not to remove" members of the putative class under the AEA. [Proposed] Temporary Restraining Order 1, Dkt. No. 3-9 (Mar. 15, 2025). Paragraph 2 would have further provided that, if there were class members who had "already been removed from the United States" pursuant to the AEA, then "such individuals shall be returned to the United States." *Id.* at 2. Yet despite having that proposed order to consider over the course of the day, the district court entered a minute order simply prohibiting "removing." So at a minimum, the contextual clues cut in both directions.

## C

Taking a step back from the specific arguments pro and con, consider the larger picture. The government's arguments for a territory-based interpretation of the TRO rest on written,

24

conventional, and publicly available sources for construing that binding legal text—ordinary dictionary meanings, legal usage in governing or related statutes, and the court's own usage in a related, earlier TRO.  Judge Pillard objects that these sources are "orthogonal" if not irrelevant to the question presented. *Post* at 34.  But this case involved challenges to the removal of aliens through the AEA, drawing an objection that the removals had to proceed through the INA.  And the district court simply barred "removing" the aliens.  In construing that order, where else would one begin other than by considering what *removal* means in ordinary usage, under the AEA, and under the INA?  Text matters, as does its linguistic and legal context.  In contrast, the competing arguments for a custody-based interpretation rest on generalized appeals to the purpose of the TRO, as well as fine parsing of the court's statements at an oral hearing—the transcript for which was unavailable until after the assertedly contemptuous acts had already occurred, and the substance of which the district court never reduced to writing and later disclaimed in significant part.

For purposes of criminal contempt, this more than suffices to show that the TRO was ambiguous.

IV

Back to mandamus standards.  As explained above, they turn on whether the government's right to relief is clear and indisputable, whether it has no adequate alternative means for obtaining relief, and whether granting the writ would be appropriate under the circumstances.  *See Cheney*, 542 U.S. at 380–81.  The answer to all three questions is yes.

A

The first consideration parallels the merits.  Instead of determining whether the government's legal position is correct,

25

we must determine whether it is "clear and indisputable." *Cheney*, 542 U.S. at 381 (quoting *Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976)). After a full-blown assessment of the merits, this determination is often straightforward enough. *See Fokker Servs.*, 818 F.3d at 749–50; *Kellogg Brown & Root*, 756 F.3d at 762.

For reasons explained above, the government's position on the merits is clear and indisputable. This is not to suggest that its territory-based interpretation of the TRO is clearly and indisputably correct; there is surely some force in the district court's broader, custody-based interpretation. But in the criminal-contempt context, the merits question is not which interpretation of the TRO is best. Instead, the question is what the TRO covers after resolving any ambiguities "in favor of the enjoined party." *Yelverton*, 831 F.3d at 587 (quoting C. Wright & A. Miller, *supra*, § 2955). And on the dispositive interpretive question addressed above, the TRO seems to me clearly ambiguous, which makes the imposition of criminal contempt clearly inappropriate.

B

The show-cause order is interlocutory, and mandamus must not become a "substitute for the regular appeal process." *Cheney*, 542 U.S. at 380–81. So in addressing mandamus at this juncture, we must consider whether the government has any adequate means for obtaining its requested relief at a later stage of the case, including on appeal from a final judgment. For criminal contempt, a final judgment would be one that imposes "specific, unavoidable penalties" on identified government officials. *Salazar ex rel. Salazar v. D.C.*, 602 F.3d 431, 436 (D.C. Cir. 2010).

26

1

Interlocutory orders can warrant mandamus if they "interfer[e] with a coequal branch's ability to discharge its constitutional responsibilities." *Cheney*, 542 U.S. at 382; *see Nat'l Right to Work Legal Def. v. Richey*, 510 F.2d 1239, 1243 (D.C. Cir. 1975) ("unnecessary and unseemly interference with a coordinate branch of government"). In particular, courts have granted mandamus to set aside interlocutory orders that interfere with the conduct of foreign policy, *Ex parte Peru*, 318 U.S. 578, 586–89 (1943); create diplomatic friction, *In re Papandreou*, 139 F.3d 247, 250–52 (D.C. Cir. 1998); or impinge upon "[t]he Executive's primacy in criminal charging decisions," *Fokker Servs.*, 818 F.3d at 741. Immediate review is particularly appropriate to stave off a looming "constitutional confrontation" between the Executive and Judicial Branches. *United States v. Nixon*, 418 U.S. 683, 692 (1974).

In *Cheney*, the Supreme Court applied these principles to set aside a discovery order directed at the Vice President and targeting the process through which he and other senior Executive Branch officials provided advice to the President. *See* 542 U.S. at 380–82. The Court acknowledged that the government could have obtained judicial review by asserting privilege at later stages of the ongoing discovery. *See id.* But it held that mandamus was nonetheless appropriate because a claim of executive privilege is an "extraordinary assertion of power" that would needlessly place the Executive and Judiciary "on a collision course." *Id.* at 389–90 (citing *Nixon*, 418 U.S. at 692).

*Ex parte Peru* applied similar principles to stop an ongoing *in rem* proceeding against a steamship owned by Peru. The Secretary of State had undertaken to "settle claims against the vessel by diplomatic negotiations," 318 U.S. at 587, and had

27

further asserted sovereign immunity on behalf of Peru, *id.* at 581. Nonetheless, the district court denied Peru's request to dismiss the suit on immunity grounds. *Id.* Rather than wait for proceedings to run their course on appeal, the Supreme Court granted mandamus "without requiring [Peru] to apply to the circuit court," in order to avoid "embarrass[ing] the executive arm of the government in conducting foreign relations." *Id.* at 587–88.

The imposition or threat of contempt against Executive Branch officials can further support mandamus. In *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) (en banc), this Court invoked mandamus to review a grand-jury subpoena served on the President. To obtain immediate review of a subpoena, most parties must defy it and then appeal an ensuing contempt citation. *See id.* at 707 n.21. But we afforded review through mandamus because, "[i]n the case of the President, contempt of a judicial order—even for the purpose of enabling a constitutional test of the order—would be a course unseemly at best." *Id.*; *see also Nixon*, 418 U.S. at 692. Likewise, although civil-contempt orders are not appealable, the Second Circuit granted mandamus to set aside an order that held the Attorney General in civil contempt. *In re Attorney General*, 596 F.2d 58, 64 (2d Cir. 1979) ("a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant"). And even absent contempt imposed on a high-ranking official, the Seventh Circuit, after concluding that the government had not filed any "objectively frivolous" briefs in the case before it, granted mandamus to stop a court-ordered, criminal-contempt investigation into which supervisors in a United States Attorney's Office had authorized or reviewed the disputed filings. *In re United States*, 398 F.3d 615, 618–20 (7th Cir. 2005) (per curiam).

28

2

The show-cause order qualifies for mandamus under these principles. The defendants in this action include the President and three Cabinet secretaries. The underlying dispute arises from the execution of a presidential order to vindicate significant national-security and counter-terrorism interests. Its execution involved coordinated activity among the United States and at least two foreign sovereigns. The district court has found probable cause that some of the involved officials—likely including "those in closest operational proximity to the President," *Cheney*, 542 U.S. at 381—committed criminal misconduct. And as explained below, the terms of the order ensure multiple further constitutional conflicts between the Executive and Judicial Branches.

The show-cause order gives the Executive Branch an ultimatum: Either "assert custody" over aliens outside the United States or face a court-ordered prosecution. Mem. Op. at 43–44. Both pathways are constitutionally fraught.

First, the order uses the threat of criminal sanctions to pressure the Executive Branch into asserting custody over aliens who, in the district court's view, were removed in violation of the TRO. But as Judge Rao explains, *post* at 7–10, the Supreme Court has vacated the TRO, so the district court cannot seek to prospectively enforce it at all. Moreover, *what* the court seeks to pressure—the assertion of custody over more than 100 alleged alien enemies now outside the United States—is also problematic. The Supreme Court repeatedly has warned, often in cases involving immigration, that courts may not intrude into foreign affairs or matters of national security. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 805 (2022); *Arizona v. United States*, 567 U.S. 387, 397 (2012); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). To be sure,

29

courts also must seek to vindicate the due-process rights of aliens to challenge AEA removals. *See A.A.R.P. II*, 145 S. Ct. at 1368. But to assert "custody" over aliens outside the country is to assert that the Executive Branch has "the power to produce" them to a United States court. *Munaf*, 553 U.S. at 686. That would seem to involve effectuating rather than just facilitating the return of suspected TdA members already removed under the AEA, which may cross a constitutionally significant line. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561 (2025) ("the Judiciary does not have unbridled authority" to enforce the Executive's "duty to follow the law"). For the question whether to bring into the United States individuals deemed enemy aliens "is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 589. Moreover, when El Salvador was detaining the class members, asserting custody would have required the United States to engage in diplomacy to effect a transfer of at least constructive custody, which the courts may not do. *See, e.g., Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948); *Edye v. Robertson*, 112 U.S. 580, 598 (1884); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (Scalia, J.). And now, the court's order would pressure some level of engagement with a regime in Venezuela that the United States does not recognize. Moreover, it is unclear whether the United States even could obtain custody over the detainees, who may wish to remain free in Venezuela rather than be detained in the United States pending further AEA litigation or INA removals. Judge Pillard seeks to dismiss these concerns because the "purge" opportunity is just one "option" that the government need not

30

pursue.  *Post* at 5.  That just brings us to the question of what the show-cause order portends absent any purge.

Absent a purge, the district court promised a court-directed criminal prosecution.  First, the court said it "will" conduct discovery into which officials, with knowledge of the TRO, decided to transfer custody of the detainees to El Salvador. Mem. Op. at 44.  Once those individuals have been identified, the court said it then "will" oversee a criminal prosecution, either by the Executive Branch or, if necessary, by a private attorney appointed by the court.  *See id.* ("If the Government declines [prosecution] … the Court will appoint another attorney to prosecute the contempt." (cleaned up)).  After the detainees were transferred from El Salvador to Venezuela, the court confirmed that it "will follow up" with contempt when and if this Court lifts the administrative stay.  ECF 169 at 3. This promised prosecution has its share of difficulties.

For starters, discovery will likely be problematic.  The government has already asserted the state-secrets privilege to protect certain operational details about the flights removing alleged foreign terrorists pursuant to international agreements. *See United States v. Zubaydah*, 595 U.S. 195, 212 (2022); *United States v. Reynolds*, 345 U.S. 1, 10 (1953).  Moreover, to the extent the discovery touches upon communications to formulate or give advice to the President, the presidential-communications privilege might apply.  *See Cheney*, 542 U.S. at 381 (citing *Nixon*, 418 U.S. at 715).  And an invocation of that privilege would set the Executive and Judicial Branches needlessly "on a collision course."  *See id.* at 389.

Further problems would arise once the court identified the putative contemnors.  Because courts are "not required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), one may safely

36

31

assume that the Executive Branch would decline to prosecute itself in the circumstances of this case. Then the district court "will" appoint a private attorney to prosecute the Executive Branch, Mem. Op. at 44, which presents its own difficulties. The Supreme Court has held that courts "possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987). But that holding is hard to reconcile with that Court's more recent insistence that "[t]he Executive Branch— not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 678–79 (2023); *see also Donziger v. United States*, 143 S. Ct. 868, 868–70 (2023) (Gorsuch, J., dissenting from denial of certiorari). In any event, *Young* itself acknowledged that the prosecutor must be "disinterested," and decisions regarding the prosecution must therefore be "all made outside the supervision of the court." 481 U.S. at 807. But then who *would* supervise such a prosecutor? If nobody did, the prosecutor would be an unconstitutionally appointed principal officer. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 18–19 (2021); *United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022). And if court-appointed prosecutors must be subject to supervision by the Attorney General, as the Second Circuit held in *Donziger*, *see* 38 F.4th at 299–300, then the private-prosecutor route will be as futile as it is provocative.

Finally, the district court has committed to punish the Executive Branch for violating an order that it lacked jurisdiction to enter. The Supreme Court vacated that order because the claims raised by these plaintiffs, however styled, fell "within the 'core' of the writ of habeas corpus." *J.G.G.*, 145 S. Ct. at 1005; *see Rooney v. Sec'y of Army*, 405 F.3d 1029, 1031 (D.C. Cir. 2005); *Monk v. Sec'y of Navy*, 793 F.2d 364,

32

366 (D.C. Cir. 1986). Accordingly, the proper respondent to sue was the detainees' immediate custodian—*i.e.*, the head of the El Valle Detention Facility, not "some other remote supervisory official" like a Cabinet secretary. *See Padilla*, 542 U.S. at 435. And the proper district in which to sue was the Southern District of Texas, not the District of Columbia. *See id.* at 443 ("for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement"). The Supreme Court has been unclear whether these rules reflect considerations of personal jurisdiction or venue. *See id.* at 451 (Kennedy, J, concurring). Nonetheless, we have treated them as rules of personal jurisdiction. *See Stokes v. U.S. Parole Comm'n*, 374 F.3d 1235, 1237–40 (D.C. Cir. 2004); *Rooney*, 405 F.3d at 1032. The government did not press this objection as a ground for mandamus. But the government did raise and prevail on this jurisdictional argument in the underlying case, so it would remain live in any contempt prosecution going forward.

The impact of jurisdictional defects in subsequent criminal-contempt proceedings is unclear. Many cases hold that a court may not impose criminal contempt for violation of an order that it lacked jurisdiction to enter. The Supreme Court explained: "When … a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void." *Ex parte Fisk*, 113 U.S. 713, 718 (1885); *see, e.g., Ex parte Burrus*, 136 U.S. 586, 597 (1890); *In re Sawyer*, 124 U.S. 200, 221–22 (1888); *Ex parte Ayers*, 123 U.S. 443, 485 (1887); *Ex parte Rowland*, 104 U.S. 604, 612–13 (1881). Two subsequent cases arguably weakened this rule, though neither purported to overrule these precedents. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 289–95 (1947); *United States v.*

33

*Shipp*, 203 U.S. 563, 573–75 (1906). Accordingly, as late as 1991, several circuits still recognized the traditional rule. *See*, *e.g.*, *In re Novak*, 932 F.2d 1397, 1401 (11th Cir. 1991); *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 726–27 (9th Cir. 1989). In rejecting this view, the district court rested primarily on *Willy v. Coastal Corporation*, 503 U.S. 131 (1992), which held that courts may impose Rule 11 sanctions even in cases where they lack subject-matter jurisdiction. *See id.* at 137–39; Mem. Op. at 19–20. But in *Willy*, the Supreme Court reasoned that sanctions are collateral to the merits, so judges may require "those practicing before the courts to conduct themselves in compliance with the applicable procedural rules" while a case remains pending. 503 U.S. at 139. This rationale has no obvious application to injunctions restricting the primary conduct of parties outside of court, as opposed to the secondary conduct of parties in litigation. Indeed, the matter at issue in *Willy*—a monetary sanction of counsel's "careless pleading," *id.* at 133—is leagues apart from an injunction restricting the Executive Branch from carrying out a significant, cross-border, national-security operation.

In sum, the district court's show-cause order would provoke many grave conflicts between the Judicial Branch and the Executive Branch at its highest levels. The courts should not have to grapple unnecessarily with the difficult, contentious issues summarized above when a straightforward and dispositive ground of decision already is apparent. And the Executive should not have to wait until the district court has imposed criminal sanctions to raise that objection. In circumstances much less fraught than this, courts have afforded mandamus relief to resolve the dispute—and defuse the inter-branch conflict—as quickly as possible. In such situations, awaiting a final-judgment appeal is not an "adequate" alternative remedy. *See Cheney*, 542 U.S. at 383–92.

