# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5124**                                        **September Term, 2025**

**1:25-cv-00766-JEB**

**Filed On:  November 14, 2025**

J.G.G., et al.,

        Appellees

     v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

        Appellants

**BEFORE:**    Srinivasan, Chief Judge, and Henderson, Millett**, Pillard*, Wilkins*,
Katsas, Rao, Walker, Childs***, Pan***, and Garcia*, Circuit Judges

## O R D E R

Appellees' petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested.  Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition.  Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

## Per Curiam

                           **FOR THE COURT:**
                           Clifton B. Cislak, Clerk

              BY:    /s/
                      Daniel J. Reidy
                      Deputy Clerk

\* A statement by Circuit Judges Pillard, Wilkins, and Garcia respecting the denial of rehearing en banc is attached.

\*\* A statement by Circuit Judge Millett, dissenting from the denial of rehearing en banc is attached.

\*\*\* A statement by Circuit Judge Pan, joined by Circuit Judge Childs, dissenting from the denial of rehearing en banc is attached.

PILLARD, WILKINS, and GARCIA, *Circuit Judges*, respecting the denial of rehearing *en banc*:

On Saturday, March 15, 2025, Executive Branch officials were implementing a plan to make novel use of a long-dormant wartime statute—the Alien Enemies Act of 1798, invoked only three times in our nation's history—to summarily remove hundreds of people from immigration detention in the United States to indefinite confinement in a prison in El Salvador. *See* 50 U.S.C. § 21; Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 20, 2025). The plaintiffs hastened to challenge their removal in district court. They sought a temporary restraining order (TRO) to allow the court to make a preliminary assessment of their claims.

The district court convened an emergency hearing. Acting under extraordinary time pressure while planes were already departing, the court issued the TRO. It directed the government to "prevent the removal" of all noncitizens in U.S. custody subject to the proclamation. Hr'g Tr. 42:16–21, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 20 (D.D.C. Mar. 16, 2025). The court made the TRO's meaning clear. It instructed government counsel that "any plane containing these folks that is going to take off or is in the air needs to be returned to the United States," and that counsel must "inform your clients . . . immediately." Hr'g Tr. 43:11–19. The court promptly memorialized its TRO in a minute order stating that, "[a]s discussed in today's hearing," the government was enjoined from removing class members for 14 days. 7:25 p.m. Minute Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB) (D.D.C. Mar. 15, 2025). Yet government officials pressed ahead, flying the plaintiffs to El Salvador and delivering them into Salvadoran custody for indefinite imprisonment. *See J.G.G. v. Trump*, 778 F. Supp. 3d 24, 33–35 (D.D.C. 2025).

In the days and weeks that followed, the district court tried to understand what had transpired over that weekend despite

2

the government's repeated refusals, citing shifting reasons, to answer basic questions about when the flights had taken off and when the plaintiffs were handed over to Salvadoran custody. *Id.* at 35–37. Based on the facts available to it, the district court issued a decision showing "probable cause exists to find the Government in criminal contempt." *Id.* at 30. As the district court put it, it "appears obvious" that the government had "deliberately flouted" the TRO. *Id.* at 37. The court took no action on that probable-cause determination beyond ordering defendants to "file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025." Order, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), Dkt. No. 80 (D.D.C. Apr. 16, 2025). The court did not refer the matter for prosecution or order any other action from the defendants. The government has never asserted any immunity or privilege to withhold the identities of the decision makers.

Instead of complying, the government immediately appealed that facially non-final order and sought a stay pending appeal. All three members of the original panel agreed that such an interlocutory order is not subject to appellate review. *J.G.G. v. Trump*, 147 F.4th 1044, 1045 (D.C. Cir. 2025) (*per curiam*). Ordinarily, criminal contempt is only appealable following conviction and sentence. *See In re Cys*, 362 A.2d 726, 728–29 (D.C. 1976); *see also* 3A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure—Criminal* § 714 (4th ed. Sep. 2025 update) (explaining that "a criminal contempt order is a final and appealable judgment, but the defendant cannot appeal before the court imposes sentence"). Here, the district court had not even decided whether to make a referral for prosecution. A majority of the panel nonetheless granted an administrative stay pending appeal and then, on August 8, announced that "the government has satisfied the stringent requirements for a writ of mandamus" and issued the

3

writ to vacate the district court's order. *J.G.G.*, 147 F.4th at 1045. The government has yet to provide the requested information.