39

34

C

For essentially the same reasons, mandamus is appropriate under the circumstances. As explained above, this Court and the Supreme Court repeatedly have afforded review through mandamus when a lower court has encroached on foreign-policy, prosecutorial, or other Executive Branch prerogatives. *See*, *e.g.*, *Cheney*, 542 U.S. at 383–92; *Peru*, 318 U.S. at 587–88; *Fokker Servs.*, 818 F.3d at 741; *Nat'l Right to Work Legal Def.*, 510 F.2d at 1243; *Sirica*, 487 F.2d at 707 n.21. The show-cause order does precisely that: It uses the threat of criminal prosecution to pressure the Executive Branch to assert custody of suspected enemy aliens outside the country, with a view to bringing them back into the country, or else to endure a court-directed prosecution by a court-appointed attorney presumably not subject to the Attorney General's control.

Immediate review is plainly warranted.

V

The district court here was placed in an enormously difficult position. Faced with an emergency situation, it had to digest and rule upon novel and complex issues within a matter of hours. In that context, the court quite understandably issued a written order that contained some ambiguity. And it quite understandably made oral remarks that it later walked back.

This proceeding does not concern the lawfulness of the AEA removals made on March 15 and 16. Nor may we decide whether the government's aggressive implementation of the presidential proclamation warrants praise or criticism as a policy matter. Perhaps it should warrant more careful judicial scrutiny in the future. Perhaps it already has. *See A.A.R.P. II*, 145 S. Ct. at 1367–68; *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (Mem.) (2025). Regardless, the government's initial

40

35

implementation of the proclamation clearly and indisputably was not criminal.

Given this analysis, I concur in the order granting the petition for mandamus and vacating the probable-cause order. And because no prosecution could overcome the fatal ambiguity explained above, I would also terminate the criminal-contempt proceeding.

RAO, *Circuit Judge*, concurring: This case arises in the midst of a high stakes clash between the Executive Branch and a district court. In March, the President issued a proclamation ordering the removal of members of the Venezuelan criminal gang Tren de Aragua, a designated foreign terrorist organization, pursuant to the Alien Enemies Act. The following day, the government removed dozens of alleged gang members from the United States and transferred them to the custody of El Salvador. But while the removal was in process and after two planes carrying the detainees had already left the United States, the district court entered a temporary restraining order (TRO) barring the detainees' removal. The Supreme Court subsequently vacated the TRO, holding the district court lacked authority to issue it.

Despite the Supreme Court's decision, the district court sought to remedy what it perceived as the Executive's noncompliance with the vacated TRO. Relying on its criminal contempt authority, the court issued an order finding probable cause that government officials willfully violated the TRO by not turning the planes around. The order offered the government a choice: either (1) come into compliance with the vacated TRO, such as by asserting custody over the individuals detained in El Salvador, or (2) identify the officials responsible for the removals so the district court could initiate prosecutions for criminal contempt.

The district court's order is a "clear abuse of discretion" that warrants the "drastic and extraordinary remedy" of mandamus. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (cleaned up). When an injunction has been vacated, as occurred here, a district court loses the authority to coerce compliance with the order. *See Dep't of Homeland Sec. v. D.V.D.*, No. 24A1153, 2025 WL 1832186, at *1 (U.S. July 3, 2025) (holding that a district court cannot use a remedial order "to enforce an injunction that our stay rendered unenforceable"). Punishment through criminal contempt *might*

2

still be available in these circumstances, but the district court cannot use the threat of such punishment as a backdoor to obtain compliance with a vacated and therefore unenforceable TRO.

The district court's abuse of the contempt power is especially egregious because contempt proceedings against senior Executive Branch officials carry profound "separation of power[s] overtones" that demand the most "sensitive judicial scrutiny." *In re Att'y Gen. of U.S.*, 596 F.2d 58, 64 (2d Cir. 1979). Lacking the authority to compel obedience, the district court nonetheless pressured the government to take custody of alleged alien enemies held in El Salvador. This intrusion on the President's foreign affairs authority "constitute[s] an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390. Because the order exceeds the court's authority and amounts to a clear abuse of discretion, mandamus is appropriate.

## I.

The government seeks a writ of mandamus terminating these contempt proceedings. Although mandamus is an extraordinary remedy, the writ has long been used to prevent "judicial usurpation of power, or a clear abuse of discretion," including actions that "would threaten the separation of powers by embarrassing the executive arm of the Government." *Cheney*, 542 U.S. at 380–81 (cleaned up); *see also Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943) ("The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction."). This court has previously issued the writ to protect against unlawful encroachments on executive power and to prevent erroneous practices from taking hold in the

3

lower courts. *See, e.g.*, *Cobell v. Norton*, 334 F.3d 1128, 1143 (D.C. Cir. 2003); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762–63 (D.C. Cir. 2014); *In re Clinton*, 973 F.3d 106, 118 (D.C. Cir. 2020).

To determine if mandamus is appropriate, a reviewing court first must consider whether the district court exceeded its legal authority or abused its discretion. If so, the court must assess whether the error is of the type that justifies mandamus. *See In re Kellogg Brown & Root*, 756 F.3d at 756–57; *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 740, 747 (D.C. Cir. 2016).

## II.

The government maintains that mandamus is an appropriate remedy to the district court's overreach. It argues that the district court is attempting to "enforce a vacated order by exploiting the threat of contempt," and this approach puts the Executive to an "extraordinary and coercive Hobson's choice." Furthermore, the government contends that the district court's order "dangerously intrudes on core executive prerogatives" in the conduct of foreign affairs.

Assessing the lawfulness of this unusual order requires properly characterizing what the district court did. The district court claimed it was undertaking a "compliance inquiry" because the government's disobedience of the TRO "is punishable as contempt." *J.G.G. v. Trump*, 25-cv-766, 2025 WL 1119481, at *1 (D.D.C. Apr. 16, 2025). After applying the standards for criminal contempt and determining there was "probable cause" to find a willful violation of a clear order, the district court gave the government the option of either complying with the vacated TRO (by asserting custody of the individuals or other similar action) or facing criminal contempt prosecutions. *Id.* at *20–21.

4

The purpose and effect of this preliminary order is to compel the government to exercise its foreign affairs powers to assert custody of the removed gang members. *Id.* at *20. The district court acknowledged that it can no longer coerce this action through civil contempt because its order was vacated by the Supreme Court. *See id.* at *8 (invoking the collateral-bar rule, which is available only in criminal contempt). Lacking the power to coerce the government, the district court nonetheless sought to achieve the same result with the threat of criminal contempt. Dangling this sword of Damocles to compel the Executive to exercise its foreign affairs powers exceeds the court's authority and is an abuse of discretion.

A.

The authority of the federal courts to punish for contempt is an inherent attribute of the judicial power. *See Potter v. District of Columbia*, 126 F.4th 720, 723 (D.C. Cir. 2025); *see also Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874) ("The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice."). Contempt proceedings come in one of two forms: civil or criminal. *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 328 (1904).

It is well established that the "proper classification" between civil and criminal contempt is often essential to ensure trial courts stay within constitutional and equitable limits. *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 444 (1911); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 830–34 (1994). When reviewing whether the contempt power has been properly exercised, we look to "the substance of the proceeding and the character of the relief that

5

the proceeding will afford," not the label attached by the parties or the court below. *Hicks v. Feiock*, 485 U.S. 624, 631 (1988); *see also Shillitani v. United States*, 384 U.S. 364, 369–70 (1966).

Several key features distinguish civil from criminal contempt. Civil contempt is an equitable device used to secure compliance with a court order and to preserve and enforce the rights of the parties. *See In re Nevitt*, 117 F. 448, 458–59 (8th Cir. 1902). Its sanctions are therefore coercive and remedial, rather than punitive. *See Shillitani*, 384 U.S. at 368–70; *Gompers*, 221 U.S. at 441–43. The "paradigmatic … civil contempt sanction" is the conditional penalty that may be "purge[d]" through compliance with the original order. *Bagwell*, 512 U.S. at 828; *see also Shillitani*, 384 U.S. at 368 (explaining the civil contemnor "carr[ies] the keys of [his] prison in [his] own pocket[]" and can avoid the penalty by complying) (cleaned up). Because civil contempt proceedings are aimed at securing the benefits of the court's order to the prevailing party, they take place between the original parties and are part of the underlying case. *See Gompers*, 221 U.S. at 444–45.

By contrast, criminal contempt is an action at law to punish the violation of a court order and "'vindicate the authority of the court' following a transgression rather than to compel future compliance or to aid the plaintiff." *Cobell*, 334 F.3d at 1145 (quoting *Bagwell*, 512 U.S. at 828). Whereas a coercive civil contempt sanction is conditional and may be purged through compliance, a criminal contempt sanction is a fixed and "unconditional sentence for punishment or deterrence." *Shillitani*, 384 U.S. at 370 n.5.

Although the line between them can sometimes be difficult to draw, civil and criminal contempt are distinct. They serve

6

different purposes and are bounded by different procedural, constitutional, and equitable limits. *See Gompers*, 221 U.S. at 441, 444–45. Recognizing these fundamental distinctions, the Supreme Court has warned courts not to blur the line between civil and criminal contempt when doing so would result in "substantial prejudice" to the contemnor. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 300–01 (1947); *see also Gompers*, 221 U.S. at 443–52 (vacating criminal contempt sanction imposed after civil contempt proceedings because criminal procedures were not followed and because the underlying dispute had been settled). For instance, a court may not use civil contempt to impose an unconditional punishment, thereby depriving the contemnor of the constitutional protections required for criminal contempt. *See, e.g.*, *Gompers*, 221 U.S. at 444; *Hicks*, 485 U.S. at 632.

Civil contempt also has important limits. As relevant here, the coercive power of civil contempt is extinguished once the underlying order is stayed or vacated. *See United Mine Workers*, 330 U.S. at 295 ("The right to remedial relief falls with an injunction which events prove was erroneously issued."); *D.V.D.*, 2025 WL 1832186, at *1. Because the power of civil contempt is coercive and remedial, it may be exercised only so long as there is an underlying order for the court to enforce. Simply put, a court cannot compel compliance with an invalid order.

B.

The district court's order is an improper use of the contempt power. Unable to compel compliance with its vacated order, the district court used the threat of criminal process to coerce the government to "purge" its contempt. The government correctly says it has been put to a Hobson's choice: comply with an invalid order or name Executive Branch

7

officials for the initiation of criminal contempt proceedings.[1] The proffered choice impermissibly commingles civil and criminal contempt in a manner that results in substantial prejudice to the government. Compounding this error, the district court's order attempts to control the Executive Branch's conduct of foreign affairs, an area in which a court's power is at its lowest ebb.

When it became clear the government had transferred over 200 individuals into Salvadoran custody, the district court ordered the government to show cause why it had not violated the TRO. The proceedings that followed initially bore the hallmarks of civil contempt. The show cause order was filed on the same docket as the main cause and with the same case caption. *See Gompers*, 221 U.S. at 444–46. Moreover, the court solicited briefing from the plaintiffs and allowed them to participate in a hearing on the issue. *See id.* at 444–45. All of this suggests the district court was contemplating holding the government in civil contempt to coerce compliance with the TRO.

Before the district court ruled on contempt, however, the Supreme Court intervened. The Court determined that challenges to removal under the Alien Enemies Act fall within the "core" of habeas corpus and therefore that "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005–06 (2025) (cleaned up). The

---

[1] It is swinging at a strawman to say that this issue was never raised or briefed. *See* Dissenting Op. 42. The government maintained that it was being put to a Hobson's choice between compliance and ceding control of its foreign affairs power and that the district court was trying to enforce its vacated TRO through the threat of criminal contempt. The legal error identified here follows directly from arguments raised and pressed by the government.

8

Court vacated the TRO because the detainees subject to the proclamation were confined in Texas, making venue improper in the District of Columbia. *Id.* at 1006.

This decision was fatal to the pending civil contempt proceedings, as the district court, the parties, and the dissent all seem to concede. Once the underlying order was vacated, the district court lost the power to compel the Executive to come into compliance with the TRO. *See United Mine Workers*, 330 U.S. at 294–95; *Ayuda, Inc. v. Thornburgh*, 948 F.2d 742, 760 (D.C. Cir. 1991) (holding that when "the district court had no power to determine plaintiffs' rights … there is no longer a basis for holding the government in civil contempt"), *vacated on other grounds*, *Ayuda, Inc. v. Reno*, 509 U.S. 916 (1993).

Barred from coercing compliance, the district court issued a highly unusual order finding "probable cause" that government officials had committed criminal contempt. *J.G.G.*, 2025 WL 1119481, at *1. The court invoked the collateral-bar rule to justify continuing with criminal contempt proceedings notwithstanding the Supreme Court's vacatur.[2] *Id.* at *8. The court then explained that "before initiating any criminal-contempt proceedings, courts typically allow the contumacious party an opportunity to purge its contempt." *Id.* at *20.

---

[2] Under the collateral-bar rule, criminal contempt may remain available even after an order is vacated because "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal." *United Mine Workers*, 330 U.S. at 294. Of course, a district court must still consider whether criminal contempt is appropriate under the circumstances, taking into account the invalidity of the underlying order and serious separation of powers concerns. *See Donovan v. City of Dallas*, 377 U.S. 408, 414 (1964).

49

9

It is true that while an order remains in place, the district court may seek either to remedy non-compliance through civil contempt or to punish non-compliance with criminal contempt. Sometimes a court will first attempt civil contempt remedies before criminal proceedings to afford a party one last chance to comply before facing "more drastic criminal sanctions." *Yates v. United States*, 355 U.S. 66, 75 (1957). That approach is appropriate where civil contempt remains available. But here the TRO is invalid, and as everyone agrees, the district court has no authority to compel compliance.

Nonetheless, the court offered a choice aimed at securing compliance: The government could either "purge its contempt" and "remedy its violation by voluntarily obeying" the TRO or face criminal prosecutions. *J.G.G.*, 2025 WL 1119481, at *20–21. The district court used the threat of criminal contempt to pressure the government to exercise its foreign affairs power and assert custody over the removed individuals.

This approach exceeded the court's authority and constituted an abuse of discretion. What a court lacks the power to do directly, it cannot accomplish indirectly. *See Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows."); *cf. Lonchar v. Thomas*, 517 U.S. 314, 320 (1996) ("[I]f the district court lacks authority to directly dispose of the petition on the merits, it would abuse its discretion by attempting to achieve the same result indirectly."). The district court had no authority to demand compliance with the vacated TRO through civil contempt, so it had no authority to attain the same coercive result by threatening criminal contempt proceedings. The power to hold defendants in criminal contempt is the power only to punish for past violations of a court order. Having lost its civil contempt

10

authority, the district court could not use the threat of a criminal punishment to achieve compliance with the TRO.[3]

The Supreme Court recently clarified that a district court may not use contempt to "'coerce' the Government into 'compliance'" with an injunction stayed by the Supreme Court. *D.V.D.*, 2025 WL 1832186, at *1 (quoting *United Mine Workers*, 330 U.S. at 303). The Court explained that a stay divests the district court's order of enforceability. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 428 (2009)). As Justice Kagan emphasized, "I do not see how a district court can compel compliance with an order that this Court has stayed." *Id.* (Kagan, J., concurring). The Court's reasoning applies with even greater force in this context, where the district court's TRO was not just stayed but *vacated* by the Supreme Court. The district court cannot coerce compliance with an invalid and unenforceable TRO through the threat of contempt.