The facts the district court recounted present grave rule-of-law concerns. Obedience to court orders is vital to the ability of the judiciary to fulfill its constitutionally appointed role. Judicial orders are not suggestions; they are binding commands that the Executive Branch, no less than any other party, must obey. *See Walker v. City of Birmingham*, 388 U.S. 307, 314, 320–21 (1967). Disagreements with judicial decisions must be resolved through motions, stays, and appeals, not through unilateral noncompliance. The power to hold a party in contempt of court enforces that principle and is accordingly foundational to the rule of law and an essential safeguard against defiance and lawlessness. *See, e.g.*, *Michaelson v. United States*, 266 U.S. 42, 65–66 (1924).

The district court's order here was a measured and essential response to what it reasonably perceived as shocking Executive Branch conduct. The first step to judicial exercise of contempt authority may require factual inquiry regarding the seeming defiance, including finding out who was responsible—precisely what the district court sought here.

A midstream intervention by an appellate court into a district court's ongoing effort to identify potential contemnors must surely be reserved for truly exceptional circumstances. We doubt this order presented such circumstances and met the demanding standard for mandamus relief.

That said, any errors in the panel's analysis do not warrant the further step of *en banc* review. Despite the seriousness of the underlying facts, the product of the panel's intervention— the actual order it has issued—has no further practical effect, nor does it establish any binding precedent.

4

As for practical effect, although Judge Katsas would have barred the contempt proceeding entirely, Judge Rao ruled only that the district court could not allow the defendants to avoid contempt proceedings by belatedly complying with the TRO they appear to have violated.  That was an error, in Judge Rao's opinion, because that TRO had been vacated for want of venue by the time of the contempt proceeding.  *J.G.G.*, 147 F.4th at 1064–68 (Rao, J., concurring); *see Trump v. J.G.G.*, 604 U.S. 670, 671–72 (2025).  The contempt-avoidance option in the district court's order no longer has real-world impact given ensuing events:  The affected individuals were released from the Salvadoran prison and transferred to Venezuela, and their ability to challenge their removal is now being litigated separately.  *See J.G.G. v. Trump*, 2025 WL 2317650, at *1, *3 (D.C. Cir. Aug. 8, 2025).  The petition for rehearing *en banc* itself acknowledges that this aspect of the district court's order has been "overtaken by events" and is no longer of any practical significance.  Pet. for Reh'g En Banc 14; *see id.* at 14–16.  Indeed, all of this may have rendered moot any perceived defect in the contempt-avoidance option, further undercutting the case for the full court to decide whether to set aside the panel disposition.

In the end, two judges on the panel voted to deny the primary relief the government sought—to bar the criminal contempt proceeding.  Those judges agreed that the district court retains discretion to proceed to consider whether the facts support a criminal contempt referral, including by requiring the government to identify the potential contemnors.  Judge Rao, notably, declined to "grant the government's request to terminate the criminal contempt proceedings." *J.G.G.*, 147 F.4th at 1072 (Rao, J., concurring).  Her opinion expressly acknowledges that "[w]hether to proceed with criminal contempt is a choice left to the district court." *Id.* at 1073.  And Judge Pillard sees no basis to have intervened in the first place. *See id.* at 1098 (Pillard, J., dissenting).  To dispel any doubt,

5

we observe that no member of this court has taken the position that the panel's disposition stands in the way of the district court proceeding just as it intended to do in April, only without the voluntary contempt-avoidance option that has now been overtaken by events.

Nor will the panel order have precedential effect on any other case. The order granting the writ of mandamus contains no substantive reasoning of any kind as to when mandamus relief is warranted in general, or why mandamus relief was warranted in this case. *See J.G.G.*, 147 F.4th at 1044–45 (per curiam). So—as before—mandamus in this circuit remains a "drastic" remedy, available only in "extraordinary situations." *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (citation omitted). The party seeking the writ must establish a "clear and indisputable" right to relief, "no other adequate means" to obtain it, and that issuance is "appropriate under the circumstances." *In re Cheney*, 544 F.3d 311, 312–13 (D.C. Cir. 2008). And the grant of mandamus in this case cannot serve as a guidepost for future panels.