---

[3] Judge Pillard's primary rebuttal is that the district court was in fact proceeding in criminal, not civil, contempt. *See* Dissenting Op. 42–43. My argument, however, is not that these proceedings are civil, but rather that the district court cannot use its criminal contempt power to cajole and threaten the government into complying with the vacated order. The fact that criminal contempt might be available in these circumstances does not change the unlawfulness of the choice put to the government.

Judge Pillard's secondary rebuttal—that demanding the names of Executive officials for a criminal proceeding is not coercive—carries even less force. *See id.* at 44. The district court declared its intent to identify the responsible officials through depositions and hearings and, if necessary, appoint its own prosecutor to bring charges. *J.G.G.*, 2025 WL 1119481, at *21. Judge Pillard maintains that this is just a "standard request for information," but calling it such does nothing to mitigate the coercion inherent in the district court's stated commitment to initiate a criminal investigation.

51

11

C.

Furthermore, the district court's abuse of discretion is compounded by the fact that the order intrudes on the Executive's foreign affairs power. The threat of criminal contempt is directed at forcing the Executive to engage in diplomacy to assert custody over individuals held by a foreign sovereign.

The district court's directive requires diplomacy because its "most obvious" purge option—the government "asserting custody" over the detainees—is an outcome the Executive cannot achieve unilaterally. *J.G.G.*, 2025 WL 1119481, at *20. At the time of the court's probable cause order, the individuals were in the custody of El Salvador. Therefore, asserting custody would require the Executive Branch to open negotiations and then persuade a foreign sovereign to relinquish control.[4] While the court offered to "evaluate" any "other methods of coming into compliance," it reserved the ultimate power to define what constitutes a successful diplomatic outcome. *Id.*

The district court's order intrudes upon the powers committed to the Executive Branch. The Constitution entrusts the conduct of the nation's foreign affairs to the political branches. The President's foreign affairs responsibilities include weighty matters such as "making treaties, appointing ambassadors, recognizing foreign governments, meeting foreign leaders, overseeing international diplomacy and

---

[4] Since the district court's probable cause order, the individuals in question have been transferred from the custody of El Salvador to Venezuela. *See* Gov't Suppl. Br. 1. While this development changes aspects of the underlying litigation, it does not alter the fact that the probable cause order was an abuse of discretion.

12

intelligence gathering, and managing matters related to terrorism, trade, and immigration." *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024). As we have held, "the commencement of diplomatic negotiations with a foreign power is completely in the discretion of the President …. The Executive is not subject to judicial control or direction in such matters." *U.S. ex rel. Keefe v. Dulles*, 222 F.2d 390, 394 (D.C. Cir. 1954); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13–16 (2015); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (recognizing the President is the "sole organ of the federal government in the field of international relations").

Decisions concerning diplomacy and foreign policy are "of a kind for which the Judiciary has neither aptitude, facilities[,] nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *see also* Concurring Op. 28–29 (Katsas, J.). These separation of powers principles are only reinforced by the Supreme Court's recognition in this litigation that the statute under which the removals were made, the Alien Enemies Act, "largely 'precludes judicial review.'" *J.G.G.*, 145 S. Ct. at 1005 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948)). The judiciary should not "embarrass the executive arm of the Government in conducting foreign relations" by "assuming an antagonistic jurisdiction." *Ex parte Peru*, 318 U.S. 578, 588 (1943) (cleaned up).

By pressuring the Executive Branch to take diplomatic action through the threat of criminal contempt, the district court's order impermissibly encroaches on the Executive's conduct of foreign affairs.

\* \* \*

13

"[T]he very amplitude of the [contempt] power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper." *Gompers*, 221 U.S. at 451. After the Supreme Court vacated the TRO, the district court no longer had authority to coerce compliance with that order. The attempt to do so with the threat of criminal contempt was both unlawful and a clear abuse of discretion, particularly because the coercion was directed at the Executive's conduct of foreign affairs.

III.

Having concluded the district court exceeded its legal authority and abused its discretion, the next question is whether this error justifies mandamus. *See* 28 U.S.C. § 1651 (authorizing courts to issue "appropriate" writs). Before issuing a writ of mandamus, "three conditions must be satisfied: (i) the petitioner must have 'no other adequate means to attain the relief he desires'; (ii) the petitioner must show that his right to the writ is 'clear and indisputable'; and (iii) the court 'in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.'" *Fokker Servs.*, 818 F.3d at 747 (quoting *Cheney*, 542 U.S. at 380–81). All three conditions are satisfied here.

A.

First, the government has no other adequate means to challenge the district court's unlawful order. Immediate appeal is likely not available. *See* Concurring Op. 10 (Katsas, J.); Dissenting Op. 17. And any post-judgment appeal would be an inadequate form of relief because it is doubtful such review could remedy the harm caused by the order.

The district court's order places the government in an untenable position between two choices. If the government

54

14

"comes into compliance" to avoid criminal contempt for its officials, such compliance could foreclose future appellate review of the district court's coercive order. *Cf. Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 59 F.4th 1319, 1322–23 (D.C. Cir. 2023) (holding compliance with an order rendered an appeal from that order moot). Moreover, post-judgment appellate review could not undo the intrusion on the Executive Branch caused by pressuring the government to assert custody of the individuals (or to take some similar action). *See Cobell*, 334 F.3d at 1140 (finding no adequate alternative when the government's alleged harms included "interference with the internal deliberations" of the government that could not "be remedied by an appeal from the final judgment") (cleaned up); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065–66 (D.C. Cir. 1998) (finding appellate review inadequate when the government would suffer "irreparable harm" before the appeal).

If, on the other hand, the government refuses to come into compliance with the district court's directives, any appeal from subsequent criminal contempt proceedings could not correct the unlawful and abusive choice the district court offered here. The harm is in the choice itself. The order forces a coequal branch to choose between capitulating to an unlawful judicial order and subjecting its officials to a dubious prosecution. Mandamus is the only mechanism available to provide relief from this unlawful order. *See Fokker Servs.*, 818 F.3d at 749; *Maryland v. Soper*, 270 U.S. 9, 30 (1926) ("Except by the issue of mandamus, [the government] is without an opportunity to invoke the decision of this Court upon the issue it would raise.").

Because an appeal would come too late to undo the constitutional injury of the court's coercive choice, the

15

government has established that it has no other adequate means to attain relief.

B.

Second, the government's right to the writ is clear and indisputable. As explained above, the district court exceeded its legal authority and abused its discretion, an error exacerbated by the intrusion into the Executive's power to conduct foreign affairs. *See Cheney*, 542 U.S. at 380.

This case is highly unusual, and I have found no other like it, perhaps because no district court has threatened criminal contempt against Executive Branch officials as a backdoor to coercing compliance with an order that has been vacated by the Supreme Court. Even so, "we have never required the existence of a prior opinion addressing the precise factual circumstances ... at issue in order to find clear error justifying mandamus relief."[5] *Fokker Servs.*, 818 F.3d at 749–50. In fact, mandamus is often granted to correct judicial innovations. As the Supreme Court has explained, appellate courts have the power to review by mandamus "an issue of first impression" or "to settle new and important problems." *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964); *see also Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 525–26 (D.C. Cir. 1975) (using mandamus to resolve an issue of first impression that was

---

[5] The district court's order is novel, but our analysis of it turns on longstanding principles underlying the limits of the contempt power. Judge Pillard maintains that an "open question[]" cannot justify mandamus. Dissenting Op. 47. But she provides no response to the Supreme Court and circuit precedents cited above, which squarely hold that mandamus is appropriate to correct judicial innovations that exceed the judicial power. In any event, this case does not present an "open question" of law but rather a novel *assertion* of judicial power that runs contrary to settled equitable and legal limits.

16

"important to the administration of discovery"); *In re Att'y Gen.*, 596 F.2d at 64 (using mandamus to answer "underlying issues of first impression").

"[W]hen a court has no judicial power to do what it purports to do," such "usurpation of power" must be corrected by a higher court. *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 217 (1945). The district court's order exceeds the contempt power and intrudes on the powers of the Executive Branch—that error is clear and of the type that warrants mandamus.

C.

Finally, the writ is appropriate in these circumstances. "Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities." *Cheney*, 542 U.S. at 382. The district court sought to coerce a result it has no authority to compel, and the coercion intrudes on the Executive's foreign affairs powers. *Cf. Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022) (explaining courts should "take[] care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy'") (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013)). Such judicial interference is especially unwarranted when, as here, it is undertaken to enforce an order the Supreme Court has already declared invalid. When a lower court infringes on an "action of the political arm of the Government taken within its appropriate sphere," the overreach must "be promptly recognized" and corrected to prevent "the delay and inconvenience of a prolonged litigation." *Ex parte Peru*, 318 U.S. at 587.

This court often grants mandamus to correct unlawful encroachments on executive power, even when proceedings in

57

17

the district court have not fully run their course. For example, in *In re Cheney*, we granted mandamus in the early stages of litigation to bar the deposition of the Vice President's Chief of Staff because it "would constitute an unwarranted impairment of the functioning" of the Office of the Vice President. 544 F.3d 311, 314 (D.C. Cir. 2008) (cleaned up). Likewise, in *In re Sealed Case No. 98-3077*, we granted mandamus to vacate an order requiring the independent counsel to produce documents, submit to depositions, and respond to subpoenas for live testimony, because these requirements would cause "irreparable harm" to a pending grand jury investigation and would "divert petitioner's focus" away from that investigation "at a crucial juncture." 151 F.3d at 1065–66. And in *Cobell v. Norton*, we granted mandamus when the appointment of a court monitor "intrude[d] into the internal affairs of the Department [of the Interior]." 334 F.3d at 1143; *see also Fokker Servs.*, 818 F.3d at 750 (finding mandamus appropriate when the district court's ruling would "have enormous practical consequences for the government's ability to negotiate future settlements") (cleaned up); *In re Clinton*, 973 F.3d at 117–21 (finding mandamus appropriate to vacate an intrusive discovery order directed at the former Secretary of State). Consistent with these many examples, we issue the writ of mandamus here to correct the district court's "unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390.

Moreover, mandamus is appropriate to "forestall future error in trial courts." *Colonial Times*, 509 F.2d at 524. The court's contempt authority is uniquely "liable to abuse." *Ex parte Terry*, 128 U.S. 289, 313 (1888); *see also Bloom v. Illinois*, 391 U.S. 194, 202 (1968). Accordingly, as a court of review, we must ensure the power is not wielded to reach "arbitrary or oppressive conclusions." *Cooke v. United States*, 267 U.S. 517, 539 (1925). Mandamus is appropriate here to

18

forestall courts from using criminal contempt to indirectly coerce enforcement of an unenforceable order.

Lastly, a word about the appropriateness of the specific mandamus remedy we grant today. In issuing the writ, we vacate the district court's probable cause order, but we do not grant the government's request to terminate the criminal contempt proceedings. We have before us only the district court's preliminary order on probable cause, an order that seeks to use the threat of criminal contempt to coerce compliance with a TRO vacated by the Supreme Court. Because the immediate harm is the unlawful choice the district court imposed, vacating the order is the appropriate and necessary remedy.

"Although the remedy by mandamus is at law, its allowance is controlled by equitable principles." *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 359 (1933). Those principles demand that the remedy be tailored to the specific harm before us. *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). A court's relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) (cleaned up); *see also id.* at 2563 (Thomas, J., concurring) ("In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries."). Here, the harm was putting the government to an unlawful choice, and the relief must be limited to that harm.[6]

---

[6] Vacating only the purge option would not cure the district court's error. *Cf.* Dissenting Op. 7–8. Because the district court's two choices are linked, eliminating the purge option would immediately require the government to identify executive officials for

19

With the probable cause order vacated, the district court will have to squarely face the difficult questions that would arise from initiating criminal contempt against senior Executive Branch officials. In this and related proceedings, the district court's primary focus has been securing the government's compliance and bringing the removed individuals back into the government's custody. *Cf. J.G.G. v. Trump*, 25-cv-766, 2025 WL 1577811, at *14 (D.D.C. June 4, 2025) (allowing plaintiffs to bring new due process claims notwithstanding the Supreme Court's determination that such challenges could be brought only in habeas and that the District of Columbia was an improper venue). A pivot now to a purely punitive proceeding would be a momentous decision.

Although executive officials are not above the law and are not "immune from punishment for contempt," they are very rarely held in either civil or criminal contempt. *Land v. Dollar*, 190 F.2d 623, 638–40 (D.C. Cir. 1951) (per curiam), *vacated as moot*, *Sawyer v. Dollar*, 344 U.S. 806 (1952). Indeed, I am not aware of any case in which punishment for contempt against a senior executive official was upheld on appeal. *See, e.g.*, *In re Att'y Gen.*, 596 F.2d at 68 (vacating a contempt finding against the Attorney General); *Sawyer*, 344 U.S. at 806 (vacating and dismissing as moot a contempt finding against

---

prosecution. But the district court imposed this directive only if the government did not accept the purge option. In light of the serious constitutional and other concerns identified here and by Judge Katsas in his concurrence, vacating the order in full allows the district court to consider how to move ahead, if at all, without the purge option. *Cf. Donovan*, 377 U.S. at 414 ("Whether the Texas court would have punished petitioners for contempt had it known that the restraining order … was invalid, we do not know. However, since that question was neither considered nor decided by the Texas court, we leave it for consideration by that court on remand.").

20

the Secretary of Commerce). Holding Executive Branch officials in contempt demands "more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant" because these officials are representatives of "another branch of government coequal to the judicial branch in constitutional function and design." *In re Att'y Gen.*, 596 F.2d at 64–65.

Another concern is whether the district court may appoint an independent prosecutor if the Department of Justice declines—as one may reasonably expect—to prosecute for criminal contempt in these circumstances. *See* Concurring Op. 30–31 (Katsas, J.); Dissenting Op. 24 (arguing that such separation of powers claims are presently unripe but acknowledging that they may be raised by the government if an independent prosecutor is appointed in the future). I have found no precedent for a court independently prosecuting an Executive Branch official for criminal contempt, much less any instance of a district court seeking criminal punishment against an Executive Branch official for violating an order that the Supreme Court has vacated.

Whether to proceed with criminal contempt is a choice left to the district court, which "enjoys a discretion akin to the non-prosecution power in the executive." *Potter*, 126 F.4th at 725. With the issuance of this writ of mandamus, I would not assume that such an extraordinary step is forthcoming. *See D.V.D.*, 2025 WL 1832186, at \*1 (assuming the district court will comply with the Supreme Court's decision and "cease enforc[ement]" of the stayed injunction). In any event, today we correct the particular error before us. If the district court chooses the problematic and uncertain path of criminal contempt, the government may seek relief from this court to remedy any specific harms arising from the district court's actions.

21

\* \* \*

The district court used the threat of criminal contempt to coerce the Executive Branch to comply with an order it had no authority to enforce. And it directed that coercion toward the Executive's exercise of its foreign affairs power. The significance of the district court's error, coupled with the potential for abuse in future cases, justifies our intervention at this stage of the proceedings. Considering the "totality of the circumstances," the writ is appropriate. *In re Kellogg Brown & Root*, 756 F.3d at 762.