Neither of the separate concurrences has precedential effect either. Those opinions have no meaningful points of agreement. Judge Rao, as noted, objected to a purportedly improper commingling of civil and criminal contempt in the unique circumstances presented here. *J.G.G.*, 147 F.4th at 1064–68 (Rao, J., concurring). Judge Katsas focused on a perceived ambiguity in the district court's TRO itself. *See id*. at 1051–58 (Katsas, J., concurring). The Supreme Court has instructed that, when its own decisions lack a majority rationale, the controlling opinion is the position taken by "those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). Even if one were to apply that approach to fragmented circuit panel decisions—which is an open question in this court—it governs only "when one opinion is a logical

6

subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991). Here, neither concurrence is a logical subset of the other—they address entirely different putative defects in the district court's order. Neither concurrence, therefore, can meaningfully inform the resolution of any future case. This, too, is not disputed by any member of this court.

Those considerations counsel against *en banc* review. This court reserves *en banc* proceedings for questions of exceptional importance, or for orders that establish precedent in conflict with decisions of this court or the Supreme Court. Fed. R. App. P. 40(b)(2).

These proceedings unquestionably involve at least two exceptionally important principles: the foundational importance of a district court's ability to enforce its orders and to consider criminal sanctions for willful disobedience, and the need for appellate courts to avoid premature intervention into district court proceedings absent the most exceptional circumstances.

But the peculiar circumstances of this case make *en banc* review an unnecessary and inapposite vehicle to vindicate either principle. As to the first, as just explained, the panel's order does not prevent the district court from exercising its contempt authority. The district court remains free to require the government to identify the decision makers who directed the potentially contemptuous actions and to carefully consider next steps. As to the second, *en banc* review could not undo the time that our court has devoted to this case at the expense of the district court's ability to proceed; further review could only prolong that delay. And because the panel's order has no precedential effect, *en banc* review is unnecessary to clarify the law and reaffirm the demanding requirements for issuing a writ of mandamus.

7

In short, despite the gravity of the underlying facts and the understandable concern about the government's compliance with court orders, the writ of mandamus issued by the panel has no ongoing practical or precedential effect.

The vote not to review the panel's order *en banc* should not be misinterpreted. We fully appreciate the seriousness of the governmental conduct the district court observed, and we do not endorse the panel's premature intervention in the district court's decision-making process. Nor should this vote be understood as judicial acquiescence to any disregard for court orders. It most assuredly should not be read to diminish the judiciary's proper use of its contempt power or to excuse non-compliance by government officials. To the contrary, respect for judicial orders, and courts' independence, are essential to the rule of law. The district court has every ability to set a new deadline for production of the information it sought regarding the probable contempt it identified or to proceed otherwise within his sound discretion. For its part, the government will have the full opportunity at the appropriate time to raise any defenses it may have. If it is dissatisfied with any appealable order the district court may enter, it will have the opportunity to seek review through the ordinary process. That is how our system of justice is designed to work.

MILLETT, *Circuit Judge*, dissenting from the denial of rehearing en banc:

I dissent from the denial of rehearing en banc. The unreasoned *per curiam* order granting the writ and the splintered opinions concurring in its issuance contravene both (1) settled precedent requiring an exceptional and demanding justification for mandamus relief, *Cheney v. United States District Court for D.C.*, 542 U.S. 367, 380 (2004), and (2) our en banc decision in *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020), which ruled that it is improper to use mandamus to cut off lawful district court proceedings before that court has a chance to rule. That combined precedent should apply with its fullest force when, as here, the district court exercises its most fundamental and inherent authority to obtain non-privileged information necessary to police the integrity of proceedings in its own courtroom.

PAN, *Circuit Judge*, joined by CHILDS, *Circuit Judge*, dissenting from the denial of rehearing en banc:

In our constitutional system of checks and balances, it is the duty of the Judicial Branch to "say what the law is," and to restrain the Executive and Legislative Branches when they exceed the bounds of their authority. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The Framers designed the tripartite structure of our government to ensure that no single branch could accumulate excessive power and thereby threaten the liberty that they fought a war to secure. The case before this court implicates those foundational principles of our democracy. When the political branches cease to honor the judgments and decisions of the judiciary, the carefully calibrated structure of our government collapses, and we are no longer a society that is protected by the rule of law.