For the foregoing reasons, I concur in the decision to grant the government's petition for a writ of mandamus and to vacate the district court's order.

PILLARD, *Circuit Judge*, dissenting:   The rule of law depends on obedience to judicial orders.  Yet, shortly after the district court granted plaintiffs' emergency motion for a temporary restraining order, defendants appear to have disobeyed it.   Our system of courts cannot long endure if disappointed litigants defy court orders with impunity rather than legally challenge them.  That is why willful disobedience of a court order is punishable as criminal contempt.

When it appears that a judicial order has been disobeyed, the court's ability to learn who was responsible is the first step to accountability.   In defense of the integrity of our courts, the district judge promptly issued an opinion describing in detail the facts giving rise to probable cause to believe that contempt of court had occurred.   The accompanying order required only that defendants identify the people responsible for the apparently contumacious conduct.

Defendants assert no claim of privilege to withhold the identities of the decisionmakers aware of the TRO who decided not to halt the flights carrying detainees to prison in El Salvador.   They affirm that executive branch officials can be subject to sanction for criminal contempt.   Reply in Supp. of Stay 5-6.   And they squarely deny any suggestion "that [the executive branch] would never prosecute an official for criminal contempt." *Id.*

Yet my colleagues, each for a distinct and non-overlapping reason, vote to grant a writ of mandamus to vacate the district court's Order.   Judge Katsas would go further and "terminate the criminal-contempt proceeding."  Katsas Op. 35.

They intervene in error.   We all agree we lack appellate jurisdiction.   It should be even more apparent that defendants have no clear and indisputable right to the extraordinary writ of mandamus. *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 381 (2004).   The right to relief is only "clear and

2

indisputable" when a petitioner "can point to cases in which a federal court has held that relief is warranted in a matter involving like issues and comparable circumstances." *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (citation and internal quotation marks omitted). Neither defendants nor my colleagues cite to any such cases. Moreover, I am unaware of any prior case in which a court has asserted the clarity on which mandamus relief depends without a majority agreeing as to what is so clear. Because the district court's order is not remotely one from which defendants have an indisputable right to relief, I would deny mandamus and dismiss the appeal.

The district court's April 16, 2025, Order is decidedly not a "criminal contempt order" that "unconstitutionally commandeers" the Executive's prosecutorial powers. Mot. for Stay 1. Nobody contends the Order imposed punishment. Nobody says it even made a referral to the Department of Justice for prosecution. The Department accordingly has had no occasion to decide whether to prosecute, nor has the district court had reason to appoint a prosecutor to pursue contempt charges the Department declines. And defendants' right to appeal any conviction—or perhaps a future order of private prosecution—provides "other adequate means to attain the relief" from the unconstitutional infringement of executive prerogative that they forecast, which alone should defeat mandamus. *Cheney*, 542 U.S. at 380.

The court's Order did only two things. First, it set an April 23, 2025, deadline for defendants to file a declaration identifying "who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025." Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 80 (D.D.C. Apr. 16, 2025) [hereinafter April 16 Order]. The court correctly explained why it retains jurisdiction to

3

consider the potential criminal contempt even after the Supreme Court held that venue of the plaintiffs' individual habeas claims is not in D.C. where defendants are, but in Texas or wherever plaintiffs are confined. *J.G.G. v. Trump*, No. 25-cv-766 (JEB), 2025 WL 1119481, at *9-10 (D.D.C. Apr. 16, 2025) (citing *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (per curiam)). Nobody contends that the identity of the potential contemnors is irrelevant to the potential criminal contempt, and no immunity or privilege is asserted. Requiring a party to produce nonprivileged information of central relevance to a pending dispute is an entirely routine judicial function.

If the district court had stopped there, Judge Rao provides no reason to grant mandamus.

But the court's Order gave defendants another option: Instead of identifying the potential contemnors, defendants could commit to rectifying the harm their apparent defiance of the TRO inflicted on the plaintiffs. The constitutional dimension of the harm to the plaintiff class members is beyond dispute. Shortly after defendants rushed to transfer plaintiffs to a Salvadoran prison in the face of TROs (that we declined to stay in order to prevent further such removals), the Supreme Court ruled unanimously that the Constitution guaranteed plaintiffs' pre-removal due process rights to dispute their alleged role in Tren de Aragua. As the district court observed, "[i]n holding as much, the [Supreme] Court effectively said that the Constitution flatly prohibits the Government from doing exactly what it did that Saturday, when it secretly loaded people onto planes, kept many of them in the dark about their destination, and raced to spirit them away before they could invoke their due-process rights." *Id.* at *7.

4

Punishment for contempt would vindicate the authority of the court. But the court also recognized the plaintiffs' ongoing peril. So, it gave defendants the option to make an alternative April 23 filing—one that would "explain[] the steps they have taken and will take" to remedy the effect on the plaintiffs of their potentially contemptuous actions. April 16 Order; *see J.G.G.*, 2025 WL 1119481, at *20. Defendants would "not need to release any of those individuals, nor would [they] need to transport them back to the homeland," but only make some arrangement for plaintiffs to "avail themselves of their right to challenge their removability through a habeas proceeding." 2025 WL 1119481, at *20. The court was flexible about the details, "giv[ing] Defendants an opportunity to propose other methods of coming into compliance," which it would "evaluate." *Id*.

The choice was up to defendants: They could voluntarily provide a habeas process for plaintiffs to dispute and a court determine whether they are in fact members of Tren de Aragua, as defendants assert. Or defendants could leave that task for another day and proceed to identify the people responsible for the actions the court deemed potentially contemptuous. They chose neither, instead appealing the Order and moving to stay it pending resolution of the appeal or, in the alternative, for a writ of mandamus to vacate the Order.

We lack appellate jurisdiction, so we dismiss the appeal. But the majority grants mandamus and vacates the probable-cause Order.

Again, defendants do not assert that the court lacks power to order them to identify the potential contemnors. And they explicitly disclaim "any power to defy judicial orders." Reply in Supp. of Stay 6. They instead argue that they *complied* with the TRO.

5

Judge Katsas apparently views defendants' claim of compliance as at least objectively plausible.  He deems the TRO unable to support a contempt prosecution because he believes the TRO was so ambiguous that defendants could have reasonably believed they obeyed it.  As he sees it, the TRO failed to make clear whether the court (a) was *exercising the full extent of its undisputed jurisdiction* to enjoin defendants from delivering the plaintiffs on board U.S.-controlled planes into the hands of the Salvadoran government for indefinite imprisonment or, alternatively, (b) *opting to limit itself* to enjoining that conduct only insofar as the planes containing the plaintiffs remained within U.S. airspace by the time the judge imposed the TRO.  But that theory fails to support mandamus relief for at least two reasons.

First, if such ambiguity were present, it could be fully litigated as an ordinary defense to a contempt prosecution and on appeal from conviction, which makes it ineligible for mandamus.  I am unaware of any case—and none is cited— holding that ambiguity in the disobeyed court order is grounds for a writ of mandamus to abort a contempt inquiry even before any charging decision has been made.  Judge Katsas views mandamus as nonetheless necessary because the Order "gives the Executive Branch an ultimatum" that is "constitutionally fraught."  Katsas Op. 28.  He worries that the order is "problematic" because it "seeks to pressure" "the conduct of foreign relations," *id.* at 28-29, or might require discovery that could run afoul of state-secrets or presidential communications privileges, *id.* at 30.  But any diplomatic efforts would be at the option and under the command of the Executive, *cf. Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (holding that the district court properly required the Executive to "facilitate" a U.S. resident's "release from custody in El Salvador" and questioning the court's authority only insofar as it directed the Executive to "effectuate" such release), and no informational

67

6

privilege was asserted in support of mandamus.  Neither those nor any of the other problems Judge Katsas anticipates, Katsas Op. 30-33—including some defendants admittedly "did not press . . . as a ground for mandamus," *id*. at 32—provides a clear and indisputable entitlement that could support mandamus.

Second, there is no ambiguity in the TRO.  "[A]n alleged contemnor may not avoid" contempt proceedings "by 'twisted interpretations' or 'tortured constructions' of the provisions of the order."  *In re Holloway*, 995 F.2d 1080, 1084 (D.C. Cir. 1993) (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974)).  On the current record, it is not plausible that defendants, aware of the TRO, might have reasonably thought they were complying so long as their planes had exited the territorial United States before the minute order appeared on the docket.  The putative ambiguity defendants assert and Judge Katsas carefully elaborates depends on taking the term "removing" out of the context of the words and events in this case and substituting as "context" entirely different circumstances, where statutory references or concepts of "removal" have been used in ways that even defendants themselves do not seriously contend apply here.

Judge Rao takes a different tack.  She sees the Order's "purpose and effect" as compelling the executive branch "to assert custody of the removed gang members" or to take similar action, which she concludes means the order improperly "commingles civil and criminal contempt."  Rao Op. 4, 7.  I see at least three fatal defects in that position.

First, defendants make no version of that argument, and indeed expressly disclaim it.  *See* Reply in Supp. of Stay 5 n.1 (arguing that it is "wrong" to "suggest that contempt proceedings in this case [are] properly . . . characterized as

7

civil, not criminal").  Judge Rao's departure from the party-presentation principle alone should foreclose mandamus relief, which depends on the petitioners, not the court, carrying the burden to demonstrate a clear and indisputable right to such relief.  *Cf. Cheney*, 542 U.S. at 371, 380.

Second, even if such a departure were justifiable, I am unaware of any authority, and Judge Rao cites none, providing a clear entitlement to intrude on and limit a criminal contempt inquiry because the court provides an option for the potential contemnors to take voluntary, lawful action to avoid the inquiry.  If we accept that the district court has jurisdiction to consider criminal contempt as a standalone matter, which Judge Rao does not appear to question, the inclusion of a "purge" option that defendants are entirely free to pretermit makes the order, if anything, less onerous.  Judge Rao sees no such free choice, given what she says is the "coercive," "threatening," "sword of Damocles"-like consequence to the defendants should they decide against the purge option.  But the "threat" that would await them is none other than a completely ordinary requirement to produce information of central relevance to the pending criminal contempt inquiry.  That requirement is not rendered somehow impermissibly coercive by the undoubted distastefulness of defendants' duty to respond in court to substantial claims of misconduct.  That is an onus our justice system regularly places even on persons ultimately deemed to have committed no wrong.

Third, if there were merit to the defect Judge Rao sees, it would be fully and most narrowly remedied by eliminating the "purge" option; her theory provides no support for her preferred remedy of vacating the entire Order.  But, again, defendants have no clear and indisputable entitlement to eliminate the "purge" option, nor have they sought that relief.

8

They have not shown a clear right to narrow the Order, let alone vacate it.

Because defendants can seek relief through the ordinary appeals process and have no clear and indisputable right to vacatur of the probable-cause Order—a point my colleagues' differences highlight—I would deny the petition for the writ of mandamus.

**I**.

**A.**

The district court's Memorandum Opinion describes the facts supporting its April 16 probable-cause determination.  *See J.G.G.*, 2025 WL 1119481, at *1-5.  I recount the most salient aspects here.

 In the early hours of Saturday, March 15, 2025, executive branch officials reportedly "loaded scores of Venezuelans," including some of the five named plaintiffs in this case, "onto buses, drove them to a nearby airport, and began putting them onto . . . planes."  *Id.* at *2.  The detainees were unaware that, the day before, "the President had seemingly signed—but not yet made public—a Proclamation invoking the Alien Enemies Act" (AEA) of 1798 against members of Tren de Aragua (TdA), a Venezuelan criminal gang, and prepared to summarily deport them in reliance on the Proclamation.  *Id.*  The AEA grants extraordinary authority to the President to restrain and remove "natives, citizens, denizens, or subjects" of a hostile nation or government that is in a "declared war" with the "United States" or when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by [the] foreign nation or government."  50 U.S.C. § 21.

9

Plaintiffs' attorneys caught wind of those developments. At 1:12 a.m. that Saturday, they filed a class action complaint and habeas petition in the District Court for the District of Columbia and moved for a TRO to prevent their clients' removal under the Proclamation. Plaintiffs, acting for themselves and a class of similarly situated detainees, claimed the AEA is inapplicable to TdA, which is not the Venezuelan government, and challenged defendants' reliance on the AEA to sidestep protections of applicable statutes and the Due Process Clause. *See* Compl. ¶¶ 1-4, 70-106, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 1 (D.D.C. Mar. 15, 2025). Each plaintiff was already being held in immigration custody, and each "adamantly denie[d] that he [was] . . . a member of Tren de Aragua." *J.G.G.*, 2025 WL 1119481, at *2.

Upon receiving no response from defendants, the district court issued an *ex parte* TRO at 9:40 a.m. "to maintain the status quo until a hearing can be set." 9:40 a.m. Minute Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB) (D.D.C. Mar. 15, 2025). The five named plaintiffs and their counsel each attested that plaintiffs were being held at the El Valle Detention Facility in Raymondville, Texas, and were told they would be deported at some point in the next two days. The TRO enjoined defendants from "remov[ing] any of the individual Plaintiffs from the United States." *Id.* In response, defendants "abruptly removed" several of the named plaintiffs from the planes. 2025 WL 1119481, at *2.

But defendants appeared to be moving forward with preparations to fly the hundreds of unnamed class members to El Salvador, so plaintiffs' counsel quickly moved for class certification and a TRO to protect the class against removal under the AEA before the court could consider its legality. *See* Emergency Appl. for TRO at 1, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 3 (D.D.C. Mar. 15, 2025). At plaintiffs'

71

10

request, the district court set an emergency hearing for 5:00 p.m. the same day.

An hour before the Saturday afternoon hearing was set to begin, the White House made the Proclamation public by posting it on its website. *See* Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 20, 2025); *J.G.G.*, 2025 WL 1119481, at *3. Then, with the hearing before the district court already underway, defendants rushed to dispatch two flights removing Venezuelan detainees pursuant to the Proclamation. At the hearing, the district court asked counsel for defendants whether there were any "removals under this proclamation planned . . . in the next 24 or 48 hours." Hr'g Tr. 11:13-14, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 20 (D.D.C. Mar. 16, 2025) [hereinafter Hr'g Tr.]. Counsel that defendants had sent to court to represent them on a challenge to the removals' legality replied "I don't know the answer to that question." Hr'g Tr. 11:15-16. When the court asked how soon he could get that information, counsel responded "I can certainly talk to them ASAP," and undertook "as quickly as possible" to "find out that information." Hr'g Tr. 11:21-25. The court took a brief recess to allow counsel to confer with his clients.

We now know that one flight departed at 5:25 p.m. and the other at 5:45 p.m. *J.G.G.*, 2025 WL 1119481, at *3. When the hearing reconvened at 6:00 p.m., defendants' counsel reported that he had "talked to the clients" who let him know "operational details as to what is going on." Hr'g Tr. 15:9-11. When he referred to "potential national security issues" and said "we may be able to provide Your Honor additional details in an *in camera* hearing," the court immediately responded "Fine." Hr'g Tr. 15:11-16. The courtroom deputy promptly closed the public line to enable an *in camera* session. But, with those arrangements in place, defendants' counsel said he had nothing he could report about removal flights—even though in

11

fact two flights with over two hundred people on board had by then taken off.  *Plaintiffs*' counsel then stated his understanding "that two flights went to El Salvador this afternoon; one very recently," and another (he thought but was not "entirely sure") was scheduled to depart for Honduras at 6:23 p.m., meaning "only in a matter of minutes."  Hr'g Tr. 17:24-18:3.