In this case, the district court was called upon to assess the legality of an action taken by the Executive Branch. To maintain the status quo while it performed its constitutional function, the district court ordered the government to temporarily pause the allegedly unlawful conduct. But the government apparently defied the court's order. Faced with a serious transgression that went to the heart of the judicial process, the district court properly proceeded to investigate whether the government had committed a contempt of court and who should be held accountable for that violation if it occurred. Although the district court's proceedings were ongoing, and it therefore had not yet done anything that was appealable, the government filed an obviously meritless appeal and asked this court to stop the district court in its tracks. The government also asked for extraordinary relief, in the form of a writ of mandamus, asserting that it had a clear and indisputable right to relief and that the district court should be compelled to terminate the contempt proceedings that were underway.

2

A panel of this court improvidently intervened. The panel majority immediately halted the district court proceedings by entering an administrative stay. Almost four months later, the panel majority granted the government's request for a writ of mandamus and vacated the district court's order that required the government to provide information about its apparent contempt of court.

The case now comes before the full appellate court on a call for rehearing en banc. The question before us is whether the full court should review and vacate the panel's order granting the government's petition for a writ of mandamus. As relevant here, we must decide whether this case raises a question of exceptional importance, such that we should correct any error by the panel. Fed. R. App. P. 40(b)(2)(D). Applying that standard, a majority of the court votes to deny en banc review, even though a separate majority agrees that the writ of mandamus was issued in error.[1]

Some of my colleagues who vote against en banc review disavow the issuance of the writ: They "doubt" that the panel's order "met the demanding standard for mandamus relief." Statement of Judges Pillard, Wilkins, & Garcia at 3. But they

---

[1]     Six of the eleven active judges on this court opine that the district court did not err. *See* Statement of Judge Millett at 1 ("[H]ere, the district court exercise[d] its most fundamental and inherent authority to obtain non-privileged information necessary to police the integrity of proceedings in its own courtroom."); Statement of Judges Pillard, Wilkins, & Garcia at 3 ("The district court's order here was a measured and essential response to what it reasonably perceived as shocking Executive Branch conduct."); Statement of Judge Pan & Judge Childs, *infra* at 11–12 ("We should vacate the erroneous mandamus order to make clear that the district court acted properly when it investigated the government's apparent violation of a court order, and to communicate that we unequivocally reject the government's unsupported claim of judicial overreach.").

3

reason that the standard for en banc review is not met because they believe that the mandamus order has no "practical effect." *Id.* at 3–4. They opine that the mandamus order sets no precedent and does not impede the district court from issuing a new order to reinitiate its contempt proceedings. *See id.* at 4–5. They decline to grant en banc review just to vacate an order that they think has no impact on the logistics of the case before us, or on future cases. And yet, they emphasize that they fully appreciate the seriousness of the government's conduct, that they do not endorse the panel's premature interjection into the district court's decision-making process, and that their votes should not be understood to either acquiesce in the disregard of court orders or diminish the judiciary's proper use of its contempt power. *See id.* at 7.

In my view, those colleagues acknowledge but do not properly address the context in which this case arose and the overarching constitutional principles at stake. While my colleagues narrow the aperture through which we view this case and see it as a mistake that has no real-world consequences, I take a broader view of "practical effects." As I see it, an attempt by the government to prevent the district court from performing its constitutional function has a real and detrimental impact on the ability of the judiciary to uphold the rule of law. The mandamus order undercuts the district court's legitimate efforts to investigate an apparent contempt of court, and we should vacate it. I also believe that the panel's erroneous order dilutes our rigorous standard for granting mandamus relief and implies, through its sheer novelty, that the government is not subject to the same rules and standards as other litigants who seek justice before courts of law. I therefore believe that this case raises multiple issues of exceptional importance. I would grant en banc review and vacate the panel's mandamus order.

4

**I.**

On March 15, 2025, the government relied on a new interpretation of the Alien Enemies Act of 1798 (AEA) to commence deporting Venezuelan nationals based on their alleged membership in Tren de Aragua, a Venezuelan transnational gang. *J.G.G. v. Trump*, 778 F. Supp. 3d 24, 31 (D.D.C. 2025). Five individuals taken to the airport for deportation filed suit to challenge the government's novel legal theory. *Id.* at 32. At an emergency hearing, the district court provisionally certified a class of detainees subject to removal under the AEA and entered a temporary restraining order (TRO) to preserve the status quo while it considered the legality of the deportations. *Id.* at 34. The TRO required the government to refrain from deporting any class members for the time being. *Id.* The court orally instructed the government that if class members were on a plane "that is going to take off or is in the air, . . . those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately." Hr'g Tr. 43:13–19, *J.G.G.*, 778 F. Supp. 3d 24 (No. 25-cv-766), ECF No. 20. Shortly after the hearing, the court entered a minute order: "As discussed in today's hearing, . . . [t]he Government is ENJOINED from removing [class members] . . . for 14 days." Mar. 15, 2025, 7:25 PM Min. Order, *J.G.G.*, 778 F. Supp. 3d 24 (No. 25-cv-766).