"With growing realization . . . that the Government might be rapidly dispatching removal flights in an apparent effort to evade judicial review," the district court then moved swiftly to provisionally certify a class of plaintiffs including all noncitizens in U.S. custody subject to removal solely under the Proclamation.  *J.G.G.*, 2025 WL 1119481, at *4.  At around 6:45 p.m., with flights in the air, the court granted the TRO:

> So I find that a TRO is appropriate for the class members, and it would be to prevent the removal of the class for 14 days or until further order of the Court.  And the class will be all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025, and its implementation.

Hr'g Tr. 42:16-21.  Spelling out how the TRO applied to the facts if they were as the plaintiffs described, the court said that, if class members were on a plane "that is going to take off or is in the air," then

> those people need to be returned to the United States.  However that's accomplished, whether turning around a plane or not embarking anyone on the plane . . . I leave to you.  But this is something that you need to make sure is complied with immediately.

Hr'g Tr. 43:13-19.  Several attorneys from the Department of Justice listened on the public line to the district court delivering that command.  *See* Show Cause Hr'g Tr. 19:4-21, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt No. 76 (D.D.C. Apr. 4,

12

2025).[1]  Former counsel for DOJ has since attested that he
communicated in a 6:44 p.m. email to client officials at DHS
Office of General Counsel, ICE Office of the Principal Legal
Advisor, and the DOS Office of Legal Advisor that the court
had issued a class-wide TRO, and in a 6:48 p.m. email that it
"specifically ordered us to not remove anyone in the class, and
to return anyone in the air."  Mot. to Supplement, Ex. A-4 at
17-19; ACLU Rule 28(j) Letter (June 25, 2025), Ex. 1 at 4, 11.

The court entered a minute order on its docket at 7:25 p.m.
memorializing the TRO announced from the bench:

> As discussed in today's hearing . . . [t]he Government is
> ENJOINED from removing [class members] pursuant to
> the Proclamation for 14 days.

---

[1] One of the lawyers listening to the hearing when the court ruled was
Erez Reuveni, who, at the time, was Acting Deputy Director for the
Office of Immigration Litigation.  Mr. Reuveni has since disclosed
to Congress multiple emails he sent, beginning at 6:14 p.m. on March
15 and continuing until 8:07 a.m. the following morning, to senior
Homeland Security and State Department officials.  He reported on
the entry of the TRO from the bench and the judge's explanation that
it applied to plaintiff class members who might already be on planes
in the air.  And he specifically confirmed at 10:13 p.m. that the TRO
prohibited removing detainees who had not yet been disembarked
from flights on the ground in El Salvador and restated DOJ's
understanding that anyone in the air should be returned to the United
States.  He further attests that lead counsel for defendants—Drew
Ensign—also sent an email at 7:31 p.m. (after the issuance of the
Minute Order) to those officials informing them of the injunction and
that it prohibited them from removing anyone within the class
definition.  Mr. Ensign, like Mr. Reuveni, understood that the TRO
prohibited DHS from deplaning abroad any detainees on planes that
had departed U.S. airspace.  *See* ACLU Rule 28(j) Letter (June 25,
2025), Ex. 1 at 4, 11-13; Mot. to Supplement, Ex. A-4 at 17-20.

74

13

7:25 p.m. Minute Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB) (D.D.C. Mar. 15, 2025) [hereinafter 7:25 p.m. Minute Order].

The two removal flights that had departed with hundreds of plaintiff class members on board did not turn back. In the face of the district court's TRO barring plaintiffs' removal, defendants appear to have taken no steps to comply. Nor, to the extent there was any confusion about the meaning of the TRO, did defendants seek any clarification from the court. The planes flew on to Honduras, one touching down at 7:37 p.m. and the other at 8:10 p.m., and they remained there for several hours. The planes did not then return from Honduras to the United States. Instead, they continued to El Salvador, landing in that country shortly after midnight on March 16.

Because women and Central American nationals were not accepted at the notorious Center for Terrorism Confinement (CECOT), U.S. agents retained custody of the handful of women and one Nicaraguan man aboard these planes and returned them to the United States. *See J.G.G.*, 2025 WL 1119481, at *4. They transferred the rest of the detainees into Salvadoran custody for imprisonment in CECOT.

Plaintiff class members remained imprisoned at CECOT for four months, with no access to counsel or information available about their circumstances. Just days ago, the United States announced that 252 of those detainees have been repatriated to Venezuela as part of a prisoner exchange. The plaintiff class members, many of whom sought asylum in the United States because of persecution they suffered at the hands of the Venezuelan government and Tren de Aragua, still do not appear to have been provided any opportunity to dispute the executive branch's allegations that they belong to TdA or the legality of the Proclamation. *See* Manuel Rueda, *10 Americans Are Freed by Venezuela in a Prisoner Swap for Migrants in El*

14

*Salvador*, NPR (July 18, 2025), https://perma.cc/AE7U-SC3F. Several of the class members who have been transferred to Venezuela report that prison staff at CECOT subjected them to abuse. *See* Sergio Martínez-Beltrán & Manuel Rueda, *'Hell on Earth': Venezuelans Deported to El Salvador Mega-Prison Tell of Brutal Abuse*, NPR (July 27, 2025), https://perma.cc/TP69-SMHJ.

**B.**

Following the March 15 emergency hearing, the district court denied defendants' motion to vacate its TRO. The court held that plaintiffs were likely to succeed on their claim that the Due Process Clause guarantees individuals subject to removal under the Proclamation an opportunity to challenge the government's assertion that they are enemy aliens before they are removed on that basis. Defendants appealed, and we denied a stay pending appeal. The two judges supporting that denial doubted that the activities of a criminal gang satisfied the Alien Enemies Act's requirement that there be an "invasion or predatory incursion . . . against the territory of the United States by any foreign nation," 50 U.S.C. § 21, and objected to the lack of process afforded to the people subject to removal. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8-10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *id.* at *13-14 (Millett, J., concurring).

The Supreme Court summarily vacated the TROs on the ground that habeas claims belong in the district of a detainee's confinement, not in the District of Columbia where defendants are located. *Trump*, 145 S. Ct. at 1005-06. The Court unanimously held, however, that detainees subject to removal orders under the AEA are entitled to advance notice and an opportunity to challenge their removal. *Id.* at 1006; *id.* at 1011-12 (Sotomayor, J., dissenting). The Court has since enjoined

15

further removals to ensure detainees receive the process they are due. *See A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025).

Meanwhile, the district court began to consider whether defendants had knowingly defied its TRO by transferring detainees to Salvadoran custody after it enjoined them from doing so. The court issued an Order to Show Cause eliciting briefing on whether defendants had violated the court's TRO by failing to return class members they flew to El Salvador on the evening of March 15 and turning them over for indefinite imprisonment there. It then issued a Memorandum Opinion and Order identifying probable cause to believe that they had. *J.G.G.*, 2025 WL 1119481, at *22.

The court noted that, from the outset of the emergency proceedings, defendants "refused to provide any relevant facts" in hearings and filings and implausibly invoked the state-secrets doctrine to avoid (or perhaps only to delay) providing—even *ex parte*—publicly available flight details. *Id.* at *5-6. It reasoned that the "numerous exchanges throughout the hearing" demonstrated that its TRO was "clear and specific in proscribing the handover of class members to Salvadoran officials." *Id.* at *15. And it explained why defendants' assertion that the TRO might have been read to prevent only the physical removal of class members from the territory of the United States is unsupportable. *Id.* at *11-13. The wording was clear, defendants acknowledged that the TRO must be understood in the context in which it was issued, and "[a]nyone paying attention to the hearing" would have known that the TRO sought to prevent "not [plaintiffs'] mere transportation across the U.S. border, but instead their discharge from U.S. custody into a foreign country or into foreign hands." *Id.* at *12.

77

16

Accompanying its probable-cause Memorandum Opinion, the court entered the Order from which my colleagues conclude defendants have a clear and indisputable right to relief. The Order says:

> Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that:
>
> 1. If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and
>
> 2. If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025.

April 16 Order. The district court thereby ordered the production of information to enable it to assess a potential referral for a contempt prosecution. And it offered defendants an opportunity to avoid such a referral, whether by taking steps to enable the individuals removed in apparent violation of the Court's classwide TRO to exercise their right to challenge their removability, or by another "method[] of coming into compliance" defendants themselves could propose. *J.G.G.*, 2025 WL 1119481, at *20.

Defendants moved the district court and this court to stay that order pending appeal. The district court denied the motion based, in part, on its view that defendants had not "made an adequate showing [of likelihood of success] on the merits" nor

17

shown irreparable harm or any public interest in support of a stay. *J.G.G. v. Trump*, No. 25-cv-766 (JEB), 2025 WL 1337037, at *1 (D.D.C. Apr. 18, 2025). As to the unlikelihood that defendants would succeed in challenging the probable-cause order, the court held that defendants "misconstru[ed] . . . the Court's directive" as having committed to a contempt prosecution. *Id*. The court underscored that it "might eventually refer this matter for prosecution," but that "we are not at that juncture," making "separation-of-powers arguments concerning any future prosecution(s) . . . premature and misplaced." *Id*. Defendants then filed in this court an emergency motion for stay pending appeal or, in the alternative, a writ of mandamus. Because the district court's order was not appealable, I noted my dissent from my colleagues' imposition of an administrative stay.

## II.

As in every case, we must first "assure ourselves of our jurisdiction." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017). Defendants assert that there are two grounds for us to exercise jurisdiction to stay or vacate the district court's Order. First, they contend we may enter a stay pending appeal because the Order is effectively an injunction or an appealable collateral order. Alternatively, they argue that a writ of mandamus under the All Writs Act is appropriate to halt the proceedings below. *See* 28 U.S.C. § 1651.

The panel is unanimous that no immediate appeal is available. My colleagues instead grant a writ of mandamus. They thus face the high burden to justify intervening in an ongoing district court proceeding to overturn an unappealable district court order. The extraordinary writ of mandamus is available only when: (1) "the party seeking issuance of the writ [has] no other adequate means to attain the relief he desires;"

18

(2) "the petitioner [satisfies] the burden of showing that his right to issuance of the writ is clear and indisputable;" and (3) "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81 (citations, internal quotation marks, and alterations omitted). Because it has not been shown to be available here, I would also deny mandamus relief.

I proceed by recounting how settled contempt doctrine establishes the district court's authority to proceed with its criminal contempt inquiry despite the Supreme Court's vacatur of the underlying TRO. I then address, in turn, Judge Katsas and Judge Rao's separate analyses as to why mandamus relief is warranted to halt those proceedings. I explain why each theory is inconsistent with our precedent governing contempt proceedings, the demanding standard for mandamus relief, and the facts.

## A.

It is fundamental to the "fair administration of justice" that "no man can be judge in his own case" and "ignore all the procedures of the law." *Walker v. City of Birmingham*, 388 U.S. 307, 320-21 (1967). That rule applies no less to executive branch officials than to anyone else who seeks protection or vindication in the courts. A court has "inherent contempt authority" to punish disobedience as a power "'necessary to the exercise of all others.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)). "Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), working mainly through deterrence but ultimately dependent on recognized authority to punish defiance when it occurs. Congress codified that authority in 18 U.S.C. § 401, which provides that any "court of the United

80

19

States shall have power to punish by fine or imprisonment, or both, at its discretion, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."  18 U.S.C. § 401(3).

The district court's authority to find probable cause that criminal contempt occurred is well established, and it is undiminished by the Supreme Court's holding—after the potentially contemptuous action—that venue of plaintiffs' habeas claims lay in Texas, not here.

Court orders routinely meet with strong opposition. Ensuring that opposition seeks vindication by appeal within the legal system, not in defiance of it, depends on contempt authority.  Whether valid or not, "an order issued by a court . . . must be obeyed by the parties until it is reversed by orderly and proper proceedings."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947).  Because criminal contempt undergirds the obligation to obey even legally defective court orders, a party "may be punished for criminal contempt for disobedience of an order later set aside on appeal," even if it is set aside because the district court lacked jurisdiction over the action.  *Id.* at 289-95.

The contempt power notably provides stronger protection of judicial commands than the law affords to authoritative statements of lawmakers or regulators:  One who is prosecuted for violating an *invalid law or regulation* may successfully defend by challenging its legality, but the collateral bar rule generally deprives a person of the same defense if he violates a *court order applying that same law*.  That is why civil rights demonstrators who marched through Birmingham on Easter Sunday 1963 in defiance of a court injunction enforcing Birmingham's unconstitutional parade ordinance had no First Amendment defense to criminal contempt, whereas marchers

81

20

not subject to the injunction successfully challenged their convictions based on the parade ordinance's constitutional flaw. *Compare Walker*, 388 U.S. at 321, *with Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 159 (1969).

The district court's authority to consider criminal contempt is thus plainly unaffected by the Supreme Court's vacatur of the TRO for want of venue. Defendants argue only that the district court lacked authority to pursue *civil* contempt because the TRO had been vacated. *See* Reply in Supp. of Stay 5 n.1 (citing *Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992)). But the Supreme Court in *Willy* acknowledged that, even if the order a putative contemnor defied is later held to have been entered by a court lacking jurisdiction, it could nonetheless support "a criminal contempt citation." *Willy*, 503 U.S. at 137 (citing *Mine Workers*, 330 U.S. 258). To the extent that Judge Katsas suggests otherwise, he claims only that the "impact of jurisdictional defects in subsequent criminal-contempt proceedings is unclear." Katsas Op. 32. But the defect is not "jurisdictional"; it has no impact on the criminal-contempt proceedings, *see Mine Workers*, 330 U.S. at 294, as Judge Rao appears to join me in recognizing, Rao Op. 8 n.2; and even if its impact here were not clear, the "unclear" impact of a venue defect on a court's power to punish contempt of court is no basis for mandamus.

Because of the potency of the criminal contempt power, parties facing a potential contempt charge have significant procedural rights. *See Bagwell*, 512 U.S. at 831-32. An accused contemnor may be entitled to "notice and a hearing," "the full protections of a criminal jury trial," and the "right[] to counsel." *Id.* at 832-34. Further, criminal contempt must be proved "beyond a reasonable doubt." *Id.* at 834.

82

21

And, although not required, courts sometimes opt to provide additional protection to a potential criminal contemnor by making a finding of probable cause before initiating contempt proceedings. *See J.G.G.*, 2025 WL 119581, at *8 (noting examples). The district court in this case considered "that practice to be a prudent way of affording alleged contemnors the procedural protections associated with other criminal proceedings," and so followed it here. *Id.*

**B.**

Judge Katsas votes to grant mandamus relief because, in his view, the March 15 TRO's prohibition against "removing" the plaintiff class members was fatally ambiguous and therefore unable to support a contempt determination. Recognizing that "mandamus must not become a 'substitute for the regular appeal process,'" Katsas Op. 25 (quoting *Cheney*, 542 U.S. at 380–81), he identifies various anticipated separation of powers concerns that he concludes tip the scale in favor of mandamus. But no prosecution has been authorized, no conduct of foreign relations ordered, and defendants have adequate means to assert ambiguity or separation-of-powers defenses in the ordinary course of any criminal contempt prosecution that might ensue. Because defendants will have ample, timely opportunity to assert their defenses, none of them, whether singly or combined, is grounds for a writ of mandamus.