During and after the emergency hearing, the government transported detainees to El Salvador, apparently in violation of the TRO. Public "boasts" by government officials "intimated that they had defied the Court's Order deliberately and gleefully." *J.G.G.*, 778 F. Supp. 3d at 35 (citing the Secretary of State's retweet of a post stating that return of removed class members was "Oopsie . . . Too late 😂."). Moreover, in

5

response to the TRO, the President of the United States publicly called for the impeachment of the district court judge. Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 18, 2025, at 9:05 ET), https://perma.cc/XZ43-TTFQ.

Recognizing the gravity of the government's apparent violation of the TRO, the district court commenced proceedings to determine what had happened. The district court gave the government multiple opportunities to explain or to justify its conduct, in written filings or at court hearings. But the government sought to evade the court's inquiries by attempting to cancel hearings, refusing to answer basic questions, and claiming that providing information about the deportations would "jeopardize state secrets." *J.G.G.*, 778 F. Supp. 3d at 35–36. The government also offered "imaginative" and "hyper-technical" arguments for why it had complied with the district court's TRO. *Id.* at 35, 38. The district court ultimately issued a memorandum opinion finding probable cause that the government had committed criminal contempt by violating the TRO, based on a well-supported finding that the government's conduct "manifest[ed] a willful disregard of the Court's legally binding proscriptions." *Id.* at 38. Contemporaneously with the probable-cause finding, the district court issued an order requiring the government to "identify[] the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025." Order, *J.G.G.*, 778 F. Supp. 3d 24 (No. 25-cv-766), ECF No. 80.

Although the district court proceedings were ongoing — and only final orders of the district court are appealable — the government filed an appeal to stop the district court from getting to the bottom of its contempt of court. The government also petitioned this court for a writ of mandamus, claiming that

6

it had a clear and indisputable right to have the contempt proceedings terminated.

A writ of mandamus is a "drastic" remedy "reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)). It is an order that "compel[s] the performance of a clear nondiscretionary duty," *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) (cleaned up), or remedies "a clear abuse of discretion," *Cheney*, 542 U.S. at 380 (cleaned up). The writ is available only when (1) the petitioner lacks "other adequate means to attain the relief he desires"; (2) the petitioner's "right to issuance of the writ is clear and indisputable"; and (3) "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances." *Id.* at 380–81 (cleaned up).

After the government filed its appeal and mandamus petition, a divided panel of this court entered an administrative stay that temporarily halted the district court proceedings. Administrative stays are not adjudications on the merits. Because they are not based on any legal analysis, they are intended to be brief and merely to give courts time to consider emergency petitions — such as a motion for a stay pending appeal, which requires satisfaction of a demanding four-part test. *See* D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025); *see also United States v. Texas*, 144 S. Ct. 797, 799 (2024) (mem.) (Barrett, J., concurring in denial of applications to vacate stay) (describing an administrative stay as "a short-lived prelude to the main event . . . [that] should last no longer than necessary to make an intelligent decision on the motion for a stay pending appeal"). The administrative stay in this case remained in place for almost four months.

On August 8, 2025, the panel vacated the administrative stay and issued its ruling. The panel unanimously agreed that

7

it lacked jurisdiction to hear the government's appeal of the district court's investigative order and dismissed the appeal. *J.G.G. v. Trump*, 147 F.4th 1044, 1045 (D.C. Cir. 2025). But two of the panel members voted to grant the government's petition for a writ of mandamus, under unusual circumstances: Those two judges relied on completely different grounds to find a "clear and indisputable" right to relief. One panel member focused on the facts, reasoning that the district court's TRO prohibiting the removal of class members was so plainly ambiguous that the government could not have willfully violated it. *Id.* at 1051–58 (Katsas, J., concurring). That judge would have terminated the criminal-contempt proceedings entirely. The second panel member, relying on a new legal theory that had not been pressed by the government, posited that the district court erred by giving the government the option of "purging" the contempt — *i.e.*, allowing the government to avoid further contempt proceedings by providing habeas hearings to class members who had been wrongfully deported. *Id.* at 1064–70 (Rao, J., concurring); *see also J.G.G.*, 778 F. Supp. 3d at 54.