And in any case, defendants have no clear right to relief. The TRO was not ambiguous. The district court could hardly have been clearer. On the record in open court, with multiple executive branch representatives listening, the court ordered defendants for 14 days or until further notice not to remove the class of noncitizens in its custody based on the Proclamation. Hr'g Tr. 42:16-21 ("I find that a TRO is appropriate . . . to

22

prevent the removal of the class for 14 days or until further order of the Court."); *see* 7:25 p.m. Minute Order ("As discussed in today's hearing . . . [t]he Government is ENJOINED from removing [noncitizens in U.S. custody] pursuant to the Proclamation for 14 days.").

The only "ambiguity" was the factual opacity executive branch officials created by refusing to provide the court with any information whatsoever about what they were doing or had done with the class members.  During the TRO hearing, even as defendants were secretly rushing to get the plaintiffs into the Salvadoran prison, their counsel was filibustering the court's direct inquiries with assertions that he had no facts to share.  Once confronted with "plaintiffs' information[,] unrebutted by the government that flights are actively departing and plan to depart," Hr'g Tr. 43:6-10, the court quickly shifted from its patient yet fruitless factual questioning of defendants' counsel to rule on the predicate questions and announce the TRO.

Immediately after he announced the TRO barring the plaintiffs' "removal," Judge Boasberg explained in concrete and specific terms what the bar against "removing" the class members meant on the opaque and shifting facts before him.  In open court, he told defendant's counsel to "inform your clients of this immediately" that "any plane containing these folks that is going to take off or is in the air . . . those people need to be returned to the United States.  However that's accomplished, whether turning around a plane or not embarking anyone on the plane, I leave to you.  But this is something that you need to make sure is complied with immediately."  Hr'g Tr. 43:12-19.  The clarity and force of those statements was striking to anyone paying attention to the proceedings.

84

23

**1.**

As an initial matter, Judge Katsas' analysis does not justify mandamus because defendants have "other adequate means to attain the relief [they] desire[]." *Cheney*, 542 U.S. at 380. Defendants' key argument—that the TRO is ambiguous—is a quintessential merits defense to prosecution for criminal contempt. But the court has not even announced it will make a referral for such a prosecution. If defendants are prosecuted, they will have the opportunity to raise any such defense during those proceedings; if convicted, they will have the opportunity to raise it again on appeal. That is how defendants have raised similar arguments in every other case we have heard evaluating the clarity of an injunction for contempt purposes. *See, e.g.*, *Holloway*, 995 F.2d at 1081-82; *United States v. Young*, 107 F.3d 903, 907-08 (D.C. Cir. 1997); *In re Levine*, 27 F.3d 594, 595-96 (D.C. Cir. 1994).

Neither defendants nor Judge Katsas identify any case in which putative ambiguity in the disobeyed court order constituted grounds for a writ of mandamus to abort a contempt inquiry even before any charging decision has been made. Granting the writ here is especially inappropriate. As explained in greater detail below, defendants have offered only spurious, *post hoc* rationalizations to manufacture ambiguity where there is none.

To the extent defendants suggest such a departure from our regular procedure is warranted in this case because of separation-of-powers concerns, those arguments are premature and, at least as vaguely sketched at this stage, meritless. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). Defendants have not claimed any applicable constitutional

24

privilege shielding them from the obligation to comply with the district court's order to disclose the names of relevant decisionmakers. Their separation-of-powers objections are illusory and, at best, unripe. No appointment of an independent prosecutor has been made, nor even any referral to the Justice Department for prosecution. *See J.G.G.*, 2025 WL 1119481, at *21. If it comes to that, there will be a time—perhaps as early as a charging decision—for defendants to raise their separation-of-powers claims. Assessing defendants' sweeping constitutional assertions in their current contingent, speculative, and nebulous form, without a concrete context necessitating their resolution, is not a task we should embrace in any context. And the demanding mandamus standard makes our avoidance obligation dispositive: The availability of other means to resolve defendants' constitutional objections, if and when they arise, should have caused us to deny mandamus.

Judge Katsas also objects to the probable-cause Order's invitation to provide a process for plaintiffs to challenge their membership in Tren de Aragua as a potential path out of the contempt inquiry because he insists it interferes with the Executive's constitutional power to conduct foreign affairs. But the Order does not require the executive branch to "effectuat[e]" detainees' return. Katsas Op. 29. It fully respects the executive branch's diplomatic prerogatives. The Venezuelan government, which apparently now has custody of the plaintiff class members, has announced that it will permit them to leave Venezuela to travel to the United States if: (1) they are called for in legal proceedings, such as a habeas hearing, or otherwise required by court order; (2) the U.S. government is willing to facilitate their travel; and (3) they are willing to travel to the United States. *See* Harper Decl. ¶ 9, *J.G.G. v. Trump*, 25-cv-766 (JEB), Dkt. No. 168-1 (D.D.C. July 18, 2025).

86

25

And, if the Executive elects to "assert custody," Katsas Op. 28, presumably with the cooperation of the Venezuelan government, nothing in the Order suggests that successfully doing so would require the U.S. to "release any of those individuals" within the United States. *J.G.G.*, 2025 WL 1119481, at *20. In that regard, the Order's approach comports with the Supreme Court's recent decision upholding an order insofar as it urges the executive branch to "facilitate" a resident's "release from custody in El Salvador." *Noem*, 145 S. Ct. at 1018. That is especially true when the court has invited defendants to propose their own, preferred approach as the district court did here. None of that amounts to commandeering the foreign policy of the United States. But even if the "purge" option were somehow beyond the court's power to include, the correct course would be to grant mandamus relief by striking that option for avoiding criminal contempt proceedings, not the order in its entirety.

The prematurity of defendants' objections also demonstrates why they fail the third requirement for mandamus relief—that issuance of the writ be an appropriate exercise of judicial discretion under the circumstances. Defendants could take their pick of compliance alternatives. If they opted to afford the plaintiff class members the process that habeas requires, the district court's invitation to propose other acceptable "methods of coming into compliance" would remain open to them. *J.G.G.*, 2025 WL 1119481, at *20. None of that would "interfere" with the executive branch's ability to discharge its constitutional responsibilities. Katsas Op. 26. And the ball is still entirely in defendants' court. Without having made *any* decision as to what they will do, they cannot show that the "writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. That is yet another reason mandamus is not warranted.

26

**2.**

Defendants also have not carried their burden to demonstrate a clear and indisputable right to relief. They claim such a right based on their assertion that the TRO is ambiguous and therefore cannot support a contempt conviction. But the TRO unambiguously forbade the very actions defendants took.

"In determining whether an order is sufficiently clear and specific to justify a contempt conviction, we apply an objective standard that takes into account both the language of the order and the objective circumstances surrounding the issuance of the order." *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997).

The court's language was plain. It restrained defendants from "removing" the class of plaintiffs in their custody. Defendants had no basis to wonder whether that applied to plaintiff class members on planes that had already left the United States en route to El Salvador; the court told them point-blank that they must bring back anyone on the planes, even if the planes were in flight.

The context in which the court announced the TRO confirms that it unambiguously barred defendants from removing plaintiffs from U.S. custody even if they were no longer in the United States. The relevant context includes "[1] the relief sought by the moving party, [2] the evidence produced at the hearing on the injunction, and [3] the mischief that the injunction seeks to prevent." *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982).

Begin with the relief plaintiffs sought. Their counsel rushed to the court for a TRO to prevent plaintiffs' removal under the AEA without any prior opportunity to dispute their membership in Tren de Aragua or the validity of the

88

27

Executive's reliance on the AEA. They sought to prevent removal because "if Plaintiffs are *removed to the custody of another country, this Court will lose jurisdiction*." Emergency Appl. for TRO 1, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 3 (D.D.C. Mar. 15, 2025) (emphasis added in part, and in original in part).

And consider the evidence produced at the emergency hearing later the same day, which fueled the concerns voiced in plaintiffs' TRO application about the potential evasion of judicial authority. At the hearing, plaintiffs' counsel reported new information from "people on the ground . . . that planes are going right now taking Venezuelans to El Salvador," that the plaintiffs "may be ending up in a Salvadoran prison," Hr'g Tr. 12:17-20, and that "two flights . . . may have already taken off," Hr'g Tr. 12:23-25.

The proceedings highlighted the third contextual element—"the mischief that the injunction seeks to prevent"— in unmistakable terms. Counsel for plaintiffs drove home that the TRO must prevent class members' transfer to Salvadoran custody both because people "ending up in a Salvadoran prison" are "in real trouble" and because such a transfer would "*divest this Court of jurisdiction*," Hr'g Tr. 12:19-21, making it unable "to offer a remedy," Hr'g Tr. 36:17-19. The court echoed the plaintiffs' concern that it could lose "jurisdiction to require [the class members'] return" if "planes have already landed and discharged their occupants." Hr'g Tr. 44:6-9. Defendants think it fatal that the court said, a few minutes earlier, "once [detainees] are out of the country, I'm not sure what I can do there." Mot. for Stay 15 (quoting Hr'g Tr. 36:20-21). But the entire discussion, before and after that statement, centered on the potential loss of the court's jurisdiction if defendants ceded custody over the plaintiff class members to a foreign sovereign. That is why the court expressed concerns

28

about what would happen if the planes that landed abroad *discharged their occupants*. *See* Hr'g Tr. 44:6-9.

Within a minute of announcing its TRO to "prevent the removal" of "all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025," Hr'g Tr. 42:16-21, the court spelled out the compliance it expected: "[A]ny plane containing these folks that is going to take off or is in the air needs to be returned to the United States." Hr'g Tr. 43:12-18. The court's meaning was manifest when it announced the TRO, which it duly memorialized in unchanged form on its docket thirty minutes later.

**3.**

Faced with the unambiguous command, overwhelmingly confirmed by context—to prevent plaintiffs from being transferred out of U.S. custody and bring them back to the United States—defendants attempt *post hoc* to manufacture ambiguity in the TRO. They assert that "the most appropriate contextual reading of 'removal' is the physical, territorial one," limited to removing plaintiffs from "the territory of the United States," and that it had "not anything to do with 'custody.'" Mot. for Stay 15. They claim it would have been reasonable for defendants to think the court's prohibition meant only that defendants must not convey plaintiffs *across the U.S. border*, and that it had *no effect* if plaintiffs had already been spirited out of the country when the court announced the TRO. Judge Katsas sees that alternative reading as sufficient to support mandamus. Starting from the premise that ambiguity in an order must be resolved in favor of the party alleged to have defied it, he concludes that these defendants have "a clear and indisputable right to relief because the TRO was insufficiently clear to support criminal contempt." Katsas Op. 11.

29

For potential contemnors "[t]o provide a defense to criminal contempt, [their] mistaken construction of an order must be one which . . . was adopted in good faith and which, given the background and purpose of the order, is plausible." *Holloway*, 995 F.2d at 1084 (quoting *Greyhound Corp.*, 508 F.2d at 532 (alterations removed)). Defendants' mistaken construction is entirely implausible. Their argument asks us to:

1. Separate the TRO from its context by treating the 7:25 p.m. Minute Order in isolation as the entirety of the TRO. Mot. for Stay 16-17; *see* Katsas Op. 11-12.

2. Scrutinize the Minute Order's text to ascribe various meanings to the word "removing," including some from inapposite contexts in which "removing" has what the parties term a "territorial" meaning limited to physical expulsion from the territory of the United States. Mot. for Stay 14-15; *see* Katsas Op. 13-16.

3. Conclude that the district court used the term "removing" in a "territorial" way in the 7:25 Minute Order, in conflict with the "custodial" way in which it used the same term in the TRO as announced from the bench and reiterated in the probable-cause Order. Mot. for Stay 17; *see* Katsas Op. 20-22.

4. Conclude that, despite the consistent prohibition in the TRO as announced orally and as memorialized in the 7:25 Minute Order against "removing" members of the plaintiff class, a reasonable observer might have thought that, in the thirty-minute interval between the TRO hearing and the Minute Order, the district court changed its mind and entered a Minute Order adopting a distinct, arbitrarily limited, "territorial" view of its own power that directly conflicted with what it said

30

during the hearing.  And we would have to find plausible that the court, in doing so, saw no need to alert defendants of a substantial shift from its clear and vehement contrary position, and that defendants saw no need to confirm what they now claim was an about-face of determinative benefit to them.  Mot for Stay 17-18; *see* Katsas Op. 21-23.

None of those propositions is plausible.  Failure on any one is sufficient to foreclose mandamus relief.  Because each building block of the defendants' position crumbles under scrutiny, we should deny the writ.

**i.**

Defendants begin by attempting to cleave the TRO from its context by treating the 7:25 p.m. Minute Order as the only operative order.  *See* Mot. for Stay 16-17.  They imply no TRO was entered until the 7:25 p.m. Minute Order appeared on the court's docket.  *See id.* at 13-14.  But the court's oral command to halt the removal of plaintiff class members in U.S. custody already bound the defendants.  *See, e.g.*, *In re LeFande*, 919 F.3d 554, 562-63 (D.C. Cir. 2019) (holding that "the judge's in-person order sufficed to compel LeFande to give testimony" and supported his criminal contempt citation); *In re Bradley*, 588 F.3d 254, 261-63 (5th Cir. 2009) (holding that district court's oral injunction, which was not reduced to writing for almost a month, supported contempt citation for actions taken in violation of the oral injunction).  "Oral orders are just as binding on litigants as written orders; the consequences for violating an oral order are the same as those for violating a written order."  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993).  And there is no question that the "explanation" for an injunction—especially one orally

31

announced—"can be oral rather than written." *EEOC v. Severn Trent Svcs.*, 358 F.3d 438, 442 (7th Cir. 2004) (Posner, J.).

The court spelled out from the bench how its just-announced TRO restrained removal of plaintiff class members, even if they were already in the air or had landed abroad. *See* Hr'g Tr. 43:13-19. That is the TRO the Minute Order memorialized when it recorded on its docket that, "[a]s discussed in today's hearing," "[t]he Government is ENJOINED from removing [noncitizens in U.S. custody] pursuant to the Proclamation for 14 days." 7:25 p.m. Minute Order.

In the cases defendants cite from the Seventh Circuit, the ordering courts either refused to explain the scope of an injunction when requested to do so by the parties—either orally or in writing—or failed to clarify whether the court's statement was an injunction at all. *See* Mot. for Stay 16-17; Katsas Op. 21. Those cases also "discussed the inadequacy of oral decrees in determining whether there was a valid, appealable order, not in the context of contempt proceedings." *Bradley*, 588 F.3d at 262. Their reasoning is self-evidently inapplicable (and nonbinding) here. The 7:25 Minute Order both tracked the ordering language the court used from the bench and explicitly referenced the TRO hearing minutes before, during which the court had spelled out how the TRO against "removing" the plaintiffs applied to the unfolding events. Defendants suggest the Minute Order's failure to reiterate those explanations made it reasonable to think the court intended it as a new and different order disavowing the TRO announced and explained at the just-concluded hearing. *See* Mot. for Stay 17-18.