The third judge on the panel dissented from granting the mandamus petition. She strongly disagreed with the factual and legal analyses of her colleagues and argued that neither of their alternative theories was correct, much less indisputably so. *J.G.G.*, 147 F.4th at 1076–77, 1086–98 (Pillard, J., dissenting). She also argued that mandamus — which is premised on the violation of an "indisputable" right — was inappropriate where the court could not agree on a single rationale for granting the writ. *Id.* at 1074. Ultimately, the panel majority's mandamus order vacated the district court's investigative order, but it did not terminate the criminal-contempt proceedings or prevent the district court from reissuing a similar order.

8

**II.**

Lawyers representing the wrongfully deported parties petitioned for rehearing en banc, and a member of this court *sua sponte* called for rehearing en banc. *See* D.C. Circuit Handbook of Practice and Internal Procedures 59 (2025). En banc review is reserved for decisions that conflict with a decision of this court, the Supreme Court, or another court of appeals, and for cases that raise questions of exceptional importance. Fed. R. App. P. 40(b)(2).

In my view, this case warrants en banc review because it implicates principles that are vital to maintaining the structure of our government and our commitment to the rule of law. The government's apparent "willful disregard of . . . legally binding proscriptions" was a blow to our constitutional system that the district court was duty-bound to address. *J.G.G.*, 778 F. Supp. 3d at 38. We should vacate the panel's mandamus order because it is exceptionally important (1) to correct a serious error that dilutes our stringent standard for granting mandamus relief; (2) to repudiate the implication that the government is not subject to the same rules and standards as other litigants who turn to the courts to seek relief; and (3) to dispel any suggestion that the district court acted improperly when it took decisive steps to enforce a court order.

I start with the simple fact that a majority of the en banc court believes that the panel majority erred when it issued the writ of mandamus. *See supra* n.1. Indeed, it is difficult to see how the government had an "indisputable" right to relief when the panel members themselves disputed the basis for granting the writ, and neither member of the panel majority could point to any cases in which mandamus was granted based on "like issues and comparable circumstances." *J.G.G.*, 147 F.4th at 1074 (Pillard, J., dissenting) (cleaned up). Although en banc review is not to be deployed for the correction of one-off errors,

9

the panel's mandamus order sets a dubious precedent for granting the extraordinary relief of mandamus when no panel majority agrees on the basis for issuing the writ. With the increased volume of emergency petitions that have been filed in our court of late, it is possible that what happened in this case will recur. Although some of my colleagues opine that the mandamus order has no precedential value, I do not see why a future panel could not rely on it to issue a writ of mandamus despite the failure of the panel members to agree on a single legal theory to justify that "drastic" action.

I do not question the good faith of my colleagues in the panel majority, who each undoubtedly cast their vote based on a sincere belief that the mandamus standard was met. To my mind, the legal issue that warrants review is whether mandamus may be granted when two judges essentially concur in the judgment, with each believing in a different clear and indisputable right to relief. The panel majority assumed that such an outcome was permissible without explaining why. But mandamus is a "drastic" remedy, available only in "extraordinary situations," and is "hardly ever granted." *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (cleaned up). Meeting such an "exacting" standard surely must require at least a majority of the panel to agree on what entitles the petitioner to relief. The writ may be issued only if *the court* determines that the petitioner has a "clear and indisputable" entitlement to relief. *Cheney*, 542 U.S. at 381 (cleaned up). Individual judges who express idiosyncratic opinions in separate statements do not speak for the court. And, in my view, they cannot combine non-overlapping theories to satisfy a legal standard premised on the existence of a "clear and indisputable right," especially when the separate statements do not rely on well-established principles of law. *Cf. In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) ("[W]e will deny mandamus [whenever] a petitioner's argument . . . is not clearly mandated by statutory authority or case law.").

10

Our failure to vacate the mandamus order suggests that if two judges rely on disparate, novel legal theories to vote in favor of granting mandamus, those legal theories may be insulated from scrutiny because they individually are nonprecedential, even though their combined effect is to cause the "drastic" consequence of issuing the writ. *See* Statement of Judges Pillard, Wilkins, & Garcia at 5 (declining to vacate the mandamus order in part because "[n]either of the separate concurrences has precedential effect"). We should grant en banc review and vacate the mandamus order to make clear that our mandamus standard remains high and difficult to satisfy: It cannot be met by employing the panel majority's unprecedented, splintered approach.