There was only one TRO. The ordering language memorialized on the docket was the same as the wording the court used in the TRO as announced from the bench. Nothing

32

suggests that the TRO's meaning somehow changed when it was written in the docket. It still meant, as the district court had just explained from the bench, that defendants must not remove the plaintiffs to the custody of another country and must return them to the United States. The Minute Order made that continuity explicit when it incorporated what was "discussed in today's hearing." 7:25 p.m. Minute Order. Because there was only one TRO, and it unambiguously prohibited defendants from removing the plaintiff class members from U.S. custody, no matter where they were located, there is no conflict that requires us to "elevate[]" the Minute Order above the court's oral statements. Mot. for Stay 17.

**ii.**

The second essential premise of defendants' position is also unsound. They insist that the Minute Order's reference to "removing" class members could be understood as barring only their removal from the territory of the United States, thereby lacking any prohibitive force against defendants' transferring custody of any class members to the Salvadoran government if, by the time of the TRO, defendants had already taken them outside the United States. Under the rule of lenity, they argue, that putative ambiguity suffices to foreclose further criminal proceedings. *See* Mot. for Stay 14-15; Katsas Op. 12-13. Lenity applies when, "after seizing everything from which aid can be derived," the statement is "still grievously ambiguous." *Wooden v. United States*, 595 U.S. 360, 377 (2022) (Gorsuch, J., concurring) (internal quotation marks omitted). It "does not apply" when a statement "merely contains some ambiguity or is difficult to decipher." *Id.* Nothing was ambiguous, let alone "grievously" so, in the TRO the court held defendants probably defied.

33

The variety of ways the word "removing" may be used in the law and in general parlance did not somehow render ambiguous the district court's TRO restraining these defendants from removing these plaintiff class members under the circumstances before the court on the evening of March 15. Defendants argue it is fatal to contempt proceedings that "the district court itself acknowledged that both definitions are possible."  Mot. for Stay 14.  But the court was only summarizing defendants' argument to emphasize that the existence of *possible* meanings of the word "removal," taken out of context, does not mean there are multiple *plausible* constructions of this TRO.  *See J.G.G.*, 2025 WL 1119481, at *11.  For example, dictionary definitions of the word "remove" may "connote *physical* displacement from one location to another," Katsas Op. 13 (emphasis in original), but that says nothing about the *scope* of a court's intention or authority to restrain physically sending persons to a foreign sovereign's prison.

Reference to "removal" in the Alien Enemies Act is unhelpful to defendants.  The importance under the AEA of repelling and excluding nationals of an invading enemy from U.S. territory imposes no logical or legal constraint on a court's jurisdiction over U.S. officials transporting detainees abroad. As the district court put it, "just because an 'invasion' or 'predatory incursion' must be 'against the territory of the United States' to trigger the Act's authorities does not resolve whether the process of removal comprises a physical departure or a transfer of custody." *J.G.G.*, 2025 WL 1119481, at *11 (quoting 50 U.S.C. § 21).  If we assume that U.S. power to "remove" citizens of an enemy country under the AEA is unconstrained by the enemy country's agreement to take them back, *see* Katsas Op. 14-15, that proposition carries no implication that "removing" in the March 15 TRO—or even under the AEA itself—is *limited* to ejecting them from U.S.

34

territory.  The AEA's attention to removals from the territorial homeland provides no reason to think the district court's ability to enjoin removal of the plaintiff class members terminated at the U.S. border.

Various definitions of removal in the Immigration and Nationality Act (INA) similarly do not bear on its meaning in the TRO.  The notion that a removal may suffice to support a prosecution under 8 U.S.C. § 1326(a)(1) for illegal entry after having been "removed" from the United States "regardless of any admission or detention decision by the country on the receiving end," for example, Katsas Op. 15, does not imply a limit on a court's authority to halt the removal of aliens still in U.S. custody during the removal process—whether the United States holds those aliens on a plane, a boat, *see id.* (citing *United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010)), or in some other manner.

Judge Katsas asks where else defendants should have looked but to the AEA and INA to understand what Chief Judge Boasberg meant in his TRO barring defendants from "removing" the members of the plaintiff class.  Katsas Op. 24. The Minute Order itself says where:  Look to "today's hearing,"  7:25 p.m. Minute Order, at which the district court had just spelled out that its TRO not to "remove" the members of the plaintiff class required "those people need to be returned to the United States . . . [h]owever that's accomplished."  Hr'g Tr.  43:15-16.    Defendants'  "territorial"  interpretation  is orthogonal to the question that was before the district court—how it could maintain its authority to provide plaintiffs a remedy—and is entirely implausible as a reading of the district court's TRO.

35

**iii.**

Defendants' third essential step is to distance themselves from the TRO's unmistakably clear bar against removing the plaintiffs from U.S. custody. They do not dispute that the district court's order from the bench—to prevent the removal of all noncitizens in U.S. custody who are subject to the Proclamation by returning any planes containing them to the United States—used the term "removal" in a custodial sense. *See* Hr'g Tr. 42:16 – 43:18. Rather, they argue that the 7:25 Minute Order reflected a "territorial" interpretation of "removing" that conflicts with the TRO as orally announced in open court, such that ambiguity arising from that conflict entitles them to mandamus relief.

The clarity of the TRO as announced, and the irrelevance of the material defendants muster in support of a territorially limited interpretation, fatally undermine the existence of the conflict they assert. The Minute Order cannot permissibly be read in isolation from the oral TRO it explicitly memorialized and the context the hearing provides. The "conflict" is entirely manufactured by defendants *post hoc*. And the abstract "context" in which defendants and Judge Katsas seek to situate the Minute Order cannot supersede the actual context of the TRO.

**iv.**

Finally, to credit defendants' contention that the court's oral statements and the Minute Order "conflict," we would have to accept a fourth essential premise that they have failed to establish. Defendants cannot explain how any reasonable person in defendants' position might have concluded on the evening of March 15 that the district court in fact changed its mind as to the scope of the TRO it announced from the bench, and so entered a Minute Order that it intended as a new and

36

different TRO. To establish as much requires more than a theory of how the Minute Order might be read to conflict with the TRO as announced. It demands that we find it plausible that defendants could have thought the district court actually did change its mind in the thirty-minute interval between the hearing and issuing the Minute Order but said nothing to alert defendants of that change. Defendants' account is at war with the record, common sense, and their own counsels' emails, which show that they had a custodial understanding of the TRO—which they promptly and consistently communicated to their clients.[2]  *See* ACLU Rule 28(j) Letter (June 25, 2025), Ex. 1 at 4, 11-13; Mot. to Supplement, Ex. A-4 at 17-19.

a.

Defendants observe that the *ex parte* TRO issued on the morning of March 15 enjoined removal of the named plaintiffs "from the United States," whereas the 7:25 p.m. Minute Order made no geographic specification. *See* Mot. for Stay 13-15; Katsas Op. 17. But if anything, that distinction cuts against reading the evening TRO as territorially limited. The difference accounts for the practical reality that the circumstances had changed during the day. In declarations attached to the morning TRO application, each named plaintiff attested to being held in the El Valle Detention Facility in Texas. By the evening, however, unrebutted, credible evidence suggested that flights carrying detainees had already departed or imminently would leave Texas for El Salvador, so a TRO framed in terms of removal "from the United States" might be

---

[2] Defendants "forcefully den[y]" the whistleblower report. Gov't Rule 28(j) Letter at 2 (June 26, 2025). But the report's unrebutted allegations and attached emails further underscore why mandamus relief is inappropriate here: Defendants cannot show a clear and indisputable right to relief when there is, at minimum, a material dispute over how they themselves understood the TRO.

37

ineffective to ensure the plaintiffs remained in U.S. custody and returned to the United States. *See supra* Section II.B.2. It is clear under the circumstances that both TROs required defendants to maintain custody of the plaintiffs and keep them in the United States so the district court would have jurisdiction to order a remedy. There is certainly no anomaly of the evening TRO "exceed[ing] the protection afforded . . . under the first [TRO]." Katsas Op. 17.

The record also does not support the notion that the district court "changed its mind" about requiring defendants to bring back to the United States any alleged Tren de Aragua members the Executive had flown abroad, nor does it show the court having "strongly disclaimed" its order to turn planes around mid-flight. Katsas Op. 22; *see also* Mot. for Stay 17-18. To the contrary, it consistently maintained in the hearing at which it announced the TRO and ever since that the TRO was an "order . . . to turn the planes around, or . . . in whatever fashion [defendants] could, to bring people to the United States." Mot. Hr'g Tr. 5:12-15, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt No. 51 (D.D.C. Mar. 21, 2025). And defendants' counsel has confirmed that he "understood [that was the court's] intent." Mot. Hr'g Tr. 6:1-2.

The putative disavowal was nothing of the sort. What defendants cite is just the court's refutation of their own accusation that the court "mandat[ed] that they turn[] planes around in mid-air without regard to important logistical constraints such as fuel availability or foreign airspace restrictions," 2025 WL 1119481, at *17 (internal quotation marks omitted), by recalling that it had said "[h]owever that's accomplished . . . I leave it to you." Hr'g Tr. 43:16-19. The court took care at the time to make clear it was not dictating aviation maneuvers when it ordered that "those people need to be returned to the United States." Hr'g Tr. 43:15.

(Page 102 of Total)

38

Judge Katsas reads one observation by the district court—that, as to the nine detainees whom defendants brought back to the United States, "the choice to hold them in the United States . . . was the Government's, not this Court's," *J.G.G.*, 2025 WL 1119481, at *17—to disavow having imposed "any overarching requirement to return suspected TdA members to the United States." Katsas Op. 20. But he reads too much into that descriptive phrase. The return of those individuals was undisputedly due to the Salvadoran government's refusal to accept them, not in response to—or suggesting anything about the scope of—the district court's TRO. Indeed, the ease with which defendants brought those nine detainees back only underscores the absurdity of their claim that it was somehow dangerous or logistically impossible to bring back all class members, even after the planes had landed.

The court repeatedly emphasized its unambiguous objective not to lose jurisdiction even as it offered flexibility as to the means available to defendants to comply. And it did so in the face of defendants' effort to keep the court in the dark about what they were doing. To the extent defendants had unvoiced operational concerns about turning planes around or bringing the class members back to the United States, the court explained that they could take any steps necessary to address those concerns, so long as they maintained custody of the plaintiffs in the interim and returned them to the United States when it was feasible to do so. The court's focus throughout was that defendants keep the detainees in U.S. custody, return them to the United States, and not act to defeat the court's jurisdiction while the case was being adjudicated.

b.

Defendants also cannot explain why the district court would have thought its authority to halt the removals

100

39

terminated when the planes left U.S. airspace. It is telling that they never argue the court's authority was so limited. Nor could they. The federal courts' jurisdiction over executive branch activities abroad is well settled. *See Munaf v. Geren*, 553 U.S. 674, 685-86 (2008); *Doe v. Mattis*, 928 F.3d 1, 21-23 (D.C. Cir. 2019); *see also Fuld v. Pal. Liberation Org.*, 145 S. Ct. 2090, 2119 (2025) (Thomas, J., concurring) ("[C]oncerns over foreign affairs are no reason to impose constitutional limits on federal courts' extraterritorial jurisdiction."). When the court entered its TRO, the plaintiff class members remained squarely in U.S. custody. They were aboard planes chartered by the U.S. government, directed and staffed by U.S. government personnel or agents, who reported to a chain of command consisting of senior executive branch officials located in Washington, D.C.

Judge Katsas gestures towards three legal concerns he believes could reasonably have been thought to have influenced the district court's thinking but none of them is applicable and none of them delimits the district court's authority to U.S. territory. *See* Katsas Op. 19-20.

First, he suggests that *Munaf v. Geren* stands for the proposition that the court could not enjoin defendants from transferring detainees into Salvadoran custody once the planes arrived there. *See id.* at 20. But petitioners in *Munaf* had voluntarily traveled from the United States to Iraq for the purpose of committing serious crimes in that country and were detained there for ongoing Iraqi criminal proceedings when they sought habeas. *See* 553 U.S. at 694. The plaintiffs here committed no crimes in El Salvador giving rise to any Salvadoran interest in asserting custody to prosecute them there and they were not yet in Salvadoran territory. Nothing about the district court's decision to enjoin their removal from U.S. custody could have reasonably been thought to infringe El

40

Salvador's "exclusive jurisdiction to punish offenses against its laws committed within its borders." *Id.* at 694-95 (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)). And even if *Munaf* did prevent a U.S. court from halting any transfer of detainees on foreign soil, by its terms that prohibition would only become applicable after they entered El Salvador, not—as defendants contend—as soon as the planes left the territorial United States.

Second, Judge Katsas reasons that the district court could not order members of Tren de Aragua back to the United States because the INA prohibits the admission of members of foreign terrorist organizations into the United States. *Id.* at 19 (citing 8 U.S.C. § 1182(a)(3)(B)(i)(V)). That argument inappropriately assumes that detainees are all members of TdA, which the detainees have a right to contest and the Executive has yet to prove. *See J.G.G.*, 145 S. Ct. at 1006. And, even if we assume that prohibition applies to detainees in continuous U.S. custody who are brought back into the U.S. in response to a court order to temporarily restore the *status quo*, defendants had other options to retain the plaintiffs in their custody. They could presumably bring them in as parolees, *i.e.*, entrants without legal admission, *see* 8 U.S.C. § 1101(a)(13)(B); *id.* § 1182(d)(5). Defendants' failure to raise any such concern at the TRO hearing, where the district court equated defendants' retaining custody over the class members with bringing them back to the United States, further undercuts their effort to ascribe to the court a sudden about-face on that basis.

Finally, Judge Katsas likens a TRO requiring defendants to maintain custody of the detainees to Justice Douglas's order halting the bombing of Cambodia during the Vietnam War. Katsas Op. 20. But to suggest on that ground that the district court might reasonably have suddenly changed its mind and narrowed its TRO to avoid judicial overreach only makes the

41

opposite point.  Whatever one might think about a Supreme Court Justice's emergency order superintending an ongoing military operation,[3] the authority of a federal district court to temporarily restrain government officials from transferring presumptively noncriminal detainees to a foreign prison without any pre-removal process is well recognized.  *See, e.g.*, *Doe*, 928 F.3d at 22-23.

\* \* \*

It is entirely inappropriate to issue a writ of mandamus under these circumstances.  Defendants cannot show they lack alternative means of getting relief when their main argument—that the TRO is ambiguous—is an ordinary merits defense.  That is an issue for any future trial, if one takes place, and on appeal from any conviction.  And Defendants' diffuse and premature constitutional objections to the April 16 Order's contingent and unexercised options do not ripen their argument that the TRO was ambiguous.  The consistency of the TRO as orally announced and memorialized in the Minute Order, the context of the proceedings, the vague constitutional concerns, and the striking absence of any underlying legal theory supporting a territorially limited interpretation all belie defendants' strenuous efforts to explain away the district court's clear command.  *Post hoc* analysis of the word "removal," taken out of the context of the TRO, surely can tease out varieties of other uses with distinct meanings.  But that falls short of establishing that any reasonable person in

---

[3] Throughout the litigation that culminated in *Holtzman v. Schlesinger*, 414 U.S. 1316 (1973), the Executive never asserted it was exempt from compliance with court orders defining the parameters of lawful overseas military activity.  *See* Burt Neuborne, *No, the Defense Department Did Not "Ignore" a Judicial Order in 1973 Cambodia Bombing Case*, JUST SEC. (Feb. 27, 2025), https://perma.cc/YE2U-4ZEW.