The mandamus order also creates the unintended but unfortunate impression that the government is not subject to the same rules and standards as other parties who come before our court. It is beyond debate that we must apply the law evenhandedly and consistently, regardless of the identity of the parties that stand before us. Otherwise, we open ourselves to charges of favoritism and bias, and we may erode public confidence in the judicial system. *See Glob. Health Council v. Trump*, 153 F.4th 1, 35–36 (D.C. Cir. 2025) (Pan, J., dissenting). Here, the court's unjustified intervention in the district court proceedings, culminating in the issuance of an unusual split-decision mandamus order, may have been perceived by the public as bending the rules to benefit one of the parties to this case: the government. As perhaps the only mandamus precedent of its kind — relying on two different theories of purportedly "indisputable" entitlements to relief — the mandamus order unintentionally suggests that the government is entitled to special treatment in the form of a bespoke legal standard. We should dispel that implication to the extent that we can — by vacating the mandamus order.

11

Finally, and most importantly, the mandamus order casts unjustified doubt on the propriety of the district court's contempt proceedings: It wrongfully holds that the district court clearly abused its discretion and that the government had a clear and indisputable right to be relieved from complying with the district court's investigative order. The granting of mandamus signified that "drastic" relief was necessary because the district court either failed to perform a "clear nondiscretionary duty" or committed "a clear abuse of discretion." And yet, a majority of the en banc court seems to believe that the mandamus order should not have issued at all. *See supra* n.1.

We should not leave in place a ruling that says that the district court erred when it did not. We live in a world in which judges face threats and harassment because of their rulings and have been called "rogue" by government officials who disagree with them. And we cannot overlook that, in response to this very case, the President of the United States called for the district judge's impeachment. Some lawyers and interested observers might read the statements accompanying our denial of en banc review and realize that a majority of the full court does not believe that the district court was in the wrong. *See supra* n.1. But the meaning of this vote is likely to be misunderstood by members of the broader public who just read headlines, or who choose to focus only on the bottom line — they will see only that we let stand the mandamus order, which took the drastic step of vacating the district court's investigative order, based on a determination that the district court clearly abused its discretion. That misperception will harm public confidence in the judiciary and in the righteousness of the district court's contempt proceedings.

We should vacate the erroneous mandamus order to make clear that the district court acted properly when it investigated the government's apparent violation of a court order, and to

12

communicate that we unequivocally reject the government's unsupported claim of judicial overreach. The district court performed its constitutional duty with unwavering integrity and courage, in the face of undue public criticism from the most powerful official in our nation. Although the government and the panel majority have deviated from norms and applicable legal standards in this case, the district court most certainly has not. In my view, it is unacceptable to leave in place an erroneous mandamus order that holds that the *district court* exceeded its authority when it did nothing but its duty. The mandamus order baselessly impugns the district court's handling of this case, and it should not stand.[2]

\*   \*   \*

The context in which this case was brought and litigated makes it exceptionally important. Our constitutional system was functioning as designed until a panel of this court improvidently intervened. The district court was called upon to check an allegedly unlawful policy implemented by the Executive Branch. When the government apparently defied a court order, the district court properly investigated. In merely seeking information about the government's apparent contempt of court, the district court did not violate any nondiscretionary duty nor clearly abuse its discretion. The panel's erroneous issuance of a writ of mandamus vacating the district court's investigative order undercuts the district court's

---

[2]     In a closing nod to "practical effects," I note that we can grant en banc review and vacate the mandamus order without additional oral argument or briefing. Thus, granting en banc review would not necessarily delay the proceedings in the district court any more than what we are doing now. Either way, the process can be boiled down to the writing of statements by members of the court who wish to explain their votes.

13

efforts to hold the government accountable for a serious transgression and to uphold the rule of law.

We must set the record straight:  It is the panel majority that erred by granting the writ of mandamus, and the district court did nothing wrong.  As a court of law, the coin of our realm is reasoned decision-making, based on faithful application of the law to the facts, without fear or favor.  That is what allows us to play our role within the constitutional system that the Framers envisioned.  The district court upheld those principles, while the mandamus order undermines them. I would grant the petition for rehearing en banc and vacate the mandamus order.