42

defendants' position could have misunderstood it—let alone that defendants actually did. I would therefore deny mandamus relief.

## C.

Judge Rao votes to grant mandamus relief based on a novel theory that defendants never raised and neither party briefed. She casts the district court's Order as an impermissible commingling of civil and criminal contempt and concludes that, since the underlying TRO is vacated, the district court lacks jurisdiction to pursue the part that looks to her like civil contempt. *Cf. United Mine Workers*, 330 U.S. at 295. But courts must remain "neutral arbiters" by "adopt[ing] the framing of the dispute that is advanced by the parties," *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024) (internal quotation marks and citations omitted), and defendants themselves recognize that the potential contempt the Order describes is criminal. *See, e.g.*, Mot. for Stay 11 & n.1, 20; Reply in Supp. of Stay 3, 5 n.1, 6, 10, 11. Defendants nowhere object, as Judge Rao does, to the "purge" option as impermissibly injecting a civil element into the contempt proceeding. That alone forecloses mandamus relief. It is "the petitioner," not the court, that "must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (internal quotation marks and alterations omitted). Defendants surely cannot satisfy that demanding burden when they expressly disclaim the very argument that Judge Rao believes meets it.

Even if defendants had advanced it, Judge Rao's theory fails. The common thread that defines a contempt proceeding as civil is that it seeks to prod the recalcitrant contemnor to come into compliance with the court's order in an ongoing proceeding. To that end, a civil contempt order imposes punishment from which it offers relief when the contemnor

104

43

complies.  Criminal contempt, in contrast, imposes a definite sanction on a completed contempt, and is the only option when compliance with a resisted order is no longer possible.  When courts sentence a contemnor to confinement, the contempt is criminal if "the contemnor cannot avoid or abbreviate the confinement through later compliance."  *Bagwell*, 512 U.S. at 828-29.  If the contemnor can secure earlier release by complying with a court order, the contempt is civil.  *See id.* at 828.  So, too, when a court imposes a fine, contempt is criminal if the "contemnor has no subsequent opportunity to reduce or avoid the fine through compliance," and it is civil if it can halt an accumulating fine by complying.  *Id.* at 829.

The district court's Order does not seek to "coerce the government" to comply with the TRO.  Rao Op. 6.  If it did, Judge Rao's theory would fail the first requirement for mandamus relief, that there be no "other adequate means to attain the relief [they] desire[]."  *Cheney*, 542 U.S. at 380.  A coercive order that granted plaintiffs some of the relief they seek would be immediately appealable as "an order that had the practical effect of an injunction."  *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) (defining appealable injunctive orders as "any order directed to a party, enforceable by contempt, and designed to accord or protect[] some or all of the substantive relief sought by a complaint in more than preliminary fashion" (internal quotation marks omitted)).  Judge Rao insists that the "purpose and effect of [the probable-cause Order] is to compel the government to exercise its foreign affairs powers to assert custody" of the class members.  Rao Op. 4.  She forswears a stay pending a merits panel's adjudication of defendants' appeal in favor of the stronger medicine of mandamus, *see* Rao Op. 13, but the availability of that other relief on the theory she advances renders mandamus inappropriate.

44

In any event, the Order is not a civil contempt order seeking to coerce compliance, and it entirely lacks the practical effect of an injunction. The timing of defendants' potentially contumacious conduct prevented the probable-cause Order from "coercing" the executive branch the way a civil contempt order could—by presenting the contemnor with the choice to comply or face immediate and continuing punishment. There was no chance to coerce defendants' compliance as the planes flew toward El Salvador in the face of the TRO; the stealth and speed of defendants' action left no opening for a civil contempt order pressuring them to turn the planes back. By the time the potential contempt was apparent, it was *fait accompli*, with criminal contempt the sole remaining choice. The district court thus proceeded to spell out the facts raising probable cause of criminal contempt. Neither of the options it provides coerces the government.

There is no "coercion" in the district court requiring defendants to provide the names of potential contemnors. That is not a threat but a standard request for information that may inform a prosecution for criminal contempt. Unlike other cases in which we blocked inquiries into government officials' role in challenged conduct, *see* Rao Op. 17, defendants here have not denied the relevance of these materials to any future proceedings; they have not asserted any applicable immunity or privilege shielding them from responding; and they have not claimed that any high-ranking official gratuitously faces burdensome inquiries that other witnesses are better suited to answer. Accordingly, there is no encroachment on executive power in that request that could amount to coercion.

There are, to be sure, overtones of civil contempt in the district court's "purge" option—and, indeed, the concept of purging contempt is drawn from the civil version, but it is simply not the case that the presence of that option means the

45

probable-cause Order imposes civil contempt. A court's offer of lenient treatment to a potential criminal defendant in exchange for a commitment to engage in mitigating conduct does not render the invitation to mitigate impermissibly coercive. A court may, for example, afford lenience to a person facing criminal charges if the defendant agrees to act as an informant or provide inculpating testimony, even though the court plainly lacks power to order those actions. Even "[w]here a judgment of contempt is embodied in a single order which contains an admixture of criminal and civil elements, the *criminal aspect of the order fixes its character* for purposes of procedure on review." *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 591 (1947) (emphasis added). And there is no "substantial prejudice" to defendants in the district court's decision to proceed in criminal contempt so long as their "rights in the criminal trial are not diluted." *Mine Workers*, 330 U.S. at 301. No prosecution has been initiated, let alone a trial conducted to determine whether there has been any such dilution.

The Supreme Court has repeatedly confirmed as much. In *Yates v. United States*, it held that a contempt sentence imposed on a witness who refused to testify before a district court was criminal even though the sentencing judge "express[ed] . . . hope that [the] petitioner would still 'purge herself'" by answering questions at the time of her sentencing or in the 60-day period thereafter and suggested he would reduce her sentence if she did so. 355 U.S. 66, 70-72 (1957). And in *Bagwell*, the Court squarely rejected the argument that the trial court's supplementation of its $642,000 fine for past disobedience with a "prospective fine schedule that [a] union could avoid through compliance" for "conduct that can recur" rendered the fines "civil in character." *Bagwell*, 512 U.S. at 824, 834-37. What mattered was "the character of the entire decree." *Id*. at 836.

46

The Court's recent decision in *Department of Homeland Security v. D.V.D.*, No. 24A1153, 2025 WL 1832186 (July 3, 2025), did not disturb that precedent. Respondents in that case argued that the district court's remedial order "effectively operates as a remedy for *civil contempt*" of a stayed order. *Id.* at *1 (emphasis added). Accepting that characterization *arguendo*, the Court agreed that the district court could not pursue civil contempt for the stayed order any more than it could had the order been vacated. *See id.* (citing *Mine Workers*, 330 U.S. at 303); *see also supra* Section II.A. But here, as Judge Rao acknowledges, the district court is "us[ing] its criminal contempt power," Rao Op. 10 n.3, and *D.V.D.* does "not dispute that '[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal.'" 2025 WL 1832186, at *3 n.1 (Sotomayor, J., dissenting) (quoting *Mine Workers*, 330 U.S. at 294).

There is no clear precedent or other indisputable legal support for the notion that the presence of the "purge" option here deprived the court of power—power that Judge Rao does not otherwise question—to make a finding of probable cause of criminal contempt and order defendants to respond. Indeed, the contrary rule is well established.

The right to relief is only "clear and indisputable" when a petitioner can identify relevant precedent providing relief in analogous circumstances. *See Al Baluchi*, 952 F.3d at 369. Judge Rao acknowledges no case exists in which a federal court has invalidated an order as presenting an impermissible civil contempt sanction as if it were an allowable criminal contempt inquiry. She chalks that up to the paucity of district courts "threaten[ing] criminal contempt against Executive Branch officials." Rao Op. 15. But nothing in her contempt analysis turns on the potential contemnors' official status. The absence of any supportive precedent involving even private parties

108

47

defeating a criminal contempt inquiry for including an opportunity to avoid it through mitigation suffices to foreclose mandamus relief. The flaw Judge Rao sees cannot support mandamus because "open questions . . . are the antithesis of the 'clear and indisputable' right needed for mandamus relief." *In re al-Nashiri*, 791 F.3d 71, 85-86 (D.C. Cir. 2015). Nor is mandamus justified to correct "innovations that exceed the judicial power," Rao Op. 15 n.5, given that the Supreme Court has confirmed the authority of courts to pursue criminal contempt while offering leniency to contemnors.

Judge Rao sees other support for her understanding of the order as a civil contempt in criminal clothing. She points to the district court's decisions to file its probable-cause Memorandum and Order on the same docket as the civil case, and to solicit briefing and argument from plaintiffs as well as defendants, which she calls the "hallmarks of civil contempt." Rao Op. 7. When criminal contempt proceedings arise from conduct in civil cases, however, courts' show-cause orders to putative contemnors are often reflected on the civil docket of the case in which the contempt occurred. Only if a criminal prosecution is initiated does the court direct filings, including the criminal indictment, to a separate criminal docket. *See, e.g.*, *Chevron Corp. v. Donziger*, No. 11-cv-00691, Dkt. No. 2276 (S.D.N.Y. July 31, 2019) ("Order to Show Cause Why Defendant Steven Donziger Should Not Be Held in Criminal Contempt"); *id.*, Dkt. No. 2291 (S.D.N.Y. Aug. 5, 2019) ("The Clerk shall assign a criminal docket number to proceedings with respect to the criminal contempt proceeding.").

Criminal contempt, like other crimes, is a wrong against the public, not just the immediate victim. But it is not unusual to invite briefing from private parties to a civil case in which potential contempt occurred as to whether to initiate a criminal contempt inquiry. *See, e.g.*, *In re Res. Tech. Corp.*, No. 8-cv-

109

48

4040, Dkt. No. 45 (N.D. Ill. Sept. 15, 2008) ("Motion by Trustee . . . for rule to show cause *why [parties] should not be held in criminal contempt*."). That practice helps ensure the court's decision is informed by persons familiar with the context and the players and likely to have witnessed the conduct at issue. None of the district court's procedural choices converts the Order into an effective use of civil contempt without jurisdictional basis.

Finally, even if issuing a writ of mandamus were appropriate in this case, we are bound to limit the relief to whatever is "no more burdensome . . . than necessary to provide complete relief." Rao Op. 18 (quoting *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025)). Complete relief from what Judge Rao sees as an unlawful choice requires no more than vacatur of the purportedly objectionable "purge" option, which would leave the district court where Judge Rao says it should be: "squarely fac[ing] the difficult questions that would arise from initiating criminal contempt against senior Executive Branch officials." Rao Op. 19. Judge Rao is right that "we do not grant the government's request to terminate the criminal contempt proceedings," Rao Op. 18, yet she gratuitously vacates the entire order—including the requirement that defendants identify the persons involved in the decisions at the heart of the criminal contempt proceeding. The only defense she offers of such broad intrusion into the district court's legitimate exercise of its acknowledged jurisdiction to consider criminal contempt is that "the harm was putting the government to an unlawful choice." Rao Op. 18. Invalidating the "purge" option eliminates the choice. Even if I were to agree with the entirety of Judge Rao's analysis in support of mandamus, I cannot see how it supports an order that does more than that.

49

\* \* \*

For all the above reasons, defendants have not satisfied the demanding requirements for a writ of mandamus vacating the probable-cause order.  We should deny their petition.

### III.

Chief Judge Boasberg was called on a weekend evening to adjudicate an emergency application to temporarily restrain United States officials from carrying out an unprecedented operation to ship hundreds of people to El Salvador to be indefinitely confined in one of the world's most brutal prisons.  On short notice, he entered a TRO to pause that operation until a full hearing could be held to determine whether the operation could proceed while its legality was litigated.  Unrestrained, defendants shipped off the plaintiffs to a terrible fate based solely on the executive branch's unilateral and unsupported assertion that they are members of Tren de Aragua.  Their designation has legal significance only because the executive branch has unilaterally deemed their very presence in the United States an "invasion" by a foreign government—even though TdA is a criminal gang, has not been established to act on behalf of the government of Venezuela, and each supposed "gang member" was secured in ICE detention at the time.

Chief Judge Boasberg faced immense pressure to make a quick decision in a rapidly evolving, high-stakes situation.  He performed that task calmly and with an even hand, bringing to bear his skill and wisdom as an experienced jurist.  Even when faced with what reasonably appeared to him to be foot dragging, evasion, and outright disregard for his jurisdiction and his orders, he responded with unfailing composure.  The majority does an exemplary judge a grave disservice by

111

50

overstepping its bounds to upend his effort to vindicate the judicial authority that is our shared trust.

"[I]t is a foundational legal precept that every judicial order 'must be obeyed'—no matter how 'erroneous' it 'may be'—until a *court* reverses it." *J.G.G.*, 2025 WL 1119481, at *1 (quoting *Walker*, 388 U.S. at 314) (emphasis in original). That rule "reflects a belief that in the fair administration of justice no man can be judge in his own case," no matter how "exalted his station" or "righteous his motives." *Walker*, 388 U.S. at 320-21. The rule of law means those principles apply to officials in the executive branch just as they apply to all of us. Defendants have not satisfied the exacting standards for mandamus relief. I would therefore deny their petition. Because my colleagues grant defendants that relief and, in doing so, cut short an entirely lawful and regular process to determine accountability for violation of a court order, I respectfully dissent.

## CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to Circuit Rules 28(a)(1)(A) and 40(c), Plaintiffs-Appellees J.G.G., G.F.F., J.G.O., W.G.H., and J.A.V. certify as follows:

**Plaintiffs:** Plaintiffs-Appellees in this matter are J.G.G., G.F.F., J.G.O., W.G.H., and J.A.V. The district court provisionally certified a class of "[a]ll noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation," *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 15, 2025) (Minute Order). The TRO enjoining the provisional class's removal is central to this matter. Subsequent to the filing of this appeal, Plaintiffs-Appellees filed an amended complaint in the district court that also names as Plaintiffs-Petitioners D.A.R.H., M.M.A.A., M.Y.O.R., M.Z.V.V., Dorys Mendoza, Liyanara Sanchez, and Eylan Schilman.

**Defendants:** Defendants-Appellants in this matter are Donald J. Trump, President of the United States, in his official capacity; Pamela Bondi, Attorney General of the United States, in her official capacity; Kristi Noem, Secretary of the U.S. Department of Homeland Security, in her official capacity; the U.S. Department of Homeland Security; Madison Sheahan, Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity; U.S. Immigration and Customs Enforcement; Marco Rubio, Secretary of State, in his official capacity; and the U.S. State

113

Department. Subsequent to the filing of this appeal, Plaintiffs-Appellees filed an amended complaint that also names as Defendants Pete Hegseth, Secretary of Defense, in his official capacity, and the U.S. Defense Department.

**Intervenors:** Paul Dorsey is a putative intervenor in this matter.

**Amici Curiae:** Landmark Legal Foundation filed an amicus curiae brief in support of Defendants-Appellants in this Court. Heidi Kitrosser, Mark J. Rozell, and Mitchel A. Sollenberger filed an amicus curiae brief in support of Plaintiffs at the district court. Subsequent to the filing of this appeal, John W. Keker, Robert A. Van Nest, Elliot R. Peters, and Laurie Carr Mims filed an amicus brief in support of Plaintiffs at the district court, Coolidge-Reagan Foundation filed an amicus brief in support of Defendants at the district court, and Meghan Kelley filed an amicus brief in support of neither party at the district court.

114